# Exhibit No. 18

SHARON K. EADS
ROBERT S. PELCYGER
Native American Rights Fund
1506 Broadway
Boulder, Colorado  80302
(303) 447-8760

PETER J. WILKE
Swinomish Tribal Offices
P. O. Box 416
La Conner, Washington  98257
(206) 466-3163

Attorneys for Swinomish Tribal Community


DEPARTMENT OF THE INTERIOR

BUREAU OF INDIAN AFFAIRS


In the Matter of Appeal of     )
Burlington Northern, Inc. from )
Decision Refusing to File an   )     ANSWER OF SWINOMISH
Application for Right-of-Way    )     TRIBAL COMMUNITY
through the Swinomish Indian    )
Reservation, Washington        )


I.    INTRODUCTION

        The main thrust of the Railroad's appeal in this matter
is directed at avoiding the requirement that the consent of the
Swinomish Tribal Community be obtained before a railroad right-
of-way is granted across tribal lands.  Such an effort requires
the Railroad to advance rather far-fetched legal arguments in
attempting to avoid the express language of the applicable
statutes and regulations.  Moreover, the Railroad's position is
anachronistic and directly contrary to the current federal policy

SITC000006133

in Indian affairs to promote and encourage tribal self-
determination and financial self-sufficiency.  See, e.g.,
Letter of June 19, 1978 from Forrest J. Gerard, Assistant
Secretary - Indian Affairs, to Echeverria & Osborne (Assistant
Secretary's Decision).  See also, the congressional declaration
of policy in the Indian Financing Act of 1974.  25 U.S.C. § 1451.
And see Santa Rosa Band of Indians v. Kings County, 532 F.2d
655, 663-64 (9th Cir. 1975), cert. denied, 429 U.S. 1038 (1976).

          The basic facts of this Appeal are identical to the
basic facts involved In the Matter of Appeal of Southern Pacific
Transportation Co. from Decision Refusing to File an Application
for Right-of-Way through the Walker River Reservation, Nevada
(hereinafter referred to as Southern Pacific Appeal).  The
Southern Pacific Railroad and its predecessors built and
maintained a railroad across the Walker River Reservation
without a valid right-of-way for over 90 years, the Tribe filed
suit for ejectment and trespass damages, and Southern Pacific
attempted to sidestep the statutory and regulatory requirement
of tribal consent by applying for a right-of-way under the
1899 Act. [1]/  After Southern Pacific exhausted its intermediate
level administrative appeals, the Assistant Secretary for Indian
Affairs, by letter of June 19, 1978, affirmed the Superintendent's
and Area Director's decision to reject Southern Pacific's

-------------------------------

     [1]/Act of March 2, 1899, 30 Stat. 990. 25 U.S.C.
§§ 312, et seq.

SITC000006134

application for a right-of-way under the 1899 Act because there
was no tribal consent (Exhibit A).

Identically in the present situation, Burlington
Northern and its predecessors built and maintained a railroad
across the Swinomish Indian Reservation without a valid right-of-
way for approximately 90 years, the Tribe has filed suit for
ejectment and trespass damages, and Burlington Northern is
attempting to sidestep the statutory and regulatory requirement
of tribal consent by arguing tribal consent is not required under
the 1899 Act. [2/] Thus, the Assistant Secretary's Decision issued
on June 19, 1978 requiring tribal consent in an identical fact
situation is controlling in this matter.

Nevertheless, we will again show in this answer, as we
did previously in the Southern Pacific Appeal, that the Railroad's
arguments as to why it cannot be required to obtain the consent
of the Swinomish Tribal Community to a railroad right-of-way
across tribal lands are totally without foundation.

II.   THE 1899 ACT AND THE 1948 ACT CONSTITUTE PARTS OF ONE
      CONGRESSIONAL SCHEME FOR THE ADMINISTRATION OF RAILROAD
      RIGHTS-OF-WAY GRANTS OVER INDIAN LANDS, AND PROPERLY CON-
      STRUED TOGETHER MEAN THAT TRIBAL CONSENT IS A PRECONDITION
      TO SUCH GRANTS UNDER EXISTING LAW

The Railroad argues that the grant of the railroad
right-of-way in this case is governed solely by the terms of the

_____

[2/] Not only is Burlington Northern making the same
arguments Southern Pacific made, which have been rejected by the
Department of Interior, but with few exceptions Burlington
Northern's Appeal is an exact copy of Southern Pacific's Appeal.

-3-

SITC000006135

1899 Act, and not by the terms of the 1948 Act. [3/] This is clearly wrong. Secretary's Decision at page 2. As a matter of law, the 1899 Act must be construed together with the 1948 Act. Read together the conclusion is clear that, under present law, tribal consent is a precondition to any railroad right-of-way grant, where the tribe involved is organized pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461, et seq., and in particular § 476. [4/] See 25 U.S.C. § 324. A discussion follows.

The legislative history of the 1948 Act shows beyond question that Congress enacted the 1948 Act on the specific recommendation of the Secretary of the Interior that there was a real need "for simplification and uniformity in the administration of grants of rights-of-way of any nature over Indian lands." See S. Rept. No. 823, 1948 U.S. Code Cong. Services 1033, 1036. The suggestion for a general right-of-way act was initiated by the Secretary of the Interior in a report on a bill dealing solely with the administration of rights-of-way grants over the Osage Reservation. The Secretary's report suggested "that there is a real need for additional legislation relating not only to the right-of-way on Osage Indian lands but also to the rights-of-way on Indian lands on all reservations

---

[3/] Act of February 5, 1948, 62 Stat. 17, 25 U.S.C. §§ 323, et seq.

[4/] The Swinomish Tribal Community is organized under 25 U.S.C. § 476.

-4-

SITC000006136

. . . ." S. Rept. No. 823, supra at 1034. The text of the
1948 Act as finally adopted is the same as the bill drafted by
the Secretary and attached to his report and recommendation for
general right-of-way legislation. Id.

Generally, the Secretary traced his problems in
granting rights-of-way to the fact that his authority to grant
any right-of-way

> [i]s contained in many acts of Congress, dating
> as far back as 1875. Thus, each application
> for a right-of-way over Indian land must be
> painstakingly scrutinized in order to make
> certain that a right-of-way sought falls
> within a category specified in some existing
> statute, which may limit the type of right-of-way
> that may be granted, or the character of the land
> across which it may be granted.

Id. at 1036. The Secretary further pointed out that some such
acts were applicable to certain types of Indian lands and not to
others for no valid reason. And finally, the Secretary stated
that in many instances when no statutory authority could be found
for a particular right-of-way grant, the Secretary was forced to
spend an inordinate amount of time and expense obtaining the
signatures of all owners of interests in land to obtain an
easement deed. The time and expenses were generally not justified
by the benefits obtained from the right-of-way. Id.

Thus, the 1948 Act was specifically designed to address
the administrative problems of the Secretary in granting rights-
of-way over Indian lands caused by the existence of so many
special statutes governing specified rights-of-way over Indian
lands. The 1948 Act addresses the problems outlined by the

-5-

SITC000006137

Secretary essentially by vesting in the Secretary the power to make grants of rights-of-way of all kinds across Indian lands as well as the power to establish the conditions for such grants. Presumably the regulations implementing the Act would simplify and provide uniformity in the granting of rights-of-way across Indian lands.

The 1948 Act does expressly preserve existing statutory authority for rights-of-way, including the 1879 Act. The legislative history reveals that the reason for such preservation was "to avoid any possible confusion which may arise, particularly in the period of transition from the old system to the new. . ." Id. The 1948 Act expressly provided that it would not go into effect until 30 days after its approval, presumably to allow sufficient time for the Secretary to promulgate regulations implementing the "new system" of right-of-way grant administration. A second reason was presumably to avoid any question as to the Secretary's authority which might have arisen from a repeal of the pre-existing statutes on Indian rights-of-way.

Accordingly, the regulations promulgated pursuant to the 1948 Act establish a uniform procedure for the administration of right-of-way grants over Indian lands, but preserve certain

-6-

SITC000006138

provisions of pre-existing right-of-way statutes which the
Secretary has determined do not affect the uniform administration
of right-of-way grants across Indian lands.  See 25 C.F.R.
Part 161.

It is clear from the above-described legislative
history of the 1948 Act that the intention of Congress was to
authorize the Secretary by regulation [5] to effect the
simplification and uniformity of the multitude of statutes
authorizing rights-of-way over Indian lands, including the
1899 Act.  Moreover, the 1948 Act expressly refers to all such
pre-existing statutes by stating "nor shall any existing statutory
authority empowering the Secretary of the Interior to grant
rights-of-way over Indian lands be repealed."  25 U.S.C. § 326.
Furthermore, § 324 expressly incorporates as part of the 1948 Act
the protection afforded tribes organized under the Indian Reor-
ganization Act, supra, "to prevent the sale, disposition, lease,
or encumbrance of tribal lands, interests in lands, or other
tribal assets without the consent of the tribe; . . ."  25 U.S.C.
§ 476; Assistant Secretary's Decision at page 2.

