1                            THE HONORABLE ROBERT S. LASNIK

2

3

4

5

6

7                 UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF WASHINGTON
8                        AT SEATTLE

9 SWINOMISH INDIAN TRIBAL
   COMMUNITY, a federally recognized Indian       NO. 2:15-cv-00543 - RSL
10 tribe,

11                   Plaintiff,      **OMNIBUS RESPONSE TO BNSF**
                             **RAILWAY COMPANY'S MOTION**
12 v.                            **FOR SUMMARY JUDGMENT AND**
                             **REPLY IN SUPPORT OF**
13 BNSF RAILWAY COMPANY, a Delaware     **SWINOMISH INDIAN TRIBAL**
   corporation,                         **COMMUNITY'S MOTION FOR**
14                Defendant.     **SUMMARY JUDGMENT**

15                               **NOTE ON MOTION CALENDAR:**
                              **Friday, September 2, 2016**
16
                              **ORAL ARGUMENT REQUESTED**
17

18

19

20

21

22

23

24

25

26

27

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL STATEMENT ................................................................................. 2

III.  ARGUMENT ................................................................................................... 6

    A.    BNSF's Purported Interpretation of the Easement Agreement Is
       Nonsensical ........................................................................................... 6

    B.    BNSF Fails To Show any Support for the Proposition That the Tribe's
       Effort To Enforce the Limitations in the Easement Agreement Is
       Arbitrary as a Matter of Law ................................................................. 9

         1.    The cases cited by BNSF are distinguishable and provide no
            support for its argument that the Tribe is acting "arbitrarily" as a
            matter of law ................................................................................ 9

         2.    The Hazmat Act undermines BNSF's position ..................................... 13

    C.    Arbitrary Means Arbitrary ................................................................... 14

    D.    Neither the History of the Parties' Negotiation of the Easement
       Agreement nor the Agreement Itself Supports BNSF's Interpretation ............. 16

    E.    The IRWA and the Tribe's Rights Thereunder Are Crucial to This
       Dispute ................................................................................................ 18

    F.    All the Cases Involving the Interplay Between Common Carrier
       Obligations and Tribal Rights Resolve Disputes in Favor of Tribal
       Rights ................................................................................................. 20

    G.    BNSF's Arguments Ignore the Status of the Tribe as a Sovereign Entity ........ 25

    H.    BNSF Ignores the Body of Case Law Holding That Federal Statutes Do
       Not "Preempt" Other Federal Statutes ................................................ 26

    I.    BNSF Is Asking the Court To Find That the ICCTA Impliedly Repealed
       the Provisions of the IRWA Meant To Protect Tribal Rights, but It Did
       Not ..................................................................................................... 27

    J.    BNSF's Voluntary Commitment Should Be Enforced ................................... 29

IV.   CONCLUSION ............................................................................................. 30

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

# TABLE OF AUTHORITIES

**Cases**

*A&W Properties Inc. v. Kansas City S. Ry. Co.*,
  200 S.W.3d 342 (Tex. App. – Dallas 2006) ...................................................... 21

*Baker v. IBP, Inc.*,
  357 F.3d 685, 688 (7th Cir. 2004) .................................................................... 26

*BNSF Ry. Co. v. Albany & E. R.R. Co.*,
  741 F.Supp.2d 1184 (D. Or. 2010) ................................................................... 27

*Boynton v. Com. of Virginia*,
  364 U. S. 454 (1960) ......................................................................................... 11

*Branch v. Smith*,
  538 U.S. 254, 273 (2003) ................................................................................... 27

*City of Seattle v. Nazarenus*,
  60 Wn.2d 657, 665, 374 P.2d 1014 (1962) ........................................................ 8

*Confederated Tribes of Chehalis Indian Reservation v. Washington*,
  96 F.3d 334, 340 (9th Cir. 1996) ...................................................................... 28

*Cowley v. Northern Pac. Ry. Co.*,
  68 Wash. 558, 123 P. 998 (1912) ...................................................................... 13

*CSX Trans., Inc. — Pet. for Decl. Order*,
  STB Fin. Docket No. 34662, 2005 WL 584026, at *8 (S.T.B. Mar. 14, 2005) ................... 27

*Flores v. American Seafoods Co.*
  335 F.3d 904, 910 (9th Cir.2003) ....................................................................... 8

*Hayes v. National Elec. Contractors Ass'n*,
  781 F.2d 1321, 1324 (9th Cir. 1985) ................................................................. 15

*Intertec Elec. Inc. v. Mahoning County Comm'rs*,
  85 F.3d 257, 260 (6th Cir. 1996) ...................................................................... 15

*Iowa Mut. Ins. Co. v. LaPlante*,
  480 U.S. 9 (1987) .............................................................................................. 28

*Klamath Water Users Protective Ass'n v. Patterson*,
  204 F.3d 1206, 1210 (9th Cir. 1999) ................................................................... 8

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*,
  713 F.3d 187, 206 (4th Cir. 2013) ...................................................................... 7

*Lawson v. State*,
  107 Wn.2d 444, 450, 730 P.2d 1308 (1986) ....................................................... 8

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - iii

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

*Louisville & Nashville R.R. v. Mottley*,
    219 U.S. 467 (1911) ..................................................................................... 12

*Mark Lange — Petition for Declaratory Order*,
    FD 35037, 2008 STB LEXIS 45 (STB Jan. 28, 2008) ........................................ 21

*Merrion v. Jicarilla Apache Tribe*,
    456 U.S. 130, 140 (1982) .............................................................. 25, 26, 28

*New Mexico v. Mescalero Apache Tribe*,
    462 U.S. 324, 333 (1983) ............................................................................ 25

*New Mexico Navajo Ranchers Ass'n v. Interstate Commerce Comm'n*,
    702 F.2d 227, 230 (D.C. Cir. 1983) ............................................................. 24

*Norman v. Baltimore & O.R. Co.*,
    294 U.S. 240 (1935) .................................................................................... 13

*Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Community*,
    991 F.2d 458 (8th Cir. 1993) ....................................................................... 14

*Oneida County v. Oneida Indian Nation*,
    470 U.S. 226, 247 (1985) ............................................................................ 29

*Railroad Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH and
Darlington, PA*
    4 STB 467, 2000 WL 1125904 (STB 2000) .................................................. 12

*Railroad Ventures, Inc. v. Surface Transp. Bd.*,
    299 F.3d 523 (6th Cir. 2002) ................................................................. 11, 12

*Randolph v. IMBS, Inc.*,
    368 F.3d 726, 730 (7th Cir. 2004) ............................................................... 27

*Robesky v. Qantas Empire Airways, Ltd.*,
    573 F.2d 1082, 1088–90 (9th Cir. 1978) ...................................................... 15

*Sanders v. City of Seattle*,
    160 Wn.2d 198, 214–15, 156 P.3d 874 (2007) ........................................ 7, 14, 19

*Southern Pacific Transp. Co. — Abandonment Exemption — in Mineral County, NV*
    (I.C.C. Docket No. AB-12)
    1991 WL 108066, ...............................................................21, 22, 23

*Southern Pacific Transp. Co. v. Watt*,
    700 F.2d 550, 556 (9th Cir. 1983) .............................................................. 21

*Star Lake R. Co. v. Lujan*,
    737 F. Supp. 103, 105 (D. D.C. 1990) .................................................... 24, 25

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

*Star Lake R.R. Co. v. Area Director*,
  94 Int. Dec. 353, 15 IBIA 220 (1987) ................................................................. 25

*State v. Illinois Cent. R.R. Co.*,
  928 So.2d 60 (La. App. 2005) ........................................................................... 21

*Sunnyside Valley Irr. Dist. v. Dickey*,
  149 Wn.2d 873, 880, 73 P.3d 369 (2003) ............................................................. 8

*Swan v. O'Leary*,
  37 Wn.2d 533, 225 P.2d 199 (1950) ..................................................................... 8

*Town of Conway v. Atlantic Coast Line R. Co.*,
  20 F.2d 250, 259–60 (E.D.S.C. 1926) ................................................................. 21

*Tubbs v. Surface Transp. Bd.*,
  812 F.3d 1141 (8th Cir. 2015) ............................................................................ 21

*U. S. v. Carmack*,
  329 U.S. 230 (1946) ........................................................................................... 15

*U. S. v. Southern Pac. Transp. Co.*,
  543 F.2d 676 (9th Cir. 1976) ........................................................................ 20, 21

*United States v. Baltimore & O.R. Co.*,
  333 U.S. 169 (1948) ................................................................................. 9, 10, 12

*United States v. Mazurie*,
  419 U.S. 544, 557 (1975) ................................................................................... 25

*United States v. Park*,
  536 F.3d 1058, 1061 (9th Cir. 2008) .................................................................... 7

*Viking Bank v. Firgrove Commons 3, LLC*,
  183 Wn. App. 76, 120, 334 P.3d 116 (2014) ..................................................... 15

*Wagner v. County of Maricopa*,
  747 F.3d 1048, 1056 (9th Cir.2013) (quoting Fed. R. Evid. 801(c) ...................... 6

*Water Wheel Recreational Area, Inc. v. Larance*,
  642 F.3d 802, 808 (9th Cir. 2011) ................................................................ 25, 26

