THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SWINOMISH INDIAN TRIBAL
COMMUNITY, a federally recognized
Indian tribe,

                Plaintiff,

v.

BNSF RAILWAY COMPANY, a
Delaware corporation,

                Defendant.

No. 2:15-cv-00543-RSL

**BNSF RAILWAY COMPANY'S REPLY
IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT**

**NOTED FOR CONSIDERATION:
Friday, September 2, 2016**

BNSF RAILWAY COMPANY'S REPLY IN
SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II.  THE TRIBE'S CLAIM THAT IT CAN FORCE BNSF TO VIOLATE ITS
COMMON-CARRIER OBLIGATIONS IS CONTRARY TO THE CLEAR
RULE IN *BALTIMORE*. ............................................................................................ 3

III.  THE TRIBE'S EFFORTS TO BLOCK RAIL TRANSPORTATION ACROSS
THE EASEMENT VIOLATE ICCTA AND THE HAZMAT ACT. .......................... 5

    A.  ICCTA's Provisions Govern Here, and Provide an Additional Reason for
Rejecting the Tribe's Claims .................................................................................. 5

    B.  The Tribe's Claims Also Run Afoul of the Hazmat Act ...................................... 7

IV.  THE TRIBE CANNOT EVADE THE *BALTIMORE* RULE, ICCTA, AND THE
HAZMAT ACT BY INVOKING INDIAN SOVEREIGNTY AND IRWA. ................. 7

V.  THE ICC'S *SOUTHERN PACIFIC* DECISION ILLUSTRATES HOW
RAILROAD STATUTES AND REGULATIONS MUST BE APPLIED IN
THIS CONTEXT ....................................................................................................... 10

VI.  THE EASEMENT CANNOT BE INTERPRETED IN A WAY THAT
VIOLATES THE LAW, WHICH IS WHAT WOULD OCCUR UNDER THE
TRIBE'S INTERPRETATION. .................................................................................. 13

VII.  THE TRIBE DOES NOT CONTEST, AND THEREFORE CONCEDES, THAT
ITS ESTOPPEL ARGUMENT IS MERITLESS. ....................................................... 17

VIII.  CONCLUSION ........................................................................................................ 17

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1

**TABLE OF AUTHORITIES**

CASES                                                                 PAGE

2

3

*Bort v. Parker*,
110 Wn. App. 561 (2002) ................................................................ 14

4

5

*Gemperle v. Crouch*,
44 Wn. App. 772 (1986) .......................................................... 14, 15

6

*Iowa Mutual Insurance Co. v. LaPlante*,
480 U.S. 9 (1987) .......................................................................... 9

7

8

*Lawson v. State*,
107 Wn.2d 444 (1986) .................................................................. 15

9

10

*Lombardi v. Columbia Recovery Grp.*,
LLC, No. C12–1250 RSM, 2013 WL 5569465 (W.D. Wash. Oct. 9, 2013) ..................... 17

11

*Matter of Midway Airlines, Inc.*,
6 F.3d 492 (7th Cir. 1993) ............................................................ 15

12

13

*Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982) ............................................................... 1, 8, 9

14

15

*Muskogee Nat. Tel. Co. v. Hall*,
118 F. 382 (8th Cir. 1902) ............................................................. 8

16

*New Mexico v. Mescadero Apache Tribe*, 462 U.S. 324 (1983) ..................................... 8

17

*PCS Phosphate Co. v. Norfolk S. Corp.*,
559 F.3d 212 (4th Cir. 2009) ........................................................... 6

18

19

*Roth v. Norfalco LLC*,
651 F.3d 367 (3d Cir. 2011) ............................................................ 7

20

21

*Southern Pacific Transp. Co.—Abandonment Exemption—in Mineral County, NV* (ICC
Docket No. AB-12), 1991 WL 108066 (Jan. 16, 1991) ............................... 11, 12

22

*Southern Pacific Transp. Co.—Petition for Exemption—Abandonment Between Thorne and
Wabuska, Mineral and Lyon Counties, Nevada,* (ICC Docket No. AB-12 (SUB-NO.
136X), 1991 WL 40203 (March 12, 1991)...................................................11, 12

23

24

*Star L. R. Co. v. Lujan*,
737 F. Supp. 103 (D.D.C. 1990)........................................................ 12

25

*State v. Farmers Union Grain Co.*,
80 Wn. App. 287 (1996) ............................................................... 14

26

*Tanner Elec. Coop. v. Puget Sound Power & Light Co.*,
    128 Wn.2d 656 (2006).................................................................. 14

*Thompson v. Texas Mexican Ry. Co.*,
    328 U.S. 134 (1946) ................................................................ 10

*Township of Woodbridge v. Consolidated Rail Corp.*,
    5 S.T.B. 488, 2001 WL 283507 (STB served Mar. 23, 2001) ........................... 6

*United States v. Baltimore & O. R. Co.*,
    333 U.S. 169 (1948) .......................................................... passim

*United States v. Funmaker*,
    10 F.3d 1327 (7th Cir. 1993) ....................................................... 8

*Walsh v. Schlecht*,
    429 U.S. 401 (1977) .......................................................... 14, 15

*Waring v. Loomis*,
    48 Wash. 541 (1908) ......................................................... 14, 16

*Washington v. Confederated Tribes*, 447 U.S. 134 (1980) ....................................6

*Western Energy Alliance v. U.S. Department of the Interior*,
    1:16-cv-00050 (D. N.D.) ........................................................... 9

**STATUTES**

25 C.F.R. § 169.9 (2015).............................................................. 9

49 U.S.C. § 5125 ...................................................................... 7

49 U.S.C. § 10501(b).............................................................. 5, 6

49 U.S.C. § 11101(a) ................................................................. 5

11 U.S.C. §§ 365 ................................................................ 14, 15

**OTHER AUTHORITIES**

Restatement (Second) of Contracts § 203 (1981)....................................... 15

