UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
SWINOMISH INDIAN TRIBAL )
COMMUNITY, a federally recognized ) No. C15-543RSL
Indian tribe, )
 )
                       Plaintiff, )
    v. )
 ) ORDER REGARDING CROSS-
BNSF RAILWAY COMPANY, a ) MOTIONS FOR SUMMARY
Delaware corporation, ) JUDGMENT
 )
                       Defendant. )
_____)

      This matter comes before the Court on plaintiff's "Amended Motion for Summary Judgment" (Dkt. # 58) and defendant "BNSF Railway Company's Cross-Motion for Partial Summary Judgment" (Dkt. # 63). Plaintiff filed this suit in April 2015 alleging that defendant breached a Right-of-Way Easement Agreement ("Easement Agreement"), asserting claims of breach of contract and trespass, and seeking damages, declaratory judgment, and injunctive relief. Defendant raised preemption as an affirmative defense, arguing that plaintiff's claims are barred by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10501 *et seq*. Plaintiff filed a motion for a summary determination of the preemption defense. Defendant cross-moved on the preemption issue and seeks judgment in its favor on the breach of contract, trespass, and injunctive relief claims.

      Summary judgment is appropriate when, viewing the facts in the light most favorable to

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT

the nonmoving party, there is no genuine dispute as to any material fact that would preclude the entry of judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that show the absence of a genuine dispute of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." Krechman v. County of Riverside, 723 F.3d 1104, 1109 (9th Cir. 2013). Although the Court must reserve for the jury genuine issues regarding credibility, the weight of the evidence, and legitimate inferences, the "mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient" to avoid judgment. City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1049 (9th Cir. 2014); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties and having heard the arguments of counsel, the Court finds as follows:

## BACKGROUND

Plaintiff, the Swinomish Indian Tribal Community, is a federally-recognized Indian tribe organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 476. The Tribe is a successor to the signatories of the Treaty of Point Elliott of 1855, which established the Swinomish Reservation on Fidalgo Island, Washington, for the Tribe's "exclusive use." 12 Stat. 927, 1859 WL 10138 at *2 (signed Jan. 22, 1855). The reservation lands are held by the United States in trust for the Tribe.

In or around 1889, the Seattle and Northern Railway Company began constructing a rail line across the northern edge of the Swinomish Reservation. The Tribe objected, and the construction was temporarily halted while an agent of the Commissioner of Indian Affairs investigated. The local U.S. Attorney was "directed to institute proceedings to prevent the building of the railroad across the said Indian reservation." Dkt. # 33-1 at 13. In response, the railway company petitioned the Department of Interior, Office of Indian Affairs, to obtain consent to a right of way across the reservation. The Acting Commission notified the railway company that "in all cases where right of way for railroads through Indian reservations is not provided for by treaties or agreements by the United States with the Indians, congressional action is necessary to ratify agreements by railway companies with the Indians for such right of way &c." Dkt. # 33-1 at 10. There is no indication that Seattle and Northern Railway Company obtained approval from the Tribe, the Department of Interior, or Congress before completing the line.

In or around 1970, the Tribe contacted Seattle and Northern Railway Company's successor, Burlington Northern Railroad, regarding what it regarded as an on-going and unauthorized use of tribal lands. The parties were unable to come to an agreement and, in 1977, the Tribe requested that the United States bring a lawsuit against Burlington Northern for trespass damages and removal of the rail line. Dkt. # 33-1 at 15 and 18. Burlington Northern filed an application with the Bureau of Indian Affairs ("BIA") for a railroad right of way across the reservation, arguing that its right was established by the Act of March 2, 1899, 25 U.S.C. § 312. Dkt. # 33-1 at 24. The Tribe objected, and the application was denied. Dkt. # 33-2 at 4-5 and 15. Burlington Northern sought an administrative appeal, arguing that tribal consent was not required. Dkt. # 33-2 at 31-44. The Area Director of the BIA affirmed the decision, noting that "Congress had made it clear that the consent of tribes organized under the Indian Reorganization Act was essential before the United States could alienate interests in those tribe's trust lands . . . ." Dkt. # 33-3 at 47. A further appeal to the Assistant Secretary for Indian Affairs was denied on

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                 -3-

the same ground. Dkt. # 33-4 at 4.

