1          UNITED STATES DISTRICT COURT

2       WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3  _____

                              )
4   SWINOMISH INDIAN TRIBAL        ) C15-00543-RSL
    COMMUNITY, a federally         )
5   recognized Indian tribe,       ) SEATTLE, WASHINGTON
                              )
6                  Plaintiff,      ) December 15, 2016
                              )
7   v.                             ) Motion Hearing
                              )
8   BNSF RAILWAY COMPANY, a        )
    Delaware corporation,          )
9                              )
                   Defendant.      )
10                             )

11  _____

12          VERBATIM REPORT OF PROCEEDINGS
       BEFORE THE HONORABLE ROBERT S. LASNIK
          UNITED STATES DISTRICT JUDGE
13  _____

14  APPEARANCES:

15  For the Plaintiff:      Christopher I. Brain
                           Paul W. Moomaw
16                          Tousley Brain Stephens
                           1700 Seventh Avenue
17                          Suite 2200
                           Seattle, WA  98101
18
                           Stephen T. LeCuyer
19                          Office of the Tribal Attorney
                           Swinomish Indian Tribal Community
20                          11404 Moorage Way
                           La Conner, WA 98257
21

22  For the Defendant:      Stellman Keehnel
                           Jeffrey B. DeGroot
23                          Andrew R. Escobar
                           DLA Piper U.S.
24                          701 Fifth Avenue
                           Suite 7000
25                          Seattle, WA  98104

1          THE COURT:  Good morning.  Thank you.  Please be seated.

2          THE CLERK:  Case C15-543-L, Swinomish Indian Tribal

3    Community v. BNSF Railroad Company.

4       Counsel, would you please rise and make your appearances?

5          MR. BRAIN:  Chris Brain representing the Tribe.

6          THE COURT:  Okay.

7          MR. MOOMAW:  Paul Moomaw representing the Tribe.

8          MR. LECUYER:  Stephen LeCuyer representing the Tribe.

9          THE COURT:  Great.  Thank you.

10          MR. KEEHNEL:  Good morning, Your Honor.  Stellman

11   Keehnel of DLA Piper for Burlington Northern Santa Fe.

12          MR. DEGROOT:  Jeff DeGroot on behalf of BNSF.

13          THE COURT:  Great.

14          MR. ESCOBAR:  Good morning, Your Honor.  Andrew Escobar

15   with DLA Piper on behalf of BNSF as well.

16          THE COURT:  Thank you very much.

17          MR. KEEHNEL:  And, Your Honor, this morning, two counsel

18   from Burlington Northern Sante Fe, David Rankin, Senior General

19   Attorney, and Tyler White, General Attorney.

20          THE COURT:  Great.  Welcome.

21          MR. KEEHNEL:  Up from Texas to say hi.

22          THE COURT:  And you have some clients with you also,

23   Mr. Brain.

24          MR. BRAIN:  Yes, I do, Your Honor.  I have three

25   senators with me.  I have Chairman Brian Cladoosby.

1              THE COURT:  Welcome.

2              MR. BRAIN:  I have Leon John.

3              THE COURT:  Hello.

4              MR. BRAIN:  And I also have Kevin Paul.

5              THE COURT:  Great.  Thanks very much.  I appreciate you

6      all being here.

7          All right.  Mr. Brain, we will start with your summary

8      judgment motion, and then we will have a response from Burlington

9      Northern, and then their summary motion, and the response, you

10     will respond to theirs and reply to yours, and then Mr. Keehnel

11     can reply on his, okay?

12             MR. BRAIN:  Thank you, Your Honor.

13         The issue before this Court on these motions is really fairly

14     simple, fairly direct.  The question is, does 25 U.S.C. 323

15     through 328 control, or does 49 U.S.C. 10501(b) trump the express

16     terms of the right-of-way authorized by 25 U.S.C., which we refer

17     to as the Indian Right-of-Way Act.

18         We submit that the statutory scheme and case law compel

19     denial of preemption by the ICCTA.  BNSF relies on generic

20     reference in 10501(b), and I will read that to you.  It says,

21     "Except as otherwise provided in this part, the remedies provided

22     under this part with respect to regulation of rail

23     transportation are exclusive and preempt the remedies provided

24     under Federal or State law."

25         The issue is, does this reference to a generic federal law

1    preempt other federal laws?  The issue of preemption is that it

2    arises out of the U.S. Constitution Supremacy Clause, but that

3    clause only references state and local jurisdictions.  And I will

4    quote that clause.  It states the laws of the U.S. "shall be the

5    supreme law of the land; and the judges in every state shall be

6    bound thereby, anything in the Constitution or laws of any State

7    to the contrary notwithstanding.

8        The IRWA is a specific federal law.  We are not dealing with

9    state laws or tort claims.  We are dealing with a right-of-way

10   that is specifically addressed and granted by that Act.  Based on

11   the ICCTA, BNS believes and maintains that it impliedly repeals

12   the IRWA.

13       As pointed out in the cases cited on page 16 of our motion,

14   this argument has no merit.  For example, Your Honor, I will

15   quote from *BNSF Railway v. Albany,* where the Court stated,

16   "Although a literal reading of section 10501(b) might suggest

17   that it supersedes other federal law, the Board and the courts

18   have rejected such an interpretation as overbroad and

19   unworkable."

20       Without specific reference, federal laws cannot preempt

21   another.  And, in fact, Your Honor, there is no case cited which

22   holds that the ICCTA has indeed preempted another federal

23   statute.

24           THE COURT:  So if you are right, Mr. Brain, then we have

25   two laws, each of which has validity, and it's the Court's job to

1   try to make them work either together or in ways that don't

2   absolutely undermine each other.  So how do I do that?

3          MR. BRAIN:  Your Honor, I think, in that situation,

4   obviously, the cases have held that you try to harmonize them.

5   And if you cannot harmonize them, then you have to see which one

6   should prevail.  And here we believe that the case law and the

7   cases clearly indicate that with respect to laws related to

8   Indians, that statute is primary.  And I think there's a whole

9   bunch of other issues, which I will get to, that explain that.

10         THE COURT:  But even saying that, what does the Indian

11  Right-of-Way Act say would have to happen for the Tribe and the

12  federal government, through the Bureau of Indian Affairs, or the

13  Secretary of Interior, to withdraw from Burlington Northern the

14  right-of-way or the permission to use the right-of-way?

15         MR. BRAIN:  Well, the Right-of-Way Act itself provides

16  that it can be terminated if there's a breach of the grant.  I

17  mean, that's very specific in the Act.

18      And I think the other issue, and we will get into that, is

19  the fact that, what is the grant, and is it an original grant?

20  And all of those things bound together supersede.

21      We also have the fact that the Right-of-Way Act specifically

22  addresses railways and how rights-of-way across Indian lands are

23  addressed, whereas the ICCTA simply references federal laws.  It

24  has no reference whatsoever to what you do when you are dealing

25  with sovereign land.

1      And that's where I would like to go next, is address how do

2   we get here from there.  And I think your questions are right on

3   point, but they're answered, I think, by the sequence of events

4   in this case as well as the other federal laws.  And I will go

5   forward.

6              THE COURT:  Okay.

7              MR. BRAIN:  This case is unique because we are dealing

8   with a tribe.  And, again, it's a sovereign entity.  And the land

9   we're talking about here is trust land administered by the United

10  States.  Those are very unique situations.  Other federal laws,

11  we don't have those situations.  And I will show you a couple of

12  them.  But the courts have also, in essence, consistently held

13  that "Ambiguities in federal law have been construed generously

14  in order to comport ... with traditional notions of sovereignty

15  and with the federal policy of encouraging tribal independence."

16  That's the *Merrion* case, Your Honor.  And it goes on to say, as

17  the Ninth Circuit has stated, the "Courts have uniformly held

18  that treaties, statutes and executive orders must be liberally

19  construed in favor of establishing Indian rights.  Any

20  ambiguities in construction must be resolved in favor of the

21  Indians.  These rules of construction 'are rooted in the unique

22  trust relationship between the United States and the Indians.'"

23  And I think it's those principles, Your Honor, which take the

24  IRWA and elevate it to, we mean it when we say it, with laws

25  relating to Indians; we have to give them the benefit of the

1    doubt.

2        And the *Merrion* case, that was *Merrion v.* -- that case, it

3    was in 1982, and in that case, it stated -- it was the *Jicarilla*

4    *Apache Tribe* case.  In discussing these cases, the dissent

5    correctly notes that "a hallmark of Indian sovereignty is the

6    power to exclude non-Indians from Indian lands, and that this

7    power provides a basis for tribal authority to tax."  And that

8    was a taxation case.  It was not having to do with what we're

9    dealing with here.

10        But, here, the Swinomish Reservation was established by the

11   1855 Treaty of Point Elliott, and that treaty explicitly provided

12   the right of the Tribe to exclude all non-Indian individuals and

13   entities from entering the reservation.  There is much discussion

14   in BNSF'S pleadings about private contracts being preempted.  I'm

15   going to address that in more detail in a moment, but I want to

16   emphasize that we're not dealing with a simple private contract

17   here.  We are dealing with a right-of-way granted by the United

18   States Department of Interior.  Also, as stated in *Merrion*, it

19   states, "When a tribe grants a non-Indian the right to be on

20   Indian land, the tribe agrees not to exercise its ultimate powers

21   to oust the non-Indian as long as the non-Indian complies with

22   the initial conditions of entry."  Those initial conditions of

23   entry here are the grant of easement under Title 25.

24        Unlike 10501(b), which makes no reference whatsoever to

25   tribal lands, the IRWA has specific provisions, and I'm just

1  going to summarize some of those provisions to you that relate to

2  railroads.  323 allows conditions to be imposed on railroads.

3  And that's codified in C.F.R. 169.23 as well.  169.18 says one

4  condition can be a limitation on the term of that grant.  169.20

5  provides for termination if the railroad breaches the conditions

6  of the grant.  Section 324 provides that it can only be granted

7  if the tribe consents to the terms and conditions of the grant.

