The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SWINOMISH INDIAN TRIBAL
COMMUNITY, a federally recognized Indian
Tribe,

                  Plaintiff,

      v.

BNSF RAILWAY COMPANY, a Delaware
corporation,

                  Defendant.

NO. 2:15-cv-00543-RSL

JOINT STATUS REPORT

      Pursuant to the Court's Order Granting Motion for Certification of Interlocutory Appeal (Dkt. No. 103), the parties hereby submit the following Joint Status Report and proposed schedule.

**I.    All Interlocutory Appellate Proceedings Have Concluded**

      1.1    On March 4, 2020, the Ninth Circuit issued its Opinion affirming this Court's ruling. (Dkt. No. 111). A copy of the Opinion is attached. BNSF filed a petition for rehearing and for rehearing en banc on March 30, 2020, which was denied on April 22, 2020. (Dkt. No. 112). The mandate issued on April 30, 2020. (Dkt. No. 117).

      1.2    The parties have conferred and agreed that BNSF will not seek certiorari to the Supreme Court, the Tribe will not to move for a preliminary injunction, and the parties will

JOINT STATUS REPORT (2:15-cv-00543-RSL) - 1

instead proceed with discovery, dispositive motions and preparation necessary for a trial on liability and the Tribe's request for specific performance/permanent injunctive relief enforcing the terms of the easement agreement.  Accordingly, the appellate proceedings have concluded.

**II.     Case Status**

2.1     The Court, with the parties' agreement, bifurcated this case into two phases, with damages to be resolved after the preemption and liability issues, including the Tribe's request for specific performance/injunctive relief. (Dkt. No. 19).

2.2     The parties completed discovery related to BNSF's preemption defense, including the prior litigation, and the negotiation, drafting, and execution of the Settlement Agreement and Right-of-Way Easement. The parties are still in the process of completing discovery on the remaining issues in the liability phase[1]: (1) whether BNSF materially breached the Right-of-Way Easement and, as to any breach, what remedies are available to the Tribe; (2) whether BNSF trespassed on the Tribe's property and, if so, what remedies are available to the Tribe; and (3) whether the Tribe properly withheld its consent to increased rail traffic under the terms of the Right-of-Way Easement and, if not, the remedies available to the Tribe.

2.3     The Tribe maintains that there are no material issues of fact with respect to the materiality of the breach of the Easement Agreement, BNSF's trespass, or the Tribe's withholding of permission to increase the number of trains or cars. The Tribe contemplates filing a summary judgment motion on these issues; however, the Tribe will continue to participate in discovery pending a decision on such a motion. BNSF maintains that further discovery is required on these issues, and that after such discovery is concluded the case will be ready for summary judgment.

2.4     Prior to the appeal and stay, following the agreed ESI protocol, the Tribe reviewed approximately 56,000 documents, which was reduced to approximately 5,000

---

[1] The parties are not conducting discovery on monetary damages. Further, the Court limited discovery on the Tribe to the date of filing the lawsuit, April 7, 2015. (Dkt. No. 47).

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

1    relevant documents. The Tribe has completed its privilege review of these relevant documents

2    and is preparing the documents and a privilege log for production. Several months before the

3    stay, the Tribe was advised by its discovery vendor that there were approximately 72,000

4    additional documents that were not properly uploaded and set up for the Tribe's counsel's

5    review. Many of these documents were from individuals who were not listed as possible

6    custodians with knowledge. Based on the Tribe's review of the initial set of documents, the

7    Tribe is confident that it is unlikely that there are few, if any, relevant documents among the

8    72,000 that will not be produced as part of the first set of 5,000 relevant documents. The Tribe

9    maintains that it is not required under the Rules of Civil Procedure to review all of the 72,000

10   documents (or the subset of those documents belonging to disclosed custodians). Prior to the

11   Appeal to the Ninth Circuit, the Tribe offered to run more refined search terms on the second

12   set of documents or use a Technology-Assisted Review ("TAR") program to reduce the number

13   of documents for its review. Interlocutory review was granted and there were no further

14   discussions  on the issue. In order to move this process forward while the appeal was pending

15   the Tribe utilized TAR and has begun review of approximately 24,000 TAR-identified

16   documents from disclosed custodians of the 72,000 additional documents. The Tribe has

17   informed BNSF's counsel that it remains open to negotiating an alternative review protocol

18   with BNSF. BNSF is open to a TAR review, but is requesting more details on how it will be

19   structured so the process is transparent. BNSF also has yet to receive any of the documents that

20   were a result of the search term hits, so it is unsure as to the accuracy of using the initial set of

21   search term documents to inform the TAR.

22         2.5     Further, the Tribe has not received complete discovery from BNSF. In

23   particular, the Tribe continues to seek communications and contracts with the refineries and

24

25

26

27

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

internal communications related to the Easement and Right-of-Way Agreement and notice to the Tribe.

**III.     Mediation/Settlement**.

3.1     The Parties are committed to remaining open to ongoing settlement and resolution discussions. Subject to coordinating the schedules of the key decision makers for the parties and the willingness of the March Point refineries to participate, the parties intend to engage in mediated settlement discussions by the end of September 2020.

**IV.     Parties' Proposed Case Schedule**

4.1     The Parties have conferred regarding an appropriate schedule for the liability phase of this case:

| | |
|---|---|
| **Document Exchange Deadline:** | **August 31, 2020** |
| **Completion of Fact Discovery:** | **December 18, 2020** |
| **Primary Expert Witness Disclosures:** | **January 18, 2021** |
| **Rebuttal Expert Witness Disclosures[2]:** | **March 4, 2021** |
| **Completion of Expert Discovery:** | **April 15, 2021** |
| **Deadline for Filing Dispositive Motions:** | **April 29, 2021** |

4.2     **Trial**: This case was filed in April of 2015. The parties request the earliest possible trial date after August 1, 2021. The parties are aware that there is currently uncertainty

---

[2] The parties have agreed to reserve the right to serve sur-rebuttal expert disclosures as necessary.

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1  in the Court's ability to schedule and hold trials, and that the trial setting is at the discretion of

2  the Court's availability.