As stated by the Ninth Circuit in Stevens v. C.I.R.,
452 F.2d 741, 744 (1971):

> Federal policy toward particular Indian tribes
> is often manifested through a combination of
> general laws, special acts, treaties, and

---

[5] 25 U.S.C. § 328 authorizes the Secretary "to
prescribe any necessary regulations for the purpose of
administering the provisions of §§ 323-27 of this title.

SITC000006139

> executive orders.  All must be construed
> in pari materia in ascertaining congressional
> intent.  [Emphasis added.]

The instant case is even simpler because of the congressional

intent as to the administration of grants of rights-of-way over

Indian lands is clear from the legislative history and from the

terms of the 1948 Act itself.  Plainly Congress intended that the

1948 Act effectuate a consolidated, simplified and manageable

system of granting rights-of-way across Indian lands to replace

the then existing fragmented and unmanageable system.  Thus, the

1948 Act, the 1899 Act, and all other pre-existing statutes

specially authorizing the grants of rights-of-way of any nature

across Indian lands, and the Indian Reorganization Act of 1934,

especially 25 U.S.C. § 476, constitute, by virtue of the 1948

Act, parts of a single congressional system governing grants of

rights-of-way over Indian lands.  Those statutes are therefore in

pari materia, and must be so construed.  See, e.g., Stevens v.

C.I.R., supra; Kirkwood v. Arenas, 243 F.2d 863, 866-67 (9th Cir.

1957); United States v. Jackson, 280 U.S. 183, 194-96 (1930);

United States v. Fixico, 115 F.2d 389, 393 (10th Cir. 1940); and

see generally, 2A Sutherland Statutory Construction §§ 51.01-.05

at 289-320 (1973 Cum. Supp. 1977).

Finally, the following principle of construction is

pertinent to the construction of the 1899 Act and the 1948 Act

stated by the Supreme Court in United States v. Jackson, supra

at 193:

-8-

SITC000006140

> It is a familiar rule of statutory
> construction that great weight is properly
> to be given to the construction consistently
> given to a statute by the Executive
> Department charged with its administration
> [citations omitted] and such construction
> is not to be overturned unless clearly
> wrong, or unless a different construction
> is plainly required.

Accord, Stevens v. C.I.R., supra at 746.

Construing all applicable statutes together in light of the intent of Congress in enacting the 1948 Act, and giving weight to their interpretation by the Department of the Interior and Interior's long-established practice, the conclusion is inescapable that the consent of tribes organized under 25 U.S.C. § 476 of the Indian Reorganization Act, supra, is a precondition to any grant of the railroad right-of-way across the tribal lands. This conclusion is, of course, expressly incorporated into the regulations of the Secretary pursuant to the 1948 Act at 25 C.F.R. § 161.3(a) which states:

> No right-of-way shall be granted over
> and across any tribal land, nor shall any
> permission to survey be issued with respect
> to any such lands, without the prior written
> consent of the tribe.

III. THE 1899 ACT READ TOGETHER WITH 25 U.S.C. § 476 OF THE INDIAN REORGANIZATION ACT MEANS THAT TRIBAL CONSENT IS A REQUIRED PRECONDITION TO A GRANT UNDER THE 1899 ACT

Even assuming that the 1948 Act does not apply to railroad rights-of-way grants, an assumption which we think is clearly unsupportable, nevertheless, the 1899 Act must be read together with 25 U.S.C. § 476 of the Indian Reoganization Act. 25 U.S.C. § 476 states in pertinent part:

-9-

SITC000006141

> In addition to all powers vested in any
> Indian tribe or tribal council by existing
> law, the constitution adopted by said tribe
> [pursuant to the IRA] shall also vest in
> such tribe or its tribal council the following
> rights and powers:  . . . to prevent the sale,
> disposition, lease, or encumbrance of tribal
> lands, interests in lands, or other tribal
> assets without the consent of the tribe.

In construing the effect of the above language as a limitation on the granting of rights-of-way across Indian lands, the Solicitor for the Interior Department in 1936 declared:

> The only limitations which the Reorganization
> Act imposes upon the exercise of authority
> conferred by such specific acts of Congress
> are:  (a) a tribe organized under section 16
> may veto the grant under the broad power
> given it by that section "to prevent the sale,
> disposition, lease, or encumbrance of tribal
> lands, interests in lands, or other tribal
> assets without the consent of the tribe" and
> (b) a tribe incorporated under section 17 may
> be given the power to make such grants without
> restriction.

Memo. Sol. I.D., September 2, 1936.  Quoted in Cohen, Handbook on Indian Law, 105 (1942 ed.).

Based on the above Solicitor's Opinion, Cohen in the 1942 edition of the Handbook on Indian Law states:

> [I]t would appear that section 16 of the
> act requires the consent of an organized
> tribe to any grant of right-of-way which
> the Secretary is authorized to make.

Cohen at 105.

Subsequently, in the 1956 revision of Cohen's Handbook, the Department of the Interior confirms Cohen's opinion by adding after the previous statement that "[a]ny doubt that may have existed [as to whether the IRA requires tribal consent to

-10-

SITC000006142

grants of rights-of-way] was resolved by the act of February 5, 1948 [25 U.S.C. § 324]." Federal Indian Law 62 (1956 ed.).

Indeed the legislative history of the 1948 Act expressly states that the Act "preserves the powers of those Indian tribes organized under the Indian Reorganization Act of 1934 . . . with reference to the disposition of tribal land." [Emphasis added]. S. Rept. No. 823, supra at 1036. The unmistakable implication from this language is that prior to the 1948 Act, IRA tribes had the power to veto grants of rights-of-way of any nature, and Congress wished to make it clear that the 1948 Act did not abrogate that existing power.

Therefore, the Swinomish Tribal Community, as a tribe organized under 25 U.S.C. § 476, has the power under that section to consent or not consent to any proposed grant of a railroad right-of-way under the 1899 Act. 25 C.F.R. § 161.3 simply reflects the existence of that power, and provides a place for it in the procedural scheme of such grants.

IV.  THE QUESTION OF WHETHER THE SECRETARY HAS ABUSED HIS DISCRETION IS NOT RIPE FOR REVIEW WHERE DEFENDANT HAS REFUSED TO COMPLY WITH THE REQUIREMENTS OF FEDERAL LAW FOR OBTAINING A RAILROAD RIGHT-OF-WAY ACROSS TRIBAL LANDS

The Railroad's contention that the Secretary will be in abuse of his discretion if he refused to approve the Railroad's application is not ripe for review for two basic reasons.

First, the Secretary has not denied the Railroad a right-of-way grant. Rather, the Secretary has merely rejected

-11-

SITC000006143

the Railroad's application for a right-of-ray across Swinomish
Tribal Community lands essentially because the Railroad has
failed to comply with the regulation's requirements as to the
content of an application.  The primary reason for the Railroad's
failure to apply appears to be its insistence that the 1948 Act
is not applicable to grants of railroad rights-of-way.  The most
glaring defect in the Railroad's application is the failure to
provide evidence of the written consent of the Swinomish Tribal
Community pursuant to 25 C.F.R. § 161.3.  Without this required
consent, the Secretary has no power to act upon the application
and to grant a right-of-way.

Another defect is that the amount deposited with the
filing of the right-of-way application, as consideration for the
right-of-way, must "not be less than the amount specified in the
consent covering that parcel." 25 C.F.R. § 161.14.  The Secretary
simply reviews the consideration specified in the consent and
determines whether such compensation is adequate.  25 C.F.R.
§ 161.14.  The Railroad ignored this requirement and simply
deposited its own estimated amount of compensation.

Clearly, the written consent requirement of 25 C.F.R.
§ 161.3 contemplates an initial agreement between the Tribe and
the Railroad.  This conclusion is supported by 25 C.F.R. § 161.15
which states that the conveyance instrument evidencing such
grant "shall incorporate all conditions or restrictions set
out in the contents obtained pursuant to § 161.3." Thus, until
the Railroad obtains the written consent of the Tribe pursuant

SITC000006144

to 25 C.F.R. § 161.3, its application is incomplete and, in particular, cannot be completed insofar as determining the amount of compensation to be deposited "[a]t the time of filing an application for right-of-way."  25 C.F.R. § 161.14.  And until the application is filed with all required data, any discretionary action by the Secretary in interpreting the data in light of the law would be premature.

The second reason that the abuse of discretion issue is not ripe for review is that the major issue raised in this appeal is the extent of the Secretary's discretion to grant railroad rights-of-way.  Until that issue is resolved, the question of whether the Secretary abused his authority by applying the law and regulations in an arbitrary manner is premature.  This is particularly applicable in this case because the Railroad has simply not complied with certain requirements of the Secretary, and thus, the Secretary has insufficient information under the present regulatory scheme upon which to take any action, reasonable or arbitrary.

In summary, the question of whether the Secretary abused his discretionary power under the relevant acts and regulations governing railroad rights-of-way is necessarily dependent upon a resolution of the threshold question of the scope of the Secretary's discretionary power under the relevant acts.  See, e.g., Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16 (1971); Udall v. Littell, 366 F.2d 668, 674 (D.C. Cir. 1966); Board of Com'n of Pawnee County, Okl. v.