*Waubay Lake Farmers Ass'n v. BNSF Ry. Co.*,
  2014 U. S. Dist. LEXIS 120160 (D.S.D. Aug. 28, 2014) ................................... 21

*White Mountain Apache Tribe v. Bracker*,
  448 U.S. 136, 143–44 (1980) ............................................................................. 28

*Williamson v. Hampton Mgmt. Co.*,
  339 F. Supp. 1146 (N.D. Ill. 1972) .................................................................... 13

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - v

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

*Wichita Termainal Ass'n et al. – Petition for Declaratory Order*
   STB Fin. Docket No. 35765, 2015 WL 3875937 (STB June 23, 2015) .............................. 12

**Statutes**

28 U.S.C. § 1332 ............................................................................................................. 27
49 U.S.C. §§ 5101–5127 ............................................................................................... 13

**Other Authorities**

Gold Reserve Act of 1934 ............................................................................................. 12
William B. Stoebuck & John Weaver, 17 Wash. Prac., Real Estate §2.9 (2nd ed.)................... 8

**Rules**

*Proposed Rules, Rights of Way over Indian Lands*, 51 Fed. Reg. 1391–01 (Proposed Jan 13, 1986)
   1986 WL 91426 ......................................................................................................... 19

**Regulations**

25 CFR Part 169 ................................................................................................. 18, 28, 29
25 C.F.R. § 169.18 .......................................................................................................... 18
25 C.F.R. § 169.201(a) ................................................................................................... 18
25 C.F.R. § 169.5(i)................................................................................................... 18, 19
25 CFR § 169.7 .............................................................................................................. 29
25 C.F.R. § 169.9............................................................................................................ 29

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - vi

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

# I.     INTRODUCTION

BNSF Railway Company ("BNSF") has invented an imaginative reading of the parties' right-of-way easement agreement (the "Easement Agreement") that is completely at odds with the plain language of the Agreement.   According to BNSF, Swinomish Indian Tribal Community ("the Tribe") may only withhold its consent to an expanded use of the right-of-way if a shipper is asking BNSF to do something illegal.  Of course, the Easement Agreement does not say this. The Easement Agreement expressly states that the Tribe may refuse to consent to a traffic increase on the right-of-way as long as its refusal is not "arbitrary." To get around the plain language of the Easement Agreement, BNSF argues that the Tribe's effort to enforce the terms of the Agreement is itself arbitrary as a matter of law. But there is nothing in the case law or elsewhere that supports BNSF's definition of the term "arbitrary." To the contrary, the well-settled definition of the term "arbitrary" means "without any rational basis." Therefore, under the Easement Agreement, the Tribe is authorized to refuse to consent to a traffic increase as long as it has some rational basis for doing so. The Court should deny BNSF's request to enter a summary judgment ruling concluding that the Tribe's effort to enforce the terms of the Easement Agreement is arbitrary as a matter of law.

BNSF also does not persuasively argue that the ICCTA preempts the Tribe's efforts to enforce the Easement Agreement. Contrary to BNSF's contention, the Tribe's rights under the IRWA govern this dispute. The IRWA requires Tribal consent to the right-of-way, but BNSF asserts the existence of a right-of-way — one of unlimited scope and duration — to which the Tribe never consented. The cases addressing the interplay between railroad rights and tribal rights under the IRWA uniformly resolve disputes in favor of the Indian tribes.  This is consistent with canon of statutory construction that federal statutes are liberally construed in favor of establishing Indian rights, and that any ambiguities in construction are to be resolved in favor of tribal rights.  Here, there is nothing in the ICCTA stating that it was intended to override tribal rights under the IRWA.  But to the extent there is a conflict between the two

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 1

1
2
3

enactments, it must be resolved in favor of the Tribe.  The Tribe respectfully requests that the Court grant its motion for summary judgment, finding and concluding that the ICCTA does not preempt its right to enforce the terms and conditions of the Easement Agreement.

## II.      FACTUAL STATEMENT

4
5
6
7

The Court is quite familiar with the essential facts underlying this dispute, and the Tribe will not repeat them here. Nevertheless, it is worth addressing some of the factual assertions BNSF makes in its brief.

8
9
10
11
12
13
14
15
16
17
18
19
20

First, BNSF states that the central issue in the earlier trespass litigation between the parties was whether or not the Tribe owned the property over which the right-of-way travels, and states that the issue was never resolved with certainty. BNSF Railway Company's Cross-Motion and Opposition to Plaintiff's Motion for Summary Judgment ("BNSF Brief"), at pp. 4–5. BNSF is incorrect. The parties resolved that issue with certainty the moment they entered into the Easement Agreement, which plainly and conclusively recognizes Tribal ownership of the property.  Paragraph D of the Easement Agreement explicitly states that it is intended to grant an easement "over any and all lands comprising part of the Swinomish Indian Reservation and held in trust by the United States for the benefit of the Tribe over which the existing railway of BN passes." It is difficult to conceive of a more explicit recognition that the right-of-way passes over lands held in trust by the United States for the Tribe. At the very least, by having entered into the Easement Agreement, BNSF has waived any argument to the contrary.

21
22
23
24
25
26

BNSF also contends that "the Tribe never asserted an ownership interest in the lands at issue for the hundred-plus years preceding the litigation." BNSF Brief, at pg. 4.  This is inaccurate. BNSF completely disregards the actions of the United States — which holds title to the land in trust for the Tribe — to prevent construction of the railroad as well as the United States' explicit direction to the railroad that it must seek congressional authorization for a right-of-way "upon such terms and conditions with reference to compensation to the Indians

27

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 2

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 ● FAX (206) 682-2992

etc." *See* Declaration of Christopher I. Brain ("Brain Decl.") at Exs. 1–5.  In addition, correspondence as early as 1914 relating to the railroad's trespass on the reservation illustrates that the Tribe always asserted such an interest.  *See* Declaration of Christopher I. Brain Regarding Additional Summary Judgment Exhibits ("Supp. Brain Decl."), at Exs. 45–47.

Second, BNSF again inaccurately characterizes the Tribe's lawsuit as an effort to "regulate" the shipment of hazardous materials across the Reservation.  Indeed, this mischaracterization is sprinkled liberally throughout BNSF's brief.  The Tribe does not dispute that it has safety concerns related to the shipment of Bakken crude across the Reservation, in addition to its other concerns.  Indeed, it is those very safety concerns that demonstrate that the Tribe's refusal to consent to the increased traffic on the right-of-way is not "arbitrary." However, the Tribe objected to BNSF's overburdening of the right-of-way long before it became aware of the significant dangers of shipping crude by rail.  *See* Declaration of Elissa Kalla ("Kalla Decl."), at Ex. 52 (October 18, 2011 letter from Tribe expressing concern over "an apparent proposed change in the number of rail cars crossing the Swinomish Indian Reservation"); Declaration of Andrew Escobar ("Escobar Decl."), at Ex. L, pg. 13 (indicating that "Chairman Cladoosby informed BNSF in his September 25, 2012 letter to Terry Finn that BNSF must immediately cease unauthorized use and must conform its use to the terms of the easement agreement"); *Id.* at Ex. L, pg. 1 (stating that "subsequent events involving the transport of crude oil by rail have resulted in the Tribe's growing awareness of a safety and risk environment relating to the use of the easement for transport of crude oil that is vastly different from that in October 2011, or even in 2013").  Moreover, BNSF mischaracterizes the deposition testimony of Tribal senate chairman Brian Cladoosby regarding the reason the Tribe refused to consent to increased traffic on the right-of-way.  As Chairman Cladoosby stated in response to BNSF's attorney's question about why the Tribe was withholding its consent: "Because we have a deal — a deal is a deal is a deal — that only allows for 25 cars across our Reservation a day, and we would hope that Burlington Northern would honor that

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 3

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

deal that was signed in 1991." *See* Escobar Decl., at Ex. R, pg. 8:15–20.  In short, the Tribe's safety concerns aside, its primary objection has always been to BNSF's failure to abide by the traffic limitations set forth in the Easement Agreement. The Court should disregard BNSF's effort to turn this into a case about improper "regulation."

Third, BNSF claims that, after the Tribe relayed its concerns to BNSF regarding the increased traffic on the right-of-way, the parties "commenced discussions to adjust the Easement's rental fee."  *See* BNSF Brief, at pg. 8.  This is a misrepresentation of what occurred.  In August 2011, the Tribe sent BNSF a letter seeking an adjustment in the annual rental amount for the right-of-way based on Paragraph 3(b)(ii) of the Easement Agreement, which allows for a rental adjustment "to reflect changes in property values." *See* Kalla Decl., at Ex. 51.[1]  Later, in October 2011 — not having received a response from BNSF — the Tribe sent another letter, again seeking the appraisal adjustment, but also indicating the Tribe's concern that, according to a Skagit County land use document, there was a plan for BNSF to begin transporting crude oil to the Tesoro refinery in 100-car unit trains every other day, in contravention of the Easement Agreement.  *Id*. at Ex. 52.  The letter reported that the Tribe had not received any request from BNSF for an increase in trains or cars crossing the Reservation, and pointed out that, under the Easement Agreement, <u>if</u> the Tribe were to consent to an increase in the traffic on the right-of-way, the annual rental payment would need to reflect the increase. However, nothing in the letter suggested that the Tribe was willing to grant consent, much less to accept additional compensation in exchange.  Indeed, in his September 2012 letter, Chairman Cladoosby made it clear that the Tribe objected to BNSF's overburdening of the right-of-way.  Escobar Decl., at Ex. I.