80 Fed. Reg. at 72503................................................................. 9

1    **I.      Introduction**

2        BNSF asks the Court to find that the Tribe did not obtain a right under the Easement to

3    prevent BNSF from meeting its common-carrier obligations.   Under the Supreme Court's

4    decision in *United States v. Baltimore & O. R. Co*., 333 U.S. 169 (1948), the Tribe could not

5    have obtained such a right.   *Baltimore* holds that a contract provision is unlawful to the extent it

6    requires a railroad to violate its common-carrier obligations.   ICCTA[1] and the Hazmat Act

7    require the same result.   ICCTA explicitly overrides state and federal law remedies that

8    interfere with the rights and obligations established under ICCTA.   The Hazmat Act expressly

9    prohibits Indian tribes from interfering with hazardous materials transportation.

10        The Tribe asks the Court to ignore these clear rules of federal law because the Tribe is a

11   sovereign entity within the U.S. federal system.   This would be reversible error, as confirmed

12   by the very caselaw the Tribe cites for its position.   The Supreme Court decision that, according

13   to the Tribe, allows Indian tribes to condition access to their land (*Merrion v. Jicarilla Apache

14   Tribe*, 455 U.S. 130 (1982)), specifically states that a tribe's access conditions must be

15   consistent with federal law.   The statute that, according to the Tribe, gives Indian tribes the

16   right to condition access to their land (IRWA) requires that easements be consistent with

17   federal law.   And the ICC cases the Tribe discusses at length to illustrate how ICCTA is

18   supposedly subservient to IRWA actually show that once common-carrier obligations on

19   existing rail lines are established, they cannot be abrogated by railroads or Indian tribes without

20   authorization from the STB.   The *Southern Pacific* cases, which the Tribe misreads, cogently

21   illustrate this principle.

22        BNSF told the Tribe in negotiating the Settlement Agreement and Easement that it

23   could not agree to override its federal law obligations.   The Easement recognizes in multiple

24   instances that BNSF is subject to federal law requirements, and the Settlement Agreement

25   ---
     [1] Unless otherwise stated, capitalized and abbreviated terms have the same meaning ascribed to them in BNSF
26   Railway Company's Cross-Motion for Partial Summary Judgment and Opposition to Plaintiff's Motion for
     Summary Judgment.

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 1
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

expressly states that "nothing" in the Easement shall "supersede any federal law or regulation." The Tribe nevertheless argues that it would not have agreed to the Easement if it had known that federal law limited the Tribe's ability to control traffic over the right-of-way. This factual assertion is at the heart of the Tribe's motion for summary judgment. According to the Tribe, the Easement could not have included such a restriction because the Tribe would never have agreed to it. As an initial matter, the Tribe supports this statement though an attorney declaration that relies on privileged communications, but the Tribe improperly refuses to produce the privileged communications that underlie its counsel's statement. In addition, the only declarations the Tribe submits to support this factual claim are based on inadmissible hearsay. The Tribe's motion therefore fails (even without considering the flaws in the Tribe's legal analysis) because it relies on disputed issues of fact: BNSF has submitted clear-cut evidence that it informed the Tribe that federal law restricted the ability of the parties to limit traffic over the Easement; the Tribe offers only inadmissible hearsay in response.

In contrast, BNSF's motion does not turn on disputed facts. Even if the parties had agreed to give the Tribe power to restrict BNSF's ability to meet common-carrier obligations, which they did not, federal law would not permit enforcement of such an agreement. Moreover, the requirement in the Easement that the Tribe act in a non-arbitrary manner must be defined within the context of federal law. Here, the Tribe's refusal to consent to the increased rail traffic can only be considered arbitrary under the Easement, Settlement Agreement, and federal law, because its decision—if upheld—would force BNSF to violate its common-carrier obligations. This is the only interpretation that can be given to the Easement's Section 7(c) that does not violate federal law. Thus, the Court should hold as a matter of law, and as a matter of contract interpretation, that the Tribe did not obtain a right under the Easement to prevent BNSF from meeting its obligations under federal law.

In its opposition, the Tribe intimates that BNSF "knew" that it had no right to operate the at-issue rail line in the absence of the Easement. The duration of the litigation resulting in

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 2
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ǀ Tel: 206.839.4800

the parties' settlement belies such a notion.  The Tribe did not win the prior litigation.  Nor did it receive a right under the Settlement Agreement and Easement to force BNSF to violate federal law.

## II.      The Tribe's Claim That It Can Force BNSF to Violate Its Common-Carrier Obligations Is Contrary to the Clear Rule in *Baltimore*.

The Supreme Court's decision in *Baltimore* is dispositive here.  In *Baltimore*, the Court held that a landowner cannot condition a railroad's access to property used for interstate rail transportation on a requirement that the railroad violate its common-carrier obligations.  The Court expressly rejected the landowner's argument that "an owner has the right to let others use his land subject to whatever conditions the owner chooses to impose."  *Baltimore*, 333 U.S. at 176–77.  The Court ruled:  "Property can be used even by its owner only in accordance with law, and conditions its owner places on its use by another are subject to like limitations." *Id*. at 177.  Railroads' obligations under federal law cannot be overridden by private agreements granting access to land.

The Tribe attempts to distinguish *Baltimore*, claiming that the situation in that case "is starkly different from the case at bar."  Opp. at 10:24.  This attempt rings hollow.  First, the Tribe states that *Baltimore* does not involve Indian land, the implication being that Indian tribes are somehow free from the constraints of federal law when they negotiate land access agreements.  As discussed below, the cases the Tribe cites for this proposition say just the opposite.