Meanwhile, the Tribe filed a trespass action in this district against Burlington Northern seeking both damages and injunctive relief. Dkt. # 33-2 at 20-23. Burlington Northern filed a separate complaint seeking to compel the Secretary of the Interior to grant a right of way across the reservation. Dkt. # 33-4 at 8-14. The Tribe intervened in that matter, and the parties filed cross-motions for summary judgment on the issue of tribal consent. The Honorable Donald S. Voorhees deferred consideration of the motions until the Ninth Circuit issued a ruling in a factually similar case. Dkt. # 33-4 at 24-25. When the Ninth Circuit held that tribal consent is a condition precedent to the grant of a railroad right of way across tribal lands (S. Pac. Transp. Co. v. Watt, 700 F.2d 550 (9th Cir. 1983)), Burlington Northern acknowledged that the decision was contrary to its position. Summary judgment was entered in favor of the Tribe and the United States. Dkt. # 33-4 at 28-29. Burlington Northern appealed the decision to the Ninth Circuit, dismissing the appeal only after the Supreme Court denied the petition for certiorari in Southern Pacific.

The Tribe's suit for ejectment and damages remained pending in this district. The Interstate Commerce Commission ("ICC") sought leave to intervene, arguing that it had exclusive jurisdiction over whether abandonment of the rail line or discontinuance of rail transportation over a line, as sought by the Tribe, was in the national interest. Dkt. # 33-6 at 30-31. Judge Voorhees denied the motion as premature: the matter had been bifurcated, and the ICC's concerns regarding an appropriate remedy could be heard if and when liability were established. Dkt. # 33-7 at 2-3. The Tribe and Burlington Northern eventually negotiated a settlement of all outstanding matters through which Burlington Northern would submit to the BIA an application for a right of way easement on terms and conditions agreed to by the parties, and the Tribe would notify the BIA that it consented to the specified terms. Dkt. # 33-4 at 35. Both parties performed, and the BIA approved the settlement and granted the right of way on the

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT -4-

terms described in the Easement Agreement and under the authority of the Indian Right of Way Act of 1948 ("IRWA") and its implementing regulations. Dkt. # 33-5 at 3 and 33-8 at 21.

This action arises out of the Easement Agreement. Burlington Northern agreed to pay $125,000 as full payment "for all rent, damages and compensation of any sort, due for past occupancy of the right-of-way from date of construction in 1889 until January 1, 1989." Dkt. # 33-5 at 4. Thereafter, Burlington Northern would pay $10,000 per year, adjusted periodically based on the Consumer Price Index and changes in property values. The easement has an initial term of forty years, with two twenty year extensions at Burlington Northern's option. Burlington Northern promised to "keep the Tribe informed as to the nature and identity of all cargo transported by Burlington Northern across the Reservation" through annual disclosures and to "comply strictly with all Federal and State Regulations regarding classifying, packaging and handling of rail cars so as to provide the least risk and danger to persons, property and the natural environment of the Reservation." Dkt. # 33-5 at 10-11. Burlington Northern also promised that:

> unless otherwise agreed in writing, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the Reservation each day. The number of trains and cars shall not be increased unless required by shipper needs. The Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs. It is understood and agreed that if the number of crossings or the number of cars is increased, the annual rental will be subject to adjustment . . .

Dkt. # 33-5 at 11.