8  169.23 specifically addresses railroad grants and that the grants

9  are subject to all of the rules and regulations under the guides.

10  And 169.23 also provides for automatic abandonment if the rail

11  line is not used continuously for two years.

12      There is no statement that abandonment under this Act is

13  subject to the ICCTA or STB approval.  There is no statement in

14  the grant in this case that in any way is subject to ICCTA or STB

15  approval.  These points are contrary to the cases cited by BNSF

16  related to private contracts.

17      Your Honor, in support of their argument, the railroad has

18  cited to the Hazmat Act, and I want to address that briefly.

19          THE COURT:  Okay.

20          MR. BRAIN:  The Hazmat Act was adopted in 1990, and it

21  states explicitly that it preempts, and I will quote,

22  "requirements of a state or Indian tribe."  Our position is that,

23  clearly, Congress knew how to deal with legislation which could

24  address the unique rights of Indian tribes, and it did so with

25  the Hazmat Act by specifically addressing that.  Moreover, the

1    IRWA and its provisions with respect to right-of-way grants date

2    back to 1899.  This statute has not been a secret.  It's been out

3    there.  And there have been many grants that have been issued

4    under it.  And that date is set forth in C.F.R. 169.23.  It's

5    also discussed, and the history of the Act was discussed, in

6    *Southern Pacific v. Watt*.  And that was a 1983 case that resolved

7    the *Andrus* case, which was the parallel case, or the ancillary

8    case here, when the Court held that tribal consent was required.

9    And I will quote from that case.  "In interpreting the 1899 Act,

10   we are guided by our earlier determination in this case that the

11   Act was fully intended to protect Indian interests.  We must also

12   bear in mind that the construction of a statute rendered by the

13   agency charged with its administration is ordinarily entitled to

14   substantial deference."  Again, these comments clearly indicate

15   the significance of the IRWA and how it's to be interpreted.

16       In *Star Lake v. Navajo Area Director*, which was a 1987

17   decision, the chief administrative judge in that case addressed

18   and discussed C.F.R 169.20 regarding the termination of

19   rights-of-way.  And in that case the judge was comparing the

20   policy concerning rights-of-way for public lands as opposed to

21   tribal lands.  And here is what he said.  "The Federal policy

22   concerning termination of rights-of-way over public lands is

23   embodied in Federal statutes, which specifically include an

24   excuse provision."  And if you will recall, in the *Star Lake*

25   case, the railroad did not construct the line within two years,

 1   and it was claiming it could not do so because of causes beyond

 2   its control, so it was looking for an excuse.  The Court went on

 3   to say, "Federal policy concerning rights-of-way over Indian

 4   lands is also embodied in Federal statutes, none of which contain

 5   a provision analogous to the excuse provision in the public land

 6   laws.  The failure of Congress to include such a provision in the

 7   Indian right-of-way statutes, when it has included one in the

 8   public land statutes, is reasonably construed, under rules of

 9   statutory construction, as an indication of intent on the part of

10   Congress to deal differently with these two types of land."

11       Your Honor, I think that's the same principle you would use

12   between the ICCTA and the IRWA.  The bottom line is that if

13   Congress had intended the ICCTA to preempt the IRWA, it should

14   have and could have done so.  It did not.

15           THE COURT:  But we have no case that's on point with

16   this one, where there was a separate contract, easement,

17   agreement, or whatever, and the railroad breached the agreement,

18   and the remedy included withdrawing the right-of-way, do we?

19           MR. BRAIN:  No, we don't, Your Honor.  And I suspect

20   this will be that case.

21           THE COURT:  Okay.

22           MR. BRAIN:  But I will also say, we're not asking for

23   the easement to be withdrawn.

24           THE COURT:  You are asking for it to be complied with?

25           MR. BRAIN:  We are asking it to be enforced.  I think

1     there's a difference there.  I think there's a big difference

2     there.

3          I now want to address another issue, which I think is very

4     relevant to this, because the case law supports this as also a

5     reason why preemption does not apply, and that's the original

6     contract grant terms, as opposed to a later restriction or

7     amendment.  The Tribe maintains that restrictions and conditions

8     imposed in the original deed or grant to a railroad are not

9     preempted by the ICCTA.  And that is very significant because,

10    first of all, BNSF, on page 3 of its reply, without any

11    supporting citation, simply dismisses the issue and says, quote,

12    "This original-versus-amendment contrast is immaterial."  Of

13    course, it basically holds and says that the IRWA is immaterial.

14    But all of the cases cited by BNSF in support of its preemption

15    are, one, cases having to do with state or local regulation, in

16    other words, where a government, a subordinate government, not

17    the federal government, has issued a regulation or law; two, they

18    are state court claims, such as trespass or negligence, which are

19    based upon state common law; or, three, they are cases where the

20    preemption decision is based on a contract or amendment entered

21    into after the original grant.  In other words, you have a grant

22    to a railroad, and later on you have an amendment which imposes

23    restrictions, tariffs, or some other restriction.  No case finds

24    federal preemption of terms in an original grant of use.  And I

25    think that's very important.

1    Instead, BNSF, it's bell-ringer case, as you probably have

2   determined, is *U.S. v. Baltimore*.  Frankly, Your Honor, we think

3   the case supports our position, and let me tell you why.  First

4   of all, the tracks were constructed in 1899.  Apparently a lot of

5   railroads were being constructed back at the turn of the century

6   and prior.  In any event, there was a restriction in the original

7   grant that it could not interfere with the business of the owner.

8   However, that was not the issue that was before the courts.

9   There was an amendment in 1924, an agreement.  That was not

10   before the courts.  It was the 1935 amendment which was the

11   agreement that was at issue.  And that was the situation where

12   the owner of land, a company called Stock Yards, it was an entity

13   which imposed a tariff on the delivery of livestock to competing

14   yards serviced by the tracks over its land.  The railroad

15   determined that the fee was unreasonable, did not pay it, and

16   therefore did not ship the livestock to its competitors.  Well,

17   the Court held that the railroad cannot engage in discriminatory

18   conduct and Stock Yards could not compel the railroad to operate

19   in a way that violated the ICC.  Well, okay, but we're talking

20   about an amendment.  There was no such restriction in the

21   original grant.  It was a later agreement that they found.  And,

22   remember, this is an operating line where there was a later

23   agreement.

24    There is nothing even remotely relevant in *Baltimore* to our

25   case.  I guess you could suppose that if the Tribe were to

1  construct a refinery on the reservation land and then ask BNSF to

2  charge a tariff for shipments to Tesoro, to Shell, we would be in

3  a parallel situation.  But that's not where we're at.  We are

4  talking about an original grant which has restrictions on what

5  BNSF can do.

6      Cases have consistently held that where the railroad has

7  voluntarily agreed to conditions in the original grant, that

8  those conditions will be enforced.  For example, Your Honor, we

9  have cited *PCS Phosphate v. Norfolk Southern*.  Now, that's a

10  2009 case.  So it's one of the more recent cases cited by anyone.

11  And that was a situation where the mine owner had granted the

12  railway a right-of-way, through deeds, which had a provision that

13  required the railroad to relocate the railroad line if the land

14  was needed for mine purposes.  The railroad successor refused to

15  move the line when the mine requested it.  The Court discusses

16  the ICCTA preemption.  And I'm going to do several quotes from

17  that case.  "If enforcement of these agreements were preempted,

18  the contracting parties' only recourse would be the 'exclusive'

19  ICCTA remedies.  But the ICCTA does not include a general

20  contract remedy.  Such a broad reading of the preemption clause

21  would make it virtually impossible to conduct business, and

22  Congress surely would have spoken more clearly, and not used the

23  word 'regulation,' if it intended that result."

24      It goes on further to say, "As the STB has recognized,

25  'voluntary agreements must be seen as reflecting the carrier's

1   own determination and admission that the agreements would not

2   unreasonably interfere with interstate commerce,'" citing the

3   *Township of Woodbridge v. Consolidated Rail*, a decision which was

4   an ICC decision.

5           THE COURT:  But those were curtailing idling locomotives

6   or who's going to pay for relocating a track.

7       I mean, the railroad's argument is, in the agreement itself,

8   we said we cannot limit the number of trains into the future

9   because we don't know what shipper needs are going to turn out to

10  be down the line, and so there has to be something in there that

11  says that we can run more trains, maybe larger trains in terms of

12  numbers of cars, when shipper needs call for it, and you agree

13  not to arbitrarily withhold your consent.

14      So when you say you are asking the Court to enforce the

15  agreement, that is part of the agreement listed.

16          MR. BRAIN:  And I will get to that, Your Honor.  It is

17  part of the agreement.  But, remember, the restriction is, what

18  can we do, what are the restrictions in there, and I'm going to

19  get to that negotiation.

20          THE COURT:  Right.  You are talking preemption right

21  now.  I get that.

22          MR. BRAIN:  I'm just talking preemption.

23          THE COURT:  Yeah.

24          MR. BRAIN:  But I'm also talking about original

25  contract, because what they're trying to do is avoid that issue

1   and somewhat slide it under.  And the important thing is, *PCS*

2   *Phosphate* also said -- this was the holding in the case -- "We

3   affirm the district court's judgment that the rail carrier is

4   liable for the payment pursuant to a covenant in the original

5   deeds of easement granting the carrier's predecessor-in-interest

6   a right-of-way across the mine's property."  Again, what we are

7   talking about was, what was the agreement of the parties at the

8   time the grant or the right was provided.  We want the agreement

9   to be held valid the way it reads, and that's all.  And the issue

10  of arbitrary is the only issue that then would be addressed,

11  whether our failure to consent would be there.

12      I'm not going to go through the *Township of Woodbridge* in any

13  detail, but, again, that was an expression by the ICC, and it

14  basically said, "These voluntary agreements must be seen as

15  reflecting the carrier's own determination and admission that the

16  agreements would not unreasonably interfere with interstate

17  commerce."