3       DATED this 7th day of May, 2020.

4

5  TOUSLEY BRAIN STEPHENS PLLC     PACIFICA LAW GROUP LLP

6  By: _/s/ Christopher I. Brain_     By: _s/Paul J. Lawrence_
   Christopher I. Brain, WSBA #5054     Paul J. Lawrence, WSBA #13557
7  By: _/s/ Chase C. Alvord_     By: _s/ Michelle Vaughan_
   Chase C. Alvord, WSBA #26080     Michelle Vaughan, WSB# 54571
8  By: _/s/ Rebecca L. Solomon_     By: _s/ Gregory J. Wong_
9  Rebecca L. Solomon, WSBA #51520     Gregory J. Wong, WSBA #39329
   1700 Seventh Avenue, Suite 2200     Email: paul.lawrence@pacificalawgroup.com
10  Seattle, Washington  98101     Email: michelle.vaughan@pacificalawgroup.com
   Tel: 206.682.5600/Fax: 206.682.2992     Email: greg.wong@pacificlawgroup.com
11  Email: cbrain@tousley.com     1191 Second Avenue, Suite 2000
   Email: calvord@tousley.com     Seattle, WA 98101
12  Email: rsolomon@tousley.com     Tel: 206.245.1708/Fax: 206.245.1756
13       **_Attorneys for Defendant BNSF Railway_**
   OFFICE OF THE TRIBAL     **_Company_**
14  ATTORNEY,
   SWINOMISH INDIAN TRIBAL
15  COMMUNITY

16  By: _/s/ Stephen T. LeCuyer_
17  Stephen T. LeCuyer, WSBA #36408
   11404 Moorage Way
18  LaConner,  WA  98257
   Telephone:  360.466.1058
19  Fax: 360.466.5309
   Email: slecuyer@swinomish.nsn.us
20
   **_Attorneys for Plaintiff_**
21

22

23  4817-4449-8875, v. 3
24

25

26

27

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

JOINT STATUS REPORT (2:15-cv-00543-RSL) - 5

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

SWINOMISH INDIAN TRIBAL
COMMUNITY, a federally
recognized Indian Tribe,
<em>Plaintiff-Appellee</em>,

v.

BNSF RAILWAY COMPANY, a
Delaware corporation,
<em>Defendant-Appellant.</em>

</td><td>

No. 18-35704

D.C. No.
2:15-cv-00543-RSL

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted May 14, 2019
Seattle, Washington

Filed March 4, 2020

Before: Michael Daly Hawkins, William A. Fletcher,
and Mark J. Bennett, Circuit Judges.

Opinion by Judge W. Fletcher

# SUMMARY[*]

## Indian Law

The panel affirmed the district court's interlocutory orders denying defendant BNSF Railway Co.'s motion for summary judgment on Swinomish Indian Tribal Community's claim that BNSF violated a right-of-way and easement agreement limiting train traffic across the Tribe's reservation.

The district court held that BNSF violated the terms of the easement agreement, issued pursuant to the Indian Right of Way Act, and the Tribe was entitled to injunctive relief.

The panel held that the Interstate Commerce Commission Termination Act did not repeal the Indian Right of Way Act and did not defeat the Tribe's right to enforce conditions in the easement agreement. The panel further held that the ICCTA did not abrogate the Treaty of Point Elliott and the Tribe's treaty-based federal common law right to exclude and condition a third party's presence on, and use of, reservation lands. Finally, the panel held that the Tribe had the right to pursue injunctive relief to enforce the terms of the easement agreement. The panel remanded the case to the district court.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Benjamin J. Horwich (argued) and Teresa A. Reed Dippo, Munger Tolles & Olson LLP, San Francisco California; Sarah G. Boyce, Munger Tolles & Olson LLP, Washington, D.C.; Stellman Keehnel, Andrew R. Escobar, and Jeffrey B. DeGroot, DLA Piper LLP (US), Seattle, Washington; for Defendant-Appellant.

Christopher I. Brain (argued) and Chase Alvord, Tousley Brain Stephens PLLC, Seattle, Washington; Stephen T. LeCuyer, Office of the Tribal Attorney, La Conner, Washington; for Plaintiff-Appellee.

Thomas H. Dupree Jr. and David A. Schnitzer, Gibson Dunn & Crutcher LLP, Washington, D.C.; Kathryn D. Kirmayer and Timothy J. Strafford, Association of American Railroads, Washington, D.C.; for Amicus Curiae Association of American Railroads.

Philip J. Bezanson, Bracewell LLP, Seattle, Washington, for Amicus Curiae Tesoro Refining & Marketing Company LLC.

Jeffrey M. Harris, Consovoy McCarthy Park PLLC, Arlington, Virginia; Allison Starmann, Deputy General Counsel, American Chemistry Council, Washington, D.C.; Richard Moskowitz, General Counsel, American Fuel & Petrochemical Manufacturers, Washington, D.C.; Andrew S. Miles, Senior Counsel, American Petroleum Institute, Washington, D.C.; Daryl L. Joseffer and Michael B. Schon, U.S. Chamber Litigation Center, Washington, D.C.; Peter C. Tolsdorf and Leland P. Frost, National Association of Manufacturers, Washington, D.C.; Katie Sweeney, National Mining Association, Washington, D.C.; for Amici Curiae

American Chemistry Council, American Fuel & Petrochemical Manufacturers, American Petroleum Institute, Chamber of Commerce of the United States of America, National Association of Manufacturers, and National Mining Association.

Robert W. Ferguson, Attorney General; Julian H. Beattie, Assistant Attorney General; Laura Watson, Senior Assistant Attorney General; Office of the Attorney General, Olympia, Washington; Letitia James, Attorney General, Albany, New York; Ellen F. Rosenblum, Attorney General, Salem, Oregon; for Amici Curiae Washington State, New York, and Oregon.

Jan E. Hasselman and Ashley N. Bennett, Earthjustice, Seattle, Washington, for Amici Curiae Suquamish Tribe, Tulalip Tribes, and Quinault Indian Nation.

---

## OPINION

W. FLETCHER, Circuit Judge:

Over one hundred years ago, the predecessor to BNSF Railway Co. ("BNSF") built a railroad line across the Reservation of the Swinomish Indian Tribal Community ("Tribe") without the Tribe's permission. In the 1970s, the Tribe and the United States brought suit against the railroad for trespass. That litigation eventually resulted in a Settlement Agreement and an Easement Agreement. As a result of those Agreements, BNSF applied for and obtained a right-of-way across the Reservation, issued by the Department of the Interior under the Indian Right of Way Act of 1948. The right-of-way incorporates the terms of the Easement Agreement. BNSF agreed to a daily maximum of

one train in each direction, with a maximum number of rail cars, unless the Tribe agreed in writing to an increase in that number.  BNSF also agreed to submit to the Tribe annual reports of the cargo carried by the trains.

In 2011, the Tribe learned that BNSF was violating the parallel terms of the right-of-way and the Easement Agreement by running more trains and cars across the Reservation than permitted by its terms.  BNSF had also failed for many years to submit to the Tribe the required annual cargo reports.  The Tribe requested that BNSF comply with the terms of the Agreement.  BNSF refused.  The Tribe then sued BNSF in federal district court.

BNSF argued in the district court that the Interstate Commerce Commission Termination Act ("ICCTA") preempts the Easement Agreement.  The district court disagreed, holding in several orders that the ICCTA does not defeat the Tribe's right to an injunction to enforce the Agreement.  The district court reserved for later decision the terms of any injunction, as well as the Tribe's right to recover damages.

We granted interlocutory review of the district court's orders under 28 U.S.C. § 1292(b).  We affirm.

## I.  Factual and Procedural Background

The Swinomish Indian Tribal Community is a federally recognized Indian Tribe organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 5123.  The Tribe is a successor to signatories of the Treaty of Point Elliott of 1855, 12 Stat. 927 ("Treaty").  The Treaty established the Swinomish Reservation on Fidalgo Island in Washington

State, roughly halfway between the towns of Burlington and Anacortes.  The Tribe's reservation land is held in trust for the Tribe by the United States.