SITC000006145

United States, 139 F.2d 248, 252 (10th Cir. 1943).

V.   WHETHER THE 1899 ACT IS APPLICABLE TO ALREADY CONSTRUCTED
     RAILROADS IS, UNDER THE LAW OF THIS CASE, IRRELEVANT TO
     THE ISSUE OF WHETHER THE RAILROAD CAN OBTAIN A RIGHT-OF-WAY
     GRANT TODAY

     The Railroad argues that the 1899 Act is applicable to
railroads constructed before its passage.  The Railroad relies
upon parts of the Ninth Circuit's opinion in the case indicating
that the 1899 Act may indeed apply to such instances.  However,
as the Railroad admits, the Ninth Circuit specifically declined
to decide that question.

     However, contrary to the Railroad's view, see Appeal
at page 6, the district court clearly held that the 1948 Act
constitutes the current basis for authority to grant railroad
rights-of-way over Indian lands.  The district court declared
in its opinion at page 16: [6]

          Future enjoyment of that right [to operate
          a railroad across Indian lands] hinges on
          the defendant's success in . . . obtaining
          a right of way interest pursuant to present
          statutes enacted for that purpose.  See
          25 U.S.C. §§ 324, 325.  [Emphasis added.]

     It is the Tribe's position that insofar as present
grants of railroad rights-of-way are concerned, it is irrelevant
whether the 1899 Act applied to railroads constructed prior to
its passage, for the authority granted by the 1948 Act is broad

--------------------------------------------------------

[6] United States v. Southern Pacific Transp. Co.
(Civ. No. R-2708 BRT) and Walker River Paiute Tribe v. Southern
Pacific Transp. Co. (Civ. No. R-2707 BRT)(consolidated cases,
unpublished opinion dated May 28, 1974)(Exhibit B).

-14-

SITC000006146

enough to enable the Railroad in this case to acquire a railroad right-of-way grant.

Thus, the law of this case is that the 1948 Act governs grants of railroad rights-of-way. Therefore, the issue of the application of the 1899 Act to railroads constructed prior to its passage is irrelevant to whether a right-of-way may be authorized across Swinomish Tribal Community tribal lands today.

VI.  CONCLUSION

Upon the foregoing points and authorities, the Swinomish Tribal Community submits that the Area Director must affirm the decision of the Superintendent of the Western Washington Agency, and reject the application of the Railroad for a right-of-way until such time as it complies with all requirements as established by statute and the Secretary's regulations, including obtaining the written consent of the tribe upon such terms and conditions and for such consideration as may be mutually agreeable to both parties.

DATED:  December ___/___, 1978.

Respectfully submitted,

SHARON K. EADS
ROBERT S. PELCYGER
Native American Rights Fund
1506 Broadway
Boulder, Colorado  80302
(303) 447-8760

-15-

SITC000006147

PETER J. WILKE
Swinomish Tribal Offices
P. O. Box 416
La Conner, Washington  98257
(206) 466-3163

Attorneys for Swinomish Tribal
Community


By _____
     Sharon K. Eads

SITC000006148

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing ANSWER OF SWINOMISH TRIBAL COMMUNITY was placed in the United States mail, certified, return receipt requested, postage prepaid and correctly addressed to:

> WOODROW L. TAYLOR
> LAWRENCE D. SILVERNALE
> Burlington Northern, Inc.
> 350 Central Building
> Seattle, Washington  98104

on this ____/____ day of December, 1978.

_Sharon K. Eads_
Sharon K. Eads

Attorney for Swinomish Tribal Community

SITC000006149



## United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

CERTIFIED-RETURN RECEIPT REQUESTED

Echeverria & Osborne, Chartered
555 South Center Street
Reno, Nevada  89501                      JUN 1 9 1978

Mr. Larry W. Telford
One Market Plaza
San Francisco, California  94105

Gentlemen:

This is an appeal by the Southern Pacific Transportation Company,
through its attorneys, from a decision of the Assistant Area
Director of the Phoenix Area Office affirming the decision of the
Superintendent, Western Nevada Agency, to reject for filing,
Southern Pacific's application for a railroad right-of-way across
tribal lands of the Walker River Reservation.  A request was made
on behalf of the appellant that the matter be referred to an
Administrative Law Judge to conduct an evidentiary hearing.  This
request has been taken into consideration and rejected.  The deci-
sion is therefore based on the written briefs of the appellee and
the appellant.

A review of the file indicates the following relevant facts.  The
Southern Pacific Transportation Company (hereinafter "appellant")
filed an application on April 28, 1977, for a railroad, telephone
and telegraph right-of-way under the Act of March 2, 1899 (25
U.S.C. § 312, et seq.).  The application is for a 60-foot width,
10.89 miles in length, across tribally-owned land.  On May 4, 1977,
the Agency Superintendent returned the application as being incom-
plete without written evidence of tribal approval.  He recommended,
at that time, ". . . that negotiations between you and the tribe be
finalized before approval action can be considered on your applica-
tion."

On May 27, 1977, the Acting Superintendent sent appellant a second
letter outlining the contents of a properly filed application.  In
so doing, the Acting Superintendent specified that the application
should be submitted under the Act of February 5, 1948 (25 U.S.C. 323),
and that, among other things, the application ". . . must have the
tribe's concurrence in the form of a tribal resolution."  The Super-
intendent also indicated that the application for telephone and
telegraph lines should be submitted separately.

EXHIBIT A

SITC000006150

-2-

On May 27, appellant filed an appeal with the Area Director.  On
December 12, 1977, the Assistant Area Director, acting on the
advice of the Portland Regional Solicitor, affirmed the agency's
decision to return the application.  The Area Director concen-
trated on the issue of whether appellant needed to show evidence
of tribal consent in presenting its application.  In so doing,
the Area Director stated that the Secretary has the authority to
require appellant to apply under the 1948 Act, but regardless of
which act applied, tribal consent is a matter of statutory law
and congressional policy.  Therefore, waiver of the consent re-
quirement would constitute an abuse of the Secretary's discretion.
The current appeal is from the Area Director's decision.

In its argument, appellant has argued that it is entitled to file
its application under the 1899 Act, and that requiring tribal
consent is inconsistent with the terms of the 1899 Act.  Appellant
argues that the 1899 Act provides for an in praesenti grant and
that requiring tribal consent cannot therefore be imposed afterwards
as a condition of such a grant.  Alternatively, the appellant argues
that applying the 25 CFR 161.3 consent requirement to applications
filed pursuant to the 1899 Act is a denial of due process because
the regulations do not make it clear that 161.3 is a pertinent
section, applicable to applications under the 1899 Act.  Finally,
appellant has argued that given the history of the United States'
actions toward appellant and its predecessor in interest, the
Assistant Secretary should in this case exercise his discretion to
waive the consent requirement.  Alternatively, because of such
behavior, the Assistant Secretary is estopped from applying the
consent requirement.

Consent Requirement

We conclude that it is immaterial whether the subject application
is filed pursuant to the 1948 or the 1899 Acts, since Congress has
made it clear that the consent of tribes organized under the 1934
Indian Reorganization Act is essential before the United States can
alienate interests in their trust lands.  The Walker River Tribe is
an IRA tribe.  This requirement flows from 25 U.S.C. § 476, which
guarantees IRA tribes the power to prevent the sale, disposition,
lease or encumbrance of tribal lands, interests in lands, or other
tribal assets without the consent of the tribe.  In other words,
the consent requirement is not, in our view, an attribute of the
Secretary's power or discretion but is a statutory element of a
tribe's sovereign power which the Secretary does not have the
discretion to waive.

SITC000006151

--3--

Indeed, the 1948 Right-of-Way Act specifically bars the Secretary's ability to abrogate a tribe's prerogative in such matters. "No grant of a right-of-way over and across any lands belonging to a tribe organized under sections 461-473 and 474-479 of this title; . . . shall be made without the consent of the proper tribal officials." 25 U.S.C. § 324. (See also 1948 U.S. Code Cong. Service, p. 1033.)

That Congress fully understood and intended such a policy is clear from a 1969 report of the House Committee on Government Operations (H. Rep. 91-78, 91st Cong. 1st Sess.), concerning this Department's revised right-of-way regulations which would have allowed the Secretary to waive the consent requirement in the case of non-IRA tribes.

> "We believe the Department's obligation to protect the rights of the Indian tribes should be concluded in regulations which clearly and emphatically preclude any possible misuse of right-of-way grants to alienate Indian land without the consent of the Indians or to evade the maximum terms of years fixed in the acts of Congress authorizing land leasing.
>
> For all of these reasons, it would appear best to retain the present section 161.3 without any change, and to announce unambiguously that your Department intends to observe its own regulations."
>
> (Letter to the Secretary of the Interior from Chairman, Natural Resources and Power Subcommittee, February 16, 1968.)