Later, in a March 13, 2015 letter to the Tribe's attorney, Stephen LeCuyer, BNSF stated:

---

[1] The Tribe's letter was sent to BNSF's designated agent, Jones Lang LaSalle, in accordance with BNSF's previous written instructions to the Tribe. Kalla Decl., at Ex. 50.

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 4

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

[W]e have been working with the Tribe to increase the rail traffic levels
specified in the easement for over two years . . . We also acknowledge that the
easement calls for an increase in the amount of annual payments in connection
with volumes of rail traffic, and we remain willing to increase the easement
rental amount commensurately.

*Id.* at Ex. M.  As Mr. LeCuyer responded:

I also want to correct a separate misunderstanding or misstatement in BNSF's
March 13, 2015 letter, which indicates that BNSF has been "working with the
Tribe to increase the rail traffic levels specified in the easement for over two
years." The Tribe has never affirmatively sought to increase the rail traffic
levels across the Reservation. To the contrary, in 2011, the Tribe informed
BNSF, through its then-designated easement agent, of the existing limitations
on trains and railcars in the easement agreement, in the context of the Tribe's
request for a fee adjustment. When the Tribe learned in 2012 that, despite this,
BNSF was reportedly operating trains across the Reservation in violation of the
easement limitations, the Tribe again informed BNSF of the easement
restrictions. Since then, the Tribe has informed BNSF of its continued objection
to BNSF's operation in violation of the easement limitations . . . .

*Id.* at Ex. O.  Thus, while BNSF may have suggested compensating the Tribe for its unilateral

overburdening of the right-of-way, it is inaccurate to state that the parties were negotiating

increased compensation for the increased traffic and presuming Tribal consent to unit trains.

The Tribe always objected to BNSF's violation of the traffic limitations.

Finally, BNSF takes the position that the Tribe's summary judgment motion is

predicated on the facts that "BNSF never advised the Tribe about its common carrier

obligations," and the Tribe "would have never consented to a right-of-way if it had known that

BNSF relied on its common carrier obligations to exceed, if requested by shippers, the

Easements qualified car limitation." To begin with, this mischaracterizes the Tribe's

statements. In its summary judgment motion, the Tribe stated that "BN never once indicated

that it might not be able to comply with the limitations contained in the Easement Agreement

due to its common carrier obligations" and "[i]f it had done so, the Tribe would not have

consented to the Right-of-Way." *See* Plaintiff's Amended Motion for Summary Judgment, at

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 5

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

pg. 7.[2]  This is very different from saying that BNSF never informed of the Tribe of its common carrier obligations. In any event, the Tribe's motion is by no means predicated on these facts. The Tribe's motion is predicated on the explicit terms of the Easement Agreement, to which BNSF voluntarily agreed, and upon the Tribe's rights under the IRWA, which are in no way preempted by the ICCTA.

## III.   ARGUMENT

### A.   BNSF's Purported Interpretation of the Easement Agreement Is Nonsensical

BNSF's motion for summary judgment is based on a reading of the Easement Agreement that is completely at odds with its own terms.  The essence of BNSF's argument is summarized at page 11 of its brief: "Thus, while the Tribe may have a contractual right to oppose a traffic increase, it can exercise that opposition to an increase based on shipper needs **only when that opposition would <u>not</u> cause BNSF to violate its federal law obligations** — *e.g.,* when the shipper's request does not comply with federal safety and security regulations." (Emphasis added.)  In other words, according to BNSF, the Tribe may only withhold its consent to an expanded use of the easement if the shipper is asking BNSF to do something illegal under federal law.

But that is not what the agreement says.  At the risk of redundancy, the Easement Agreement states as follows:

> Burlington Northern agrees that, **unless otherwise agreed in writing**, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the Reservation each day. The number of trains and cars shall not be increased unless required by shipper needs. **The Tribe agrees not to <u>arbitrarily</u> withhold permission to increase the number of trains or cars when necessary to meet shipper needs**.

Easement Agreement, at ¶ 7(c) (emphasis added).

---

[2] BNSF's hearsay objection to the declarations of Allan Olson and Jim Wilbur is without merit. "Hearsay 'is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' " *Wagner v. County of Maricopa*, 747 F.3d 1048, 1056 (9th Cir.2013) (quoting Fed. R. Evid. 801(c)). Neither Mr. Olson nor Mr. Wilbur are relating out-of-court statements in their declaration testimony; on the contrary, they are making statements based upon their own personal knowledge of the negotiations between the Tribe and BNSF.

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 6

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 ● FAX (206) 682-2992

Indeed, BNSF itself adeptly summarizes the essence of what the Easement Agreement actually says: "Insofar as the Tribe received a right to oppose an increase in traffic, this right was limited to only those circumstances in which its opposing the increase is not arbitrary." BNSF Brief, at pg. 11. (The Easement Agreement also states that a written agreement is a prerequisite to an increase in traffic. This has never happened, making BNSF's statement that its "use of the right-of-way is consistent with the Easement's terms" even more far-fetched.) Thus, the Easement Agreement expressly gave the Tribe the right to prevent BNSF from meeting its shipper needs, so long as the Tribe was not acting arbitrarily.  Nowhere does it state that the Tribe's ability to withhold consent to an increase in traffic is limited to those situations in which a shipper's request would not comply with Federal laws relating to safety and security regulations.  BNSF is asking the Court to rewrite the parties' agreement to state something it does not remotely express.

Further, BNSF's hypothetical scenario makes no practical sense. Why would BNSF ever seek to satisfy a shipper's request that violates federal safety and security regulations? And if BNSF would not do so, why would BNSF ever ask the Tribe to consent to an increased number of railcars carrying that shipper's goods in a manner that violates safety and security rules?

Instruments granting easements are construed strictly in accordance with their terms.

The extent of an easement, like any other conveyance of rights in real property, is fixed by the language of the instrument granting the right. . . . <u>An easement must be construed strictly in accordance with its terms in an effort to give effect to the intentions of the parties.  A party is privileged to use another's land only to the extent expressly allowed by the easement.</u>

*Sanders v. City of Seattle*, 160 Wn.2d 198, 214–15, 156 P.3d 874 (2007) (emphasis added) (internal citations omitted).[3]  Thus, courts give effect to the intentions of the parties to an

---

[3] Federal courts may look to state law interpreting easements, even where the interests of the United States are involved.  *See United States v. Park*, 536 F.3d 1058, 1061 (9th Cir. 2008) (employing Idaho law in interpretation of easement between United States and private party). In any event, "a deed of easement is a contract." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 206 (4th Cir. 2013). Under federal law, "[a] written contract must be read as a whole and every part interpreted with

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 7

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

easement, as expressed by the written terms of the easement.  As one commentator has put it:

> When an easement is created by express language, of course we look to the language to determine the permitted uses. It is a question of determining the parties' intent. <u>If their language is very precise and restrictive, *e.g.*, only so many trips per day or only certain modes of transportation, then of course that permanently restricts the usage.</u>

William B. Stoebuck & John Weaver, 17 Wash. Prac., Real Estate §2.9 (2nd ed.) (emphasis added).  The rule applies with equal force to easements for railroad rights-of-way. "[T]he particular deeds conveying [a railroad] right-of-way must be interpreted to determine the scope and duration of the easement granted." *Lawson v. State*, 107 Wn.2d 444, 450, 730 P.2d 1308 (1986) (citing *Swan v. O'Leary*, 37 Wn.2d 533, 225 P.2d 199 (1950)).  And, "[r]egardless of what general rule might apply to easements for railroads, the court must always look to the particular language of the deed in question to determine intent." *Id*. at 462 (Pearson, J., concurring) (citations omitted). Moreover, only if an easement is ambiguous can the Court look beyond the wording of the document.  "If the plain language is unambiguous, extrinsic evidence will not be considered." *Sunnyside Valley Irr. Dist. v. Dickey*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003) (citing *City of Seattle v. Nazarenus*, 60 Wn.2d 657, 665, 374 P.2d 1014 (1962)).

        In this case, the Easement is unambiguous.  BNSF's attempt to persuade the Court it says something it does not is nonsensical.  The only plausible scenario under which BNSF would ever request Tribal consent to an increase in traffic over the easement would be to meet shipper needs. Based on BNSF's logic — and contrary to the explicit terms of the Easement Agreement — the Tribe could only decline consent if the requested traffic increase somehow did not comply with federal law.  But it strains credulity to suggest that BNSF would ever satisfy a shipper request, let alone request a traffic increase, that it believed did not comply

---

reference to the whole, with preference given to reasonable interpretations. Contract terms are to be given their ordinary meaning, and when the terms of the contract are clear, the intent of the parties must be ascertained from the contract itself." *Flores v. American Seafoods Co.*, 335 F.3d 904, 910 (9th Cir. 2003) (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999)).