Second, the Tribe claims that *Baltimore* can be ignored because "[h]ere, the right-of-way grant itself placed conditions upon BNSF's use of the right-of-way," while the *Baltimore* case involved an amendment to the original easement grant.  Opp. at 10:24–25.  This original-versus-amendment contrast is immaterial.  The *Baltimore* Court did not distinguish between the ability of a landowner to violate federal law in the *initial* grant of access as opposed to a

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 3
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ǀ Tel: 206.839.4800

1   subsequent amendment to that initial grant.  The rule announced by the Court—that landowners

2   cannot condition access to land on a violation of federal common-carrier law—applies to both

3   the original grant of access and to subsequent amendments.  Nor does such a distinction make

4   sense.  The *Baltimore* rule applies on all fours here.

5        *Baltimore* is one of a long line of cases holding that private contracts may not be used to

6   override a railroad's common-carrier obligations.  *See* Cross-Mot. at 13:3–14:17.  In response,

7   the Tribe labors to avoid these cases by arguing that "none of the cases cited by BNSF involve

8   a party's efforts to enforce the conditions contained in the easement grant itself, as the Tribe is

9   attempting to do in this case."  Opp. at 9:19-21.  While true, the distinction the Tribe highlights,

10  between an easement and a contract, is irrelevant.  The rule in those cases—which the Tribe

11  eventually acknowledges (*see* Opp. at 13:9 ("Congressional acts sometimes override contracts

12  between private parties"))—applies with as much force to easements with railroads as to other

13  types of contracts with railroads.

14       In *Baltimore*, the parties to a trackage rights agreement expressly and unambiguously

15  agreed to terms that would force the railroad to violate its common-carrier obligations, and the

16  Court ruled that such an agreement is unenforceable.  The Tribe claims here that the parties to

17  the Easement reached a similar unambiguous agreement to override BNSF's common-carrier

18  obligations.  *See* Opp. at 8:17 ("the Easement is unambiguous").  Even if the Tribe were correct

19  that the parties expressly agreed to override BNSF's obligations—and it is not—*Baltimore*

20  would make the agreement to violate federal law unenforceable.

21       But the parties did not agree to override BNSF's federal law obligations.  Indeed, the

22  parties effectively adopted the *Baltimore* rule when they agreed, as part of the prior litigation's

23  settlement, that "Nothing in this Settlement Agreement or the associated Right-of-Way

24  Easement shall supersede any federal law or regulation as they now exist or as they may be

25  amended or changed from time to time."  Brain Decl. Ex. 28 at SITC000008137.[2]  The Tribe

26  _____

[2]  Numerous other provisions in the Settlement Agreement and Easement recognize what should be an

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 4
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

argues that it only intended to subject the Easement to those provisions of federal law that were favorable to the Tribe's interests.  *See* Opp. at 17:3–4 n.7 (stating the provision was "inserted by the Tribe, in order to protect its own interests" relating to rental payments).  But the Tribe cannot pick and choose among applicable federal law.  Even if the Tribe sought the protection of federal law only with respect to rental payments, as it claims, it did so with broad language subjecting the Easement to "any" federal law or regulation.  There is no ambiguity in this language.  The Tribe, BNSF, and the United States signed an agreement stating that the Easement could not supersede "*any* federal law or regulation."  *Baltimore* compels that result, and the parties' own agreement requires it.

### III.   The Tribe's Efforts to Block Rail Transportation Across the Easement Violate ICCTA and the Hazmat Act.

*Baltimore* makes clear that the obligations of a common carrier under federal law cannot be overridden through contracts granting a railroad access to land.  BNSF's motion can, and should, be granted on this legal principle alone.  In addition, ICCTA, and its broad preemption provision, as well as the Hazmat Act's express prohibition on interference with hazardous material transportation, supply independent reasons that achieve the same result.

#### A.   ICCTA's Provisions Govern Here, and Provide an Additional Reason for Rejecting the Tribe's Claims

It is not in dispute that BNSF has a common-carrier obligation here.  The rail line at issue is part of the interstate rail network subject to the STB's exclusive jurisdiction.  *See* 49 U.S.C. § 10501(b); *see also* Escobar Decl. Ex. C at 2; Escobar Decl. Ex. E at 5.  There is no dispute that BNSF has a statutory obligation to provide service on reasonable request.  *See* 49 U.S.C. § 11101(a).  There is also no dispute that the shippers have a need for service and that

---

unremarkable proposition, namely that the parties will be subject to and respect federal law requirements.  The Settlement Agreement states that "BN shall comply with all applicable federal laws and regulations pertaining to BN's activities within the Swinomish reservation."  Brain Decl. Ex. 28 at SITC000008138.  The Easement provides that BNSF "will comply strictly with all Federal and State Regulations regarding classifying, packaging and handling of rail cars . . . ."  Brain Decl. Ex. 29 at SITC000005527.

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 5
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ǀ Tel: 206.839.4800

their request for service triggers BNSF's service obligations under the statute.  *See* Escobar Decl. Ex. P (Verified Statement of Keith M. Casey at ¶¶ 5, 8, 12, 20), Ex. Q (Verified Statement of Michael A. Carr at ¶ 33).  The urgency of the shippers' need is reinforced by the pleadings they filed with the STB, in which they seek an order confirming their right to obtain service from BNSF over the line.