The Tribe alleges that BNSF Railway Company, Burlington Northern's successor, has breached the terms and conditions of the easement and that the overburdening of the right of way constitutes a trespass. Since at least 1999, BNSF had not complied with the cargo reporting requirement despite requests from the Tribe. In October 2011, the Tribe contacted BNSF about reports that Tesoro Refining & Marketing Company, LLC, one of the oil companies with

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                  -5-

operations in Anacortes, Washington, intended to ship – and BNSF intended to carry – crude oil in 100-car trains across the reservation. The Tribe reminded BNSF of its obligation to obtain written approval for any such increase in traffic and expressed concern regarding the impact of the proposed increase on the Tribe's recently-completed hotel development project. BNSF did not respond. Dkt. # 64-9 at 2-3. The Tribe sent a second letter in September 2012 when 100-car shipments from Tesoro began. In February 2013, BNSF confirmed that, in addition to the locals that serve the March Point refineries, unit trains of crude oil from North Dakota averaging 102 cars in each direction were crossing the reservation almost every day. The Tribe would not approve such shipments, and BNSF announced its intention to continue running the unit trains as it had been doing since 2012. This litigation followed, with the Tribe seeking declaratory and injunctive relief in addition to damages. The cross-motions for summary judgment raise three separate issues: (1) whether there has been a breach of contract; (2) whether the ICCTA preempts the Tribe's state law claims; and (3) whether the ICCTA preempts the remedies afforded by the IRWA for breach of the Easement Agreement.

## DISCUSSION

**A. Breach of Contract**

There is no genuine issue of fact regarding the existence of a breach in this case. BNSF's predecessor promised to keep the Tribe apprised of the cargo it was carrying and to limit the number of trains (and the number of cars in those trains) "unless otherwise agreed in writing." BNSF has breached both of those promises: it failed to timely disclose its cargo and it made no attempt to obtain the Tribe's written agreement to an increase in traffic across the reservation until long after the unit train shipments had begun. Regardless of whether the Tribe subsequently withheld its consent in an arbitrary manner, BNSF breached the Easement Agreement.

**B. Preemption of State and Local Regulation Under the ICCTA**

The Interstate Commerce Commission Termination Act of 1995 ("ICCTA") substantially

deregulated the railroad industry and replaced the ICC with the Surface Transportation Board ("STB"). Assoc. of Am. R.R. v. S. Coast Air Quality Mgmt. Dist., 622 F.3d 1094, 1096 (9th Cir. 2010); PCS Phosphate Co., Inc. v. Norfolk S. Corp., 559 F.3d 212, 218 (4th Cir. 2009). The STB has exclusive jurisdiction over "transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers," as well as the "abandonment, or discontinuance of" tracks. 49 U.S.C. § 10501(b). The remedies provided by the ICCTA "with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." Id.

Prior to 1995, state authorities had a role in administering the standards and procedures that governed transportation by rail carriers. See Staggers Rail Act of 1980, Pub. L. No. 96-448, § 214(c)(5), 94 Stat. 1895, 1915 (1980). Consolidating regulatory control in a federal agency was meant to prevent "the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation." Fla. E. Coast Ry. Co. v. City of W. Palm Beach, 266 F.3d 1324, 1338 (11th Cir. 2001) (*quoting* H.R. Rep. 104-311, at 96 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 808). The STB's exclusive sphere of influence reaches all state and local attempts to affect "transportation by rail carriers." It does not, however, reach every regulation that impacts a carrier in any way. "State and local regulation is appropriate where it does not interfere with rail operations. Localities retain their reserved police powers to protect the public health and safety so long as their actions do not unreasonably burden interstate commerce." Grafton & Upton R.R. Co., FD 35779, 2014 WL 292443, at * 5 (STB Jan. 22, 2014) (citing Green Mountain R.R. v. Vt., 404 F.3d 638, 643 (2d Cir. 2005)). See New England Cent. R.R., Inc. v. Springfield Terminal Ry. Co., 415 F. Supp. 2d 20, 27 (D. Mass. 2006) ("Courts have consistently found that state law that directly or indirectly regulates railroads is preempted by § 10501(b). In other words, preemption clearly applies where a claim will directly affect railroad transportation. On the other hand, where adjudication of a claim will address garden

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT            -7-

variety issues of negligence, without significant 'regulation' of the railroad, then preemption generally will not be appropriate.").