18      In our case, Your Honor, the original contract is the

19  right-of-way, and it was executed in 1991.  In its CR12(b)(6)

20  pleadings, and you may recall this, BSN argued that the

21  right-of-way was merely confirming its preexisting right to cross

22  the reservation.  Well, there was and is no basis in fact or law

23  for that position.  Prior to 1991, BNSF had no right whatsoever

24  to cross the reservation.  And it's pretty clear that they

25  couldn't condemn it.  They had no power of eminent domain over

1   trust lands, they didn't have any right to adverse possession,

2   and they didn't have any right to a prescriptive easement.  BNSF

3   now alludes to and alleges that the Tribe did not prevail in the

4   litigation; in other words, that there wasn't a final decision

5   that we actually could exclude them.

6       That position has no merit because if you look at section C

7   and D of the right-of-way, it states that the easement -- and I

8   will quote from section D -- "over any and all lands comprising

9   part of the Swinomish Indian Reservation and held in trust by the

10  United States for the benefit of the Tribe over which the

11  existing railway of BN passes."

12      This statement is a clear admission.  Because it's a

13  right-of-way.  It's not a simple contract.  It is a government

14  grant by the U.S. as the trustee.  And, again, the Tribe had to

15  consent.

16      As stated again in *Merrion*, "Indian sovereignty is not

17  conditioned on the assent of a nonmember; to the contrary, the

18  nonmember's presence and conduct on Indian lands are conditioned

19  by the limitations the tribe may choose to impose."  And those

20  are the limitations in the right-of-way.

21      The Tribe submits there are no material issues of fact.  And

22  BNSF basically agrees with that, but raises two alleged issues of

23  fact.  The first is the meaning of the term "arbitrary."  They

24  take the basic position that arbitrary, if what they're doing is

25  legal, then for us to object to an increase of what they are

1    doing is, per se, by law, arbitrary.

2        They also state that whether the Tribe would have -- they

3    also question whether the Tribe would have consented if it knew

4    the condition regarding use could be eviscerated by common-

5    carrier rights.  As to this consent, there is no evidence that

6    the Tribe would have consented to different terms, number one;

7    two, there's substantial evidence that the Tribe continually

8    objected to and rejected compromises to its position.  But as to

9    this issue, the issue of consent, we are seeking to enforce the

10   terms as they're written.  And the speculative allegation as to

11   what the Tribe might have consented to, had it known the truth,

12   is irrelevant.  We're looking at the contract terms that are

13   there and saying, these are the terms that must be enforced.  As

14   Chairman Cladoosby stated in his deposition, a deal is a deal is

15   a deal.  And that is this deal.

16       As to arbitrary, Your Honor, there is no evidence to support

17   BNSF's position.  It is a legal argument, and a legal argument

18   distilled down to what it really means, is that any refusal by

19   the Tribe to a shipper request which is not illegal is, per se,

20   arbitrary.  That renders that entire provision superfluous,

21   meaningless, and irrelevant.  There's no point in having any kind

22   of restriction in there because, by their interpretation, any

23   time there's a legal request, you can't refuse.  And if that's

24   what was intended, that's what it should have said.

25       To be clear, the Tribe requests that the right-of-way be

1  declared valid, that all of its terms and conditions be enforced.

2  BNSF requests that any restrictions be deemed meaningless and

3  superfluous, as indicated.

4          THE COURT:  So your position is, the Tribe can take a

5  position that's inconsistent with the Hazardous Material Act, and

6  that could still be a valid reason to reject a request?

7          MR. BRAIN:  Your Honor, our objection to this request is

8  not merely because it's Bakken.  Our objection to this request is

9  because it's a five-fold increase to Tesoro.  And if you add

10  Shell, it's another four.  And we built our economic center based

11  upon the understanding that there would be a limitation in this

12  easement.  And, indeed, the issue of the economic center is

13  discussed both in the settlement agreement and in the grant of

14  easement.  And it's there for a reason.  It's there because we're

15  concerned about all this stuff.  And why else would it be there?

16      And let me address the Hazmat.  That issue is not before us.

17  It's there by example, and we use it by example because the

18  government knew how to address tribal rights.  But the Hazmat Act

19  has no case interpreting where the original contract -- I think

20  it's very possible, Your Honor, that if you owned 1,000 acres and

21  you agreed that a rail line could cross your property, but you

22  restricted it to only passenger service, and that was the grant

23  that you issued, and the railroad decided it wanted to ship

24  hazardous materials instead of passengers, would the Hazmat Act

25  trump that?  I don't think so.  We don't have a case on that, but

1    I don't think so.

2       But I do want to point out, it's not just Bakken crude.  Yes,

3    that is a concern.  The Tribe was concerned about that.  And does

4    that support its decision to refuse?  Yes.  Is it the exclusive

5    decision?  No, not at all.

6       Your Honor, I want to briefly go through the facts and then

7    get to the critical point of the negotiation, because I think

8    those issues add the context as to why this agreement reads the

9    way it did.  I don't think there's any question that the history

10   clearly establishes that the railroad was trespassing without

11   permission and that the Department of Interior and the BIA

12   recommended action be taken to enjoin the construction, but

13   nothing happened.  Basically, as we know, the Tribe did not get

14   much of a voice back then.

15      In 1935, Great Northern admitted that there was no

16   documentation whatsoever to document the fact that it had a

17   right-of-way over the reservation.  In 1970, the Tribe wrote to

18   BN, and it said that there was no grant of a right-of-way and you

19   are trespassing.  And that instituted some negotiation.

20      In 1977, they attempted to come to a resolution, but it

21   didn't happen, and the Tribe requested that the U.S. Solicitor

22   commence an action to remove BN.  In August, there was a letter

23   from the superintendent to the area director, and he recommended

24   that it be reviewed by the solicitor.  And there was the writing

25   on the wall to BN.  And so how did it deal with that?  It filed

1    for its own right-of-way application with the Department of

2    Interior, trying to circumvent the action by the Tribe and the

3    BIA.  And the letter that was issued in October of 1977 by the

4    BIA states that the BN application was lacking under C.F.R.

5    regulations because the landowner tribe did not consent.  That

6    started basically a sequence of events which went on for the next

7    six years.

8        What happened in October, after that, is that NARF wrote a

9    letter, a memo, to The Western Agency, and that was the memo that

10   talked about travel consent is necessary.

11       In December of that year, the Tribe passed a resolution that

12   said, the last offer of the railroad was $150,000, which was

13   inadequate for 87 years of trespass, and it requested that the

14   United States bring an action to eject.

15       In the summer of 1977, we know that the litigation was filed,

16   and BN answered.

17       In October of 1978, the Tribe passed another resolution which

18   acknowledged the BN application, and it specifically refused to

19   authorize the Secretary of Interior to grant the right-of-way.

20   In other words, it was on record, we don't want that

21   right-of-way, we're not going to grant consent.  And it urged

22   again the U.S. to remove BN as a trespasser.

23       In October of '78, there's a letter from the

24   superintendent -- and this letter is the one that denies the

25   application because there was no tribal consent -- and it

1　acknowledges the October 3rd resolution I just cited.

2　　　In November of 1978, BN appeals to the superintendent, and

3　the sole issue is the claim of consent.  In other words, we don't

4　need your consent.  In December, the Tribe responds, it says

5　consent is required, and there is no consent granted.

6　　　In 1979, May, there's the decision by the area director.  He

7　again affirms the superintendent in that tribal consent is

8　required.  In May of 1979, BN appeals to the assistant secretary

9　of Indian Affairs.  In September, there is a decision by the

10　acting deputy, and he says, very unmistakably, that 25 U.S.C.

11　Section 324 requires tribal consent and therefore it cannot grant

12　a right-of-way as the Tribe has not consented.

13　　　In October, BN files the U.S. district case against Andrus

14　and other Department of Interior individuals, and it asks for

15　declaratory relief and to compel issuance of the right-of-way.

16　Interestingly enough, it does not name the Tribe as a party.

17　　　In February of the following year, the Tribe is allowed to

18　intervene.  The judge in October of 1980 denies cross-motions for

19　summary judgment pending the resolution of the *Southern Pacific*

20　case.  And at that point not much happens on the underlying case,

21　because if consent is not required, then the trespass case is

22　going to go away.  If consent is required, then the trespass case

23　has to be dealt with.

24　　　As we know, in March of 1983, the Ninth Circuit issued the

25　*Southern Pacific v. Watt* case, and held under the 1899 Act that

1    consent by the Tribe was required.  That was appealed by BN, and

2    in February of 1984, the appeal was dismissed.

3        Now, BN really doesn't address the issue of consent in any of

4    its pleadings.  But that is a very key issue here, because if the

5    Tribe has to consent to the grant, then it has to consent to the

6    original conditions that are imposed by that grant which are

7    authorized by the IRWA.

8        Ultimately, in 1986, settlement discussions began, but they

9    really didn't get down to the bottom line until the summer of

10   1989, and then there's a fairly short period of time with the

11   critical terms of negotiating, and those critical terms did not

12   include money and they did not include the term; they had to do

13   with hazardous materials and they had to do with the number of

14   trains crossing the reservation and the number of cars per day.

15       And at this point, Your Honor, if you will recall, we put in,

16   as Exhibit 30, a concept site plan.  The reason I put that in

17   there is to confirm that the Tribe was indeed going forward with

18   the project, and, in fact, it had obtained a grant from the

19   government to proceed with an economic development plan.

20       Okay.  Now, we're going to go through what I consider to be

21   the critical letters.  In June of 1989, the Tribe wrote and at

22   that point in time it requested that any settlement agreement

23   have the language which BNSF relies upon, and that's the language

24   that says that it shall comply with TEDRA law.  But BNSF always

25   fails to quote the sentence that follows that, which states as

1 follows: "Specifically, the annual rental shall not be less than

2 that required by federal law in effect at any time during BN's

3 occupancy of the right-of-way. BN shall comply with all

4 applicable federal laws and regulations pertaining to BN's

5 activities within the Swinomish Reservation." Clearly, the whole

6 point of it was to protect the Tribe's interests that BN would

7 comply with the hazardous hauling and the payment to it.