In about 1889, the Seattle and Northern Railway Company—a predecessor to BNSF—began constructing a railroad line across the northern part of the Reservation.  The Tribe objected.  W.H. Talbott, the U.S. Indian Agent of the Tulalip Agency, Washington Territory, investigated.  Based on Talbott's findings, the U.S. Attorney for Washington Territory was "directed to institute proceedings to prevent the building of the railroad across the said Indian reservation." It is unclear whether the U.S. Attorney ever instituted proceedings.

In response, on December 21, 1889, the Seattle and Northern Railway Company petitioned the U.S. Department of the Interior ("DOI") for permission and a right-of-way to build the railroad line across the Reservation.  On April 26, 1890, the Acting Commissioner for the Office of Indian Affairs in DOI sent a letter denying the petition.  The letter advised the Company that "in all cases where right of way for railroads through Indian reservations is not provided for by treaties or agreements by the United States with the Indians, congressional action is necessary to ratify agreements by railway companies with the Indians for such right of way &c."  There is no indication that the Seattle and Northern Railway Company ever obtained permission or approval from the Tribe, the Department of the Interior, or Congress to build a railroad line across the Reservation.  The Seattle and Northern Railway Company built the line nonetheless.  The Company and its successors have continued to use the line ever since.

In about 1970, the Tribe contacted Burlington Northern Railroad Company ("Burlington Northern")—a successor to the Seattle and Northern Railway Company and the immediate predecessor of BNSF—concerning Burlington Northern's continuing use of the Tribe's land for its railroad line. The Tribe was unsuccessful in attempts to negotiate a settlement with Burlington Northern. In August 1977, the Tribe asked the United States, in its role as trustee, to bring suit against Burlington Northern seeking damages and removal of the line.

Under threat of litigation, on September 27, 1977, Burlington Northern filed an application with the Western Washington Agency of the Bureau of Indian Affairs ("BIA"), seeking a railroad right-of-way across the Reservation. The Indian Right of Way Act of 1948, 62 Stat. 17, 25 U.S.C. §§ 323–28, "empower[s]" the Secretary of the Interior to "grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now or hereafter held in trust by the United States for individual Indians or Indian tribes, communities, bands, or nations." 25 U.S.C. § 323. Under the Act, "[n]o grant of a right-of-way over and across" a tribe's land "shall be made without the consent of the proper tribal officials." 25 U.S.C. § 324. Such consent "may impose restrictions or conditions" on the grant of a right-of-way. 25 C.F.R. § 169.107 (2016). "[A]ny restrictions or conditions automatically become conditions and restrictions in the grant." *Id.*; *see also* 25 C.F.R. § 169.125 (2016) ("The grant [of a right-of-way] will incorporate the conditions or restrictions set out in the Indian landowners' consents."); 25 C.F.R. § 161.15 (1968). The Indian Right of Way Act explicitly applies to railroad rights-of-ways. *See, e.g.*, 25 C.F.R. § 169.5(a)(1) (2016) ("This part covers rights-of-way over and across Indian or

BIA land, for uses including but not limited to . . . (1) Railroads."); 25 C.F.R. § 161.23 (1968).

Without conceding that its line ran across Reservation land, Burlington Northern acknowledged that the Tribe had not consented to a right-of-way as required under the Indian Right of Way Act of 1948. Burlington Northern stated in its application that it was instead applying under the "Act of March 2, 1899," 25 U.S.C. § 312 ("1899 Act"). The 1899 Act provided for grants of rights-of-way for railroads through Indian reservations. It did not require permission of a tribe, but it did require compliance with its various provisions, including payment of compensation to the tribe. Burlington Northern had not previously applied for a right-of-way under the 1899 Act and had never compensated the Tribe.

The Western Washington Agency of the BIA forwarded Burlington Northern's application to the Portland Area Director of the BIA. The Agency's cover memorandum stated, *inter alia*, that "local review finds this case to be lacking under current CFR regulations in that . . . [t]he landowners have not concurred. In fact the [T]ribe . . . has gone on record . . . requesting removal of said railroad." On October 17, 1978, the Agency denied Burlington Northern's application due to lack of tribal consent.

Burlington Northern appealed to the Portland Area Director, arguing that tribal consent was not required. On May 4, 1979, the Area Director affirmed the decision of the Western Washington Agency, concluding that for tribes organized under the Indian Reorganization Act of 1934, tribal consent was required before the United States could alienate their interests in trust lands, regardless of whether application was made under the Indian Right of Way Act or the 1899

Act.  Burlington Northern appealed the Area Director's decision to the Assistant Secretary for Indian Affairs.  The Assistant Secretary affirmed the decision of the Area Director.

On October 12, 1979, Burlington Northern filed a complaint in federal district court seeking to compel the Secretary of the Interior to grant a right-of-way across the Reservation.  *See Burlington N., Inc. v. Andrus et al.*, No. C79-1199V (W.D. Wash., filed Oct. 15, 1979).  The Tribe intervened, and the parties filed cross-motions for summary judgment.  The district court deferred consideration of the motions until our court issued a ruling in a factually similar case, *Southern Pacific Transportation Co. v. Watt*, 700 F.2d 550 (9th Cir. 1983).  We held there that tribal consent is a condition precedent to a grant of a railroad right-of-way across tribal lands.  After our decision, the district court entered judgment against Burlington Northern.  Burlington Northern had appealed to our court but dismissed its appeal after the Supreme Court denied certiorari in *Southern Pacific*.

Meanwhile, on July 18, 1978, the Tribe filed a trespass action against Burlington Northern in district court seeking damages and an injunction requiring removal of the railroad line from the Reservation.  *See Swinomish Tribal Cmty. v. Burlington N., Inc*, Case No. C78-429V (W.D. Wash., filed July 18, 1978) ("Trespass Litigation").  The United States intervened on the side of the Tribe in 1983.  The Interstate Commerce Commission ("ICC"), the predecessor to the Surface Transportation Board, had also sought leave to intervene.  The ICC argued that it had "exclusive jurisdiction to determine whether the abandonment" of the railroad—that is, the Tribe's request that Burlington Northern remove the railroad entirely—was "in the national interest."  The district

court denied the ICC's motion as premature, noting that the motion could be renewed if and when the question of remedy arose.

In 1989, after over a decade of litigation, the Tribe, the United States, and Burlington Northern reached a settlement. The parties' agreement was formalized in a Settlement Agreement and an Easement Agreement. In 1991, the BIA approved the Settlement Agreement and granted a right-of-way under the Indian Right of Way Act, consistent with the terms specified in the Easement Agreement.

Under the settlement, Burlington Northern agreed to apply to the BIA for a right-of-way consistent with the terms and conditions specified in the Easement Agreement. Burlington Northern also agreed to a one-time payment of $125,000 "for all rent, damages and compensation of any sort, due for past occupancy of the right-of-way from date of construction in 1889 until January 1, 1989." It agreed to pay thereafter an annual rental fee of at least $10,000, subject to periodic increases based on the Consumer Price Index and changes in property values. In turn, the Tribe agreed to consent to the right-of-way subject to the specified terms.