Appellant argues that since 25 U.S.C. § 326 preserves the Secretary's authority under prior right-of-way statutes, the Secretary has continuing authority under the 1899 Act to grant rights-of-way without regard to the consent requirement of § 324. We reject such an interpretation of § 326. The legislative history states that the purpose of the § 326 provision was to ". . . avoid any possible confusion which may arise, particularly in the period of transition from the old system to the new . . . ." That counters the inference that § 326 was intended to maintain separate procedures immune from the consent requirement of the 1948 Act.

SITC000006152

-4-

Also, § 326 must be read together with other sections of the same
Act.  While § 325 evidences Congress' awareness of continuing
authority under other statutes to grant rights-of-way, § 324 cate-
gorically and unequivocally states that "no right-of-way" shall be
granted without tribal consent.  Thus, the language of § 324
embraces rights-of-way granted under § 326.  Furthermore, the
precise language of § 326 creates an important distinction.  It
states that the Federal Water Power Act is neither repealed nor
amended by the 1948 Act; but, it merely states that prior right-of-
way statutes are not repealed.  In other words, if imposition of the
§ 324 consent requirement can be construed as a quasi-amendment of
the 1899 Right-of-Way Act, such an amendment is not barred by § 326.
We do not think that either the language of § 326, or its legislative
history, warrant an abridgment of the application of § 324 to all
rights-of-way granted after 1948.

Due Process

We also conclude that, contrary to appellant's assertions, 25 CFR
161.3 and 25 CFR 161.23 make it clear that tribal consent must be
obtained before any right-of-way can be granted.  Therefore, appel-
lant is not denied procedural due process.  25 CFR 161.23, the
section applying to applications filed under the 1899 Act, provides
that such applications shall also be subject to ". . . other
pertinent sections of this Part 161."  Because the consent require-
ment in 161.3 is so all-inclusive, "(a) No right-of-way shall be
granted over and across any tribal land . . .," we do not see any
room for question but that such a requirement is pertinent.  Also,
161.15, the provision concerning action on applications, states that
the grant of a right-of-way shall be evidenced in a conveyancing
instrument which incorporates the conditions or restrictions set out
in the required consent.  Moreover, 161.14 requires that the consid-
eration and damage deposit filed with the applications shall in no
event be less than the amount specified in the consent.  In other
words, the consent requirement is pervasive in the Part 161 applica-
tion scheme.

Estoppel

Finally, appellant argues that the Assistant Secretary ought to exer-
cise his discretion to waive the consent requirement because of the
Department's past approval of the right-of-way.  They also argue that
the Secretary is estopped from applying it because of such past
behavior.  As already stated, the Secretary does not have discretion
to waive the requirement.  Under the 1934 and the 1948 Acts, such an
action would, in our view, infringe upon tribal sovereignty.

SITC000006153

-5-

Moreover, estoppel is not applicable to the situation at hand.  The case of United States v. Wharton, 514 F.2d 406 (C.A. 9 1975), cited by appellants, concerned title to public lands.  The lands involved here are not public but are held in trust for the tribe.  Moreover, the Wharton decision placed emphasis on the facts that not applying estoppel would work a fundamental unfairness to the injured party but applying it against the United States would not unduly harm the public interest.  Such is not the case here.  Requiring the appellant to acquire tribal consent to its right-of-way application will not cause fundamental unfairness, as the divesting of title to land would have in the Wharton case.  Moreover, the public interest, namely the tribe's sovereignty and ability to control its lands, would be unduly harmed were the consent requirement dropped in favor of the appellant.  The compensation figure is to be negotiated and stated in the tribal consent.  The tribe is the direct beneficiary of such compensation.  Appellant essentially asks us to shift the burden of past government actions to the tribe's profound disadvantage--the loss of control over their lands and the inability to participate in the determination of how much they should be compensated for such use.

In addition, several cases cited in the Wharton decison indicate that courts are less likely to apply estoppel against the government in matters of legislative significance, as opposed to purely administrative matters (e.g., the interpretations of Department regulations).  Shuster v. C.I. R., 312 F.2d 311 (C.A. 9 1962).  Appellant asks that estoppel be applied to prevent the federal statutory consent requirement from being applied to them.  We do not see that past unauthorized Department approval of a right-of-way is adequate grounds for estopping the application of a current federal requirement.  Indeed, if estoppel did not bar the United States from obtaining a federal appellate decision that appellant did not have a valid right-of-way and is a trespasser until such time as it acquires one, we see no basis for applying estoppel to prevent the Department from requiring an applicant to adhere to federal statutory standards in filing an application.

The Area Director's decision also discussed the requirement under the 1899 Act that any deposit tendered upon application to the Secretary must be for the amount determined by the Secretary to be correct.  Also, the 1899 Act requires that the application stipulate that passenger terminals be provided.  We think that these points can be worked out in conjunction with the agency when appellant submits its amended right-of-way application.

SITC000006154

-6-

It is our conclusion that the Assistant Secretary cannot grant a right-of-way across the lands of a tribe which is subject to the provisions of the Indian Reorganization Act, without written evidence in the application of tribal consent—whether such application be submitted under the 1948 or the 1899 Act.

Accordingly, the decision of the Assistant Area Director dated December 12, 1977, is hereby affirmed. This decision, having been made in the capacity of Assistant Secretary is final for the Department and not subject to the provisions of 25 CFR 2.19(c).

Sincerely,

/s/ Forrest J. Gerard

Assistant Secretary—Indian Affairs

cc:  Jonathan Hicks, Chairman
Walker River Paiute
  Tribal Council
P.O. Box 220
Reno, Nevada  89509

Daniel H. Israel and
Yvonne T. Knight
Native American Rights Fund
1506 Broadway
Boulder, Colorado  80302

Phoenix Area Director
Bureau of Indian Affairs
P.O. Box 7007
Phoenix, Arizona  85011

Robert L. Stitser
755 Forest
Schurz, Nevada  89427

Lawrence J. Semenza
United States Attorney
Federal Building and
  U.S. Courthouse
300 Booth Street
Reno, Nevada  89502

Office of Hearings and Appeals
Attention:  Alexander H. Wilson
Board of Indian Appeals
4015 Wilson Boulevard
Arlington, Virginia  22203

SITC000006155

ENTERED   FILE COPY

MAY 28 1974

CLERK, U. S. DISTRICT COURT
DISTRICT OF NEVADA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

---oOo---

UNITED STATES OF AMERICA,          Civil No. R-2708 BRT

                Plaintiff,

        vs.

SOUTHERN PACIFIC TRANSPOR-
TATION COMPANY, et al,

                Defendants.

_____/

THE WALKER RIVER PAIUTE          Civil No. R-2707 BRT
TRIBE OF NEVADA, et al,

                Plaintiffs,

        vs.

SOUTHERN PACIFIC TRANSPOR-
TATION COMPANY, et al,

                Defendants.

_____/

ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

        This is an action joining separate suits brought by

the United States and by the Walker River Paiute Tribe of

Nevada and a class of allottees of land within the Walker

River Reservation against the Southern Pacific Transportation

and Land Companies.  The actions seek damages for trespass

or, in the alternative, breach of contract stemming from the

EXHIBIT B

SITC000006156

operation of a railroad line through the Walker River Reserva-
tion from 1880 to the present time.  The question of trespass
is currently before the Court on plaintiffs' motion for par-
tial summary judgment.  It is plaintiffs' contention that de-
fendants and their predecessors in interest have been and con-
tinue to be without right to operate their railroad on lands
within the boundaries of the Reservation.  Defendants rely on
an agreement entered into between their predecessors in in-
terest and the Tribe in 1882 (hereinafter the "Agreement") and
on claims set forth under various statutes as creating a valid
right of way for the line through the Reservation.

JURISDICTION.  Defendants challenge the Court's juris-
diction over the claims of the class of allottees of Reserva-
tion land.  Plaintiffs invoke the Court's jurisdiction under
28 U.S.C. § 1331 and 25 U.S.C. § 345.

There is no question that the allottees' claims "arise
under" the Constitution and laws of the United States.  The
question is, rather, whether the allottees' claims satisfy the
jurisdictional amount requirement.  28 U.S.C. § 1331(a).  The
allottees are joined in this action as a class pursuant to
Rules 23(a) and 23(b)(1)(B), Federal Rules of Civil Procedure. [1/]
For the purpose of satisfying the jurisdictional amount re-
quirement, the claims of the members of a class may be aggre-
gated if the claims are common and undivided.  If the claims
are separate and distinct, however, each member of the class
must satisfy the jurisdictional amount individually.  Snyder

---

[1/]  See the Court's Order filed July 20, 1973, wherein it was
determined that the class qualified under both Rules 23(b)(1)
(B) and 23(b)(3);because the Court also found that the law re-
quires that subsection (b)(1) control in cases where both sub-
sections apply (see Mungin v. Florida E. Coast Ry. Co., 318
F. Supp. 720 (M.D. Fla. 1970)), the class was approved under
the qualification of Rule 23 (b)(1)(B).