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 ● FAX (206) 682-2992

with federal law.   BNSF's interpretation thus renders paragraph 7(c) of the Easement Agreement utterly meaningless.

**B.    BNSF Fails To Show any Support for the Proposition That the Tribe's Effort To Enforce the Limitations in the Easement Agreement Is Arbitrary as a Matter of Law**

BNSF ties itself in knots attempting to show that enforcement of a voluntary contract that limits a railroad's common carrier operations is itself "arbitrary" as a matter of law.  But not a single case cited by BNSF supports this proposition.  Likewise, the Hazmat Act does not support the argument and, indeed, actually undermines BNSF's position.

*1.    The cases cited by BNSF are distinguishable and provide no support for its argument that the Tribe is acting "arbitrarily" as a matter of law.*

BNSF cites numerous cases in support of the argument that the Tribe's refusal to consent to a traffic increase, which would allegedly cause BNSF to violate its common carrier obligations, is arbitrary as a matter of law.  Each case is completely distinguishable from the situation at bar, and none remotely stand for that proposition.  Further, none of the cases deal with a contract with an Indian tribe, entered into under the auspices of the IRWA.  As discussed below, the sovereign status of the Tribe and the terms of the IRWA and its implementing regulations makes this a key distinction.  In the few cases on record dealing with the interplay between tribal rights and common carrier obligations, both the courts and the ICC have unfailingly favored tribal rights.  *See* Section III.F, *infra.*  And, none of the cases cited by BNSF involve a party's efforts to enforce the conditions contained in the easement grant itself, as the Tribe is attempting to do in this case.  Indeed, many of the cases do not relate to railroad rights-of-way at all.   In those that do, unlike here, the railroad had a valid and vested right-of-way that was later in some way circumscribed by an agreement with a third party.

For example, in *United States v. Baltimore & O.R. Co.*, 333 U.S. 169 (1948), which BNSF incorrectly contends has "striking similarities" to the instant case, a railroad company had constructed railroad tracks on property owned by the Cleveland Union Stock Yards

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 9

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

Company ("Stock Yards") in 1899.  333 U.S. at 172. The railroad and Stock Yards entered into a contemporaneous agreement that gave the railroad the right to use the tracks for railroad purposes so long as that use did not interfere with Stock Yards' livestock business.  *Id*. Later, in 1935, the parties modified the agreement to provide that the railroad was required to pay a fee to the extent it shipped livestock to one of Stock Yards' competitors.  *Id*. at 173.  Pursuant to that agreement, Stock Yards later demanded that the railroad either pay a large sum of money to Stock Yards or stop delivering to Stock Yards' competitor.  Rather than pay the fee, the railroad opted to cease deliveries to the competitor.  *Id*.  As BNSF points out, the Supreme Court held that Stock Yards could not leverage its ownership of the property underlying the track to cause the railroad to discriminate against other railroad customers.  *Id*. at 176.

As an initial matter, there is nothing in the Court's ruling that suggests that Stock Yards was acting "arbitrarily" by attempting to enforce the terms of its contract.  The Court simply found that the railroad's conduct in discriminating against another customer on the basis of that contract was inappropriate under those circumstances.  Thus, the case does not support the contention that the Tribe's effort to enforce the terms of the Easement is arbitrary as a matter of law.

Second, again, the case did not involve a contract with an Indian tribe entered into under the auspices of IRWA and under which the railroad had an ongoing obligation to comply with the conditions of the initial easement grant.  And, the case is distinguishable in that, unlike here, Stock Yards was not seeking to compel the railroad to comply with the terms and conditions of its initial grant.  The railroad had a pre-existing right-of-way created by its 1899 agreement with Stock Yards.  Stock Yards later sought to enforce an amendment to the terms of the grant in order to inhibit business competition.

That situation is starkly distinct from the case at bar.  Here, the right-of-way grant itself placed conditions upon BNSF's use of the right-of-way.  As discussed in the Tribe's opening brief, BNSF could never have obtained the right-of-way to begin with without having agreed

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 10

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

to those conditions.  Thus, the Tribe is not attempting to limit any preexisting rights BNSF had; the Tribe is simply attempting to enforce the conditions of the agreement that granted the right-of-way at the outset.

BNSF also cites *Boynton v. Com. of Virginia*, 364 U. S. 454 (1960), which is even more dramatically distinguishable.  In that case, a Virginia restaurant that serviced a bus terminal discriminated against nonwhites by requiring them to dine in the "colored" section of the restaurant. 364 U. S. at 456.  An African-American bus passenger refused to leave the white section of the restaurant, and was prosecuted under a state trespass law. *Id*. at 456–57. The passenger defended himself on the basis that, as an interstate passenger of a common carrier, he had a federal right to be served by the restaurant without discrimination.  *Id*. at 457. The Supreme Court agreed, holding that the provision of the Interstate Commerce Act prohibiting discrimination by common carriers applied with equal force to a restaurant located in an interstate transportation facility. Thus, the case had nothing to do with railroads, much less with an Indian tribe's attempt to enforce the restrictions contained in a right-of-way agreement.  Nor does it stand for the proposition that a tribe acts "arbitrarily" when it attempts to do so.

The case of *Railroad Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523 (6th Cir. 2002), is likewise distinguishable, and likewise does not support BNSF's argument that the Tribe's efforts to enforce the Easement Agreement are "arbitrary" as a matter of law. In that case, Railroad Ventures, Inc. ("RVI") had acquired a railroad line without STB authority, then — also without STB authority and with a view toward completely removing the railroad line — canceled the lease of the only railroad company that was authorized to provide service on the line. 299 F.3d at 534. After the STB ordered service to be restored, a flood damaged the railroad tracks, again preventing rail service on the line.  *Id*.   RVI failed to cooperate in the restoration of the railroad tracks, and ultimately sought STB authority to abandon the line.  *Id*. at 535. The Columbiana County Port Authority ("CCPA") acquired the line, and discovered

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 11

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

that RVI had entered into an agreement with a municipality, purportedly binding upon RVI's successors in interest, that required the construction of an underpass or overpass as a condition of restoring railroad service.  *Id*. at 538.  The STB concluded that the terms of the agreement that imposed obligations on parties other than RVI and the municipality and created a condition precedent to resuming rail service would interfere with CCPA's common carrier obligations.  Thus, the STB voided the agreement. *Id*. at 540.  The Sixth Circuit Court of Appeals affirmed.  *Id*. at 560–61.  But again, the case did not involve a Tribe's efforts to enforce the terms and conditions of a right-of-way granted under the auspices of the IRWA, nor does it support BNSF's argument that such efforts are "arbitrary" as a matter of law.  And, just as in *U.S. v. Baltimore & O.R. Co.*, there was a preexisting right-of-way with ongoing common carrier operations that a later agreement sought to curtail.  Here, again, BNSF did not have a legitimate right-of-way until the Tribe entered into the Easement Agreement, which contained limitations on BNSF's rights at the very outset.[4]

    The other cases cited by BNSF are similarly inapposite. In *Louisville & Nashville R.R. v. Mottley*, 219 U.S. 467 (1911), the railroad had entered into a settlement agreement with private parties, giving them annual passes for life in exchange for the release of a damages claim.  219 U. S. at 471–72.  Congress later enacted the Commerce Act, which contained a provision prohibiting free passes, and the railroad thus stopped honoring the settlement agreement.  *Id*. at 473.  The other party sued, and the Supreme Court ultimately held that, under the act, "the railroad company could not lawfully accept from Mottley and wife any compensation 'different' *in kind* from that mentioned in its published schedule of rates."  *Id*. at 476 (italics in original).  (Significantly, the Court left open the question of whether the Mottleys may, "by some form of proceeding against the railroad company, recover or restore the rights they had when the railroad collision occurred."  *Id*. at 486.)

---

[4] *Railroad Ventures, Inc. — Abandonment Exemption — Between Youngstown, OH and Darlington, PA*, 4 STB 467, 2000 WL 1125904 (STB 2000), and *Wichita Terminal Ass'n et al. — Petition for Declaratory Order*, STB Fin. Docket No. 35765, 2015 WL 3875937 (STB June 23, 2015) are distinguishable on like grounds.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

*Norman v. Baltimore & O.R. Co.*, 294 U.S. 240 (1935), dealt with a party's attempt to enforce a "gold clause" in a contract. The Supreme Court held that such clauses were invalidated by the Gold Reserve Act of 1934.  294 U.S. at 314.  And, *Cowley v. Northern Pac. Ry. Co.*, 68 Wash. 558, 123 P. 998 (1912), is another case invalidating a railroad's grant of free passes (this time in exchange for conveyance of property) under the Commerce Act.  68 Wash. at 559–61.

Thus, the cases cited by BNSF (other than the racial discrimination cases, which have no conceivable bearing on this dispute) stand for nothing more than the axiom that Congressional acts sometimes override contracts between private parties.  But they do not support BNSF's imaginative interpretation of the Easement Agreement, nor that the Tribe is acting arbitrarily as a matter of law in seeking to enforce the restrictions contained therein.[5] And, plainly, none of them deal with an Indian tribe's attempt to enforce restrictions contained in an easement agreement entered into under the IRWA.