Given these undisputed facts, ICCTA preempts the Tribe's claim that it can force BNSF to violate BNSF's common-carrier obligations.  ICCTA expressly preempts any federal law (and state law) remedy, including attempts to enforce contracts, that would interfere with the STB's exclusive authority to regulate common-carrier service over rail lines that are part of the national rail network.  *See* 49 U.S.C. § 10501(b).  Although the Tribe initially devoted nearly five pages to its argument that ICCTA's preemption provision does not apply to contracts, in the face of BNSF's arguments to the contrary, the Tribe offers only a paragraph, without citation to the record or authority, in its latest response.  Opp. at 29:14–25.  In that paragraph, the Tribe claims that "in entering into the agreement, the railroad made the market calculation that the economic benefits to be gained by agreeing to a given condition were worth the potential downside when that condition was later enforced."  Opp. at 29:17–19.  The Tribe misses the point.  Whether a contract may restrict rail transportation and run afoul of ICCTA is not determined by the rail carrier; it is a matter of federal law independent from the railroad's judgment.[3]  A railroad is not permitted to contract out of its common-carrier obligations.  The cases, which the Tribe originally relied on, support this notion.  *See Township of Woodbridge v. Consolidated Rail Corp.*, 5 S.T.B. 488, 491, 2001 WL 283507 (STB served Mar. 23, 2001) ("[N]othing in the December 2000 decision was intended to bar Conrail, in a future court proceeding, from raising the argument, as a matter of contract interpretation that: (1) unreasonable interference with interstate commerce would result if these voluntary agreements

---

[3] The Tribe also fails to provide any evidence that BNSF made any kind of compromise or "market calculation" on the question of compliance with its common-carrier obligations.  Accordingly, in addition to being legally flawed, this argument about a deliberate "compromise" is unsupported by the record.

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 6
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1    are interpreted to cover Conrail's main line operations, and (2) in considering enforcement, the

2    court should give due regard to the impact on interstate commerce."); *PCS Phosphate Co. v.*

3    *Norfolk S. Corp.*, 559 F.3d 212, 221 (4th Cir. 2009) ("[t]his is not to say that a voluntary

4    agreement could never constitute an 'unreasonable interference' with rail transportation").

5    ICCTA can preempt private contracts and does so here.

6        **B.    The Tribe's Claims Also Run Afoul of the Hazmat Act**

7        The Hazmat Act expressly preempts any "requirement of a state … *or Indian Tribe*"

8    that differs from the Act's regulations over the transportation of hazardous materials.    49

9    U.S.C. § 5125 (emphasis added).    The Tribe tries to juke around this express preemption

10   provision by asserting that "[t]he Tribe is not attempting to 'regulate' the types of commodities

11   BNSF ships across the right-of-way; it is trying to enforce the express limitations on train

12   traffic."  Opp. At 13:17-19.  This is a distinction without a difference.  The Tribe admits that it

13   is trying to prevent Bakken crude from moving across the right-of-way.[4]   Whether this

14   restriction comes in the form of a tribal ordinance or in the form of a lawsuit to enforce a

15   contract provision is not material. *See, e.g.*, *Roth v. Norfalco LLC*, 651 F.3d 367, 378–79 (3d

16   Cir. 2011) ("[T]here is nothing in the HMTA to indicate that Congress did not wish to preempt

17   state common law requirements. We are thus left with a robust preemption provision that

18   leaves little, if any, room for non-federal regulation.").[5]   The Hazmat Act accordingly provides

19   yet another independent reason why the Tribe's claims cannot stand.

20   **IV.    The Tribe Cannot Evade the *Baltimore* Rule, ICCTA, and the Hazmat Act by**
21   **Invoking Indian Sovereignty and IRWA.**

22       At bottom, the Tribe's position is that the Tribe does not have to comply with federal

23   law because of "the unique status of Indian tribes and the federal laws governing them."  Opp.

24   ———————————————

25   [4] *See, e.g.,* Escobar Decl., Ex. R at 12:19–13:19 ("Q:  So all the reasons [for the Tribe currently opposing the shipment of Bakken crude oil across the Easement] are safety concerns?  A:  Yes, sir.").

26   [5] Although BNSF cited *Roth* in its opening brief, the Tribe does not address the case or the proposition that the Hazmat Act preempts legal actions in addition to tribal laws.

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1    at 25:15–16.  The cases on which the Tribe relies for this proposition say just the opposite.

2        According to the Tribe, Indian tribes, as sovereigns, have the right to exclude non-

3    Indians from their land because "[a] hallmark of Indian sovereignty is the power to exclude

4    non-Indians from Indian lands."  Opp. at 25:21–22 (citing *Merrion*, 455 U.S. at 141).  As the

5    Tribe points out, the *Merrion* Court further stated that the right to exclude means that a non-

6    Indian's "presence and conduct on Indian lands are conditioned by the limitations the tribe may

7    choose to impose." Opp. at 26:14–15 (citing *Merrion*, 455 U.S. at 147).  The Tribe, however,

8    conveniently ignores the portion of the decision that qualifies these statements.  The Court went

9    on to explain that an Indian "tribe has the sovereign power of determining the conditions upon

10   which persons shall be permitted to enter its domain . . . *provided only such determination is*

11   *consistent with applicable federal laws*."  *Id.* at 147 n.12 (quoting Cohen, Handbook of Indian

12   Law, at 439) (emphasis added).

13       The *Merrion* Court recognized that Indian tribes, as sovereigns, have broad powers to

14   govern their internal affairs.  They are not, however, above federal law, and this is particularly

15   true in the context of interstate commerce and interstate rail transportation.  *See, e.g., Muskogee*

16   *Nat. Tel. Co. v. Hall*, 118 F. 382, 385 (8th Cir. 1902) ("[w]hat a state cannot do, because it

17   operates as an obstruction to the free flow of interstate commerce, the Creek Nation … cannot

18   do."); *United States v. Funmaker,* 10 F.3d 1327, 1330–31 (7th Cir. 1993) ("The decision-

19   making power of Indian tribes ends, however, at the point when those decisions would violate