Where a restriction or limit on a rail carrier's activities arises not from state regulation but from a voluntary contractual agreement, the same basic analysis applies. Such agreements are enforceable as long as they do not interfere with the carrier's operations and/or unreasonably burden interstate commerce. See Pejepscot Indus. Park, Inc., FD 33989, 2003 WL 21108198, at * 15 (STB May 9, 2003) ("[W]e have in the past determined that a carrier cannot invoke the preemption provisions of 49 U.S.C. 10501(b) to avoid its obligations under a presumably valid and otherwise enforceable agreement that it has entered into voluntarily, where enforcement of the agreement would not unreasonably interfere with interstate commerce."). Thus, breach of contract claims are not preempted when the promise to be enforced will not affect "transportation by rail carriers," including the "rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers."[1] When determining whether a contract impermissibly regulates rail transportation or merely concerns a peripheral railroad activity, the existence of a voluntary agreement gives rise to an assumption that the railroad has already evaluated the effect of the promise and determined that it can perform under the contract without adversely impacting its common carrier obligations. For example, in PCS Phosphate, 559 F.3d at 221-22, the railroad promised to pay to relocate its rail line if necessary to accommodate the landowner's future operations. The court found that the contract was enforceable and not preempted because relocation would not affect the carrier's ability to service existing customers on the line. Although the existence of a voluntary agreement is not a guarantee that there is no unreasonable

---

[1] The STB regularly declines to hear and decide purely contractual disputes, even when it was involved in establishing or approving the contract. See Boston and Me. Corp. v. New England Cent. R.R., FD 34612, 2006 WL 47366, at * 2 (STB Jan. 9, 2006) (declining to exercise jurisdiction over a claim that defendant breached the detailed trackage rights terms and conditions adopted by the agency because "the court is better suited to resolving such fact-bound issues").

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT              -8-

burden on interstate commerce, the starting point of the analysis is "that the agreements reflect a market calculation" regarding the burden on rail operations versus its perceived benefits. Id. In Pejepscot Indus. Park, Inc. v. Me. Central R.R. Co., 297 F. Supp. 2d 326, 333 (D. Me. 2003), the court denied a motion to dismiss on preemption grounds, finding that a voluntary contract for the rail transportation of materials from plaintiff's facility was enforceable unless the railroad were able to show that it is unreasonably burdensome to interstate commerce. Similarly, in Township of Woodbridge v. Consol. Rail Corp., Inc., No. 42053, 2000 WL 1771044 (STB Nov. 28, 2000), the STB determined that a railroad's agreement to curtail idling of locomotives and the switching of rail cars during certain hours was enforceable in court. "These voluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce. Moreover, Conrail has not shown that enforcement of its commitments would unreasonably interfere with the railroad's operations." Id. at *3.

BNSF's promises to disclose the cargo it carries across the reservation, to seek the Tribe's written agreement prior to increasing the traffic over the rail line, and to pay an adjusted rental amount do not constitute the regulation of "transportation by rail carriers" or involve the "abandonment or discontinuance of" track. BNSF made those agreements after balancing the benefits of obtaining a right of way across Fidalgo Island against the recordkeeping, notification, negotiation, and payment obligations to which it agreed. The starting assumption is that these voluntary agreements can be enforced in state or federal court, and BNSF has not shown that compliance with these provisions would impose an unreasonable burden on interstate commerce. The problem, however, is that the Tribe does not seek only damages for past breaches, production of cargo lists, and compelled adjustment of the rental amount.[2] Rather, the Tribe

---

[2] To the extent the Tribe seeks this type of relief, the breach of contract claim is not preempted and may proceed.

seeks an injunction precluding the transportation of certain types of cargo over the reservation, and it has refused to negotiate regarding the number of trains and the appropriate rental amount because it disapproves of the cargo BNSF is carrying.