8 But let's go to the June 8th letter draft. And, Your Honor,

9 this is Exhibit F. It's actually one of the defendant's. We put

10 a copy in, but our draft was very hard to look at. And I will

11 put it on the overhead here. It should be on your screen. This

12 is the draft of the right-of-way agreement that was being

13 circulated on June 8th of 1989. And if you look at section b,

14 the pertinent statement by the Tribe was, "Burlington Northern

15 will inform the Tribe in advance of the names of the shippers

16 and the contents of railroad cars crossing the Reservation

17 lands."

18 With respect to the number of cars, the draft at that point

19 in time said, "Burlington Northern agrees that, unless otherwise

20 agreed in writing, only one westbound and one eastbound train, of

21 25 cars or less, shall cross the Reservation each day." There is

22 no provision for the revision of that. It's an absolute

23 restriction.

24 What happens is, BN gets this, and, of course, they're

25 concerned about it. And the point I want to make here is that

1   there are two concerns which the Tribe is addressing.  One of

2   those concerns is the hazardous materials; the other is the

3   number of cars and trains.

4      If you go to Exhibit 32, that's the June 22nd, 1989 letter

5   from Mr. Silvernale, and he specifically addresses the June 8th

6   drafts.  And what does he say?  If you look at his letter -- and

7   I have got the section -- it basically addresses section b, 7b

8   and 7c.  If you look at 7b, I quote, "I do not believe that we

9   will be handling any exotic materials to and from the refineries,

10  but we have no objection to making a disclosure to the Tribe as

11  to the nature of the commodities.  We simply cannot provide this

12  information on a shipper and car by car basis in advance of

13  shipment since we do not have the knowledge until the train is

14  actually made up, just before departure.  I am sure that you are

15  aware that all cars handled have to be classified, packaged, and

16  loaded, in accordance with the DOT-FRA Rules and Regulations.

17  These rules and regulations for handling hazardous materials have

18  been developed for more than 140 years and as a common-carrier

19  railroad, Burlington Northern is obligated to handle such cars

20  properly classified, packaged, and loaded to all destinations."

21  That is the only time the word "common carrier" is used in these

22  negotiations in the written document, and it refers only to

23  hazardous materials crossing the reservation.

24     If you go to the next paragraph, where he addresses

25  Section 7c, and he says, "We cannot agree to a single train

1  limitation, or to a limitation on the number of cars.  At times,

2  depending on business at the refineries, we must have flexibility

3  with regard to the number of cars, which may exceed twenty-five

4  or thirty.  On occasion, I can imagine that more than one

5  movement will be necessary depending upon a number of factors in

6  railroad operations.  It seems to me that our current level is

7  one train each way per day.  If more trains should start

8  operating (which we doubt) it would seem to me that this could be

9  the subject of a rent adjustment based upon the greater burden to

10  the property adjacent to the right-of-way."

11      Your Honor, in its pleadings, BNSF implies that the Tribe has

12  an adequate remedy at law because the whole intent was that if

13  there were more trains, we get paid more.  But the negotiations

14  don't go that way.  I bring that as a segue, because that has

15  been segregated off out of this case, but it's important because

16  these negotiations address a number of issues.

17      But let's go to, then, this next letter, which is Exhibit 33.

18  That's a July 10th letter from Mr. Silvernale.  And it's pretty

19  clear that between June 22nd, that letter, and July 10th, there

20  were a number of negotiations, and the parties are in the process

21  of dealing with the languages for those two sections.

22      In the July 10th, 1989 letter, by the way, there's just two

23  paragraphs, and it addresses just those two provisions.  It says,

24  on 7b, "Burlington Northern will keep the Tribe informed as to

25  the nature and identity of contents of placarded cars crossing

1  the Reservation." And, basically, it's periodic, and this is

2  what the parties basically agreed to. You will note that there

3  is no statement about shipper needs or common-carrier

4  obligations.

5      If you will go to the next paragraph, that's the operative

6  paragraph that we're talking about here. And look at that

7  paragraph. That is substantially what was agreed to by the

8  parties in the right-of-way agreement. But there's something

9  missing. You will note that there is nothing in this paragraph

10  that references that if the trains are increased, that there

11  would be compensation for the increase. The Tribe did not agree

12  to that.

13      The final document -- and I will get to the final document in

14  a moment. But I think that it's very important, Your Honor, that

15  what you have here is a situation where, on June 22nd, the

16  railroad says: Guys, we can't agree to these terms, and here are

17  the reasons why. We have common-carrier issues related to the

18  types of products we're shipping, and with respect to the number

19  of trains, it could be that we need to do two trains on a day, or

20  something like that, but we can try to work that out. So on

21  July 10th, they get back, and they said, well, we couldn't do

22  that then, but here is what we can do.

23      There's no restrictions on reference to the ICC, there's no

24  condition that said, you know, we don't know if we can do these

25  conditions, we need to get prior approval by the ICC, so whatever

1  we agree to is contingent upon their approval or any of those

2  alternatives.

3      BNSF, in its reply, cites to a case, *State v. Farmers Union*

4  *Grain*.  It's a Washington case.  It has to do with interpretation

5  of contracts.  And the quote they take is, "Parties are presumed

6  to contract with reference to existing laws."  We agree.  So when

7  BNSF said we can't do it because of these reasons, on June 20th,

8  and then on July 10th said, but here is what we can do, we're

9  entitled to have a reasonable expectation that they knew what

10  their limitations were, and they didn't provide us anything that

11  would give us any intent otherwise.

12      So what the parties did is they entered into the right-of-way

13  agreement.  And I have Section 7C from the right-of-way agreement

14  up there.  And as you will see, the first part of that is as

15  suggested by Mr. Silvernale.  Now, one thing that nobody has

16  addressed, at least BNSF has not addressed, is the beginning of

17  this paragraph.  And it says, "Burlington Northern agrees that

18  unless otherwise agreed in writing ..."  There is no agreement in

19  writing, Your Honor, to have any condition.  There was no request

20  in writing.  We're here -- and as you know, BNSF made it very

21  clear to you last year at the 12(b)(6) motion that it had no

22  intention of stopping these shipments.

23      It's our position -- and, again, I want to address this --

24  but the next sentence down there, that you have to have an

25  agreement to the additional number of cars before there is any

1  annual rate adjustment.

2        THE COURT:  But, Mr. Brain, I think we are really

3  getting too much into the weeds here.

4        MR. BRAIN:  And I -- let me go on, Your Honor.  And I

5  understand that.  But I want to just summarize a couple of

6  things.

7        THE COURT:  Okay.

8        MR. BRAIN:  One, after this, it's BN who makes the

9  application to the Department of Interior.  It's BN who

10  represents that this application is made pursuant to the IRWA.

11  It's all of their application, and it's the Tribe consenting to

12  it, which allows this 1991 document to be passed.

13     Now, let me go on to a few of the cases and subjects that are

14  addressed in the BNSF materials.  First of all, with respect to

15  the trespass cases, Your Honor, do you have any specific

16  questions as to the cases they cited there?

17        THE COURT:  No.

18        MR. BRAIN:  Okay.  I won't go into them in depth.  I

19  just want to point out that, as to the trespass cases, they all

20  had to do with state issues, state law issues, or state laws.

21  They're not federal.

22     As to the Surface Transportation Board cases that were

23  submitted by BNSF, it's interesting, Your Honor, we had prepared

24  almost the identical pleadings we were going to file, but they

25  beat us to it.  So we were going to file the same thing.  We

1  believe that those cases actually are on point in our favor.

2  Neither of the cases address another federal law or preemption

3  of federal laws.  That's very clear on the face.  Neither address

4  the IRWA or tribal rights.  And both involve state law contract

5  claims.  And I can go further, if you want me to, on those cases.

6          THE COURT:  No.  Let me ask you a question, Mr. Brain.

7  They're not parties in this case, but shipper needs is part and

8  parcel of what the Surface Transportation Board is about; it was

9  what the Congressional Act was about.  There's a recognition that

10 this country needs its economy to stay on course by having common

11 carriers service shippers' needs and customers' needs in a way

12 that we're not interrupting the flow of important materials,

13 whether it's pipelines, whether it's railroads, whether it's

14 highways, or things like that.  And, you know, I'm not saying I

15 don't have a great deal of, you know, sympathy and empathy for

16 the Tribe's position.  It's not the first time they can look back

17 and say, I thought a deal was a deal was a deal, when it wasn't.

18 That's been the history of how they have been treated for

19 centuries in this country.  But there are serious issues that go

20 beyond what Mr. Silvernale wrote in a letter and how somebody

21 interpreted it that have to be looked at here.  Is Burlington

22 Northern in breach of their agreement?  Quite possibly.  Is the

23 Tribe entitled to damages for that breach?  Almost definitely.

24 But can this Court order the injunction that you're asking for is

25 what I need a little bit more discussion about.

1              MR. BRAIN:  Okay.  I think you can, and I will tell you

2      why.  First of all, it's equitable relief.  And, number two, the

3      IRWA specifically provides that if there is a material breach --

4      and I think we have a material breach here -- then it can be

5      terminated.  So if indeed the Department of Interior can

6      terminate this contract, I would say, Your Honor, you are

7      completely within your authority to enforce this contract.

8              THE COURT:  Right.  But do I refer it to the Secretary

9      of Interior to decide whether she wants to terminate the

10     contract?  Does the Tribe get to make that decision unilaterally

11     without any input?  Do I get to make the decision unilaterally,

12     anticipating that this is what the Secretary of Interior or the

13     director of the BIA would want?  You know, that's what

14     I'm asking.

15             MR. BRAIN:  Well, except -- remember, we're not asking

16     for termination.  We're simply asking for specific performance.

17     And what I'm indicating here is that if there is a right to

18     terminate, that is a very strong power.

19             THE COURT:  Okay.  So you are saying we're not asking

20     for termination, we're asking for the agreement to be enforced.