The Easement Agreement and corresponding right-of-way grant Burlington Northern the right to run a specified maximum number of trains, with a maximum number of cars, across the Reservation, unless the Tribe agrees in writing to an increase. The relevant language provides:

> Burlington Northern agrees that, unless otherwise agreed in writing, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the

> Reservation each day.  The number of trains and cars shall not be increased unless required by shipper needs.  The Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs.  It is understood and agreed that if the number of crossings or the number of cars is increased, the annual rental will be subject to adjustment . . . .

During negotiations leading up to the agreements, Burlington Northern had written in a June 22, 1989, letter that it "doubt[ed]" that it would operate more trains than the agreed-upon amount, but that it might need to "[o]n occasion."

The Easement Agreement also requires Burlington Northern to submit annual cargo reports to the Tribe:

> Burlington Northern will keep the Tribe informed as to the nature and identity of all cargo transported by Burlington Northern across the Reservation.  Initially, Burlington Northern shall prepare a summary of all such commodities expected to cross the Reservation and the quantities of such commodities.  Thereafter, the disclosure shall be updated periodically as different products, or commodities, are added or deleted. Such updates shall occur at least annually.  The disclosure updates shall identify any previously shipped cargo that is different in nature, identity or quantity from the cargo described in previous disclosures. Burlington Northern will comply strictly with all Federal

> and State Regulations regarding classifying,
> packaging and handling of rail cars so as to
> provide the least risk and danger to persons,
> property and the natural environment of the
> Reservation.

The right-of-way and Easement Agreement have an initial term of forty years, with two twenty-year extensions at Burlington Northern's option. The right-of-way and Easement Agreement therefore terminate no later than 2071.

The railroad line and underlying right-of-way run across the northern part of the Reservation and next to the Tribe's primary economic development enterprises, including a casino, a lodge, a Chevron service station and convenience store, and an RV park. According to the Tribe, "[h]undreds of guests and employees are present at the economic development facilities at all times, 24 hours a day, 7 days a week." "This economic development infrastructure serves as the primary financial source for funding of the Tribe's essential governmental functions and programs."

The railroad line crosses a swing bridge over the Swinomish Channel and a trestle bridge across Padilla Bay, both of which are within the Reservation. Both bodies of water connect directly to the Puget Sound (the Salish Sea), where the Tribe has treaty rights to fish at its usual and accustomed fishing grounds and stations. *See United States v. Washington*, 459 F. Supp. 1020, 1049 (W.D. Wash. 1978).

### A.  Events Giving Rise to Present Action

In October 2011, the Tribe learned from Skagit County government documents that Tesoro Refining & Marketing

Company, LLC, an oil company with a refinery on March Point, adjacent to Anacortes, intended to ship crude oil in 100-car "unit trains" across the Reservation every other day using BNSF trains.  On October 18, 2011, the Tribe sent a letter to BNSF, Burlington Northern's successor, reminding BNSF of its obligation to obtain written approval from the Tribe for any increases in rail traffic above the maximum level specified in the Easement Agreement.  BNSF did not respond to the letter.

In September 2012, the Tribe learned from a local news article that BNSF had begun to run 100-car trains across the Reservation.  BNSF later admitted to running six 100-car unit trains in each direction across the Reservation every week.  On September 27, 2012, the Tribe sent a letter to BNSF notifying BNSF that the increased rail traffic violated the Easement Agreement and requesting information from BNSF.

BNSF responded to the Tribe almost five months later.  BNSF confirmed in its answering letter that throughout 2012, it had run "locals" averaging between 27.8 and 28.5 cars six times per week between Burlington and the March Point refinery.  BNSF wrote further that beginning in September 2012, it had run sixty-two additional unit trains (about one every other day) of "approximately 102 cars in each direction."  Finally, BNSF wrote that it "anticipate[d] that in the near term, unit trains may increase from four to six times weekly to as much as ten times weekly."  BNSF had not previously asked, and did not now ask, the Tribe's permission to run its new 100-car unit trains across the Reservation.

In a letter to BNSF dated November 25, 2014, the Tribe complained that BNSF had violated the Easement Agreement not only by exceeding the number of trains and rail cars, but

also by failing to report to the Tribe the particularly dangerous nature of the crude oil, from North Dakota's Bakken formation, that was carried by the unit trains:

> The Tribe, like the public generally, has learned that Bakken crude oil being transported by rail—which the Tribe informally understands is being transported by rail to the Tesoro refinery on March Point—poses a potentially far greater risk to human life, health and communities than some other crude oils because of its propensity to catastrophically combust. . . . [T]he BNSF easement across the Reservation is in close physical proximity to central elements of the Tribe's economic development infrastructure, including the Casino, Lodge, Chevron and RV park.

In the fifteen-page, single-spaced letter, the Tribe described numerous recent catastrophic spills and fires in the United States and Canada resulting from derailment of trains carrying Bakken crude oil.

The Tribe quoted from a report prepared by the U.S. Department of Transportation, addressing the unusual hazards of rail transportation of Bakken crude oil. According to the report:

> The number and type of petroleum crude oil railroad accidents described below that have occurred during the last year is startling, and the quantity of petroleum crude oil spilled as a result of those accidents is voluminous in

> comparison to past precedents.  Due to the
> volume of crude oil currently being shipped
> by railroads, the demonstrated recent
> propensity for rail accidents involving trains
> transporting crude oil to occur, and the
> subsequent releases of large quantities of
> crude oil into the environment and the
> imminent hazard those releases present, this
> Order requires that railroads take the action
> described above . . . . Releases of petroleum
> crude oil, subsequent fires, and environmental
> damage resulting from such releases represent
> an imminent hazard . . . presenting a
> substantial likelihood that death, serious
> illness, severe personal injury, or a substantial
> endangerment to health, property, or the
> environment may occur.

U.S. Dep't of Transp., Emergency Restriction/Prohibition
Order, Docket No. DOT-OST-2014-0067, at 4 (May 7, 2014).

The letter recounted two recent derailments of BNSF unit
trains carrying Bakken crude.  One derailment was in North
Dakota.  It resulted in a spill of "approximately 400,000
gallons" of crude oil and "a significant fire."  The other
derailment was in Seattle.  The train had been on its way to
the March Point refinery and would have crossed the
Swinomish Reservation.  The letter acknowledged that BNSF
trains travel slowly when crossing the Reservation, but noted
that the train derailed in Seattle while traveling at a speed of
less than five miles per hour.  The Easement Agreement
limits the speed of BNSF's trains when crossing the
Reservation to less than ten miles per hour.

In communications with BNSF, the Tribe repeatedly requested that BNSF abide by the Easement Agreement. BNSF consistently refused to do so. BNSF also repeatedly failed to provide annual cargo reports to the Tribe.

## B. Federal District Court Proceedings

On April 7, 2015, the Tribe filed suit in district court against BNSF seeking a declaratory judgment that BNSF had breached, and was continuing to breach, the Easement Agreement; injunctive relief limiting train traffic in accordance with the Agreement; and damages for trespass and breach of contract. BNSF's answer contended that the Tribe's claims were preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10501 *et seq*. The parties filed cross-motions for summary judgment.