-2-

SITC000006157

1   v. Harris, 394 U.S. 332 (1969), and Zahn v. International

2   Paper Co., ___ U.S. ___ (Dec. 17, 1973), 42 L.W. 4087.  In

3   either event, "it must appear to a legal certainty that the

4   claim is really for less than the jurisdictional amount to

5   justify dismissal." St. Paul Mercury Indemnity Co. v. Red

6   Cab Co., 303 U.S. 283, 289 (1938).  (Emphasis added.)

7        At issue is the defendants' right to the use of a

8   right of way through the Walker River Reservation.  The right

9   of way crosses parcels of the reservation which have been al-

10   lotted to the individual members of the class.  The right of

11   each class member to share in the recovery, if any, in this

12   action therefore has its basis in that member's individual

13   allotment.  Whether claims growing out of such separate in-

14   terests may be aggregated for purposes of satisfying the jur-

15   isdictional amount is controlled by Skokomish Indian Tribe v.

16   France, 269 F. 2d 555 (9th Cir. 1959).

17        Plaintiff in that quiet title and trespass action in-

18   voked the Court's jurisdiction pursuant to 28 U.S.C. § 1331.

19   Defendants challenged that jurisdiction for an alleged failure

20   to satisfy the jurisdictional amount.  The Court held:

21          "The land involved in this quiet title ac-
22        tion is divided into separate parcels, each de-
           scribed with particularity in the complaint,
23        separate appellees being named as to each parcel.
           All of the appellees, however, claim to derive
24        their title from a common source.  Moreover,
           while the land in question is divided into par-
25        cels, it comprises essentially a single tract of
           land * * *.

26          "Under these circumstances, the value of
           the entire tract is to be considered in deter-
27        mining whether the jurisdictional amount has
           been pleaded, notwithstanding the fact that the
28        claims of the individual appellees relate to par-
           ticular parcels contained in such tract." Sko-
29        komish Indian Tribe, supra, at 558-559.

30   Although the Skokomish case dealt with the question

31   of the jurisdictional amount with respect to the claims against

32   the individual defendants, it is equally applicable in assess-

-3-

SITC000006158

1   ing whether a plaintiff class has the character of interest
2   warranting aggregation of its claims for determination of the
3   jurisdictional amount.  Potrero Hill Community Action Com. v.
4   Housing Authority, 410 F. 2d 974, 977 (9th Cir. 1969).
5        In the present case, a single tract of land (the Reser-
6   vation) has, in some instances, been allotted in individual
7   parcels.  The title to the individual parcels, as well as to
8   the Reservation as a whole, however, continues to rest in the
9   same entity, the United States, in trust for the allottees and
10  the Tribe.  Finally, the claims of the allottees each stem
11  from a single source, the railroad's alleged continuing tres-
12  pass.  Under Skokomish Indian Tribe, therefore, the claims of
13  the individual allottees may be aggregated to determine wheth-
14  er the jurisdictional amount is satisfied.
15       The damages sought herein arise from the alleged tres-
16  pass by defendants and their predecessors in interest over a
17  period in excess of ninety years.  Aggregating the allottees'
18  claims, the Court cannot say to a legal certainty that the
19  allottees will not be able to recover an amount satisfying the
20  jurisdictional requirement of 28 U.S.C. § 1331(a).
21       In the light of this holding, it is unnecessary to
22  consider defendants' challenge to the Court's jurisdiction
23  under the provisions of 25 U.S.C. § 345.
24       RIPENESS FOR SUMMARY JUDGMENT.  Defendants assert that
25  summary judgment is improper because there exist genuine is-
26  sues as to material facts.  Rule 56 (c), Federal Rules of
27  Civil Procedure.  With the exception noted infra, with regard
28  to the separate claim of trespass based on the erection and
29  operation of telegraph and telephone lines on the right of way,
30  defendants have not carried their burden of demonstrating that
31  such fact issues exist "by affidavits or as otherwise provided
32  in this rule * * *".  Rule 56(e), Federal Rules of Civil Pro-

-4-

SITC000006159

cedure.  With that exception, therefore, partial summary judg-
ment is appropriate.

STATUTE OF LIMITATIONS, LACHES AND ESTOPPEL.  Defend-
ants draw attention to the fact that the railroad has been in
operation over the right of way for more than ninety years
without complaint from plaintiffs.  Such a delay would, in
ordinary cases, give rise to the defenses of statute of limi-
tations, laches and estoppel.  Plaintiffs argue, however, that
the special status enjoyed by the United States and its Indian
wards insulates their claims from these defenses.

It is beyond dispute that the Government is immune
from these defenses whether bringing suit on its own behalf or
on behalf of the Indians.  Board of Comm'rs v. United States,
308 U.S. 343, 351 (1939), and United States v. California, 332
U.S. 19, 39-40 (1947).

It is also true that such defenses will not bar the
rights of Indians in lands subject to statutory restrictions.
Ewert v. Bluejacket, 259 U.S. 129, 138 (1922), and Gerard v.
United States, 167 F. 2d 951 (9th Cir. 1948).  Alienation of
Indian lands has been subject to restriction since the Act of
June 30, 1834, ch. 161, sec. 4, 4 Stat. 730, 25 U.S.C. § 177. [2]
This Act has been interpreted to require that acquisitions of
Indian lands and interests therein be approved by the Govern-
ment.  United States v. Candelaria, 271 U.S. 432 (1926); Fed-
eral Power Commission v. Tuscarora Indian Nation, 362 U.S. 99
(1960).

Transfers of interests in allotted lands are also sub-
ject to governmental approval.  McKay v. Kalyton, 204 U.S. 458,

[2]  The Act reads:  "Be it further enacted, no purchase, grant,
lease or other conveyance of lands, or of any title or claim
thereto, from any Indian nation or tribe of Indians, shall be
of any validity in law or equity, unless the same be made by
treaty or convention entered into pursuant to the Constitution."

SITC000006160

1   466 (1907); United States v. Pelican, 232 U.S. 442, 447 (1914).

2   The class of allottees therefore shares the immunity from de-

3   fenses of statute of limitation, laches and estoppel enjoyed by

4   the United States and the plaintiff tribe.

5        Defendants assert that these defenses do apply to

6   holders of patented allotments.  It is not necessary for the

7   Court to consider this question because such persons are not

8   within the plaintiff class.  The class is limited to the

9   "eight named plaintiffs and all original allottees and suc-

10  cessors in interest of original allottees."  (See the Court's

11  Order of July 19, 1973, filed in this action.)  None of the

12  named plaintiffs hold patents.  (See the letter from the

13  Bureau of Indian Affairs, Nevada Indian Agency, dated June 16,

14  1972, attached as an exhibit to plaintiffs' motion to proceed

15  as a class.)  Rule 23(a)(3), Federal Rules of Civil Procedure,

16  requires that the claims or defenses of the representatives

17  be "typical" of the class.  The claims and defenses of the

18  present representatives remain typical of those of the class

19  only so long as the class is limited to non-patentees.  The

20  class is, therefore, so limited.

21       The defenses of statute of limitation, laches and es-

22  toppel do not apply to the claims of plaintiffs in this action.

23       TRESPASS BY OPERATION OF THE RAILROAD LINE.  The cen-

24  tral issue on this motion is whether the construction and op-

25  eration of a railroad line across the Reservation by defend-

26  ants and their predecessors in interest constituted a trespass.

27  It is defendants' position that the Agreement of 1882 and

28  their compliance with the provisions of two Acts dealing with

29  acquisition of rights-of-way by railroads have authorized

30  their presence on the Reservation.

31       THE AGREEMENT OF 1882.  The Agreement entered into be-

32  tween the predecessors of the Indians and defendants provided:

-6-

SITC000006161

"THIS AGREEMENT is made subject to final ratification thereof
by Congress."  It is not disputed that Congress has never ex-
pressly ratified the agreement (see p. 3 of the Stipulation
filed by the parties on December 18, 1973).

Failing to establish express ratification, defendants
contend that Congress impliedly ratified the Agreement.  De-
fendants would substantiate this theory by the fact that Con-
gress has never expressly denied ratification and by the fact
that Congress has appropriated funds for use of the railroad
line in shipping Government supplies and materials and the
mails.

Congressional ratification will not be implied from a
failure to disapprove where its affirmative action is required.
The Agreement and the Act of June 30, 1834, as well as the
Acts of March 3, 1875 and March 2, 1899, which are discussed
below, require affirmative government approval of a transac-
tion such as that here presented by either the Congress or its
appointed administrative agency.  Failure to approve the right
of way will not satisfy the requirements of the Agreement or
the Acts.

Congressional ratification may not be inferred from
appropriation enactments where their legislative histories do
not "plainly show a purpose to bestow the precise authority
which is claimed."  Ex Parte Endo, 323 U.S 283, 303 (1943),
and followed in Greene v. McElroy, 360 U.S. 474, 505 (1959).

Because the agreement has not been expressly ratified
by Congress and because it has not been impliedly ratified,
the conditions of the agreement have not been satisfied and
the agreement does not create a valid right of way for the
operation of defendants' railroad.