2.    *The Hazmat Act undermines BNSF's position*

BNSF also points to the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101–5127, in support of its argument that the Tribe is acting arbitrarily as a matter of law in attempting to enforce the Easement Agreement. The argument has no merit. The Tribe is not attempting to "regulate" the types of commodities BNSF ships across the right-of-way; it is trying to enforce the express limitations on train traffic — one train of 25 cars or less in each direction each day — contained in the Easement Agreement. The Tribe readily acknowledges that it has safety concerns relating to the shipment of Bakken crude. However, those concerns — i.e., the very legitimate fear of a catastrophic derailment near the Tribe's economic center — go to the issue of whether the Tribe acted arbitrarily in refusing to consent to an increased

---

[5] BNSF also cites *Williamson v. Hampton Mgmt. Co.*, 339 F. Supp. 1146 (N.D. Ill. 1972), in support of this argument. This is another racial discrimination case that has no bearing on this dispute whatsoever. And there is nothing in the case stating that "a party's refusal to consent under a contractual-consent provision is . . . arbitrary if the withholding of consent would violate the law."  *See* BNSF Brief, at pg. 12, n. 17.

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 13

burden on the right-of-way. BNSF concedes for purposes of this summary judgment motion that if BNSF kept to the "one train, 25 cars or less" limitation contained in the Easement Agreement, but shipped only Bakken crude, this would be a very different case.  But BNSF has not done so.

Therefore, BNSF's reliance on *Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Community*, 991 F.2d 458 (8th Cir. 1993), is misplaced. There, an Indian tribe had enacted an ordinance that purported to regulate the transportation of nuclear materials over the tribe's reservation under an already-existing right-of-way. 991 F.2d at 459. The court concluded that the ordinance was preempted by the Hazmat Act. However, that case plainly involved an attempt to regulate through adoption of new tribal law. It did not involve the tribe's enforcement of the limitations contained in a right-of-way grant under the IRWA that limited the volume of traffic on the right-of-way.

Indeed, the Hazmat Act (adopted in 1990) actually undermines BNSF's position in this litigation.  As BNSF points out, the Hazmat Act explicitly applies to Indian tribes.  Thus, if this were a case involving "regulation," an interpretation of that statute's provisions would be pertinent.  In contrast, the ICCTA (adopted in 1995) does not explicitly apply to Indian tribes. As illustrated by the Hazmat Act, Congress knows how to make statutes applicable to Indian tribes. The fact that Congress did not do so in enacting the ICCTA lends further support to the Tribe's argument that the ICCTA was in no way intended to preempt or repeal tribal rights under the IRWA.

## C.    Arbitrary Means Arbitrary

In short, there is no authority whatsoever for BNSF's argument that the Tribe is acting "arbitrarily" as a matter of law by attempting to enforce the limitations on train traffic contained in the Easement Agreement.  Again, "[a]n easement must be construed strictly in accordance with its terms in an effort to give effect to the intentions of the parties." *Sanders*,

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR SUMMARY JUDGMENT (No. 15-00543) - 14

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

160 Wn.2d at 214–15. This applies with equal force to the term "arbitrary" in the agreement. Here, the word means exactly what it says.

In *U. S. v. Carmack*, 329 U.S. 230 (1946), the United States Supreme Court had the task of determining whether a federal agency's choice of a site for a new post office was arbitrary. There, the Court observed:

> 'Arbitrary' is defined by Funk & Wagnalls New Standard Dictionary of the English Language . . . as . . . 'without adequate determining principle; . . .' and by Webster's New International Dictionary . . . as . . . '[f]ixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance, . . . decisive but unreasoned; . . .'

329 U.S. at 243 n. 14 (1946).

Similarly, in the context of a dispute involving the adequacy of a labor union's representation of a union employee, "[t]he Ninth Circuit has defined as 'arbitrary' conduct that is 'without a rational basis,' made with reckless disregard for the right of individual employees, or 'egregious' and 'unrelated to legitimate union interests.'" *Hayes v. National Elec. Contractors Ass'n*, 781 F.2d 1321, 1324 (9th Cir. 1985) (emphasis added) (quoting *Robesky v. Qantas Empire Airways, Ltd.*, 573 F.2d 1082, 1088–90 (9th Cir. 1978)).

And, in a case involving a governmental agency's decision not to award a public contract to the plaintiff, the Sixth Circuit Court of Appeals stated: "Arbitrary means without adequate determining principle; . . . not governed by any fixed rules or standard." *Intertec Elec. Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 260 (6th Cir. 1996).

Thus, based on all the foregoing authorities, the word "arbitrary" essentially means (1) without adequate determining principle; (2) without a rational basis; and (3) without consideration of surrounding facts and circumstances. Courts "generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 76,

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 15

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

120, 334 P.3d 116 (2014).   Here, there is nothing in the Easement Agreement that demonstrates that the word "arbitrary" was to have anything other than its ordinary meaning.

**D.   Neither the History of the Parties' Negotiation of the Easement Agreement nor the Agreement Itself Supports BNSF's Interpretation**

Nor, contrary to BNSF's assertion, does the parties' negotiation history nor the Easement Agreement itself support the interpretation that the Tribe and BNSF intended anything other than the plain meaning of the term "arbitrary."

As both parties agree, in negotiating the Easement Agreement, the Tribe wanted an absolute limitation on the number of trains and attached railcars that could cross the Reservation each day. BNSF, however, insisted that it needed some flexibility in the agreement in order to meet its shipper needs. But BNSF also knew that it would not have any easement at all without the Tribe's consent, and that the Tribe would not consent to a right-of-way if the parties could not come to an agreement as to its terms. Therefore, BNSF proposed the language that exists in the Easement Agreement today, which gives BNSF a right to request an increase in train traffic based on shipper needs, but also gives the Tribe the right to reject such a request as long as it is not acting arbitrarily.   That was not the best-case outcome sought by either party, but it was the compromise both parties were willing to agree to. There is nothing whatsoever in any of the communications between the parties that suggests the interpretation advocated by BNSF in this litigation — that the Tribe could only withhold consent in circumstances where the requested traffic increase would result in a violation of federal law.[6]

---

[6] Nor does the evidence support BNSF's statement that the compromise was simply to "increase the annual rental amounts owed to the Tribe for any greater traffic over the Reservation," *see* BNSF Brief, at pg. 5, or that the Tribe only "obtained the right to seek additional rent in the event of a traffic increase necessary to meet shipper needs." *Id*. at pg. 18, n. 21.  Again, the Tribe originally proposed language stating simply that "only one westbound and one eastbound train, of 25 cars or less, shall cross the Reservation each day."  Brain Decl., at Ex. 31(a), ¶ 7(c).  BNSF proposed the language providing that traffic may increase based on shipper needs, but allowing the Tribe to refuse to consent to an increase as long as it was not acting arbitrarily. *Id*. at Ex. 33.  Again, BNSF is inviting the Court to simply ignore this language.

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 16

1    BNSF also likes to point to the provision in the settlement agreement stating that

2  nothing therein "shall supersede any federal law or regulation as they now exist or as they may

3  be amended or changed from time to time." However, again, that provision was inserted by the

4  Tribe, in order to protect its own interests. It defies reason to suggest that the Tribe would have

5  proposed a provision that was intended to give BNSF an escape clause excusing it from having

6  to comply with the terms of the agreement.  And if that language had been necessary and

7  intended to preserve some superseding right to meet lawful shipper needs, it certainly would

8  have been proposed by BNSF at the outset of the parties' negotiations. In any event, the phrase

9  "federal law" also applies to the IRWA — indeed, the Tribe proposed the language

10  specifically to assure the protections of federal law governing trust land easements[7] — which

11  requires BNSF to comply with all of the terms and conditions of the instrument granting the

12  right-of-way.

13    BNSF's interpretation is also at odds with the 80-year duration provision contained in

14  the Easement Agreement. As BNSF acknowledges, "[u]nder the Easement, BNSF has a right

15  to maintain and operate the existing railroad line for a term of 40 years, with two 20-year

16  renewal options."  BNSF Brief, at pg. 5.  According to BNSF's argument — that its common

17  carrier obligations preclude any interference with its operations on the right-of-way — this

18  duration provision is itself meaningless. According to BNSF's argument, its rights under the

19  Easement Agreement can <u>never</u> terminate, because such termination would itself be at odds

20  with BNSF's common carrier obligations. Indeed, BNSF finally admits that it will take that

21  very position once the 80-year term is up, stating that "railroads cannot be forced to abandon

22  rail lines without the agency's approval even where the agreement giving the railroad access to

23  the land has expired or terminated." *See* BNSF Brief, at pg. 24, n. 28.

24

---

25  [7] *See* Supp. Brain Decl., at Ex. 49, pg. 165:8–24 (excerpt of Allan Olson's deposition testimony, stating that the

26  inserted phrase was meant specifically to apply to rental adjustments). Indeed, the sentence in the settlement
   agreement directly following the language upon which BNSF relies states: "Specifically, the annual rental shall
   not be less than that required by federal law in effect at any time during the ends occupancy of the right-of-way."