20   federal law designed to safeguard important federal interests such as the free flow of interstate

21   commerce.").  As the Supreme Court explained in *New Mexico v. Mescadero Apache Tribe*,

22   "tribes retain any aspect of their historical sovereignty not 'inconsistent with the overriding

23   interests of the National Government.'"  462 U.S. 324, 332 (1983) (quoting *Washington v.*

24   *Confederated Tribes*, 447 U.S. 134, 153 (1980)).  Here, the Tribe seeks to prohibit interstate

25   movements of crude oil across the Easement, contrary to the strong national interest in

26   precluding local interference with such transportation, as reflected by ICCTA and the Hazmat

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 8
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ǀ Tel: 206.839.4800

1    Act.  The Tribe does not have the right to override the national interests reflected in those

2    federal laws.[6]

3          The Tribe's reliance on IRWA is misplaced for the same reason.  The Tribe claims

4    "IRWA allows the Tribe to place conditions on its consent to a right-of-way." Opp. at 18:20.

5    Although IRWA's consent requirement implicitly gives Indian tribes some discretion to

6    establish conditions of access, nothing in IRWA remotely suggests that Indian tribes may

7    establish conditions that violate federal laws.  Consistent with *Merrion*, the IRWA regulations

8    explicitly state that "rights-of-way approved under [IRWA] . . . [a]re subject to all applicable

9    federal laws."  25 C.F.R. § 169.9 (2015).  Ignoring the *Merrion* decision, which predates the

10   Easement, the Tribe erroneously claims that this regulation is a "new" substantive provision

11   that does not apply to existing rights-of-way.  Opp. at 29:8–12.  But the BIA itself noted during

12   the rulemaking process that this provision is a clarification of *existing* law, not a new policy or

13   change in the BIA's position.  *See Preamble to Final Rule*, 80 Fed. Reg. at 72503 ("Final 169.9

14   clarifies that rights-of-way are generally subject to Federal and tribal law, but not state law.").[7]

15         The Tribe spills much ink discussing IRWA's provisions relating to termination of a

16   right-of-way.  According to the Tribe, if Indian rights-of-way are subject to federal law, "the

17   Secretary of the Interior could *never* terminate a railroad right-of-way due to a failure to

18   comply with its terms and conditions, because to do so would interfere with the railroad's

19

20   ⎯⎯⎯⎯⎯⎯⎯⎯

[6] The Tribe concedes that Congress expressly precluded interference by Indian tribes with the transportation of
21   hazardous materials.  Opp. at 28:1–3.  But the Tribe argues that it can ignore ICCTA because ICCTA does not
     specifically refer to Indian tribes, citing *Iowa Mutual Insurance Co. v. LaPlante,* 480 U.S. 9, 18 (1987).  The *Iowa*
22   *Mutual* case is irrelevant because it involved federal law interference with tribal self-government (tribal court
     jurisdiction) where Congress's intent must be clearly expressed.  The Tribe does not argue (nor could it) that
23   ICCTA interferes with tribal self-government.  Rather, the Tribe's argument is that ICCTA must defer to *another*
     *federal law*–IRWA.  But ICCTA expressly states, without exception, that remedies under other federal laws are
     preempted if they interfere with the STB's regulation of interstate rail transportation.  This case presents a
24   straightforward application of the ICCTA preemption statute.
[7] The Department of Interior reiterated this when the new regulations were challenged.  *See DOI Opp'n to Mot. for*
25   *Prelim. Inj'n*, *Western Energy Alliance v. U.S. Department of the Interior et al.*, 1:16-cv-00050, Doc. 21, at 28 (D.
     N.D.) ("The Final Rule *confirms* that 'rights-of-way approved under [the Final Rule]…[a]re subject to all
26   applicable Federal laws.'") (emphasis added).  The challenge to the new regulations was voluntarily dismissed.
     *Western Energy Alliance v. U.S. Department of the Interior*, 1:16-cv-00050, Doc. 40 (D. N.D.).

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 9
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

common carrier obligations." Opp. at 19:11–14.  Similarly, the Tribe claims that if rights-of-way are subject to federal law, BNSF "would have obtained a perpetual easement over Tribal land. . . ." Opp. at 20:1.

The Tribe misunderstands both BNSF's position in this case and the applicable federal law.  ICCTA does not provide that common-carrier obligations over lines that are part of the national rail network can never be suspended or eliminated.  What ICCTA provides is that common-carrier obligations on a line must continue until the STB concludes that it is in the public interest to abandon a line or to suspend common-carrier service on the line.[8]  Congress has decided that determinations regarding the national network must be made by the STB, within the framework of ICCTA and under a public-interest standard, and not by private parties acting in their own self-interest.  As discussed in the next section, that is precisely the holding of the cases that the Tribe cites regarding the interaction between ICCTA and IRWA.

## V.      The ICC's *Southern Pacific* Decision Illustrates How Railroad Statutes and Regulations Must Be Applied in This Context.

The Tribe claims that the dispute between the Southern Pacific Transportation Company and the Walker River Paiute Tribe in the 1970s and 1980s "is remarkably similar to the dispute between the Tribe and BNSF" and "vividly illustrates" how Indian rights interact with ICCTA rights and obligations.   Opp. at 20:10–12.  BNSF agrees.  However, the Tribe grossly misstates the holding of these cases through an apparent misreading of their facts.  The ICC decision the Tribe references, along with a companion case that the Tribe overlooks, demonstrate definitively that a tribe's right to condition access to land must comport with—not supersede—ICCTA's requirements.  Indeed, these cases show that any attempt by an Indian tribe to avoid common–carrier requirements on tribal land **must** be approved by the STB under

---

[8]  As the Supreme Court held in *Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 145 (1946), even when an agreement permitting a railroad to use property expires, a railroad cannot cease providing common-carrier service without the ICC's (now STB's) authorization.