The Supreme Court has already determined that a "noncarrier owner of a segment of railroad track who contracts for an interstate railroad's use of the segment as part of its line [cannot] reserve a right to regulate the type of commodities that the railroad may transport over the segment . . . ." U.S. v. Baltimore & Ohio R.R. Co., 333 U.S. 169, 175 (1948). That sort of restriction goes to the heart of the railroad's operations as a carrier and flies in the face of the anti-discrimination purposes for which the Interstate Commerce Act was first enacted. Id. See also 49 U.S.C. § 10741(a)(1) ("A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part may not subject a person, place, port, or type of traffic to unreasonable discrimination."). No matter how voluntary the agreement or how strong the inducements were to promise the landowner whatever it demanded, a state law claim that would effectively require a common carrier to discriminate against a particular type of cargo and/or a particular region burdens interstate commerce and is therefore preempted. A significant portion of the relief requested by the Tribe is therefore unavailable in this forum, notwithstanding the Tribe's continued ability to seek damages, on-going disclosures, and an adjustment in the rental amount. See Cities of Auburn and Kent, Wash., FD 33200, 1997 WL 362017, at *6 (STB July 1, 1997) (STB's exclusive control over construction or abandonment of a rail line precludes local permitting processes that might delay or thwart those activities, but it does not preempt damage claims or enforcement actions for violations of local laws prohibiting or regulating the improper disposal of excavation wastes or the discharge of harmful substances).

**C. Preemption of Remedies Under the IRWA**

The Tribe argues that, regardless of the preemptive effect that the ICCTA may have on its state law claims, it must be permitted to pursue the remedies for breach of the Easement

Agreement that Congress made available to it under a federal statute, the Indian Right of Way Act of 1948, 25 U.S.C. §§ 323-328. BNSF points out that the ICCTA's preemption provision explicitly states that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under *Federal* or State law." 49 U.S.C. § 10501(b) (emphasis added). Despite its broad language, neither the STB nor the courts interpret § 10501(b) as preempting other federal statutes. BNSF Ry. Co. v. Albany & E. R.R. Co., 741 F. Supp. 2d 1184, 1198 (D. Or. 2010) (antitrust challenge to a rail line sale transaction that the STB had deemed exempt was not preempted); CSX Trans., Inc., FD 34662, 2005 WL 584026, at *8 (STB Mar. 14, 2005) ("[A]lthough a literal reading of section 10501(b) might suggest that it supersedes other federal law, the Board and the courts have rejected such an interpretation as overbroad and unworkable. Instead, the Board and the courts have harmonized section 10501(b) with federal statutes . . . ."); Boston and Me. Corp., FD 33971, 2001 WL 458685, at *5 (STB Apr. 30, 2001) ("[N]othing in section 10501(b) is intended to interfere with the role of state and local agencies in implementing Federal environmental statutes . . . ."); Borough of Riverdale, FD 33466, 1999 WL 715272, at * 5 (STB Sept. 9, 1999) (". . . Congress did not intend to preempt federal environmental statutes such as the Clean Air Act and the Clean Water Act.").

       Preemption is a function of the Supremacy Clause of the United States Constitution, which states that the Constitution, the laws of the United States, and all Treaties "shall be the supreme Law of the Land." Art. VI cl. 2. Under the Supremacy Clause, "state laws that 'interfere with, or are contrary to the laws of [C]ongress, made in pursuance to the constitution' are invalid." Wis. Pub. Intervenor v. Mortier, 501 U.S. 597, 604 (1991) (quoting Gibbons v. Ogden, 22 U.S. 1 (1824)) (alteration reflects original). "But federal statutes do not preempt other federal statutes." Ray v. Spirit Airlines, Inc., 767 F.3d 1220, 1224 (11th Cir. 2014). See also Baker v. IBP, Inc., 357 F.3d 685, 688 (7th Cir. 2004). Thus, with regards to the availability of remedies

under the IRWA, there is no issue of preemption. "Rather, this case involves the interplay between two statutory schemes created by Congress for different reasons and at different times." Id. The correct analytical framework is whether Congress explicitly or implicitly repealed the IRWA when it enacted the ICCTA.