21        What type of order does this Court give that says to

22     Burlington Northern:  Live up to your agreement?  They will say,

23     as Mr. Keehnel said in his brief, you can't extort from us an

24     agreement to do something illegal, like not service the needs of

25     our shippers, as long as we're complying with regulations, Hazmat

1  laws, things like that.  And, you know, maybe we're in breach

2  because we didn't give prior notice, maybe we're in breach

3  because we didn't do it in writing, maybe we have to pay some

4  damages for not increasing the amount of rentals; do to us what

5  you will, Judge, but don't tell us we can't live up to our

6  responsibilities as a common carrier.

7        MR. BRAIN:  But the ICCTA doesn't say property rights,

8  whether they be private or tribal, are trumped.  It doesn't say

9  that railroads can go across your land, whether they have a grant

10  to do so or not, and once they have done so and they have their

11  foot in the door, and you say the conditions of your foot in the

12  door are X, Y, and Z, that those can't be enforced.  If, indeed,

13  it goes to what they're saying, there are no private property

14  rights, and there are no restrictions on rights-of-way across

15  tribal lands.

16        THE COURT:  I'm not concerned about private property

17  rights, because that's not here.  I mean, you're absolutely

18  right --

19        MR. BRAIN:  I understand.

20        THE COURT:  -- the Tribe has many, many more rights than

21  a private property owner has.

22        MR. BRAIN:  Right.

23        THE COURT:  And, you know, the fact that it's trust land

24  should be considered differently than some of the cases that have

25  been cited to me by Burlington Northern that deal with, not just

1  private property owners, but even states.  This is a different

2  situation, and their tribal rights need to be respected, the

3  treaty rights need to be respected.  But there still needs to be

4  some sort of -- you know, you are asking the United States

5  District Court judge to do what and under what authority?

6  MR. BRAIN:  So, Your Honor, let's step back a little

7  bit.  Let's assume that there was no grant of right-of-way and

8  let's assume that you were sitting in Judge McGovern's seat back

9  in 1989 and this went to trial and you determined that they were

10  trespassing, and let's assume you found that they were only

11  trespassing over 100 feet, not the whole 4,000 feet.  It doesn't

12  make any difference whether it's a foot or 4,000 feet.  You can't

13  trespass.

14  THE COURT:  Okay.  And maybe the Tribe got snookered

15  into an agreement that they didn't have to make and maybe, in

16  retrospect, shouldn't have made.  But once they make it and they

17  allow it, it's a different case to try to take it away than it

18  was back before Judge McGovern.

19  MR. BRAIN:  But, again, I'm talking about the authority

20  of the Court.  What I'm saying is that at that point in time, if

21  you were sitting there as the judge, you could have held that

22  they were a trespasser and evicted them.

23  THE COURT:  I could have, right.  But that's not what

24  you are asking me to do.

25  MR. BRAIN:  No.

1     THE COURT:  You are asking me to enforce the agreement.

2     MR. BRAIN:  I am.

3     But the point being is, to get the right to cross, just like

4     the cases I cited, *PCS Phosphate*, all the other cases, you had to

5     agree to certain restrictions.  One of those restrictions is that

6     if you requested more traffic, we had the right to say yes or no,

7     because we're building our economic center there, and if we said

8     no, the standard to which we were to comply was whether that "no"

9     was arbitrary.  And, Your Honor, I think that can be specifically

10    enforced, and it really gets down to that.

11    THE COURT:  All right.  Let me hear from Mr. Keehnel.

12    MR. BRAIN:  That's fine.

13    (The Court and in-court deputy confer.)

14    THE COURT:  Okay.  Mr. Keehnel.

15    MR. KEEHNEL:  Good morning, Your Honor.

16    THE COURT:  Good morning.

17    MR. KEEHNEL:  For the record, Stellman Keehnel for BNSF.

18    I don't want to relitigate the prior case.  It sounds like

19    that's what we were doing here during part of Mr. Brain's

20    presentation.  There's been a settlement.  I'm not going to stand

21    here and say that anybody is happy with what has turned out as a

22    result of that settlement.  The Tribe may be looking backwards,

23    wondering if it should have done what it did.  I think I'm not

24    being out of line here to say that agreement maybe could have

25    been written more crisply than it ultimately was written, but I

1    think it is adequate for its purpose, and I am going to, I hope,

2    help you today try to figure out a way to both enforce the

3    agreement and be consistent with Congress's dictate on the

4    ultimate primacy of interstate commerce, of protection.

5         Let me start with three features that I think have gotten a

6    little overlooked in the minutia of we have been digging through.

7    First, while we explain in the briefing that the remedies that

8    the Tribe here is seeking are preempted by ICCTA, it is an

9    injunction permitting the 25 per day, and there's also, tucked

10   into their request for relief, an injunction against the movement

11   of any Bakken crude whatsoever across the reservation.  While we

12   think those are preempted remedies, the real fact is that the

13   plaintiff here has the remedy.  They have the right to go to the

14   STB.  They could petition the STB even to go so far as to take

15   this segment of line off the National Rail Network.  And they may

16   some day go to the STB and petition to do that.  But the fact is

17   that they have a forum and they could approach it.  We're not

18   asking you just to say, forever and anon, you are stuck with the

19   Burlington Northern tracks in your backyard.

20        The second point that I think has been overlooked, we're not

21   trying to get something for nothing here.  In a way, we're in the

22   middle, right?  We have to satisfy the shippers' needs.

23   Congress imposes that on us.  The regulators enforce that against

24   us rigorously.  On the other hand, we understand that traffic has

25   increased -- of course it has -- and Burlington Northern is

1 prepared to pay for that under the terms of the agreement. The

2 parties have gotten a little crossways on that at various times.

3 We have tried to make some of that up to them with some periodic

4 payments. I can't even remember, as I stand here today, Your

5 Honor, whether we informed the Court of that. But that has been

6 done. We're prepared to figure out a solution to that going

7 forward.

8 Third, an overarching point that I think has gotten lost a

9 little bit -- actually, I thought it had gotten lost a little bit

10 until some of the Court's questions to Mr. Brain a moment ago.

11 But the point I was going to make, and I guess I will still make

12 it, is the National Rail Network really is the economic spine of

13 this country. It has unique importance. It was fundamental to

14 the building of this country. It's still fundamental to the

15 operation of this country every day. It's something that kind of

16 gets overlooked because it's part of the foundation, and it's a

17 little bit underground in that sense. But it's not an

18 overstatement to say the country is built on it. That uniqueness

19 is reflected in 10501(b)'s provision of ICCTA. That is truly

20 unique. That is very unique, because unique is unique. It is

21 unique, Your Honor. We can't find another federal statute that

22 purports to preempt other federal statutes. This has nothing to

23 do with state-federal relations and the whole body of law where

24 preemption is looked at with a very scrutinizing eye because of

25 the constitutional implications. This is Congress in 1995

1   saying, what a mess we have got going on in this country.  Here

2   is what we're going to do:  STB, you've got complete

3   jurisdiction.  Every other federal law that might get in the way

4   is now out of the way.

5       Why aren't tribes singled out?  Well, why aren't any of a

6   dozen agencies singled out?  Why aren't a dozen or more, maybe

7   hundreds, of statutes singled out?  There would have been a

8   laundry list, you know, as long as your and my arms combined.

9           THE COURT:  But they did single out the tribes in the

10  Hazmat Act, so they know how to do it.

11          MR. KEEHNEL:  Yes.

12          THE COURT:  You can't compare an Indian tribe

13  established by treaty to just another entity, state, or locality.

14  I mean, the tribes have sovereign rights that have not been

15  respected for a long time, in this country in general and this

16  state in particular.  And it's kind of ironic that it was 1889,

17  when we became a state, that all of this happened.  But, you

18  know, you see the letters to the U.S. Attorney -- you know, stop

19  them, do something -- and, you know, the concept of getting

20  railroaded, that word didn't come out of nowhere.  The Tribe got

21  railroaded.  And now they're a little bit more assertive about,

22  hey, we're not just another contracting entity, we're not just

23  another state, we're not just a local government, we're not, you

24  know, some kind of entity that you can override.  We have very

25  specific treaty rights.  The railroad was told in the 19th

1    Century, you can't do what you want to do without an act of

2    Congress because it's an Indian tribe.

3        And I agree with you that the National Rail Network has

4    unique importance and is an entity that has to be considered in

5    here, but don't tell me that Congress preempted everyone when

6    they said federal laws.  They didn't preempt certain Indian

7    rights.

8            MR. KEEHNEL:  I will come back to that.  And I'm not

9    saying they preempted certain Indian rights.  But we will get

10   into that.  I'm just making the overarching point here of the

11   importance.

12           THE COURT:  Okay.

13           MR. KEEHNEL:  I will close up this point and move on.

14       When the Tribe contracted with Burlington Northern, it was

15   dealing with a private entity.  A private entity that, even if it

16   had wanted to, was powerless to, to use the Tribe's words in its

17   brief, compromise the national policy.  Burlington Northern had

18   no right, power, ability to compromise the national interest.  It

19   can't speak for Congress.  It can't speak for the nation.  It can

20   only speak for itself.

21       The 1948 holding of the U.S. Supreme Court in *Baltimore &*

22   *Ohio* matters here, the *Baltimore & Ohio* case, the one that

23   Mr. Brain referenced and that is sprinkled throughout our

24   briefing.  We don't have the power.  My client did not -- my

25   client's predecessor did not have the power to contract in a way

1  that would derogate from its common-carrier obligations.  It just

2  did not.

3      All right.  Let's talk about ICCTA and the statute that

4  really is, we think, at the center of this.  That's 11101(a), the

5  common-carrier duty statute.  You have seen how we have a

6  common-carrier duty.  It's understood.  I'm not going to read the

7  statute to you.  But the point is, if we were to read 7c, 7c of

8  the easement, as the Tribe is proposing that we read it, that is,

9  that even when there's a shipper demand increase that it's not

10 arbitrary to then just say no -- just for no reason at all, or

11 any reason at all, just say no -- if we were to read it that way,

12 that provision of 7c, that subpart of 7c, would be illegal.