In a series of orders dated January 13, 2017, June 8, 2017, and March 15, 2018, the district court ruled against BNSF. It held that BNSF had "breached the terms of the Easement Agreement by failing to make annual disclosures regarding the cargo it was carrying across the reservation and by increasing the number of trains and cars traversing the reservation without first seeking to obtain the Tribe's written assent." The court held that the Tribe has a treaty-based interest in its Reservation land under BNSF's tracks, and that the ICCTA does not "preempt" the Easement Agreement or remedies for its breach. The district court did not rule on the specifics of injunctive relief. It held only that injunctive relief was available. The district court reserved for later decision the Tribe's request for damages.

BNSF moved to certify the district court's summary judgment and related orders for interlocutory appeal. The district court certified its orders for appeal, and BNSF petitioned our court for permission. BNSF's petition and appeal pose one question: Whether the ICCTA precludes the use of injunctive relief to enforce the terms of the Easement Agreement. We granted permission to appeal under 28 U.S.C. § 1292(b).

## II.  Standard of Review

We review the district court's summary judgment decision de novo. *See, e.g.*, *Tulalip Tribes v. Suquamish Indian Tribe*, 794 F.3d 1129, 1133 (9th Cir. 2015).

## III.  Analysis

The district court held that BNSF violated the terms of the Easement Agreement. BNSF contends the district court erred because the ICCTA preempts the Agreement, the underlying federal common law, the Treaty of Point Elliott, and Indian Right of Way Act. We agree with the district court.

### A.  The Easement Agreement

The Easement Agreement specifies a maximum number of trains and rail cars, which can be increased only with the written permission of the Tribe. For the convenience of the reader, we again provide the relevant text:

> Burlington Northern agrees that, unless otherwise agreed in writing, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the

> Reservation each day.  The number of trains
> and cars shall not be increased unless required
> by shipper needs.  The Tribe agrees not to
> arbitrarily withhold permission to increase the
> number of trains or cars when necessary to
> meet shipper needs.  It is understood and
> agreed that if the number of crossings or the
> number of cars is increased, the annual rental
> will be subject to adjustment . . . .

The Agreement also required Burlington Northern to inform the Tribe "as to the nature and identity of all cargo transported by Burlington Northern across the Reservation. . . . [T]he disclosure shall be updated periodically as different products, or commodities, are added or deleted.  Such updates shall occur at least annually."

BNSF does not now contest that it has violated, and is continuing to violate, the terms of the Agreement.  Rather, BNSF contends that the Tribe's right to enforce the Agreement and seek injunctive relief is preempted by the ICCTA.

## B.  Preemption by the ICCTA

The Interstate Commerce Commission Termination Act of 1995 "abolished the [Interstate Commerce Commission], revised the Interstate Commerce Act, and transferred regulatory functions under that Act to the [Surface Transportation Board]."  *DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1082 (9th Cir. 2007).  The ICCTA contains a broad preemption provision:

(b) The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located entirely in one State,

is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

This provision of the ICCTA expressly preempts "a wide range of *state and local* regulation of rail activity."  *Ass'n of Am. R.R.s v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1096–97 (9th Cir. 2010) (emphasis added).  "It is difficult to imagine a broader statement of Congress's intent to preempt *state* regulatory authority over railroad operations."  *City of Auburn v. United States*, 154 F.3d 1025, 1030 (9th Cir. 1998) (citation omitted) (emphasis added).

The Supremacy Clause provides that the Constitution, the laws of the United States, and all treaties "shall be the supreme Law of the Land."  U.S. CONST., art. VI, cl. 2.  Pursuant to the Supremacy Clause, "federal law may pre-empt state law."  *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991).  Under this doctrine, "state laws that 'interfere with, or are contrary to the laws of [C]ongress, made in pursuance of the constitution' are invalid."  *Id.* (quoting *Gibbons v. Ogden*, 22 U.S. 1 (1824)).  When a federal law conflicts with a state or local law, the state or local law simply must give way.

The preemption provision of the ICCTA also grants the Surface Transportation Board ("STB") exclusive authority over *federal* regulatory authority.  *See DHX, Inc.*, 501 F.3d at 1082.  However, if there is a conflict between the ICCTA and another federal law, we do not use the analytic framework applicable to federal preemption of state and local regulation.  Indeed, the term "preempt," when applied to a conflict between federal laws, is a bit of a misnomer.  The usual terms employed in analyzing a conflict between federal laws are repeal and abrogation.  *Cf. County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 240 (1985) ("[W]e hold that the Oneidas' right of action under federal common law was not pre-empted by the passage of the Nonintercourse Acts.")

Under the usual terminology, "federal statutes do not *preempt* other federal statutes."  *Ray v. Spirit Airlines, Inc*., 767 F.3d 1220, 1224 (11th Cir. 2014); *see also Baker v. IBP, Inc*., 357 F.3d 685, 688 (7th Cir. 2004).  When a "case involves the interplay between two statutory schemes created by Congress for different reasons and at different times," we typically ask whether the later statute *repeals* the prior one.  *Ray*, 767 F.3d at 1224; *see also, e.g.*, *Morton v. Mancari*,

417 U.S. 535, 549 (1974) (analyzing whether the Equal Employment Opportunities Act of 1972 implicitly repealed Section 12 of the Indian Reorganization Act of 1934).

Similarly, under the terminology usually employed, federal laws do not "preempt" treaties.  The usual term is "abrogation."  When a later-enacted federal statute conflicts with a treaty, we typically examine whether the statute explicitly or implicitly abrogates the treaty.  *See, e.g.*, *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412–13 (1968); *United States v. Smiskin*, 487 F.3d 1260, 1264 (9th Cir. 2007).

1.  Federal Law Underlying the Easement Agreement

There are three sources of federal law underlying the Easement Agreement:  federal common law, the Treaty of Point Elliott, and the Indian Right of Way Act.

Under federal common law, Indian tribes have the right to exclude non-Indians and non-tribal members from their lands, and the commensurate right to grant admission to, or use of, their lands on such terms as the tribes see fit to impose.  "[A] hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands . . . ."  *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982); *Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 899 (9th Cir. 2017), *as amended* (Aug. 3, 2017) ("The Supreme Court has long recognized that Indian tribes have sovereign powers, including the power to exclude non-tribal members from tribal land."), *cert. denied*, 138 S. Ct. 648 (2018).  Tribes possess inherent sovereign authority "[t]o determine who may enter the reservation; to define the conditions upon which they may enter; to prescribe rules of conduct; [and] to expel

those who enter the reservation without proper authority." *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 411 (9th Cir. 1976); *see also Merrion*, 455 U.S. at 144 ("When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry.").  Tribes have a federal common law right to sue to protect their possessory interests in their lands. *See County of Oneida*, 470 U.S. at 235–36 ("In keeping with these well-established principles, we hold that the Oneidas can maintain this action for violation of their possessory rights based on federal common law.").