THE ACT OF MARCH 3, 1875.  Failing to establish a
valid right of way pursuant to the Agreement, defendants refer

-7-

SITC000006162

the Court to the Act of March 3, 1875, ch. 152, 18 Stat. 482,
43 U.S.C. § 934, et seq.  Under sections 1 and 4 of that Act
(hereinafter referred to as the Act of 1875), a railroad may
obtain a right of way over public lands by filing various
documents with the Secretary of the Interior.  The parties
have stipulated that the Secretary approved the following fil-
ings made by defendants' predecessors pursuant to the Act of
1875:

 1.  On January 29, 1881, the Secretary approved a map
of five divisions, identifying a route of 100.882 miles, in-
cluding that portion of the railroad crossing the Walker River
Reservation.

 2.  On October 9, 1926, the Secretary approved a map
in five divisions covering a route identical to that approved
on January 29, 1881, and also including a spur line 7.641
miles in length which lay entirely outside the Reservation and
which had been previously approved in a separate filing on
June 15, 1905.

 Defendants contend that these filings and the Secre-
tary's approval thereof constitute valid authorization of the
right of way in question pursuant to the Act of 1875.

 The validity of the Secretary's approval must, how-
ever, be assessed in the light of section 5 of the Act:

> "That this act shall not apply to any lands
> within the limits of any * * * Indian reservation
> * * * unless such right of way shall be provided
> for by treaty-stipulation or act of Congress here-
> tofore passed."

 The Act, therefore, limits the authority of the Secre-
tary of the Interior to the approval of rights of way outside
Indian reservations unless such rights of way have been the
subject of treaties or acts of Congress.  The right of way
crossing the Walker River Reservation has never been the sub-
ject of congressional action (see the Stipulation of the

--8--

SITC000006163

parties as discussed above), nor has the right of way been the subject of a treaty (see United States v. Walker River Irrigation Dist., 104 F. 2d 334, 336 (9th Cir. 1939)). The Secretary's actions on January 29, 1881, June 15, 1905, and October 9, 1926, were, therefore, without effect insofar as they purported to approve the right of way crossing "lands within the limits" of the Walker River Reservation.

There is no dispute as to the limits of the Reservation in 1881. The Secretary's approval of the right of way within those limits at that time was, therefore, clearly invalid.

A dispute does exist, however, as to the nature of the Reservation lands when the Secretary approved the maps in 1926. This dispute involves the effect of various transactions occurring between 1902 and 1906.[3] These Acts ceded certain lands within the Walker River Reservation back to the United States. Defendants do not contend that these Acts altered the "limits" of the reservation (see p. 7, Defendants' Memorandum, filed July 12, 1973). This position is in keeping with the law. Clarke v. Boysen, 39 F. 2d 800, 814 (10th Cir. 1930); Mattz v. Arnett, 412 U.S. 481, 504-505 (1973); United States of America ex rel. Condon v. Erickson, 478 F. 2d 684, 688 (8th Cir. 1973)

Defendants do, however, contend that these transactions transformed what had previously been Indian lands into "public lands" for the purpose of section 1 of the Act of 1875. Defendants therefore argue that these lands became subject to right of way acquisition pursuant to that Act. If this theory were correct, the Secretary's approval of the maps

---

[3] See: Act of May 27, 1902, 32 Stat. 260; Act of June 19, 1902, 32 Stat. 744; Act of March 3, 1903, 32 Stat. Part 1, 997; Act of June 21, 1906, 34 Stat. 358; Land Cession Agreement of July 24, 1906; Presidential Proclamation of September 26, 1906, 34 Stat., Part 3, 3237.

-9-

SITC000006164

on October 9, 1926 would provide defendants with a valid right
of way to the lands made public by the Acts of 1902 to 1906.

It has been held that "when Congress has once estab-
lished a reservation all tracts included within it remain a
part of the reservation until separated therefrom by Congress."
United States v. Celestine, 215 U.S. 278, 285 (1909).  Cession
of reservation land to the Government does not necessarily
render such property "public land."  "Whether or not the Gov-
ernment became trustee for the Indians or acquired an unre-
stricted title by the cession of their lands, depends in each
case upon the terms of the agreement or treaty by which the
cession was made."  Ash Sheep Co. v. United States, 252 U.S.
159, 164 (1920).

The terms of the acts here at issue contain the fol-
lowing statements relevant to the intentions of the parties
regarding the character of the land therein affected:

> "And when such allotments shall have been
> made, and the consent of the Indians obtained as
> aforesaid, the President shall, by proclamation,
> open the land so relinquished to settlement, to
> be disposed of under existing laws."  Act of May
> 27, 1902, supra, emphasis added.

> "[The Indians] for the consideration here-
> inafter mentioned, do hereby cede, grant and re-
> linquish to the United States all right, title
> and interest which they may have to the lands
> embraced within said reservation * * *."  The
> Land Cession Agreement of July 24, 1906, em-
> phasis added.

Additionally, the Acts of June 19, 1902 and June 21,
1906, supra, each refer to opening the lands in question "to
disposition under any public land law."  These various acts
culminated in the Presidential Proclamation, supra, which de-
clared that these lands were subject to settlement and dis-
posal "under the existing laws of the United States."

The terms of these relevant acts clearly intend that
the former reservation lands were to be returned to "public

-10-

SITC000006165

1    lands" subject to disposition under the then existing laws of

2    the United States.  One such law was the Act of 1875 provid-

3    ing for the acquisition of rights of way across public lands.

4         The Acts of 1902 to 1906 did not, therefore, alter

5    the limits or boundaries of the Reservation, but those Acts

6    did return certain of the lands within those limits to public

7    land status.  This finding creates a conflict within the terms

8    of the Act of 1875.  Section 1 provides for rights of way

9    across "public lands," while Section 5 denies application of

10   Section 1 to "lands within the limits" of a reservation.  The

11   Court is here confronted with a situation wherein "public

12   lands" are found "within the limits" of the reservation.

13   Which section of the Act prevails?

14        The language of the Act indicates that Section 5

15   should supersede and control Section 1.  Section 1 is the

16   provision of the Act establishing its general application; the

17   Act is to provide for rights of way across public lands.  Sec-

18   tion 5, however, limits the application of Section 1 by except-

19   ing from its effect rights of way sought across "any lands

20   within the limits" of the reservation.  (Emphasis added.)

21   The phrase "any lands" is broad.  It includes within its scope

22   the "public lands" of Section 1.  The use of the phrase "any

23   lands" therefore argues for an interpretation of the Act which

24   subjects applications for rights of way across public lands

25   which are within the limits of an Indian Reservation to the

26   requirement of Section 5 that such applications be approved

27   by treaty or Act of Congress.

28        Such a construction is supported by standard prin-

29   ciples of statutory construction.  The specific provision of

30   an Act is given precedence over the general.  Ginsberg and

31   Sons v. Popkin, 285 U.S. 204, 208 (1932).  Statutes enacted

32   for the benefit of dependent Indian tribes are to be given

-11-

SITC000006166

liberal construction protecting the rights of those Indians.
Alaska Pacific Fishermen v. United States, 248 U.S. 78, 89
(1918).  The specific nature of the provisions of Section 5
and the clear purpose of protecting Indian interests by its
enactment, therefore, support a conclusion that Section 5
limits that authority granted by Section 1.  Since the re-
search of the parties and the Court has discovered no judicial
or administrative consideration of this question in the past,
there is no reason not to follow the dictates of the language
of the Act and the principles of statutory construction in im-
posing the requirement of Section 5.

It must be concluded, therefore, that the Secretary
of the Interior exceeded his authority in approving the above-
cited applications to the extent that those applications
sought rights of way across any lands, including public lands,
within the limits of the Walker River Reservation.  The pre-
sence of the railroad lines across the Reservation is not jus-
tified by any applications for such right of way made pursu-
ant to the Act of 1875.

The Act of March 2, 1899.  Defendants also attempt
to satisfy the requirement of the Agreement that it be rati-
fied by Congress by reference to the Act of March 2, 1899,
ch. 374, 30 Stat. 990, 25 U.S.C. § 312, et seq. (hereinafter
"the Act of 1899").  Since the railroad lines here in question
were built between 1880 and 1882, the question with respect to
the Act of 1899 becomes whether it is to be given retroactive
application.

In White v. United States, 191 U.S. 545, 552 (1903),
the following statement was made with respect to the contem-
poraneous Navy Personnel Act of March 3, 1899:

"Where it is claimed that a law is to have
retroactive operation, such must clearly be the
intention, evidenced in the law and its purposes,

-12-

SITC000006167

or the Court will presume that the lawmaking
power is acting for the future only and not
the past. * * * Retroactive legislation is
not favored."

This statement comports with present standards.  Soria
v. Oxnard School District Board of Trustees, 467 F. 2d 59, 60
(9th Cir. 1972).

An examination of the language of the Act of 1899 in-
dicates an intention of prospective application only.  Section
1 of the Act (25 U.S.C. § 312), for example, provides that
"no right of way shall be granted under this act until the
Secretary of the Interior is satisfied that the company apply-
ing has made said application * * * with intent and ability to
construct said road."  This section has meaning only so long
as the statute is limited to prospective application; an exam-
ination of the applicant's intention and ability is pointless
where the road is already constructed.