27  Brain Decl., at Ex 28, pg. 11.

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 17

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

1        This illustrates where BNSF's logic breaks down.   The IRWA's implementing

2   regulations expressly provide for termination of a right-of-way, 25 C.F.R. § 169.5(i), and

3   authorize right-of-way grants to be of limited duration. 25 C.F.R. § 169.18.[8]   BNSF's

4   argument, if accepted, would render those provisions meaningless. As discussed in the Tribe's

5   opening brief and below, there is nothing in the ICCTA or in the case law relating to the

6   interplay between railroads and tribal rights that suggests such an outcome.

7        In essence, BNSF's position is that the provisions in the Easement Agreement that

8   protect Tribal rights, and were the basis for the Tribe's consent to the right-of-way, are illusory

9   and meaningless.  BNSF is, in effect, arguing that it fraudulently induced their Tribe to enter

10  into the Easement Agreement based on false premises. If that is the case, the Easement

11  Agreement would fail for lack of consideration and would be subject to rescission.

12  **E.**   **The IRWA and the Tribe's Rights Thereunder Are Crucial to This Dispute**

13       In responding to the Tribe's motion for summary judgment, BNSF makes the

14  incredible argument that the "IRWA is not relevant to this dispute, and its focus is quite

15  narrow."  BNSF Brief, at pg. 24.[9]  But as explained in great depth in the Tribe's opening brief,

16  the IRWA is the very basis for the existence of the BNSF right-of-way.  It was only under the

17  auspices of IRWA — including its requirement of Tribal consent — that BNSF could acquire

18  a right-of-way, and BNSF has an ongoing obligation to comply with the terms of the grant or

19  risk termination of the right-of-way.

20       IRWA allows the Tribe to place conditions on its consent to a right-of-way.  This is

21  consistent with the policy of tribal self-determination.  In 1985, the Bureau of Indian Affairs

22  was in the process of amending 25 CFR Part 169. As the agency stated, "[t]he primary reason

23  the regulations are proposed to be amended is to implement the [IRWA], which authorizes the

24

---

25  [8] As this provision is arguably substantive, the Tribe cites the previous version of the Rule.  But in any event, the
26  amended rule is of like effect.  *See* 25 C.F.R. § 169.201(a).
    [9] Given that BNSF fought for years before the BIA and the federal court to obtain a right-of-way under the IRWA
27  without Tribal consent, it is surprising to now hear BNSF state that the IRWA is not relevant to this dispute.

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 18

1  Secretary of the Interior to grant rights-of-way without restrictions as to term or conditions."

2  *Proposed Rules, Rights of Way over Indian Lands*, 51 Fed. Reg. 1391–01 (Proposed Jan. 13,

3  1986), 1986 WL 91426.  As the agency stated, the proposed amendment will "provide the

4  parties to a right-of-way agreement wider discretion in negotiating the terms," which is

5  "viewed as consistent with the policy of Indian self-determination." *Id*.

6  　　　Consistent with this policy, IRWA provides for termination of a right-of-way if the

7  railroad does not comply with the terms and conditions of the right-of-way grant.  25 C.F.R.

8  § 169.5(i).  In other words, if a railroad goes beyond the scope of a tribe's consent, the Interior

9  Department may terminate the right-of-way. BNSF argues that this remedy is not at issue here,

10  because the Tribe is currently seeking compliance with the Easement Agreement, not

11  termination.  But that is beside the point.  Based on BNSF's argument, an Indian tribe or the

12  Secretary of the Interior could <u>never</u> terminate a railroad right-of-way due to a failure to

13  comply with its terms and conditions, because to do so would interfere with the railroad's

14  common carrier obligations.   But plainly, this would completely nullify the consent

15  requirement, along with the policy of Indian self-determination upon which it is based.

16  　　　As detailed in the Tribe's opening brief, after years of litigation and negotiation, the

17  Tribe consented to an easement of limited scope and limited duration.  The agreement provides

18  that the Tribe might in the future agree to consent in writing to an easement different in scope,

19  but it also gives the Tribe the ability to withhold that consent as long as doing so is not

20  arbitrary.  By running far more trains and railcars over the right-of-way than initially agreed to,

21  without the Tribe's further written agreement, BNSF has exceeded the scope of the Tribe's

22  consent.  There is fundamentally no difference between doing so and using a right-of-way

23  without tribal consent to begin with.  Indeed, overburdening an easement is itself a trespass.

24  *Sanders*, 160 Wn.2d at 215.

25  　　　Moreover, again, if BNSF's arguments are accepted, the Easement Agreement's 80-

26  year duration provision would likewise be unenforceable.  *See* BNSF Brief, at pg. 24, n. 28.  If

27

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 19

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

BNSF's arguments are accepted, it would have obtained a perpetual easement over Tribal land, without restriction and without Tribal consent.  This is starkly at odds with IRWA and the policies on which it is based.

There can be no dispute that the IRWA requires tribal consent for a right-of-way. Here, BNSF asserts the existence of a right-of-way — one of unlimited scope and duration — to which the Tribe did not consent. Under the IRWA and its implementing regulations, this is impermissible.

**F.     All the Cases Involving the Interplay Between Common Carrier Obligations and Tribal Rights Resolve Disputes in Favor of Tribal Rights**

The line of cases involving Southern Pacific Transportation Company and the Walker River Paiute Tribe, which are remarkably similar to the dispute between the Tribe and BNSF, vividly illustrate the error in BNSF's reasoning.

In *U. S. v. Southern Pac. Transp. Co.*, 543 F.2d 676 (9th Cir. 1976), the Ninth Circuit Court of Appeals held that Southern Pacific had been trespassing on the Paiute reservation since the late 1800s.   In that case, the Southern Pacific Transportation Company had continuously used a right-of-way through the Paiute reservation for railway purposes since 1882.  The tribe alleged that the railroad was and always had been a trespasser.  543 F.2d at 680.  The tribe sought an injunction against future trespass, along with monetary damages.  *Id*.

The railroad put forward numerous theories about why it should be deemed to have acquired a valid right-of-way across the reservation or, at the very least, a license. The court disagreed, and held that the railroad was a trespasser (except as to a small portion of the reservation that had been ceded to the United States in 1906):

> Although it may appear harsh to condemn an apparently good-faith use as a trespass after 90 years of acquiescence by the owners, we conclude that an even older policy of Indian law compels this result. Southern Pacific does not have and has never had a valid right-of-way across lands within the original 1874 executive order boundaries of the Walker River Reservation except through lands ceded by the Tribe to the United States in 1906. Southern Pacific has never had a revocable license to operate a Railway across the reservation.

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

1   *Id.* at 699.  In making its decision, the court observed that "[a]brogation of Indian treaty rights

2   is not lightly inferred from congressional acts."  *Id.* at 686.

3        While the railroad presented multiple arguments in favor of its position, it never once

4   argued that its common carrier obligations took precedence over the tribe's property rights.

5   Nor was there anything in the court's decision to suggest that that might be the case.[10]

6        Like BNSF here, Southern Pacific would not take no for an answer.   Shortly after the

7   adverse decision in *U.S. v. Southern Pac. Transp. Co.*, the railroad filed an application with the

8   Bureau of Indian Affairs for a right-of-way through the reservation.  As discussed in the

9   Tribe's opening brief, that application was rejected due to a lack of tribal consent, and the

10  Ninth Circuit held that, under the IRWA, such consent was an absolute prerequisite for a

11  railroad right-of-way over Indian lands. *Southern Pacific Transp. Co. v. Watt*, 700 F.2d 550,

12  556 (9th Cir. 1983), *cert. den.* 464 U.S. 960 (1983). As with the Paiute tribe's trespass case,

13  Southern Pacific never bothered to argue that its common carrier obligations in any way took

14  precedence over the Tribe's rights, and never once did the court suggest that that might be the

15  case.

16       Most instructive, however, is an Interstate Commerce Commission decision that was

17  issued eight years after the *Watt* decision, and that details the aftermath of that decision.  In the

18  case of *Southern Pacific Transp. Co. — Abandonment Exemption — in Mineral County, NV*

19  (I.C.C. Docket No. AB-12), 1991 WL 108066, the ICC considered Southern Pacific's request

20

21

22  _____

23  [10] This is not a surprising outcome.  As the Tribe argued in the previous litigation with Burlington Northern, the
    Interstate Commerce Commission had no authority over a right-of-way upon which a railroad had no legal right
    to remain and was effectively a trespasser.  *See* Supp. Brain Decl., at Ex. 48, pp. 13–14 (citing *Town of Conway v.*

24  *Atlantic Coast Line R. Co.*, 20 F.2d 250, 259–60 (E.D.S.C. 1926)). Moreover, the trespass cases cited by BNSF
    are not to the contrary. *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141 (8th Cir. 2015), *Waubay Lake Farmers Ass'n*

25  *v. BNSF Ry. Co.*, 2014 U. S. Dist. LEXIS 120160 (D.S.D. Aug. 28, 2014), and *A&W Properties Inc. v. Kansas*
    *City S. Ry. Co.*, 200 S.W.3d 342 (Tex. App. – Dallas 2006), all dealt with flooding caused by a railroad adjacent

26  to the property at issue. And, *State v. Illinois Cent. R.R. Co.*, 928 So.2d 60 (La. App. 2005), and *Mark Lange —*
    *Petition for Declaratory Order*, FD 35037, 2008 STB LEXIS 45 (STB Jan. 28, 2008), both involved situations

27  where the plaintiff came into title long after the construction of the railroad right-of-way at issue.