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 10
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ı Tel: 206.839.4800

1  ICCTA's public-interest standards.  The *Southern Pacific* cases dispose of the Tribe's entire

2  argument that ICCTA is subservient to Indian interests under IRWA.

3       The *Southern Pacific* cases involved a Southern Pacific ("SP") rail line in Nevada that

4  ran roughly north–south from a point near Wabuska in Lyon County, Nevada, at the north end

5  of the line, through Thorne, Nevada, which is near a U.S. Army facility, and ending at Mina,

6  Nevada, at the southernmost point.    *See Southern Pacific Transp. Co.—Abandonment*

7  *Exemption—in Mineral County, NV* (ICC Docket No. AB-12), 1991 WL 108066 at *1 and n.3

8  (Jan. 16, 1991) ("*Thorne-Mina Decision*").  The line consisted of two discrete line segments.

9  The Wabuska–Thorne portion of the line (the northern segment) served Army facilities located

10  near Thorne.  The Thorne–Mina segment (the southern segment) had, at one time, served

11  shippers in the mining industry.  By 1989, however, demand for transportation on this southern

12  line segment had disappeared altogether and there had been no traffic on it for over two years.

13  *Id*. at *2.  Based on the lack of transportation over the Thorne–Mina line segment, SP sought

14  and obtained permission from the ICC to abandon the line.  *Id*. at *2.  The tracks were removed

15  and sold for scrap.  *Id*. at *3.

16       The northern Wabuska–Thorne line segment was the subject of a different ICC

17  proceeding.   *See Southern Pacific Transportation Company—Petition for Exemption—*

18  *Abandonment Between Thorne and Wabuska, Mineral and Lyon Counties,* Nevada, (ICC

19  Docket No. AB-12 (SUB-NO. 136X), 1991 WL 40203 (March 12, 1991) ("*Wabuska-Thorne*

20  Decision").  This northern line segment served the Army facilities at Thorne, and it was also

21  the subject of the Paiute Tribe's trespass claims.  *Id*. at *1.  However, the northern line segment

22  did have an existing shipper—the Army—so it could not be abandoned for non-use, like the

23  southern segment.  Therefore, in settlement of the Paiute Tribe's trespass claims, the parties

24  decided that SP would discontinue common-carrier service over the line and sell the line to the

25  Army, which would operate the line for its own benefit as a private non-common carrier.

26  *Thorne Mina Decision,* 1991 WL 108066 at *1, 4.

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 11
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ǀ Tel: 206.839.4800

1     Contrary to the Tribe's claim in its opposition, this settlement could *not* have been

2 achieved without first obtaining the ICC's approval.  Based on an apparent misreading of the

3 underlying facts, the Tribe wrongly claims that "the ICC plainly believed that the portion of the

4 right–of–way that was subject to the trespass suit and settlement agreement was no longer

5 under its authority."  Opp. at 23:24–25.  To the contrary, the ICC expressly stated (and the

6 parties agreed), that "[SP] must obtain either abandonment authority or an exemption from the

7 Commission to discontinue its common carrier obligation over this portion of the line."

8 *Thorne-Mina Decision*, 1991 WL 108066 at n. 4.  And consistent with the ICC's mandate,  SP

9 asked the ICC for authority to abandon its common-carrier obligations on the Wabuska-Thorne

10 line segment, notwithstanding that the line segment had been the subject of the settlement with

11 the Paiute Tribe.  *Wabuska Thorne Decision*, 1991 WL 40203, at *1.  In granting SP's request,

12 the ICC explained that the proposed abandonment was the subject of a court-approved

13 settlement of the Paiute Tribe's trespass claims, but that "a rail line may not be abandoned

14 without prior Commission approval."  *Id*.

15     The *Star Lake* cases, also cited by the Tribe, similarly support BNSF's position.  These

16 cases involved attempts to build a new line over Indian land.  *See Star L. R. Co. v. Lujan,* 737

17 F. Supp. 103, 105 (D.D.C. 1990).  There, the railroad obtained in 1981 an easement that

18 expressly stated that the easement would be terminated if a rail line was not built within two

19 years.  *Id.*  While the railroad was in the lengthy process of obtaining permission from the ICC

20 to construct the new line, the BIA terminated the easement for non–use, under the terms of the

21 easement.  *Id.* at 106.  The ICC eventually gave the railroad authority to build the new line, but

22 that authority was subject to the explicit condition that the railroad obtain a valid easement.  *Id.*

23 The railroad never obtained an easement,  and as a result, it never constructed a line.

24     The *Southern Pacific* and *Star Lake* cases demonstrate how Indian rights under IRWA

25 are harmonized with the rights and obligations of shippers and railroads under ICCTA:  With

26 respect to *new* rail lines to be built over Indian land, tribes can refuse to provide consent to use

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 12
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ǀ Tel: 206.839.4800

their land for interstate rail transportation, as in *Star Lake*.  In the case of a new rail line that has yet to be built, there are no shippers reliant on rail transportation whose rights to service would be undermined, no railroad obligations to provide service that would be overridden, and no interference with the STB's exclusive authority to regulate rail transportation over lines in the national rail network.  However, when a rail line over Indian land is already part of the interstate rail network and is already subject to the STB's exclusive jurisdiction, common–carrier obligations over that line cannot be suspended, restricted, or removed without first obtaining the STB's regulatory approval.  Even if the parties to an easement over Indian land agree to remove common–carrier service over the rail line (as they did in *Southern Pacific*), and even if that agreement is approved by a court in settlement of an Indian's trespass claims (as in *Southern Pacific*), that agreement cannot be enforced or given effect unless approved by the STB.