As discussed above, neither the STB nor the courts view the reference to federal law in § 10501(b) as an explicit preemption of all federal law. The question, then, is whether the ICCTA contains "a clearly expressed congressional intention" to repeal the IRWA when the right of way at issue is held by a railroad. Morton v. Mancari, 417 U.S. 535, 551 (1974). "An implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute." Branch v. Smith, 538 U.S. 254, 273 (2003). "If an apparent conflict exists between ICCTA and a federal law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible." Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist., 622 F.3d 1094, 1097 (9th Cir. 2010). When construing statutes that touch on Indian law, special principles of construction apply that "are rooted in the unique trust relationship between the United States and the Indians." Oneida County v. Oneida Indian Nation, 470 U.S. 226, 247 (1985). At least one such canon is relevant here: that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Mont. v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985).

The rights the Tribe seeks to assert arise out of both a treaty and a federal statute. The Treaty of Point Elliott of 1855 established the Swinomish Reservation for the Tribe's "exclusive use." 12 Stat. 927, 1859 WL 10138 at *2 (signed Jan. 22, 1855). "[P]ossessing attributes of sovereignty over both their members and their territory" (U.S. v. Mazurie, 419 U.S. 544, 557 (1975), the Tribe has a right to exclude non-members from the reservation that is "too fundamental to be easily cast aside." U.S. v. Dion, 476 U.S. 734, 739 (1986). Treaty rights will

not be abrogated absent explicit statutory language indicating Congress' intent to invalidate or modify the right in question. Id. at 738-39. In 1948, Congress enacted the IRWA to make clear that a right of way across tribal lands can be obtained only with the Tribe's consent. 25 U.S.C. §§ 323-324. The Secretary of the Interior, exercising his authority to establish implementing regulations (25 U.S.C. § 328), specifically required prior written consent from the Tribe to obtain a right of way and made clear that any conditions on the consent constitute limitations on the easement, that the IRWA and the implementing regulations apply to railroad rights of way, and that a failure to comply with the conditions of the easement may result in termination of the right of way upon thirty days' written notice from the Secretary (25 C.F.R. §§ 169.3(a), 169.15, 169.18, 169.20, and 169.23).[3]

BNSF argues that the treaty right to exclude and the law and regulations recognizing that right have been abrogated by the ICCTA. In the absence of an explicit statement, "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." Menominee Tribe v. U.S., 391 U.S. 404, 412 (1968). "What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." Dion, 476 U.S. at 739-40. There is no such evidence in this case.

In enacting the ICCTA, Congress intended to substantially deregulate the railroad industry and prevent state and local regulations from filling the void and subverting the uniform federal scheme of minimal regulation for this nationwide form of transportation. The ICCTA and the IRWA generally operate in separate spheres, and both address important national policies that are not lightly thrown aside. The statutory spheres predictably intersect and conflict: when a

---

[3] The original regulations provided that the Secretary "shall" terminate a right of way if a breach went unremedied. 33 FR 19803 (Dec. 27, 1968). The regulations under 25 C.F.R. Part 169 were recently amended, effective April 21, 2016. Only the procedural provisions of the new rules apply to rights of way granted before that date.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                -13-

1 railroad holds a right of way across tribal lands, the IRWA allows the Secretary of the Interior to
2 terminate it, in whole or in part, while the ICCTA states that abandonment and discontinuance
3 proceedings are within the exclusive jurisdiction of the STB. The question is whether there is an
4 irreconcilable conflict between the statutes that leads to the conclusion that the IRWA was
5 implicitly repealed by the ICCTA. The starting point of the analysis is that the two enactments
6 are "capable of co-existence, [and] it is the duty of the courts, absent a clearly expressed
7 congressional intention to the contrary, to reward each as effective." Morton, 417 U.S. at 551.