13 There's no plainer way to say it.  It would be an illegal clause,

14 an unenforceable, illegal clause.

15     Our briefing charts how you don't have to find that it's an

16 illegal clause.  And over the last couple of days, in trying to

17 absorb the briefing and trying to help the Court, as opposed to

18 just add to your woes in dealing with, I'm sure, what is not a

19 very easy case for you, I looked at the definitions of arbitrary

20 that were rolled out by the Tribe in its briefing.  I can't

21 disagree with them.  The core definition they have there is, it

22 has to be principled.  How can forcing someone to do an illegal

23 act be principled?  It's not.  It's arbitrary to purport to

24 require the Burlington Northern Santa Fe Railway now to commit an

25 illegal act by going to its shippers and saying, 25 a day, that's

1    it.  So there is a way to logically, I think properly under

2    Washington rules of contract construction, read 7c, not find it

3    illegal -- and, you know, the Tribe isn't going to be happy about

4    this -- but require that we be allowed to then move that traffic.

5         Mr. Brain went on about the exchange of letters.  We put

6    those letters before the Court because we wanted the Court to be

7    aware that the Tribe was fully on notice of what our

8    common-carrier obligations were.  I don't think there's a

9    question about that.  And it's not that the party wasn't acting

10   as a sophisticated party.  The Tribe's own words, in their

11   opening brief, at page 13, line 14, "Both parties were

12   sophisticated going into these negotiations."

13        Mr. Brain suggests that because the limitation, as they read

14   it, is part of an easement going in, that they can just say any

15   restriction applies.  But we know that that's not the case.  We

16   know that *Baltimore & Ohio* says exactly the opposite.  Just

17   because it's an easement doesn't mean our common-carrier

18   obligations can be erased.

19        We're going to have to grapple with preemption.  I want to

20   talk a little bit in general terms now, and then I want to try to

21   figure out how to help you make it work with IRWA.  If you

22   disagree with me ultimately, which I hope you don't -- if you

23   disagree with me and say that it would be arbitrary for the Tribe

24   to say no to more than 25 -- but if you do, you are going to have

25   to grapple with IRWA and ICCTA preemption.

1    The clause that is preemptive there, that reads, quote, "The

2    remedies are exclusive and preempt the remedies provided under

3    federal or state law," close quote.  I mean, truly, Your Honor,

4    it's extraordinary.  We looked hill and dale for something

5    similar to that.  It's just not out there.  It is extraordinary.

6    There is no great case law that's going to help you interpret

7    that because you are treading on untrodden ground.  And it's not

8    as if Mr. Brain doesn't understand that, read literally, those

9    words mean that, indeed, the remedies he seeks are preempted.

10   That's why in his brief, page 26, line 23 of his reply, he argues

11   against taking the ICCTA federal preemption language literally.

12   He understands, the Tribe understands, that if you interpret it

13   literally, then the remedies that the Tribe is seeking simply

14   cannot be granted.

15       Your Honor, there isn't a principled basis here.  I mean,

16   that state-federal body of constitutional law regarding

17   preemption just isn't going to help you.  You are dealing with a

18   statute that is, yes, broad, but emphatic, and it uses plain

19   language.  I mean, our Supreme Court now for decades has been

20   saying, when the words can only be interpreted one way, you have

21   got to enforce them even if you don't like the result.  For

22   example, in the *Hartford Underwriters* case, 530 U.S. 1, I'm going

23   to quote -- just for a second to page 6 -- a unanimous court

24   decision, "We begin with the understanding that Congress says in

25   a statute what it means and means in a statute what it says

1  there.  When the statute's language is plain, the sole function

2  of the courts -- at least where the disposition required by the

3  text is not absurd -- is to enforce it according to its terms."

4      There's nothing absurd here about plaintiff being required to

5  go to the STB to seek the relief that it's seeking in this court.

6  That's what this court -- the cross motions are asking you to

7  decide, can you apply the remedies that have been sought by the

8  Tribe?  Injunctive relief.  I think the answer to that is -- and

9  the STB is deferring to you to make that decision on

10  preemption -- the ball is in your court.  And I think the statute

11  is clear.  But that doesn't leave the Tribe without a remedy.  It

12  can go to the STP and say, come on, let's get real here.  I don't

13  think you should have to go that way because I think you should

14  find that the provision is enforceable and the injunctive relief

15  isn't necessary at all.

16      I'm going to talk about the Hazmat Act.  Its importance in

17  this case is not reflected by the degree of briefing.  It's not

18  as complicated as a statutory scheme.  We didn't spend much time

19  on it.  The Tribe's briefing, frankly, was more extensive than

20  ours, but I want to spend a few minutes today to flesh it out,

21  because I think it also gives you an alternative ground to grant

22  our summary judgment motion.

23      The Tribe has responded to our argument regarding the Hazmat

24  Act by saying, but wait a minute, we, the Tribe, didn't enact a

25  regulation, we just have a contract restriction.  That's what is

1  parroted in the language of the statute itself. 49 U.S.C.

2  5125(a) does not speak in terms of regulations. It speaks in

3  terms of, quote, "requirements," and it speaks specifically to

4  requirements imposed by an Indian tribe. If there's a

5  requirement imposed by an Indian tribe that impedes the movement

6  by a railroad of regulated hazardous material, it is preempted.

7  I don't want to oversimplify, but it really is that simple. The

8  fact a requirement is much broader than a regulation is

9  underlying. Compare, when you get a chance, 5125(a), which just

10  refers to a restriction, which we're relying upon, with 5125(b).

11  It's about five lines down below 5125(a). It uses the same word,

12  "restriction," but it precedes it in this way. 5125(b)'s

13  preemption clause reads, quote, "a law, regulation, order, or

14  other requirement." So we're not talking about law, we're not

15  talking about a regulation, we're not talking about an order.

16  We're talking about some requirement imposed by a tribe. How do

17  you impose a requirement other than those other panoply of ways?

18  Through a contract. Now, in 5125(a), when Congress is using

19  "requirement," it's not using it differently from 5125(b). You

20  don't get to substitute "regulation" for "requirement" in

21  5125(a).

22      Equally important for understanding the effect of the Hazmat

23  Act is that the trigger for 5125(a) causing preemption is the,

24  quote, "requirement," close quote, quote, "as applied or

25  enforced." "As applied or enforced." So if the Tribe has a

1    requirement -- it could be a contractual requirement -- and the

2    enforcement of it is going to restrict the flow of Department of

3    Transportation-regulated hazardous materials, the statute says,

4    Tribe, in this instance, the national interest is going to

5    predominate over the tribal interests; the materials are going to

6    have to go through.  And I understand that the clause itself

7    doesn't speak specifically to Bakken crude, but that's what is

8    being restricted now.  And that's why "as enforced" is important,

9    because "as enforced", as the Tribe would enforce its reading,

10   it would restrict the flow of exactly what the Department of

11   Transportation statute says thou shall not restrict.

12        THE COURT:  Even if there are restrictions in that area,

13   why would other contract rights be preempted, such as monetary

14   damages, and, you know, the other panoply of contract rights,

15   other than injunctive?

16        MR. KEEHNEL:  I understand.  It's no secret we're -- we

17   started thinking about what the consequences of this are.  We

18   know we're going to face that.  And you're not being called upon

19   to decide it today.  But you are correct to look down the road

20   and understand that there are implications to this.  We

21   understand that.

22        We cited the *Roth* case.  It's really the only case that has

23   interpreted the board requirement in the context of the Hazmat

24   Act.  It's actually interpreting 5125(b).  So it didn't have the

25   benefit of the "as enforced" language that's in 5125(a), which

1    makes its preemption provision even broader.  But what's
2    interesting about the *Roth* case is that -- it's a Third Circuit
3    case; it's the sole case, as I said, that's interpreted this --
4    it came out exactly where we think a logical reading of the
5    Hazmat statute comes out.  It says specifically that, in this
6    instance, court enforcement of a tort claim would have the effect
7    of essentially restricting in the way that 5125(b) defines
8    restriction, and therefore, the tort remedy was precluded.  The
9    state law tort remedy was precluded.  It was in a personal injury
10   case.  You know, it's such a crisp statute ultimately that -- I'm
11   not going to apologize for the amount of briefing that's in front
12   of it.  I am afraid it's possible to overlook it.  I think it's
13   really important.  And it's also important to note that it's not
14   like the Tribe doesn't have an alternative remedy here too.
15   Assuming the court agrees with me, the Hazmat Act is also
16   preemptive here, 49 U.S.C. 5125(e) includes a way for the Tribe
17   to go and seek a waiver from the Secretary of the Department of
18   Transportation for the preemptive effect.
19            THE COURT:  So let's get back for a second, Mr. Keehnel,
20   with the Indian Right-of-Way Act.  Because, you know, you want to
21   talk about the ICCTA, the Interstate Commerce Commission
22   Termination Act, saying, don't pay attention to any other state
23   or federal law.  This is 1995 Congress saying, from henceforth
24   forward, only consider common-carrier needs and shipper needs,
25   because the railroads move the product that makes the country

1    work.  And so the Indian Right-of-Way Act, forget about it;

2    treaties that gave the Indians the right to bar their land to

3    certain people under certain circumstances, forget about it.