The Treaty of Point Elliott was one of many treaties signed by the federal government in 1854 and 1855 with the tribes surrounding Puget Sound, under which tribes were guaranteed reservation lands for their exclusive use.  *See Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 662 (1979) ("*Fishing Vessel*") ("[C]ertain relatively small parcels of land were reserved for their exclusive use.").  The Treaty specifically provides that the Tribe has a right to exclude non-Indians from the Reservation.  *See* Treaty of Point Elliott, 12 Stat. 927, at Art. II (1859).  The Treaty is "self-enforcing." *See Fishing Vessel*, 443 U.S at 693 n.33 ("The State has . . . argued that absent congressional legislation the treaties involved here are not enforceable.  This argument flies directly in the face of Art. XIII of the treaties . . . ."); *see also Skokomish Indian Tribe v. United States*, 410 F.3d 506, 513 (9th Cir. 2005) (en banc) ("The Supreme Court has held that the Treaty of Point No Point and similar treaties are 'self-enforcing' and thus do not require implementing legislation to form the basis of a lawsuit.").  Under long-established principles of federal Indian law, treaties are enforceable in equity against third

parties.  *See, e.g.*, *United States v. Winans*, 198 U.S. 371, 377 (1905); *United States v. Washington*, 853 F.3d 946, 961 (9th Cir. 2017); *Skokomish Indian Tribe*, 410 F.3d at 513; *United States v. Washington*, 157 F.3d 630, 657 (9th Cir. 1998).

The Indian Right of Way Act provides that the "Secretary of the Interior . . . is empowered to grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands . . . held in trust by the United States for . . . Indian tribes . . . ." 25 U.S.C. § 323. "No grant of a right-of-way over and across any lands belonging to a tribe organized under the Act of June 18, 1934 [the Indian Reorganization Act] . . . shall be made without the consent of proper tribal officials."  *Id.* at § 324.  It is undisputed that the Swinomish Indian Tribal Community was organized under the Indian Reorganization Act.  Regulations under the Indian Right of Way Act provide that any unauthorized use of an existing right-of-way constitutes trespass for which a Tribe may "pursue any available remedies under applicable law, including applicable tribal law."  25 C.F.R. § 169.413; *see also* 25 C.F.R. § 169.401 ("Any . . . violation of the right-of-way grant or right-of-way document, including but not limited to encroachments beyond the defined boundaries, accidental, willful, and/or incidental trespass, unauthorized new construction, changes in use not permitted in the grant, and late or insufficient payment may result in enforcement actions including, but not limited to, cancellation of the grant.").

### 2.  Preemption, Repeal, and Abrogation

BNSF argues that the ICCTA "preempts" the treaty-based federal common law that allows tribes to exclude non-Indians from Indian land.

In support of its argument, BNSF wrote in its brief:

> Consistent with the statutory text, "[e]very court that has examined [Section 10501(b)] has concluded that [its] preemptive effect . . . is broad and sweeping," *forbidding* "impinge[ment] on the [STB]'s jurisdiction or a railroad's ability to conduct its rail operations." *CSX Transp., Inc.*, FD 34662, 2005 WL 584026, at *6 (STB Mar. 14, 2005) . . . .

BNSF Brief at 28 (emphasis added; alterations in original). BNSF misrepresented what the STB wrote in *CSX Transportation*. The actual text of *CSX Transportation* reads as follows:

> Every court that has examined the statutory language has concluded that the preemptive effect of section 10501(b) is broad and sweeping, and that it *blocks actions by states or localities* that would impinge on the Board's jurisdiction or a railroad's ability to conduct its rail operations[.]

*CSX Transp.*, 2005 WL 584026, at *6 (emphasis added). BNSF would have the reader understand that the STB had written that the preemptive force of the ICCTA is the same, whether it conflicts with federal law or with state or local law. By replacing the words "blocks actions by states or localities" with the word "forbidding," BNSF removed the qualification STB included in the actual text.

One paragraph later, BNSF wrote:

> This Court, too, has held that ICCTA squarely preempts *remedies* that "may reasonably be said to have the effect of managing or governing rail transportation." *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010)[.]

BNSF Brief at 28–29 (emphasis added). BNSF again misrepresented what was written. The actual text of *Association of American Railroads* reads as follows:

> As stated by our sister circuits, ICCTA "preempts *all 'state laws* that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.'"

*Ass'n of Am. R.R.s*, 622 F.3d at 1097 (emphasis added). Again, BNSF would have the reader understand that our court had written that the preemptive force of the ICCTA is the same, whether it conflicts with federal law or with state law. By replacing the words "all state laws" with the word "remedies," BNSF removed the qualification we included in our actual text and at the same time introduced a concept ("remedies") not included in the text.

These misrepresentations would lead the unwary reader to understand that the STB and our court have both read the ICCTA to preempt broadly, without distinction between state and local law, on the one hand, and federal law, on the other.

Such an understanding would, of course, benefit BNSF in this litigation. However, such an understanding is not supported by the decisions whose language is quoted in part by BNSF.

After oral argument in this case, our panel ordered BNSF's attorneys to explain the manner in which they quoted these cases in their brief. In their letter in response, after defending their selective quotations from *CSX Transportation* and *Association of American Railroads*, BNSF's attorneys wrote, "Responding to the Court's inquiry has led Counsel to appreciate, however, that we could have made explicit when first citing *CSX* and *AAR* that, even though these cases arose in a distinct context involving state and local law, BNSF contends they nonetheless supply the appropriate principles of law in this case. We regret not taking that approach." We, in turn, regret that BNSF's attorneys wrote only that they "could have made explicit," and that they "regret not taking that approach," instead of acknowledging straightforwardly that they misrepresented in their brief what the STB and our court had written in those cases. We expect better from the attorneys who appear before us.

The "preemption" question under the ICCTA, with respect to federal law, is really two questions. First, to the degree that there may be a conflict between the two statutes, did the ICCTA repeal the Indian Right of Way Act? Second, did the ICCTA abrogate treaty-based federal common law and the Treaty of Point Elliott, which allow tribes to exclude non-Indians from their reservations? We take those questions in turn.

### A. Repeal

When a later-enacted statute does not expressly repeal existing federal law, we ask whether the later-enacted statute implicitly repeals earlier law.  "[R]epeals by implication are not favored." *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936).  "The intention of the legislature to repeal 'must be clear and manifest.'" *United States v. Borden Co.*, 308 U.S. 188, 198 (1939) (citation omitted); *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 575 (9th Cir. 2000). "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Mancari*, 417 U.S. at 550; *see Branch v. Smith*, 538 U.S. 254, 273 (2003) ("An implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute." (citations and internal quotation marks omitted)); *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 381 (1996) ("The rarity with which we have discovered implied repeals is due to the relatively stringent standard for such findings, namely, that there be an irreconcilable conflict between the two federal statutes at issue." (citations and internal quotation marks omitted)).  "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Mancari*, 417 U.S. at 551.