Section 3 of the Act (25 U.S.C. § 314) authorizes the
railroad to survey the line "at any time, upon permission
therefor being obtained from the Secretary of the Interior."
This provision of the Act would also be negated by retroactive
application.  There would be no reason for requiring railroads
to seek permission to survey where the road was already com-
pleted.

Section 4 of the Act (25 U.S.C. § 315) provides for
forfeiture of the right of way where the railroad fails to
"construct and put in operation one-tenth of its entire line
in one year or to complete its entire road within three years
after approval of its map * * *."  Again, this provision has
meaning only with respect to prospective application of the
Act.

The language of the Act does not, therefore, evidence
a "clear intention" that the Act be given retroactive effect.

--13--

SITC000006168

To the contrary, the inference to be drawn from the language
of the Act is an intention that the Act be limited to pros-
pective application.  As to lines of railroad constructed
across the Walker River Reservation prior to March 2, 1899,
therefore, the defendants may not rely on the Act of that date
to satisfy the Agreement's requirement of congressional rati-
fication.

LICENSE.  If the unratified Agreement does not create
a valid right of way, defendants cite the construction of the
railroad line across the Reservation, the continued failure of
the Tribe to voice an objection to its presence (prior to com-
mencement of this suit), the acceptance by the Tribe of money
on the signing of the Agreement and of other considerations
in the form of services of the railroad subsequent thereto,
and the fact of the Agreement itself as facts supporting de-
fendants' position that they and their predecessors in inter-
est have, to this time, validly operated the railroad across
the Reservation as licensees.  Plaintiffs respond with the
rubric of Indian law that Indian land cannot be conveyed or
encumbered except by act of Congress.  Act of June 30, 1834,
ch. 161, sec. 12, 4 Stat. 730, 25 U.S.C. § 177.

Plaintiffs' position rests on the unsupported assump-
tion that creation of a license constitutes a conveyance of
the land subject thereto.  A license, however, merely estab-
lishes "an authority to do a particular act, or series of acts,
on another's land, without possessing any estate therein."
Smith v. Royal Insurance Co., 111 F. 2d 667, 670 (9th Cir.
1940).  It is true, of course, that a license "cannot be
granted by one having no rights in the servient property."
Norfolk Dredging Company v. Radcliff Materials, Inc., 264 F.
Supp. 399 (E.D. Va. 1967).  Although the title to reservation
lands does continue in the United States, the "'Indian title'

SITC000006169

represents * * * a right to occupancy of the land."  Bennett

County, South Dakota v. United States, 394 F. 2d 8, 11 (8th

Cir. 1968).

It has long been recognized that the Indians have the

right to regulate this possessory interest:

"In the absence of a treaty or statute, it
seems that the power of the nation thus to regu-
late its own rights of occupancy, and to say who
shall participate therein and upon what condi-
tions, cannot be doubted."  Choctaw and Chicka-
saw Permit Laws, 18 Op. Atty. Gen. 34, 36 (1884).

"That an Indian tribe may grant permission
to third parties to enter upon tribal lands and
may impose such conditions as it deems desirable
upon such permission, is a proposition that has
been repeatedly affirmed * * *."  Cohen, Hand-
book of Federal Indian Law, University of New
Mexico Press reprint of the 1942 edition, p.
332.

Based on such authority, it must be concluded that

"where the parties intend to create a bare license to use and

enjoy tribal property, there is no statute under which the

licensee may be barred from the use of such property * * *."

Id., at 333.

An Indian tribe may, therefore, create a license in a

third party for the use of reservation lands.

Whether a license has been created by a particular

transaction or set of circumstances is governed by principles

of license law:

"A license with respect to real property
may be created by way of express grant from the
person entitled to possession of the realty, or
it may arise through implications under the at-
tendant circumstances.  It may be implied from
the acquiescence of a landowner in certain acts
or in a series of acts done by another upon his
land.  A license may be implied from the acts of
the parties, from their relations, and from usage
and custom * * *.  If the owner of the land, with
full knowledge of the facts, tacitly permits an-
other repeatedly to do acts upon his land, a li-
cense may be implied from his failure to object."
Thompson, Real Property, 1964 replacement, Vol.
1A, sec. 222, p. 210-211.

The circumstances attending the railroad's use of the

-15-

SITC000006170

reservation lands, as outlined above, clearly establish an
implied license in favor of defendants and their predecessors
in interest for the use of those lands.  It is beyond dispute
that the existence of a license is a defense to a trespass
action.  See, for example, 52 Am. Jur., Trespass, sec. 39,
and cases cited therein.

Although defendants do have a defense to the trespass
action based on the license theory, it must not be overlooked
that a license is revocable and that revocation may be ef-
fected by "commencement of an action for damages by the li-
censor against the licensee."  Thompson, supra, at p. 232.
It is also of interest that "[A] railroad company does not
acquire any easement upon land by entering under a mere li-
cense from the owner and constructing its road * * *.  There
is no exception to the general rule in favor of a railroad
company that a license is revocable at the pleasure of a li-
censor where it has entered the land under a parol license
and built its road, on the ground that considerations of pub-
lic policy forbid that the continuous operation of the road
should be interrupted."  Thompson, supra, sec. 221, pp. 207-
208.

By the commencement of this action, therefore, plain-
tiffs have revoked the license formerly operating in favor of
defendants' operation of the railroad line across the Reser-
vation.  Future enjoyment of that right hinges on the defend-
ants' success in negotiating a new license or obtaining a
right of way interest pursuant to present statutes enacted
for that purpose.  See 25 U.S.C. §§ 324, 325.

TRESPASS BY OPERATION OF TELEPHONE AND TELEGRAPH LINES

Plaintiffs also seek trespass damages for defendants' opera-
tion of telephone and telegraph lines.  It is clear that
neither defendants nor their predecessors in interest applied

-16-

SITC000006171

separately for rights of way for such lines across the Reservation.  See the affidavit of Agent Robert Donlevy attached to the instant motion as Exhibit B and page 5 of defendants' Answer to Interrogatory No. 7.  It is also clear that no such right was obtained pursuant to the Agreement of 1882.  The question is thus reduced to whether the license implied for operation of the rail line extended to operation of the telephone and telegraph lines.

It is fundamental license law that:

> "As a general rule, permission to do a particular act carries with it authority and a right, by implication, to do all that is necessary to effect the principal objects and to avail the licensee of his rights under the license."  Thompson, _supra_, at p. 212.

In the analogous situation of a railroad's right to erect telephone or telegraph lines where it has an easement for the operation of the rail line, the railroad has no right to permit the use of such lines for purely commercial purposes (see Hodges v. Western Union Tel. Co., 133 N.C. 225, 45 S.E. 572 [1903]), and such use entitles the holder of the fee to additional compensation (see Query v. Postal Telegraph-Cable Co., 178 N.C. 639, 101 S.E. 390 [1919]).  An easement does, however, authorize construction of a commercial telephone or telegraph line where it is for the joint use of the railroad and the telegraph company and the preference is given to the railroad for its use in moving its trains.  Cobb v. Western Union Telegraph Co., 90 Vt. 342, 98 A. 758 [1916].

Whether the construction of telephone or telegraph lines along the railroad tracks through the Reservation was authorized as a use necessary to effectuating the principal purposes for which the license existed depends on the factual questions of whether operation of a telegraph is necessary to the operation of a railroad and whether the lines constructed

-17-

SITC000006172

1  were primarily available for that purpose.  Pursuant to Rule
2  56(d), Federal Rules of Civil Procedure, this factual question
3  is deferred for consideration at trial.  There exists a ques-
4  tion of material fact as to the claim of trespass by operation
5  of telephone and telegraph lines through the Reservation so
6  that question is not ripe for summary judgment.  Rule 56(c),
7  Federal Rules of Civil Procedure.

8      The Summary Judgment rule, Rule 56(d), Federal Rules
9  of Civil Procedure, enjoins the Court from ruling on the mo-
10 tion:

11     "(d) Case Not Fully Adjudicated on Motion.
       If on motion under this rule judgment is not
12     rendered upon the whole case or for all the re-
       lief asked and a trial is necessary, the court
13     at the hearing of the motion, by examining the
       pleadings and the evidence before it and by
14     interrogating counsel, shall if practicable ascer-
       tain what material facts exist without substan-
15     tial controversy and what material facts are ac-
       tually and in good faith controverted.  It shall
16     thereupon make an order specifying the facts that
       appear without substantial controversy, including
17     the extent to which the amount of damages or other
       relief is not in controversy, and directing such
18     further proceedings in the action as are just.
       Upon the trial of the action the facts so speci-
19     fied shall be deemed established, and the trial
       shall be conducted accordingly."
20

21     Accordingly, IT HEREBY IS ORDERED:

22     1.  That defendants Southern Pacific Transportation
23 Company and Southern Pacific Land Company have never acquired
24 and do not now own an easement for the right of way of the
25 railroad within the limits of the Walker River Indian Reser-
26 vation.

27     2.  That from 1882 until July 17, 1972 (the date this
28 action was instituted), defendants have enjoyed a revocable
29 license to maintain the railroad tracks and facilities across
30 the Reservation.