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 21

to abandon the portion of its railroad line that was subject to the Walker River tribe's trespass action. As the ICC explained:

> A right-of-way dispute involving SPT's use of the Paiute reservation trackage was a key factor leading to this abandonment. In 1976, the United States Court of Appeals for the 9th Circuit held that, for nearly a century, SPT and its predecessor (The Carson and Colorado Railroad Company) had trespassed on the Paiute reservation, because the treaty permitting the line to cross the reservation had not been ratified by the United States Senate. Accordingly, the Paiute tribe sought to eject SPT from the reservation. As such action would have severed the Mina Branch from its system, SPT began a prolonged effort to settle the right-of-way litigation and keep the Hazen Line intact.

1991 WL 108066, at *1.

The ICC outlined the settlement agreement between Southern Pacific and the Paiute tribe as follows:

> The agreement required SPT to pay $1.2 million and the United States to pay $1 million in trespass damages to the Paiute tribe; granted the Army a right to cross the reservation, contingent upon the grant of a right-of-way from the Secretary of the Interior; and required the Army to rehabilitate the Hazel Line between Wabuska and Thorne.

*Id.*

Significantly, the settlement agreement "preclude[d] the Army from conducting common carrier operations on the portion of the [right-of-way] that crosses the reservation."

*Id.* at *4.  As the ICC stated:

> SS 7a of the settlement agreement precludes the Army from operating the line as a common carrier. It is not clear, however, whether this is a prohibition against the use of the line itself for common carrier purposes or whether it would allow a third party to perform common carrier operations. Since the agreement contains detailed requirements as to how the Army will operate the line, we believe this clause prohibits common carrier operations altogether.

*Id.* at *1, n 5.  Thus, the litigation and settlement agreement terminated common carrier operations on the line, exactly what BNSF contends is impossible here.  But nowhere did the ICC suggest that this provision of the settlement agreement was improper or that the Commission's authority or approval was needed to give it force and effect.  Instead, the ICC took the termination as *fait accompli*.

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 22

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

1     Further, the ICC also observed that "the transportation of nuclear waste over the
2  Wabuska-Thorne segment of the Hazen Line is prohibited under the settlement agreement
3  reached in the Paiute reservation litigation." *Id*. at *4.  There is similarly nothing whatsoever
4  in the decision suggesting that the ICC believed this was an inappropriate tribal attempt to
5  "regulate" rail operations or that it was otherwise an unreasonable interference with interstate
6  commerce.
7     The ICC concluded that abandonment of the rail line was permissible, in large part due
8  to the fact that the railroad could not make use of the right-of-way in light of the trespass
9  litigation and subsequent settlement agreement. *Id*.  Nowhere in the ICC's decision did the
10  Commission state that it had been in any way inappropriate for the railroad to cease its
11  common carrier operations pursuant to the adverse court decision and settlement agreement,
12  nor did it suggest that Southern Pacific's common carrier obligations should somehow
13  override the Ninth Circuit's decision.
14     Indeed, a comment the ICC made in reaching its decision illustrates precisely the
15  contrary.  The settlement agreement provided in part that Southern Pacific would discontinue
16  its common carrier operations with regard to a portion of the right-of-way that was not on the
17  reservation. *Id*. at *1. Tellingly, the ICC observed that the railroad was required to obtain
18  either abandonment authority or an exemption to discontinue its common carrier operations on
19  that portion of the line.  *Id*. at *1, n 4. The ICC made no such statement with respect to the
20  portion of the line that was subject to the tribe's trespass suit, but simply took it as a given that
21  common carrier operations were no longer possible on the reservation due to the Ninth
22  Circuit's decision.  Thus, plainly, the ICC did not believe that the railroad's common carrier
23  obligations took precedence over the court decision or resultant settlement agreement.  On the
24  contrary, the ICC plainly believed that the portion of the right-of-way that was subject to the
25  trespass suit and settlement agreement was no longer under its authority.
26
27

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 23

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 ● FAX (206) 682-2992

The *Star Lake* line of cases ("*Star Lake*") similarly show that tribal rights are given precedence over common carrier obligations.  There, the Star Lake railroad had obtained a right-of-way to build its railroad, based on the consent of the Navajo Tribe and various owners of allotted lands held in trust by the United States.  However, many of those owners later claimed, in proceedings before the ICC, that Star Lake had made false and misleading statements in obtaining their consent. *New Mexico Navajo Ranchers Ass'n v. Interstate Commerce Comm'n*, 702 F.2d 227, 230 (D.C. Cir. 1983).  The ICC ignored the allegations and granted Star Lake permission to build the railroad, "subject to whatever corrective action the Department of the Interior might choose to take." *Id.*  The owners later revoked their consent and, therefore, the Interior Department refused Star Lake permission to build the railroad on tribal land. *Id.* at 231.  The Court of Appeals for the D.C. Circuit held that the ICC had acted improperly in granting Star Lake permission to build the railroad before the Interior Department had weighed in:

> [W]e do not believe that the ICC properly defers in this case by itself granting permission before action on the allegations has been taken by the Interior Department.  Rather, where, as here, a factual question within the primary responsibility of a sister agency is relevant to the ICC's determinations, the ICC should ordinarily defer by staying its decision pending a determination of the issues by the sister agency and then considering and acting upon that agency's findings.

*Id.* at 232–33.

Later, after Star Lake failed for two years to construct the railroad line, the Navajo Tribe requested that the BIA terminate the right-of-way, based on a provision of the right-of-way grant stating that it could be terminated if Star Lake failed to use it for a consecutive two-year period. *Star Lake R. Co. v. Lujan*, 737 F. Supp. 103, 105 (D. D.C. 1990).  After giving Star Lake the opportunity to correct the problem, the BIA terminated the right-of-way. *Id.* at 106. The United States District Court affirmed the action, a decision that had been upheld at all levels of administrative appeal, recognizing "the weighty rule that statutes and regulations intended to benefit Indians be liberally construed in their favor." *Id.*

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 24

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

1  Significantly, in one of those administrative decisions, *Star Lake R.R. Co. v. Area*

2  *Director*, 94 Int. Dec. 353, 15 IBIA 220 (1987), the Interior Board of Indian Appeals observed

3  that the right-of-way grant at issue in the case stated that it "shall terminate in accordance with

4  the provisions of 25 C.F.R. [Part 169] and the Interstate Commerce Act." 15 IBIA at 242–43

5  (emphasis added). Nevertheless, there was no argument or finding in that case or *Lujan* that

6  the terms of the Interstate Commerce Act in any way took precedence over the IRWA with

7  respect to termination of the right-of-way.

8  Indeed, as BNSF points out, the court in *Lujan* did indicate that the BIA decision to

9  uphold the termination "does not conflict with federal statutes, policies, or case law." 737 F.

10  Supp. at 106. Plainly, this includes statutes, policies, or case law that would otherwise have

11  protected Star Lake based on its common carrier obligations — including the Interstate

12  Commerce Act. And, indeed, nothing in any of the *Star Lake* cases in any way suggests that

13  such common carrier obligations can override tribal rights, under IRWA or otherwise.

14  **G.   BNSF's Arguments Ignore the Status of the Tribe as a Sovereign Entity**

15  A fundamental flaw in BNSF's position is that it fails to recognize the unique status of

16  Indian tribes and the federal laws governing them.  As the United States Supreme Court has

17  pointed out, "'Indian tribes within 'Indian country' are a good deal more than 'private,

18  voluntary organizations.'' They 'are unique aggregations possessing attributes of sovereignty

19  over both their members and their territory.'" *Merrion v. Jicarilla Apache Tribe*, 456 U.S. 130,

20  140 (1982) (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)). And, "[a] hallmark

21  of Indian sovereignty is the power to exclude non-Indians from Indian lands." *Id*. at 141; *see*

22  *also Water Wheel Recreational Area, Inc. v. Larance*, 642 F.3d 802, 808 (9th Cir. 2011)

23  ("[W]e first acknowledge the long-standing rule that Indian tribes possess inherent sovereign

24  powers, including the authority to exclude.") (citing *New Mexico v. Mescalero Apache Tribe*,

25  462 U.S. 324, 333 (1983)).

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 25

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

1   Moreover, the fact that an Indian tribe grants a non-Indian the permission to enter onto

2   its lands does not in any way diminish the tribe's right to revoke that permission if the non-

3   Indian does not comply with the conditions of entry.  "When a tribe grants a non-Indian the

4   right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-

5   Indian as long as a non-Indian complies with the initial conditions of entry." *Merrion*, 456

6   U.S. at 144.  When, however, the non-Indian fails to comply, the power to exclude may be

7   exercised. *Water Wheel*, 642 F.3d at 11 ("[T]hrough its sovereign authority over tribal land,

8   the CRIT had power to exclude Water Wheel and Johnson, who were trespassers on the tribe's

9   land and had violated the conditions of their entry.") The provisions of the IRWA and

10  implementing regulations — giving the Secretary of the Interior the right to place conditions

11  on the right-of-way grant, codifying the necessity of tribal consent, and confirming the right to

12  terminate the grant if the grantee fails to comply with those conditions — rest on this very

13  principle.  Thus, "Indian sovereignty is not conditioned on the assent of a nonmember; to the

14  contrary, the nonmember's presence and conduct on Indian lands are conditioned by the

15  limitations the tribe may choose to impose." *Merrion*, 456 U.S. at 147.  Indeed, this is why the

16  ICC could not and did not object when the Paiute tribe in the *Southern Pacific* cases ousted the

17  railroad from its reservation and prohibited any further common carrier operations.