As discussed below, the Tribe, BNSF, and the United States did not agree to give the Tribe the power to override BNSF's common–carrier obligations to serve the needs of shippers on the Anacortes line.  But even if they had, as the parties did in the *Southern Pacific* case, that agreement could not be given effect without obtaining the STB's approval.

## VI.  The Easement Cannot Be Interpreted in a Way That Violates the Law, Which Is What Would Occur Under the Tribe's Interpretation.

A primary focus of the Tribe's opposition is its argument that BNSF "has invented an imaginative reading of the right-of-way easement agreement" in claiming that the Easement did not give the Tribe a right to force BNSF to violate its federal law obligations.   Opp. at 1:1–2.  According to the Tribe, the "unambiguous" terms of the Easement (Opp. at 8:17) gave the Tribe the right to restrict BNSF's ability to respond to shipper needs "so long as the Tribe was not acting arbitrarily."  Opp. at 7:8.  But the argument begs the question—what constitutes an "arbitrary" refusal to consent to a traffic increase?  As BNSF explained in its motion, it would

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 13
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ı Tel: 206.839.4800

1   be arbitrary as a matter of law for the Tribe to force BNSF to violate its federal law obligations.

2   The Tribe ignores the maxim that contracts are to be interpreted in light of existing law.

3   *See Tanner Elec. Coop. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674 (2006)

4   ("[c]ontractual language also must be interpreted in light of existing statutes and rules of law."

5   (citing 3 Arthur L. Corbin, Contracts §551, at 198 (1960)); *Bort v. Parker*, 110 Wn. App. 561,

6   573 (2002); *State v. Farmers Union Grain Co.*, 80 Wn. App. 287, 292 (1996) ("Parties are

7   presumed to contract with reference to existing statutes.").  Nowhere in its response brief does

8   the Tribe address this point or mention the cases BNSF cites.  Instead, the Tribe points to

9   general authorities regarding contract interpretation that do not speak to the present situation in

10  which parties entered into a contract knowing certain federal law obligations that could not

11  be abrogated through contract.[9]  In contrast, BNSF's reading of the contract—that the Tribe's

12  discretion to restrict traffic increases is circumscribed by BNSF's federal law obligations—

13  acknowledges this reality and is the only reading that does not render portions of the Easement

14  illegal and unenforceable.  *See Walsh v. Schlecht*, 429 U.S. 401, 408 (1977) ("[A]mbiguously

15  worded contracts should not be interpreted to render them illegal and unenforceable where the

16  wording lends itself to a logically acceptable construction that renders them legal and

17  enforceable."); *Gemperle v. Crouch*, 44 Wn. App. 772, 774 (1986) ("The 2–hypotheses rule of

18  contract construction is that where the contract is susceptible of two constructions, the one

19  lawful and the other unlawful, the former will be adopted.") (internal quotations omitted);

20  *Waring v. Loomis*, 48 Wash. 541, 544 (1908).

21  The Tribe's interpretation of the Easement, under which it can restrict train/car traffic

22  for any conceivable reason and regardless of controlling law, cannot be given effect under

23  federal law, as discussed above.  Parties cannot contract around federal common-carrier

24

25  ───────────────

26  [9] Far from fraudulently inducing the Tribe to enter into the Settlement Agreement and Easement (Opp. at 18:9–10), in 1989 BNSF forthrightly and clearly warned the Tribe that BNSF "cannot agree" to abrogate its duty to serve shippers under federal law.  Brain. Decl. Ex. 32 at SITC000011050.

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 14
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ǀ Tel: 206.839.4800

obligations; the Tribe's interpretation contradicts this rule.[10]  The Tribe's interpretation would thus render certain provisions illegal and unenforceable, leaving them meaningless, which courts have held is the improper way to interpret contracts that can be given more than one meaning.  *See, e.g., Walsh*, 429 U.S. at 408; *Gemperle*, 44 Wn. App. at 774; Restatement (Second) of Contracts § 203 (1981) ("In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").[11]

BNSF's reading of the Easement acknowledges the undisputed fact that the parties knew they were contracting in the realm of federal regulation and gives effect to all terms in the Easement.  With respect to the negotiations, the Tribe makes the factual assertion, without citation to the record, that after BNSF insisted it needed flexibility regarding the number of trains/cars, BNSF "compromised" by giving the Tribe an absolute right to "reject such a request so long as it was not acting arbitrarily" (under the Tribe's expansive view of that term).  *See* Opp. at 16:8–17.  The Tribe ignores the record's realities.  After the Tribe proposed traffic restrictions, BNSF informed the Tribe it could not abide by such restrictions under the law.  *See* Brain. Decl. Ex. 32 at SITC000011050 ("as a common carrier railroad, Burlington Northern is obligated to handle such cars properly classified, package[d]and loaded to all destinations…. We cannot agree to a single train limitation, or to a limitation on the number cars.  At times,

---

[10] The fact that federal law supersedes private contracts is not a novel concept, even outside the railroad context addressed in *Baltimore*.  For example, in the bankruptcy context, Section 365 of the Bankruptcy Code gives a trustee the authority to assume a lease without the consent of the lessor, notwithstanding a consent provision in the lease that purports to restrict the assignment.  *See, e.g., Matter of Midway Airlines, Inc.*, 6 F.3d 492, 494 (7th Cir. 1993) (citing 11 U.S.C. §§ 365(a) & (f)(1)).