8       The Court finds that there is no evidence to support a finding that Congress intended to
9 implicitly repeal the IRWA, and any conflict is not irreconcilable. The IRWA preceded the
10 ICCTA by almost half a century, and its sole focus is rights of way across tribal lands.
11 "Presumably Congress had given serious thought to the earlier statute, here the [the Secretary of
12 the Interior's power to enforce the easement conditions]. Before holding that the result of the
13 earlier consideration has been repealed or qualified, it is reasonable for a court to insist on the
14 legislature's using language showing that it has made a considered determination to that end . . .
15 ." Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 134 (1974). If Congress considered the
16 conflict between the STB's exclusive jurisdiction over rail transportation and the BIA's power to
17 enforce the conditions imposed on rights of way across tribal lands, it failed to mention it. It
18 most certainly did not make clear an intention to resolve potential conflicts by abrogating the
19 treaty right of "exclusive use" or repealing the IRWA. See Burlington N. R.R. v. Fort Peck
20 Tribal Executive Bd., 701 F. Supp. 1493, 1503-04 (D. Mont. 1988) (statute intended to further
21 railroad financial stability by prohibiting state taxation of railroad property "does not refer to
22 Indian tribes and the language of the Act can hardly be construed as providing a clear indication
23 that Congress intended to deprive various Indian tribes of their sovereign power to tax.").

24       Nor do the surrounding legislative, judicial, or agency pronouncements support the
25 conclusion that Congress intended to abrogate tribal rights granted by treaty and statute. A
26

federal agency's exclusive jurisdiction over rail transportation was not new in 1995. Under the Staggers Rail Act of 1980, Pub. L. No. 96-448, § 214(c)(5), 94 Stat. 1895, 1915 (1980), jurisdiction "over transportation by rail carriers, and the remedies provided in this title with respect to the rates, classifications, rules, and practices of such carriers" was exclusive. Courts interpreted the jurisdictional statement as having preemptive effect. See Fayus Enters v. BNSF Ry. Co., 602 F.3d 444, 448 (D.C. Cir. 2010) (summarizing cases). Nevertheless, between 1980 and 1995, the courts and the ICC recognized the "primary responsibility and presumably greater expertise" of the Department of the Interior over tribal affairs, often indicating a preference that Interior or the courts resolve tribal claims in the first instance. N.M. Navajo Ranchers Ass'n v. Interstate Commerce Comm'n, 702 F.2d 227, 232-33 (D.C. Cir. 1983). See also Idaho Pub. Util. Comm's v. Interstate Commerce Comm'n, 35 F.3d 585, 598 (D.C. Cir. 1994) (tribe's demand that railroad clean up pollution as part of abandonment process cannot be resolved by ICC and is properly raised in a civil action against the railroad); Star Lake R. Co. v. Lujan, 737 F. Supp. 103, 106-07 (D.D.C. 1990) (ICC issued a certificate of public convenience and necessity to construct a railway, but acknowledged that the authorization was permissive and that the railroad would first have to overcome a tribal claim of abandonment and termination before the BIA).