4    Just look at these two things.  That's a big statement.

5            MR. KEEHNEL:  That's an overstatement of our position,

6    Your Honor.

7            THE COURT:  Okay.  So what does the Indian Right-of-Way

8    Act have to say about this situation?

9            MR. KEEHNEL:  I think the Indian Right-of-Way Act has a

10   lot to say about this, about our general situation but not

11   specifically about what's in front of you now, and there are

12   several reasons for that.  IRWA really deals with the going-in

13   process and the getting-out process.  It says, look, if you are

14   going to give a right-of-way over tribal property -- and,

15   obviously, Burlington Northern still contests whether it's on the

16   Tribe's property.  When it made the application, it says, the

17   Tribe claims the property.  We don't ever acknowledge that it

18   owns the property.  I hope we don't have to go litigate that

19   again.  So consent does have to be secured.  Yes, consent has to

20   be secured.  If there's a breach, then the parties can go to the

21   Department of Interior and request cancellation of the

22   right-of-way.  Going in, coming out.  It doesn't have a lot to

23   say about what's in front of you right now.  What the Tribe's

24   argument is, somehow, because of its reading of the way the

25   conditions are stated in 7c of the easement, that it's

1  essentially been sanctified.  Here is why not:  The Tribe would

2  admit today that, given the regulation that several years ago BIA

3  itself adopted that said all grants of easement are subject to

4  all other applicable federal laws, the Tribe wouldn't argue to

5  you today that if the easement were entered into today, it

6  wouldn't be subject to the preemption of ICCTA.  It would say

7  yes, because our regulation says it's subject to all other

8  applicable laws going in.

9     But think about the history here.  The *Merrion* case is

10  decided in 1982.  The U.S. Supreme Court at that point said that

11  while the Tribe, quote, "has the sovereign power of determining

12  the conditions upon which persons shall be permitted to enter

13  into its domain, that is provided only such determination as

14  consistent with applicable federal laws," close quote.

15     The recent adoption of the regulation by BIA is merely

16  recognizing that.  And indeed, as you saw in our papers, BIA has

17  confirmed, in both court proceeding and in its preamble to the

18  adoption of that regulation, that this is just business as usual,

19  that we understand that every time an easement is approved by the

20  Department of Interior over tribal lands that it is subject to

21  all applicable federal laws.  And that's ICCTA.

22     You don't have to say that ICCTA preempts IRWA.  You just

23  have to read them together.  And reading them together, BIA and

24  the Department of Interior have always recognized that when it

25  grants an easement, it is subject to those common-carrier

1    obligations.  It is not arguing otherwise.  It didn't when it was

2    challenged on the regulation that it adopted.  It said that this

3    just confirms what we know.

4         THE COURT:  Mr. Keehnel, I hope you consider how

5    infuriating it is to the Tribe to hear you say that Burlington

6    Northern still doesn't concede that this is their property.  Why

7    do you need to say it?  I mean, why do you want to provoke this?

8         MR. KEEHNEL:  I'm not trying to provoke anyone, Your

9    Honor.

10        THE COURT:  Yeah, you are.  I mean, you are saying,

11   yeah, we paid you a couple of hundred thousand dollars and, yeah,

12   we signed this voluntary easement thing, but, you know, we're not

13   saying you have any property rights here at all.  You don't need

14   to say it today.  I doubt it's true that you can prove anything

15   like that.  And it just makes the Tribe feel like, you know,

16   they're so disrespected and so dishonored that it takes it out of

17   the realm of can reasonable minds agree or disagree about what

18   this means into, you know, those damn Indians, they're always

19   trying to take stuff they're not entitled to, and, you know, it's

20   time for us to shut them down, or something like that.  I know

21   that's not what you mean.

22        MR. KEEHNEL:  Of course not.

23        THE COURT:  It's conveyed by when you take that

24   position.  It's waving a red flag in front of these people, and

25   it just doesn't need to be waved.

1          MR. KEEHNEL:  My apologies.  I'm not trying to be

2    inflammatory here.

3          THE COURT:  Okay.

4          MR. KEEHNEL:  I haven't a clue whether the track is on

5    Burlington Northern -- or Burlington Northern's operations are on

6    the Tribe's property or not.  I didn't litigate that case, you

7    know.

8          THE COURT:  And so we're all assuming it is.  That's the

9    point.  And let's just assume it and move on.

10          MR. KEEHNEL:  So can we just -- so I don't know.

11    Anyway, let's move on.

12       I don't want to lose sight of the point where I was, And that

13    is, in adopting the C.F.R., the BIA itself says it's just

14    clarifying, it's just confirming, it's not doing something new.

15    I understand it's a new regulation.  I understand the Tribe's

16    argument there.  But the fact is, in light of *Merrion*, a 1982

17    decision, it couldn't have been any other way.

18       You know, it's not like an easement itself doesn't recognize

19    that all of this is subject to the panoply of federal law.  That

20    was the whole point of the settlement agreement clause saying, in

21    the easement, this is not going to set aside any federal

22    publications that the parties have.

23       We did submit the STB's recent decision on the Tesoro

24    petition.  You have that now.  Obviously, the STB has asked us to

25    get a message to you.  I guess that was the whole point of how

1    they concluded their ruling, where they wrote, quote, "In ruling

2    on the preemption issue, the Board notes that the Court may" --

3    meaning you, Judge Lasnik -- "may be guided by the Board's recent

4    decisions discussing the interplay between 10501(b) preemption

5    and contract law."  And then it cites two of its own

6    September 2016 decisions.  Those referenced decisions embrace the

7    rule that ICCTA can preempt enforcement of contract terms that

8    unreasonably interfere with rail transportation.

9        It was interesting that Mr. Brain wanted to talk about the

10   *PCS Phosphate* case because one of the decisions the STB recently

11   made, that it asked you to look at, says this about *PCS*

12   *Phosphate*.  It's the *Union Pacific* decision that the STB asked

13   you to look at.  "There is precedent that a state court decision

14   applying contract law could unreasonably interfere with rail

15   transportation.  Specifically, it is possible that contract

16   remedies could force an involuntary use of railroad property

17   within the interstate rail network, which could be preempted

18   depending on the facts presented," citing "see *PCS Phosphate*."

19       You don't have an easy task.  I think the proper course here

20   is to say the parties entered into this contract, they did impose

21   a clause that says you cannot arbitrarily withhold consent if

22   shipper needs indicate that more traffic is needed than 25.

23   Because of the common-carrier obligation, because of the

24   *Baltimore & Ohio* decision, it would create an illegality for the

25   Tribe to be able to say just no, and therefore that decision

1  would be arbitrary.  So the Court must conclude that, in this

2  instance, the remedies sought by the Tribe are not to be granted.

3      Alternatively, if the Court just finds the clause illegal, we

4  will have to deal with that consequence.  We would have to

5  probably come back to the Court and figure out what the result of

6  it is.  I think the result is, that sub-clause gets erased and

7  the rest of the easement stays intact.  Because the parties had a

8  remedy.  If the number of cars is exceeded, there's economic

9  remedy already built in.  So it doesn't gut the contract.

10      Alternatively, if the Court somehow doesn't stop there and

11  wants to grapple with IRWA and ICCTA, I think given that the

12  Department of Interior itself has said, look, we're granting an

13  easement -- approving an easement, it is subject to all

14  applicable federal law.  That has to mean, in the context of our

15  situation, common-carrier law, and that means the restriction

16  that would unreasonably restrict the flow of interstate commerce.

17  To dovetail those two, I think you would have to conclude this is

18  a preempted matter, let's go to the STB and see what they say,

19  and then you wouldn't make the substantive decision at all.

20      Thank you, Your Honor.

21      THE COURT:  Thanks, Mr. Keehnel.

22      Okay.  What I want to do is, I want to take about a 15-minute

23  break now.  When we come back, Mr. Brain, you will have 15

24  minutes, and then, Mr. Keehnel, you will have 15 minutes, and we

25  will finish at noon, okay?

1      All right.  We will be at recess.

2                    (Proceedings recessed.)

3            THE COURT:  Thank you.  Please be seated.

4      Okay.  Mr. Brain.

5            MR. BRAIN:  Yes, Your Honor.  I think you will be glad

6      to hear I'm not going to use my 15 minutes.  I'm going to use a

7      shorter time.

8            THE COURT:  It depends on what that means.

9            MR. BRAIN:  Don't we bow down to that so often.

10     Your Honor, first of all, I want to acknowledge that we

11     appreciate your recognition of the importance of tribal rights.

12     And I want to also then focus on what I covered earlier in my

13     argument, and that is how did we start all of this.  Because when

14     it really comes down to it, which has control?  25?  49?

15     And I will point out again that 49 has a generic reference to

16     federal laws.  What we have to realize, and I think you know

17     this, there is no parallel set of federal laws for anything even

18     remotely close to what happens with tribal rights.  We don't have

19     other sovereign governmental entities.  We have states, we have

20     local jurisdictions, and we have the United States government,

21     and we have Indian rights.  And I think also you pointed out, and

22     we agree, those rights start with a treaty.  That's a contract

23     between the United States and those tribes.  And that treaty, to

24     take what they propose, would be having the United States breach

25     its treaty.  That treaty is then implemented by Title 25, which

1   has the laws related to Indians.  It's broader than just the

2   IRWA, we know that, and there are regulations.  But those

3   regulations and those laws are how you interpret those treaty

4   rights that were granted.  And the government in this situation

5   has much more than simply a contractual relationship with the

6   Tribe.  It has a fiduciary relationship.  It is the trustee of

7   their lands.  They could not make this grant on their own.  But

8   they have one right, one right under those rights, and that is

9   the right to consent to whatever conditions or provisions are in

10  that grant of easement.  And to adopt the position that this

11  provision, that Section 7c, is meaningless, is to vitiate the

12  right of consent.  It's that simple.  You're basically saying

13  your consent doesn't matter.  And that's not what the Ninth

14  Circuit has held, and that's not what the law is.  You have the

15  right to consent.

16      But BNSF says if that consent imposes a provision that we

17  don't like, that otherwise could be illegal on us, then your

18  right of consent is meaningless, superfluous, and not honored.

19  And, Your Honor, I would go further to say that this is so

20  significant to this agreement, that it's a lack of consideration.

21  Why would a tribe ever have consented to this or done this?  It

22  would have been much better off to go forward.

23      And, again, I point to the fact that this agreement, the

24  settlement agreement and the treaty, both address this economic

25  center.  And you have seen it.  You have got the photograph.

1   It's right there.  That's why it was of concern for them.  And

2   this was a tribe that did not have an economic center in 1989.