To the extent two federal laws appear to conflict, we attempt to harmonize them.  Both our court and the STB have done so when the ICCTA has appeared to conflict with

another federal law.  *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 761 (9th Cir. 2018); *Ass'n of Am. R.R.s*, 622 F.3d at 1097 ("If an apparent conflict exists between ICCTA and a *federal* law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible.");  *Bos. & Me. Corp. & Town of Ayer, Mass.*, No. 33971, 2001 WL 458685, at *6 n.28 (S.T.B. Apr. 30, 2001) ("[I]f two Federal statutes are 'capable of coexistence,' the statutes should be harmonized and each should be regarded as effective unless there is a 'positive repugnancy' or an 'irreconcilable conflict' between the laws." (quoting *Matsushita Elec. Indus. Co.*, 516 U.S. at 381)); *see also U.S. Envtl. Prot. Agency*, FD 35803, 2014 WL 7392860, at *7 (S.T.B. Dec. 29, 2014) ("[A]ctions taken and regulations enacted under . . . federal statutes may directly conflict with the purposes and regulatory scheme under the Interstate Commerce Act.  When such a conflict occurs, the Board or a court must determine whether the two federal statutes and their applicable regulatory schemes can be harmonized.").

In the context of a statute that touches on federal Indian law, such as the Indian Right of Way Act, there is an additional canon of construction:  "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (citations omitted); *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996) ("Courts have uniformly held that treaties, statutes and executive orders must be liberally construed in favor of establishing Indian rights.  Any ambiguities in construction must be resolved in favor of the Indians. These rules of construction are rooted in the unique trust relationship between the United

States and the Indians." (citations and internal quotation marks omitted)).

The ICCTA was enacted in 1995.  The Act served Congress's purpose of "substantially deregulat[ing] the railroad industry," with an eye toward promoting competition, by preempting "a wide range of state and local regulation" that directly managed rail activity.  *Ass'n of Am. R.R.s*, 622 F.3d at 1096–97; *DHX, Inc.*, 501 F.3d at 1082–83 (discussing the Act).  Despite the broad "preemption" language of § 10501(b) of the ICCTA, and consistent with the jurisprudence on "implicit repeals," courts and the STB have routinely held that the ICCTA does not repeal particular federal statutes and the remedies provided thereunder.  They have harmonized the ICCTA with these other federal statutes, giving effect to both.  *See, e.g.*, *BNSF Ry. Co.*, 904 F.3d at 761–62 (harmonizing the Hazardous Materials Transportation Act and holding that fees permitted in that Act are not preempted by the ICCTA); *Ass'n of Am. R.R.s*, 622 F.3d at 1098 ("[T]o the extent that state and local agencies promulgate EPA-approved statewide plans under federal environmental laws (such as 'statewide implementation plans' under the Clean Air Act), ICCTA generally does not preempt those regulations because it is possible to harmonize the ICCTA with those federally recognized regulations."); *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 522–23 (6th Cir. 2001) (holding Congress did not intend for the ICCTA to repeal the Federal Railway Administration's authority under the Federal Railway Safety Act to regulate rail safety); *BNSF Ry. Co. v. Albany & E. R.R. Co.*, 741 F. Supp. 2d 1184, 1196–98 (D. Or. 2010) (holding that the ICCTA does not displace the Sherman Act); *Ass'n of Am. R.R.s v. S. Coast Air Qual. Mgmt. Dist.*, 2007 WL 2439499, at *5 (C.D. Cal. Apr. 30, 2007) ("The District is correct that the ICCTA does not

preempt the [Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*].”); *Holland v. Delray Connecting R.R. Co.*, 311 F. Supp. 2d 744, 747–52 (N.D. Ind. 2004) (holding that the ICCTA does not repeal the Coal Industry Health Benefits Act); *Bos. & Me. Corp. & Town of Ayer, Mass.*, 2001 WL 458685, at *6 n.28 (“[N]othing in section 10501(b) is intended to interfere with the role of state and local agencies in implementing Federal environmental statutes, such as the Clean Air Act [and the federal clean water statutes].”); *Auburn & Kent, WA*, 2 S.T.B. 330, 337, 1997 WL 362017 (July 2, 1997) (same), *aff'd sub nom. City of Auburn v. United States*, 154 F.3d 1025 (9th Cir. 1998).

The specific question before us is whether § 10501(b) of the ICCTA repeals the Indian Right of Way Act. For several reasons, we conclude that it does not.

First, the ICCTA's preemption applies to “regulation” of railroads. 49 U.S.C. § 10501(b) (“[T]he remedies provided under this part with respect to *regulation* of rail transportation are exclusive and preempt the remedies provided under Federal or State law.” (emphasis added)). “The STB's interpretation of this provision . . . likewise focuses on the regulatory nature of the remedies preempted.” *PCS Phosphate Co, Inc. v. Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009) (internal citation omitted). Pursuant to the Indian Right of Way Act, if a tribe consents, the Secretary of the Interior may issue a right-of-way easement granting rights of entry to the tribe's trust land. Without a valid right-of-way easement agreement, any railroad crossing a tribe's land is doing so illegally and is trespassing. *See, e.g.*, *United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 699 (9th Cir. 1976) (“*Southern Pacific*”). Right-of-way easements under the Indian Right of Way Act are voluntary agreements between

a tribe and a railroad, approved by the United States in its role as trustee, that grant the railroad access to a tribe's land subject to certain conditions.  While it is conceivable that a right-of-way issued under the Indian Right of Way Act could operate as a "regulation" within the meaning of the ICCTA, the Easement Agreement in this case has not resulted in such a right-of-way; nor have the parties pointed to a right-of-way issued under the Indian Right of Way Act that could operate in such a way.

Consistent with this conclusion, both courts and the STB have held in the state-law context—where true preemption, not repeal, applies—that voluntary agreements between private parties "are not presumptively regulatory acts" subject to the ICCTA's preemption provision.  *PCS Phosphate*, 559 F.3d at 218.  As the Fourth Circuit has written, "Voluntary agreements between private parties, however, are not presumptively regulatory acts, and we are doubtful that most private contracts constitute the sort of 'regulation' expressly preempted by the statute." *Id.* at 218.  The Fourth Circuit concluded that "[t]he history and purpose of the ICCTA support the view that Congress did not intend to preempt all voluntary agreements concerning rail transportation." *Id.* at 219.  The court went on to hold that a right-of-way easement agreement between a mine owner and a railroad in which the railroad promised to pay to relocate its railroad line in the future, if necessary to accommodate the landowner's operations, was enforceable and was not preempted by the ICCTA.

Nor does enforcement of the Easement Agreement constitute an "unreasonable interference" with rail transportation such that it is impliedly preempted by the ICCTA.  *See id.* at 220–21.  In holding that the ICCTA did

not preempt the right-of-way easement agreement between the mine owner and railroad, the Fourth Circuit explained that "the determination of whether the action constitutes 'an unreasonable interference' requires a factual assessment of the effect of providing the claimed remedy." *Id.* at 221. Here, the conditions imposed by the Agreement—specifying the maximum number of trains and cars—do not unreasonably interfere with rail transportation. The parties reached the Agreement after extensive negotiation, during which BNSF represented that it "doubted" it would exceed the agreed-upon maximum. *See id.* (finding relevant that the "relocation agreements were freely negotiated between sophisticated business parties" and the "agreements envisioned this exact circumstance"). Further, the terms expressly provide that the "Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs." Thus, we decline to hold that injunctive relief pursuant to the Easement Agreement is categorically an unreasonable interference with rail transportation.