31     3.  Issues of fact remain for trial with respect to
32 whether the telegraph and telephone lines constructed and

SITC000006173

1  maintained by defendants are a reasonably necessary and
2  proper adjunct of the license to maintain the railroad tracks
3  and, if not, what, if any, damages have been suffered by
4  plaintiffs.
5      4.  Pursuant to Rule 54(b), Federal Rules of Civil
6  Procedure, this Court expressly determines that there is no
7  just reason for delay and directs that judgment be entered
8  forthwith in favor of defendants and against plaintiffs on
9  plaintiffs' cause of action for trespass arising from the
10  construction, maintenance and operation of the railroad
11  tracks and appurtenances across the Walker River Indian
12  Reservation from 1882 until July 17, 1972.
13      Dated:  May 28, 1974.
14
15
16  _____
    UNITED STATES DISTRICT JUDGE
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

-19-

SITC000006174

# Exhibit No. 19



Real Property Management

## United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS
PORTLAND AREA OFFICE
POST OFFICE BOX 3785
PORTLAND, OREGON  97208

CERTIFIED - RETURN RECEIPT REQUESTED

MAY 4 - 1979

Burlington Northern, Inc.
% Lawrence D. Silvernale
Associate Regional Counsel
350 Central Building
Seattle, Washington  98104

RE:  Appeal of Burlington Northern, Inc. - Application for
     Railroad Right-of-Way

Gentlemen:

This matter has come before me, the Area Director, Bureau
of Indian Affairs, on the appeal filed by Burlington North-
ern, Inc., through its attorney, Lawrence D. Silvernale,
from the decision dated October 17, 1978, of the Superin-
tendent of the Western Washington Agency, denying its
application for a railroad right-of-way across tribal
trust land on the Swinomish Indian Reservation.  The
decision from which the appeal is taken denies the appel-
lant's application because prior consent of the Swinomish
Indian Senate had not been obtained.

The notice of appeal was timely filed and received by the
Superintendent of the Western Washington Agency on
November 3, 1978, and the appeal, together with supporting
documents, was filed within the 30-day period following
the notice.  The appellant also tendered its check in the
amount of $20,858 to the Department of the Interior as the
amount claimed to be due for a grant of right-of-way.  This
was returned by me to the appellant on November 29, 1978.
Within 30 days after service of a copy of the appeal upon
it, the Swinomish Tribal Community, through its attorney
Sharon K. Eads of Native American Rights Fund, filed an
answer supporting the Superintendent's decision.

The appellant contends that the Superintendent was in error
in failing to approve its application, claiming that its
application for a right-of-way under the Act of March 2,
1899, 25 U.S.C. § 312, et seq., is a grant in praesenti and
tribal consent is not required.  It also claims that if the

EXHIBIT A

- 2 -

Superintendent had discretion to deny the grant, it would
be an abuse of discretion for him to do so.  It is noted
that the Superintendent's decision denying the application
was based solely on the failure of the appellant to obtain
tribal consent holding that such consent was required
under both the law and regulations."  The Superintendent
did not otherwise review or determine the merits of the
application.  Therefore, the decision turns solely on
whether tribal consent is a prerequisite to the review of
an application for a right-of-way under the 1899 Act.

The applicant argues that the rights granted under the 1899
Act are exclusive and compliance with the provisions of that
act is the only requirement.  To avoid the application of
Section 2 of the Act of 1948, 25 U.S.C. § 324, which pro-
hibits the grant of a right-of-way across lands belonging
to a tribe organized under the Indian Reorganization Act
without the consent of the proper tribal officials, it
relies upon Section 4, 25 U.S.C. § 326, which provides that
the act does not repeal any existing authority.  The
Swinomish Tribal Community was organized under 25 U.S.C. § 476,
its constitution thereunder having been approved by the
Secretary on January 27, 1936.

The appellant cites Nicodemus v.  Washington Water Power
Company, 264, F.2d 614 (9th Cir. 1959), as authority that
25 U.S.C. § 323 is not an exclusive method of obtaining a
right-of-way across allotted land.  However, this case lends
no support to its argument since the alternative being con-
sidered there was 25 U.S.C. § 357, which allows acquisition
of allotted land by condemnation.  That case is not precedent
since the land here is tribal land and cannot be acquired by
condemnation under that section.  Also, no one is contending
that interests in tribal land cannot be acquired under other
statutes - only that Section 2 of the 1948 Act is applicable
regardless of the authority.  Nor is the case of
United States v. Southern Pacific Transp. Co., 543 F.2d 676
(9th Cir. 1976), cited by the appellant, any assistance since
it does not address the issue here presented - the necessity
of tribal consent to a grant of a right-of-way over tribal
land.

The appellant also contends that if the Superintendent had
discretion to deny the application, it was an abuse of that
discretion to deny it based on lack of tribal consent.  The
appellant alleges that the lack of tribal consent was "based
solely on Appellant's refusal to meet the tribe's exorbitant
compensation demands" (page 10).  There is no evidence to
support this allegation.  However, if tribal consent as a

SITC000004533

- 3 -

prerequisite is imposed by Congress, the Superintendent
has no authority to disregard the lack of consent or
inquire into the reasonableness of the tribe in withhold-
ing its consent.  In such case the exercise of discretion
of the Superintendent would not be an issue.

The issue here presented -- the application of 25 U.S.C.§324
to all grants of tribal trust land of tribes organized under
the Indian Reorganization Act came before the Assistant
Secretary, Indian Affairs, in the Appeal of the Southern
Pacific Transportation Company.  By decision dated
June 19, 1978, a copy of which is attached, the Assistant
Secretary held that Congress had made it clear that the
consent of tribes organized under the Indian Reorganization
Act was essential before the United States could alienate
interests in those tribe's trust lands, and that it was
immaterial whether the application was under the 1899 or the
1948 Act.  He held that the consent requirement was not "an
attribute of the Secretary's power or discretion" (page 2).
The facts and issues presented in that matter are almost
identical with the facts and issues here presented.  The
appellant has presented no other persuasive authority than
that considered by the Assistant Secretary.  Therefore, that
decision is controlling here.  The decision of the Superin-
tendent denying the application because of lack of tribal
consent is affirmed.

The appellant has the right to appeal this decision to the
Assistant Secretary for Indian Affairs pursuant to Part 2
of Title 25 of the Code of Federal Regulations.  If an appeal
is taken, 25 CFR 2.10 requires that the notice of appeal
together with all supporting documents must be received in
this office within thirty (30) days after the notice of this
decision is received.  An extension of time cannot be granted
(25 CFR 2.10(b)).  The appeal must be filed within 30 days
after the filing of the notice of appeal.  Pursuant to
25 CFR 2.11, copies of the notice of appeal and the appeal,
together with all supporting documents, must be served on all
interested parties, and proof of service thereof must be filed
in this office within 15 days after such service.  A copy of
the notice of appeal must also be filed with the Board of
Indian Appeals, 2015 Wilson Boulevard, Arlington, Virginia,
22203.  Unless a notice of appeal is filed as above provided,
this decision will become final 60 days from the date of
receipt thereof as provided in 25 CFR 2.18.

Sincerely yours,

(Sgd.) W. D. Babby

Acting
Area Director

Enclosure

cc:  Sharon Eads, Native American Rights Fund
     Swinomish Indian Tribal Community
     Superintendent, Western Washington Agency
     Office of the Regional Solicitor

SITC000004534

# Exhibit No. 20

**BURLINGTON NORTHERN**

Lawrence D. Silvernale 625-6444
*Associate Regional Counsel*

Woodrow L. Taylor, 625-6441
*Regional Counsel*

George C. Inman, Jr.   625-6440
Robert C. Williams   625-6447
*Assistant Regional Counsel*

May 25, 1979

Gerald A. Troy   625-6448
*General Attorney*

Area Director
Portland Area Office
Bureau of Indian Affairs
United States Department of the Interior
P.O. Box 3785
Portland, Oregon  97208

RE:   Real Property Management
      Appeal of Burlington Northern Inc.--Application for
      Railroad Right of Way

Dear Sir:

Pursuant to 25 CFR 2.3 and following sections, Burlington
Northern Inc. hereby appeals to the Assistant Secretary
for Indian Affairs the decision set forth in your letter
of May 4, 1979, to affirm the decision of the Superintendent
denying our application because of lack of tribal consent.
In due course we will file our appeal with the Assistant
Secretary for Indian Affairs, the original certificate of
service pertaining to this notice of appeal, and the dupli-
cate originals of the tendered application and accompanying
documents if they are returned by you.

Will you please stamp as "Received" the attached copy of
this letter and return it to me in the enclosed stamped,
self-addressed envelope.  Please telephone me if you should
wish to discuss this matter.

Very truly yours,

*L. D. Silvernale*

Lawrence D. Silvernale
Associate Regional Counsel

LDS/mb
Encl.
cc:   Assistant Secretary for Indian Affairs
      Board of Indian Appeals
      Ms. Sharon K. Eads
      Mr. Peter J. Wilke
      Mr. Peter P. Threestars
      Office of the Solicitor, Portland Region

SITC000006178