18  **H.    BNSF Ignores the Body of Case Law Holding That Federal Statutes Do Not
19        "Preempt" Other Federal Statutes**

20  Unsurprisingly, BNSF points to the provision of the ICCTA stating that it preempts

21  state "and federal" laws in support of its argument that the Tribe's right to enforce the

22  Easement Agreement are preempted.  But BNSF fails to address the reality that neither the

23  courts nor the STB take the ICCTA's federal preemption language literally.  BNSF likewise

24  fails to address the body of case law stating very clearly that federal enactments do not

25  preempt other federal enactments — even though BNSF was a party to at least one such

26

27

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 26

decision.  Again, as the court stated in *BNSF Ry. Co. v. Albany & E. R.R. Co.*, 741 F.Supp.2d 1184 (D. Or. 2010):

> [A]lthough a literal reading of section 10501(b) might suggest that it supersedes other federal law, the Board and the courts have rejected such an interpretation as overbroad and unworkable. Instead, the Board and the courts have harmonized section 10501(b) with federal statutes. . . .

741 F.Supp.2d at 1198 (quoting *CSX Trans., Inc. — Pet. for Decl. Order*, STB Fin. Docket No. 34662, 2005 WL 584026, at *8 (S.T.B. Mar. 14, 2005)).

While Congress may have used federal preemption language in the ICCTA, courts are uniform in holding that there is no such thing as federal preemption of another federal law. *See, e.g.*, *Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004).  Instead, in order for the ICCTA to have overridden Tribal rights under the IRWA, it would have to have impliedly repealed those rights.  *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004) (citing *Branch v. Smith*, 538 U.S. 254, 273 (2003)).

## I.      BNSF Is Asking the Court To Find That the ICCTA Impliedly Repealed the Provisions of the IRWA Meant To Protect Tribal Rights, but It Did Not

Nevertheless, BNSF states that the Tribe's arguments regarding implied repeal are "completely off base," on the ground that ICCTA merely precludes the use of the IRWA to interfere with BNSF's common carrier obligations. *See* BNSF Brief, at pg. 27, n. 31.  This argument is nonsensical and misses the point. The effect of BNSF's argument is that its common carrier obligations under the ICCTA would override any and all protections given to the Tribe under IRWA, including the right to dictate the terms on which consent to a right-of-way is granted, and the right to terminate the right-of-way if the railroad fails to abide by those terms.  If BNSF is correct, this would effectively be an implied repeal by the ICCTA of those provisions of the IRWA that are meant to protect tribal rights.

But again, there is nothing in the ICCTA suggesting that it was in any way intended to abrogate or diminish Indian rights under the IRWA.  As discussed above, Congress knows how to use express language ensuring that its federal enactments apply with equal force to

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 27

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 ♦ FAX (206) 682-2992

Indian tribes.  Again, Congress did just that in explicitly stating that tribes may not enact regulations purporting to affect the transportation of hazardous materials.  In contrast, nothing in the ICCTA states that it diminishes tribal rights or self-government.  Moreover, this silence regarding Indian tribes cannot be construed against the Tribe.  For example, in *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9 (1987), the Supreme Court considered whether the diversity statute, 28 U.S.C. § 1332, limited tribal sovereignty in the absence of express language so stating. The court concluded that it did not, stating that "the proper inference from silence . . . is the sovereign power . . . remains intact."  480 U.S. at 18 (citing *Merrion*, 455 U. S. at 149, n. 14). Likewise, in the absence of express language in the ICCTA to the contrary, the Tribe's sovereign power to place conditions on a non-Indian's entry onto its land, and statutory right to place conditions on grants of easements over its land, remains intact.

BNSF argues that harmonization of the ICCTA and the IRWA is not possible, and there is a "positive repugnancy" or an "irreconcilable conflict" between them.  As the Tribe explained in its opening brief, the two laws can easily be read in harmony.  But if they cannot, it is not the railroad's rights under the ICCTA that should prevail but, rather, tribal rights under the IRWA.  The policy of construing federal laws in favor of Indian tribes means the balance must tip in favor of tribal rights.   "[A]mbiguities in federal law have been construed generously in order to comport with . . . traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *Merrion*, 455 U. S. at 152 (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143–44 (1980)).  As the Ninth Circuit Court of Appeals has explained:

> Courts have uniformly held that treaties, statutes and executive orders must be liberally construed in favor of establishing Indian rights. Any ambiguities in construction must be resolved in favor of the Indians. These rules of construction "are rooted in the unique trust relationship between the United States and the Indians."

*Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996) (quoting *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985)) (internal

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 ● FAX (206) 682-2992

1   citations omitted).   Consequently, to the extent there is an irreconcilable conflict between

2   BNSF's common carrier obligations under the ICCTA and the Tribe's right to get the benefit

3   of its bargain under the Easement Agreement, that conflict must be resolved in favor of the

4   Tribe and its rights under the IRWA.

5           Moreover, the provision of 25 C.F.R. Part 169 cited by BNSF, stating that rights-of-

6   way granted under the auspices of the IRWA "[a]re subject to all applicable Federal laws,"  25

7   C.F.R. § 169.9, does not assist BNSF.  The regulations in 25 CFR Part 169 have been amended

8   effective April 21, 2016, and the section BNSF cites is a new addition to the rules. But only

9   the procedural provisions of the new rules apply to rights-of-way granted before the effective

10  date of the amendments.   Substantive provisions do not. *See* 25 CFR § 169.7. Plainly, a

11  provision relating to which laws govern the right-of-way is "substantive" in nature.  Therefore,

12  the new provision in no way affects the analysis.

13  **J.      BNSF's Voluntary Commitment Should Be Enforced**

14          Finally, BNSF attempts to distinguish this case from the body of case law holding that

15  voluntary commitments reflect a railroad's own determination that their enforcement will not

16  interfere with interstate commerce.  But BNSF does not persuasively rebut the logic behind

17  those cases — that, in entering into the agreement, the railroad made the market calculation

18  that the economic benefits to be gained by agreeing to a given condition were worth the

19  potential downside when that condition was later enforced. Nor does BNSF address the fact

20  that this logic is particularly applicable in a case involving a right-of-way grant under the

21  IRWA.  Again, BNSF knew very well that it could not get a legitimate right-of-way without

22  the Tribe's consent. BNSF therefore made the market calculation that certain concessions were

23  worth making to obtain the right-of-way. Having made that calculation and having

24  subsequently reaped the benefits of its bargain, BNSF cannot now use ICCTA preemption as a

25  shield to prevent its enforcement.

26

27

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 ● FAX (206) 682-2992

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## IV.    CONCLUSION

For the foregoing reasons, the Tribe respectfully request that the Court deny BNSF's summary judgment motion, and grant the Tribe's summary judgment motion, finding and concluding that the ICCTA does not preempt the Tribe's efforts to enforce the Easement Agreement.

DATED this 24th day of August, 2016.

**TOUSLEY BRAIN STEPHENS PLLC**

By:  */s/ Christopher I. Brain*
      Christopher I. Brain, WSBA #5054
      cbrain@tousley.com

By: */s/ Paul W. Moomaw*
      Paul W. Moomaw, WSBA #32728
      pmoomaw@tousley.com
      1700 Seventh Avenue, Suite 2200
      Seattle, Washington  98101-1332
      T:  206.682.5600
      F:  206.682.2992

**OFFICE OF THE TRIBAL ATTORNEY,
SWINOMISH INDIAN TRIBAL
COMMUNITY**

By: */s/  Stephen T. LeCuyer*
      Stephen T. LeCuyer, WSBA #36408
      slecuyer@swinomish.nsn.us
      11404 Moorage Way
      LaConner, WA  98257
      T:   360.466.1058
      F:   360.466.5309
      *Attorneys for Plaintiff*

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101-1332
TEL. (206) 682-5600 • FAX (206) 682-2992

1

## CERTIFICATE OF SERVICE

2

3          I hereby certify that on August 24, 2016, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to all

4

counsel of record.

5

6          DATED at Seattle, Washington, this 24th day of August 2016.

7

8                                              */s/ Christopher I. Brain*
                                               Christopher I. Brain, WSBA #5054
9                                              cbrain@tousley.com
                                               Attorneys for Plaintiff
10                                             Tousley Brain Stephens PLLC
                                               1700 Seventh Avenue, Suite 2200
11                                             Seattle  WA  98101
                                               Tel:  206.682.5600
12                                             Fax:  206.682.2992

13

14    5973/001/350931.1

15

16

17

18

19

20

21

22

23

24

25

26

27

OMNIBUS RESPONSE TO BNSF RAILWAY COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION FOR
SUMMARY JUDGMENT (No. 15-00543) - 31