[11] The easement-interpretation cases the Tribe cites do not address agreements to which the rule regarding an illegal clause was germane.  Nor do the Tribe's cited cases grapple with our circumstances in which the reality is that the parties knew during negotiations that there were federal law restrictions that could affect the Easement. *See, e.g.*, Brain Decl. Ex. 32.  The only case the Tribe cites regarding interpreting contracts in the railroad context—*Lawson v. State*, 107 Wn.2d 444 (1986)—dealt with the distinguishable question of whether certain Washington statutes governing the transition of abandoned rail lines to trails were constitutional.  As the *Lawson* Court noted, the ICC approved the abandonment of the lines *before* the Washington constitutional issue arose.  *See Lawson*, 107 Wn.2d at 446.

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 15
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ⏐ Tel: 206.839.4800

depending upon business at the refineries, we must have flexibility with regard to the number of cars, which may exceed twenty-five or thirty."). It is implausible that the parties, after acknowledging BNSF's obligations under federal law and without any further discussion of the issue, decided to disregard federal law and give the Tribe a right to override BNSF's common-carrier obligations, and there is no evidence in the record to support the Tribe's implausible factual claim. *See Waring*, 48 Wash. at 544 ("This being the case, it will not be presumed that the parties intended to violate the law. On the contrary, it is a rule of interpretation that, when a contract is open to two constructions by one of which it would be lawful and the other unlawful, the former must be adopted.").

The only reading of the Easement that squares federal law, the parties' acknowledgement of that law during the negotiations, and the language of the contract, is the reading BNSF outlined in its opening brief: The Tribe obtained a qualified right to oppose increases in rail traffic when doing so would not violate federal law. The Tribe distorts BNSF's argument, claiming that "according to BNSF, the Tribe may only withhold its consent to an expanded use of the easement if the shipper is asking BNSF to do something illegal under federal law." Opp. at 6:14–16. Not so. BNSF's obligation under federal law is to provide service on reasonable request. It would certainly be unreasonable for a shipper to ask BNSF to violate federal law, but that is not the only circumstance under which a shipper's request for service would be unreasonable. As BNSF pointed out in its motion, the STB and courts have found other circumstances to justify a railroad's refusal to provide service. Cross-Mot. at 11:21–12:7. Accordingly, the Tribe is wrong to claim that the discretion it has to restrict traffic increases is "illusory."

The Tribe did not obtain a contractual right to force BNSF to violate the law. The parties agreed to an Easement under which the Tribe received rent for use of the right–of–way, a right to limit traffic when not required by shipper needs, a qualified right to limit traffic when

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 16
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1    shippers made a request to increase traffic, and where a traffic increase was required, the right

2    to a rental adjustment.

3    **VII.    The Tribe Does Not Contest, and Therefore Concedes, That Its Estoppel**
      **Argument Is Meritless.**

4

5            The Tribe did not respond to BNSF's assertion that the Tribe's estoppel argument is

6    unsupported by the facts, apparently conceding this point. *See Lombardi v. Columbia Recovery*

7    *Grp.*, LLC, No. C12–1250 RSM, 2013 WL 5569465, at *4 (W.D. Wash. Oct. 9, 2013) ("A

8    failure to respond may be treated by the Court as an admission that the argument has merit.")

9    (citing LCR 7(b)(2)).  The Tribe raised their estoppel argument before any depositions, and the

10   Tribe now appears to recognize that the facts obtained during depositions demonstrate that

11   BNSF never made false representations to the Tribe about its common–carrier obligations. *See*

12   Escobar Decl. Ex. R (Cladoosby Dep.) at 46:8–13, 47:4–49:2, 51:6–11, 56:8–60:25; Escobar

13   Decl. Ex. S (Charles Dep.) at 14:3–16, 18:2–20:24; Escobar Decl. Ex. T (Edwards Dep.) at

14   27:12–32:13; Escobar Decl. Ex. U (M. Wilbur Dep.) at 31:24–35:6; Escobar Decl. Ex. V

15   (Loomis Dep.) at 16:14–23:2, Escobar Decl. Ex. X (J. Wilbur Dep.) at 26:1–15, 28:3–22,

16   31:20–32:4, 35:14–36:4.    In fact, BNSF's representations were accurate and forthright

17   regarding the need to satisfy federal obligations to serve shipper needs. *See* Brain. Decl. Ex. 32

18   at SITC000011050.

19   **VIII.  Conclusion**

20

21           For the foregoing reasons, as well as those set forth in BNSF's cross–motion for

22   summary judgment, BNSF respectfully requests that the Court deny the Tribe's motion for

23   summary judgment and grant BNSF's motion.

24

25

26

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 17
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ׀ Tel: 206.839.4800

1    Respectfully submitted this 2nd day of September, 2016.

2                               *s/ Stellman Keehnel*
                               *s/ Andrew R. Escobar*
3                               *s/ Jeffrey B. DeGroot*
                               Stellman Keehnel, WSBA No. 9309
4                               Andrew R. Escobar, WSBA No. 42793
                               Jeffrey B. DeGroot, WSBA No. 46839
5                               DLA PIPER LLP (US)
                               701 Fifth Avenue, Suite 7000
6                               Seattle, WA  98104
                               Tel:    206.839.4800
7                               Fax:    206.839.4801
                               E–mail:  stellman.keehnel@dlapiper.com
8                               E–mail:  andrew.escobar@dlapiper.com
                               E–mail:  jeff.degroot@dlapiper.com
9
                               Attorneys for defendant BNSF Railway Company
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 18
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ׀ Tel: 206.839.4800

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that on September 2, 2016, I electronically filed the foregoing with the

3

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4

attorneys of record for the parties.

5

    Dated this 2nd day of September, 2016.

6

7

                            *s/ Andrew R. Escobar*

8

                            Andrew R. Escobar, WSBA No. 42793

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

WEST\270915905.3

BNSF RAILWAY COMPANY'S REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT - 19
No. 2:15-cv-00543-RSL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 ɪ Tel: 206.839.4800