  Despite the interference of the Department of Interior and the courts whenever a right of way over tribal lands was at issue, Congress made no mention of the IRWA and did not otherwise attempt to address the intersection of tribal rights and transportation policy when it enacted the ICCTA in 1995. Once it came into existence, the STB continued to acknowledge the Department of the Interior's responsibility for granting rights-of-way across tribal lands, handling disputes between Tribes and holders of the rights of way, and enforcing the rights set forth in 25 C.F.R. Part 169. See Alaska R.R. Corp., FD 35095, 2010 WL 1266781, at *562 (STB Mar. 16, 2010). It has also deferred action or continued abandonment proceedings to give railroads a chance to settle disputes with affected tribes and to obtain necessary BIA approvals.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT   -15-

Wis. C. Ltd., No. AB-303, 2002 WL 273602, at *1 (STB Feb. 25, 2002). The Secretary of the Interior, for her part, substantially revised the IRWA's implementing regulations in 2016 to promote tribal self-determination and self-governance regarding Indian land, to emphasize that the regulations apply to railroad rights of way, and to provide an avenue through which a tribe may unilaterally terminate a right of way (without BIA approval). 25 C.F.R. §§ 169.1, 169.5(a)(1), 169.403. The new regulations do not provide any mechanism for STB review of a right of way termination: the Secretary obviously does not share BNSF's opinion that the ICCTA abrogated the BIA's authority to terminate a railroad right of way across tribal lands.

In short, there is no evidence that Congress actually considered the obvious potential for conflict between its establishment of the STB with exclusive jurisdiction over rail transportation and the Tribe's treaty right of "exclusive use" or the BIA's right to terminate a railroad right of way, much less that it affirmatively chose to resolve that conflict by abrogating the treaty or repealing the IRWA. The courts, the STB, and the Secretary of the Interior have all continued to recognize the BIA's primary responsibility in the area of intersection. "[A]pparently conflicting statutes must be read to give effect to each if such can be done by preserving their sense and purpose. . . . Also, where possible, we resolve legal ambiguities in favor of Indians" unless the plain intent of Congress compels the opposite result. Blackfeet Indian Tribe v. Mont. Power Co., 838 F.2d 1055, 1058 (9th Cir. 1988). The Court therefore finds that the ICCTA does not preempt or repeal the IRWA when a railroad right of way crosses tribal lands.[4] The rights and remedies afforded by the IRWA and its implementing regulations remain available to the Tribe, and the

---

[4] BNSF suggests that the Hazardous Materials Act, 49 U.S.C. § 5125, also preempts the IRWA. This argument fails for many of the same reasons as the ICCTA argument. In addition, the preemption provision of the Hazardous Materials Act applies unless another law of the United States (such as the IRWA) authorizes the identified obstacle to the transportation of hazardous materials.

BIA retains the power to enforce and/or cancel the right of way pursuant to 25 C.F.R. Part 169.[5]

For all of the foregoing reasons, the cross-motions for summary judgment (Dkt. # 58 and Dkt. # 63) are GRANTED in part and DENIED in part. The Tribe is entitled to a declaration that BNSF breached the terms of the Easement Agreement by failing to make annual disclosures regarding the cargo it was carrying across the reservation and by increasing the number of trains and cars traversing the reservation without first seeking to obtain the Tribe's written assent. The state law claims for damages, compelled disclosures, and an adjustment in rent are not preempted by the ICCTA. To the extent the Tribe seeks an injunction limiting the type of cargo or the number of trains or cars crossing the reservation – whether under a breach of contract, trespass, or estoppel theory – those remedies are unavailable in this jurisdiction. The Tribe may seek a declaration of its contractual rights from the STB and/or it may initiate the right of way cancellation procedures provided under in the IRWA and its implementing regulations.

Dated this 13th day of January, 2017.

Robert S. Lasnik
United States District Judge

---

[5] At oral argument, the Tribe suggested that if the Department of the Interior has the power to terminate the right of way agreement for breach of its terms and limitations, this Court must have the power to enforce those same terms and limitations. No legal theory or authority is offered in support of this argument. As discussed in the text, the Tribe's state law claims for injunctive relief are preempted because that relief would regulate rail transportation. Although damage claims can be adjudicated in this jurisdiction, its avenue for preventing the unit trains of crude oil from North Dakota from crossing the reservation lies with the BIA pursuant to the terms and procedures set forth in the IRWA and its implementing regulations.