3   It was something they were putting together.  They were looking

4   to the future.  And these provisions were important.  They aren't

5   meaningless.

6       And the IRWA is not meaningless.  And if you look at the

7   canons of interpretation -- and I quoted some of those cases, and

8   they're in our briefs -- clearly, when you come to a conflict,

9   the laws related to Indians are to be interpreted to their

10  benefit and their protection, starting with the treaty rights.

11      I don't have too much more to say.  I would like to say that,

12  just to correct it, we have received no payments for increased

13  traffic.  There was an adjustment of the rental pursuant to the

14  provisions that allow for an adjustment.  It was based upon one

15  train each way of 25 cars.  That was the appraisal.  And it was

16  adjusted.  But there has been no payments.

17      And, lastly, Your Honor, I want to talk about the fact that

18  because this agreement is a right of consent and the fact that

19  we're dealing with a treaty, statutory and contractual rights

20  under those treaties, that a damages remedy is simply not an

21  adequate remedy.  We're basically saying that you are giving up

22  property rights in lieu of money.  And that's not what the

23  agreement says.  It's just simply not what they bargained for.

24  And had they known, and I think it's pretty clear, had they known

25  that BNSF would some day say these provisions are meaningless

1    because we might be violating some obligations we have -- of

2    course, we represented to you that we could enter into this

3    agreement -- that we could simply obviate it.

4        And, lastly, Your Honor, counsel suggests that we go back to

5    the STB. We're not going to go to the STB. They did an

6    end-around. They tried to go to the STB and have them basically

7    make a quick decision before you could hear this motion. STB

8    denied that motion. But that's not where we would go. Where we

9    would go is to the Department of Interior, because that's where

10   the remedies are. But the draconian remedy that we would go for

11   is termination. We're not asking for that. We're asking for the

12   compromise. It's the same compromise today as it was back in

13   1989, and that is that this agreement be enforced.

14       THE COURT: And let me just ask you for a second,

15   Mr. Brain, you know, you said it wouldn't be fair for Burlington

16   Northern to say, well, we don't like that or we don't want to

17   comply with that because we don't like it. That's not what they

18   are saying. They are saying that we have common-carrier

19   obligations, we have shipper obligations that we must respect.

20   How do you merge that with the clause that says, you know,

21   shipper needs are going to change, it was never just, solid, one

22   train a day or 25 cars, and the Tribe should not arbitrarily

23   withhold its consent. What's the mechanism? There's not like a

24   referral to an arbitration panel or anything like that. Who's

25   going to decide, under what situations, whether it's an arbitrary

1  withholding of consent?

2      MR. BRAIN:  Ultimately, Your Honor, I think that if we

3  couldn't agree, the Court would.

4      THE COURT:  Yeah.

5      MR. BRAIN:  I mean, that's what it really comes down to.

6  Let's assume that they had complied with the agreement and said,

7  Tribe, we want to ship more cars and more trains per day, and

8  here is the reasons why, please consider it; and we said, well,

9  give us more information; they give us more information; we say,

10  no, here is the concerns we have, we didn't bargain for that; and

11  they say, well, we think we have the right to do it; then we

12  would be here.

13      THE COURT:  Yeah.  That's what I was afraid of.  Yeah.

14  You know, I was the settlement judge on the shellfish portion of

15  the *United States v. State of Washington*, and it was a very

16  interesting process to go through, because there you had all the

17  tribes and the state and the federal government.  And we were

18  able to actually work something out.  My favorite part of that

19  was going around my conference room with all the different

20  tribes, and they had hired a biologist to advise them on some of

21  the provisions of the agreement as it related to shellfish, and

22  each one of the tribes said, yeah, we agree with that, yeah, we

23  agree with that, yeah, we agree with that, until I got to the

24  Tulalips, and the Tulalips said, "Nobody speaks for Tulalips

25  except Tulalips."  And I said, "Well, what's your position?"

1   And, of course, it was exactly the same as the others.  But,

2   yeah, you know, sometimes you just have to assert yourself, so be

3   ready for that.

4       But, you know, one of the reasons these things -- you look at

5   some of those STB cases, and they're like:  Why don't you try to

6   work these things out?  Is there any desire to try to work these

7   things out, short of having me decide this, that you want to

8   explore?  Just a yes or no on that one.

9               MR. BRAIN:  I'm going to say no.

10              THE COURT:  Okay.  That's fine.

11              MR. BRAIN:  And the reason I'm going to say that, Your

12  Honor, is that if you look at opening this door to the magnitude

13  that they want to open it, and then you consider the possibility

14  that this deep-water port could be an offloading port for crude

15  oil, when the Trump administration attempts to change the laws to

16  allow that, how many trains is too much?  And I think that you

17  have to draw the line.  And this is the line, and it's so

18  material that we're going to stick with it.

19              THE COURT:  Okay.  Thanks, Mr. Brain.

20      Mr. Keehnel.

21              MR. KEEHNEL:  So I'm just going to go over the roadmap

22  that I think I would try to follow in your chambers.

23      You are going to have to figure out, was the Tribe's

24  withholding of consent here arbitrary?  I think there's a way for

25  you to find that, because it would cause a violation of law and

1   the common-carrier obligations couldn't be satisfied, that you

2   could, even using the definitions proffered by the Tribe, say,

3   it's not principled here, therefore it's arbitrary to withhold

4   consent, given that you would put Burlington Northern Sante Fe in

5   the position of violating its federal obligations.

6       If you aren't there and you have to read the clause in the

7   way that the Tribe has suggested, that arbitrary means there's no

8   limitation whatsoever, even if it's an illegal act that would be

9   engendered, then I think you entertain the possibility of

10  striking that limitation.  Because otherwise it's an illegal

11  limitation.

12      If somehow you escape from that morass -- and I hope you

13  don't have to escape from that morass; I hope you make a decision

14  within the confines we just discussed -- you have to get into

15  what happens between ICCTA and IRWA.

16      I just want to leave you with this.  The whole point of our

17  discussion of *Merrion*, in the briefing and earlier today in my

18  oral presentation, is that while tribes, yes, are sovereigns, the

19  United States Supreme Court has said there are limits to that

20  sovereign power.  One of those limits is, if you are going to

21  permit someone to come onto your property and you put conditions

22  on that, those conditions can be those only that are, quote,

23  "consistent with applicable federal laws," close quote.  Now,

24  from the Tribe's perspective, that's not something I want to

25  hear.  I want to have complete carte blanche.  I don't want the

1   federal government saying there are other laws that apply here
2   when they're germane.  But it is germane.  And it is one, I'm
3   afraid, that if you get to the point of having to grapple with
4   IRWA and ICCTA, that you should come out knowing that when
5   consent ultimately was given by the Bureau of Indian Affairs in,
6   I think, 1991, regardless of what the words said, it had to be
7   subject to that federal law requirement of common law
8   obligation -- or, excuse me, of the common-carrier obligation.
9        I can't accept that the regulation that was adopted a few
10  years ago by the Department of Interior in the IRWA context here,
11  saying that, quote, "rights-of-way approved under IRWA are
12  subject to all applicable federal laws," I can't believe that
13  anyone in that agency for a second thought that was a sea change.
14  And that's what the Tribe is asking us to believe today, that
15  despite *Merrion* decided in 1982, when BIA adopted that regulation
16  a few years ago, that it marked a complete sea change; that
17  suddenly, instead of anything that IRWA approved in the way of an
18  easement, that was not subject to common-carrier obligations,
19  that now it would be, like that.  That makes no sense.  That's a
20  dramatic shift.  It makes no sense.
21       The regulation was not talked about in those terms.  The
22  regulation was talked about internally and in the published
23  preamble.  You know, the stuff that's in front of you.  We put in
24  front of you the preamble.  It was prepared by the drafter
25  itself, the agency.  They said this just confirms what we're

1    doing, what we know, what the law is.  And they don't list

2    that -- not just this regulation, but a series of regulations, in

3    a block, were challenged in a court proceeding.  We cited it in a

4    footnote towards the end of our reply brief.  And, again, the

5    agency comes forward and says, this is just business as usual, we

6    know this is already the case as to that particular clause.

7         Your Honor, it's not difficult, I think, to read the two

8    together.  And to read the two together, you have to understand,

9    the Department of Interior grants a lot of easements that are not

10   subject to common-carrier obligations:  private easements,

11   easements that are used that just don't trigger common-carrier

12   obligations.  No one is saying that that approval process is

13   going to get repealed.  This is not an implicit repeal.  It's

14   just that when there are common-carrier obligations, those have

15   to be part of the built-in subsumed grant of the easement.  It

16   doesn't require striking anything down.  It just requires

17   acknowledging what IRWA itself, the BIA, Department of Interior

18   have acknowledged, when they grant an easement, it's subject to

19   all applicable laws.  ICCTA is applicable, not just in the

20   preemption way, but in the common-carrier obligation way.

21        I think that gives you a path to get there without having an

22   agonizing holiday season.  And if I don't see you again, which I

23   hope not to this year, have a happy holiday season.

24             THE COURT:  Thanks very much, Mr. Keehnel.

25        A very interesting and challenging case.  I will get to it

1    and try to get my decision out by Monday.  So we will have

2    something for you hopefully by then.  If not, I will get out to

3    you that we're not going to -- I will put something on the CM/ECF

4    that says, despite the Court's best intentions, it will actually

5    be sometime in early January.  But we will try to get it out by

6    Monday.

7        Thank you very much for the excellent briefing, all the

8    materials you sent me, and for the arguments today.  And

9    everybody enjoy the rest of the holiday season.

10       We will be adjourned.  Thank you.

11                        (Proceedings adjourned.)

12

13

14                    C E R T I F I C A T E

15

16       I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

17   United States District Court in the Western District of

18   Washington at Seattle, do certify that the foregoing pages are

19   a true and accurate transcription of the proceedings to the best

20   of my ability.

21

22

23                    /s/ Nickoline Drury

24                    Nickoline Drury

25