Second, nothing in the text of the ICCTA or its legislative history indicates that Congress intended that the ICCTA repeal the Indian Right of Way Act or remedies thereunder. *See Mancari*, 417 U.S. at 550 ("There is nothing in the legislative history . . . that indicates affirmatively any congressional intent to repeal the 1934 preference."). The text of the ICCTA does not mention tribes or the Indian Right of Way Act in the context of rail transportation. *See* ICC Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 803. It mentions tribes only once, and in an entirely different context. *See* 49 U.S.C. § 13902(b)(1) and (b)(8) (providing for registration of Indian tribes as "motor carriers" under the ICCTA). Further, the ICCTA included "conforming

amendments" to dozens of other statutes, but none to the Indian Right of Way Act. *See* ICC Termination Act of 1995, Pub. L. No. 104–88, §§ 311–408, 109 Stat. 803, 943–55. Nor does the ICCTA's legislative history include any discussion of tribes or the Indian Right of Way Act. *See, e.g.*, H.R. Conf. Rep. 104–422 (Dec. 18, 1995); S. Rep. 104–176 (Nov. 21, 1995); H.R. Rep. 104–311 (Nov. 6, 1995); *see also PCS Phosphate*, 559 F.3d at 219 (discussing the legislative history).

Congress was well aware of the Indian Right of Way Act when it enacted the ICCTA. *See Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*, 918 F.3d 610, 616 (9th Cir. 2019) ("We assume Congress is knowledgeable about existing law pertinent to the legislation it enacts, *see South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 351 (1998) . . . ."). Regulations promulgated under the Indian Right of Way Act expressly provide that the Act applies to railroads. *See* 25 C.F.R. § 169.5(a)(1) ("This part covers rights-of-way over and across Indian and BIA land, for uses including but not limited to the following: (1) Railroads; . . . ."). When the ICCTA was enacted, federal courts, the Department of the Interior, and the Interstate Commerce Commission—the predecessor to the STB—had applied the Indian Right of Way Act to railroads for decades. *See, e.g.*, *Star Lake R.R. Co.—Rail Constr. & Operation in Mckinley Cty., N.M.*, FD 28272, 1987 WL 98276, at *5 (I.C.C. Apr. 10, 1987) ("Our authorization is permissive; applicants will have to obtain the easement or make some other acceptable arrangement before they can construct the line."); *Star Lake R.R. Co. v. Lujan*, 737 F. Supp. 103 (D.D.C. 1990) (upholding DOI's termination of a railroad's right-of-way, despite the fact that the ICC had approved the railroad's use of the land); *see also Southern Pacific*, 543 F.2d at 690–93

(discussing prior Acts); *Alaska R.R. Corp.*, 2010 WL 1266781, at \*562 (S.T.B. Mar. 16, 2010) (a 2010 draft environmental impact statement by the STB recognizing that the Indian Right of Way Act applies, and stating that DOI is "responsible for granting rights-of-way and handling disputes between [Alaska Native landowners] and [railroad] holders of rights-of-way" and ensuring "allotees are properly notified . . . and their lawful rights observed as prescribed in 25 CFR Part 169."). Thus, neither the text nor legislative history of the ICCTA provides any indication that Congress intended to repeal any part of the Indian Right of Way Act, let alone any "clear and manifest" indication. *Borden Co.*, 308 U.S. at 198.

Third, Title 49 of the U.S. Code, in which the ICCTA is codified, explicitly provides, "Nothing in this title shall absolve the United States from any responsibility to Indians and Indian tribes, including responsibilities derived from the trust relationship and any treaty, executive order, or agreement between the United States and an Indian Tribe." 49 U.S.C. § 102(f)(2)(B). The Indian Right of Way Act is a statutory mechanism by which the United States fulfills some of those responsibilities.

Fourth, the Indian Right of Way Act applies to a "very specific situation": the issuance of right-of-way easements that permit third parties to use a tribe's trust land, consistent with the conditions of that agreement. *Mancari*, 417 U.S. at 550. The ICCTA, on the other hand, applies to railroads broadly. *See also BNSF Ry. Co.*, 904 F.3d at 766 ("The preemption provision of the ICCTA is broad and general, providing without differentiation for preemption of state and local regulation of railroad 'rates, classifications, rules . . . , practices, routes, services, and facilities.'"). "Where there is no clear intention otherwise, a specific statute will not be

controlled or nullified by a general one, regardless of the priority of enactment." *Mancari*, 417 U.S. at 550–51; *BNSF Ry. Co.*, 904 F. 3d at 766.

Finally, "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Mancari*, 417 U.S. at 550. The ICCTA and the Indian Right of Way Act are easily reconcilable. On the one hand, tribes retain sovereign authority to control their own lands and to enforce the terms of right-of-way easement agreements issued pursuant to the Indian Right of Way Act. The Department of the Interior retains authority to issue and enforce right-of-way agreements, including any agreed-upon conditions negotiated between a tribe and a railroad. On the other, the STB retains authority under the ICCTA to regulate rail operations over Indian lands, such as rates for service, so long as those regulations are consistent with the terms of a normal easement granted under the Indian Right of Way Act. Harmonizing the Indian Right of Way Act and the ICCTA in this way does not unreasonably interfere with the purposes of the ICCTA, with the authority of the STB, or with rail transportation. *See* 49 U.S.C. § 11101(a).

## B. Abrogation

The ICCTA abrogates neither the general treaty-based federal common law right of tribes to exclude non-Indians from Indian lands nor the explicit right to exclude contained in the Treaty of Point Elliott. It is established law that we will not hold that Congress abrogated Indian treaty rights absent unambiguous language to that effect. *See Trans World Airlines, Inc. v. Franklin Mint Corp*., 466 U.S. 243, 252 (1984) ("Legislative silence is not sufficient to abrogate a

treaty."); *Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed."); *see also Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 808 (9th Cir. 2011) ("[W]e first acknowledge the long-standing rule that Indian tribes possess inherent sovereign powers, including the authority to exclude . . . unless Congress clearly and unambiguously says otherwise."). "[T]he intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." *Menominee Tribe*, 391 U.S. at 412. "What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *United States v. Dion*, 476 U.S. 734, 739–40 (1986); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999).

There is no such abrogating language in the ICCTA. The ICCTA and its legislative history do not mention Indian treaties or treaty rights at all, let alone the Treaty of Point Elliott. We affirm the district court and hold that the Tribe's treaty-based right to exclude and condition a third-party's presence on the Reservation has not been abrogated by the ICCTA.

## IV.  Conclusion

We affirm the district court. We hold that the Interstate Commerce Commission Termination Act does not repeal the Indian Right of Way Act and does not defeat the Tribe's right to enforce conditions in a right-of-way easement agreement issued pursuant to the Right of Way Act. We hold further that the ICCTA does not abrogate the Treaty of Point Elliott

and the Tribe's treaty-based federal common law right to exclude and condition a third-party's presence on, and use of, Reservation lands.  Finally, we hold that the Tribe has the right to pursue injunctive relief to enforce the terms of the Easement Agreement.

We remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED and REMANDED.**