1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SWINOMISH INDIAN TRIBAL
COMMUNITY,

                        Plaintiff,

        v.

BNSF RAILWAY COMPANY,

                        Defendant.

Cause No. C15-0543RSL

ORDER REGARDING
CROSS-MOTIONS FOR
SUMMARY JUDGMENT

        This matter comes before the Court on "Plaintiff's Motion for Partial Summary Judgment" (Dkt. # 134) and "Defendant BNSF Railway Company's Cross-Motion for Partial Summary Judgment" (Dkt. # 146). The Swinomish Indian Tribal Community ("Swinomish" or "the Tribe") filed this suit in April 2015 alleging that defendant BNSF Railway Company ("BNSF") breached a Right-of-Way Easement Agreement ("Easement Agreement"). The Tribe asserted claims of breach of contract and trespass, seeking damages, declaratory judgment, and injunctive relief. In prior motions practice, the Court found that defendant's affirmative defense of preemption under the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10501 *et seq.*, did not apply to any of the claims asserted in this litigation (Dkt. # 85 at 5) and that BNSF breached its contractual obligations to keep the Tribe apprised of the cargo it

was carrying and to limit the number of trains (and the number of cars in those trains) unless otherwise agreed in writing (Dkt. # 75 at 6). The Tribe now seeks summary judgment on the remaining liability issues, namely the materiality of BNSF's breaches, whether BNSF intentionally, knowingly, and consciously trespassed on tribal lands, and whether the Tribe acted arbitrarily in not consenting to BNSF's unilateral increase in rail traffic. BNSF, for its part, seeks a summary determination that its breaches were not material, that the Tribe arbitrarily refused to consent to an increase in traffic that was necessitated by shipper needs, that the period of trespass does not include (a) the time the parties were in discussions or (b) after the Tribe denied consent for increased rail traffic, that the trespass was not intentional or willful at any point, and that a claim of unjust enrichment is barred.

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude the entry of judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Colony Cove Props., LLC v. City of*

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 2

1   *Carson*, 888 F.3d 445, 450 (9th Cir. 2018). Although the Court must reserve for the trier of fact

2   genuine issues regarding credibility, the weight of the evidence, and legitimate inferences, the

3   "mere existence of a scintilla of evidence in support of the non-moving party's position will be

4   insufficient" to avoid judgment. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049

5   (9th Cir. 2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Factual disputes

6   whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a

7   motion for summary judgment. *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925 (9th Cir.

8   2014). In other words, summary judgment should be granted where the nonmoving party fails to

9   offer evidence from which a reasonable fact finder could return a verdict in its favor. *Singh v.*

10  *Am. Honda Fin. Corp.*, 925 F.3d 1053, 1071 (9th Cir. 2019).

11      Having reviewed the memoranda, declarations, and exhibits submitted by the parties,[1]

12  having heard the arguments of counsel, and taking the evidence in the light most favorable to the

13  non-moving party, the Court finds as follows:

**Background**

14      Since 1991, BNSF has operated a rail line over the Swinomish Reservation pursuant to an

15  Easement Agreement which provides in relevant part that BNSF "will keep the Tribe informed

---

[1] For purposes of this motion, the Court has considered Daniel Fapp's calculations regarding the revenues and costs associated with the shipment of oil over the easement and Christopher Barkan's opinions regarding the relative safety of unit trains in 2015 versus local tanker trains in 1991. Because the opinions of Tom Johnson and James Rader were not relevant to the Court's rulings (the Court has assumed that BNSF complies with all relevant safety requirements), they were not considered. The Court will rule on the parties' respective motions to exclude expert testimony (Dkt. # 144 and Dkt. # 156) separately.

as to the nature and identity of all cargo transported by Burlington Northern across the

Reservation" and that "unless otherwise agreed in writing, only one eastern bound train, and one

western bound train, (of twenty-five (25) cars or less) shall cross the Reservation each day."

Dkt. # 136-10 at 10-11. The Easement Agreement further provided that:

> The number of trains and cars shall not be increased unless required by shipper
> needs. The Tribe agrees not to arbitrarily withhold permission to increase the
> number of trains or cars when necessary to meet shipper needs. It is understood
> and agreed that if the number of crossings or the number of cars is increased, the
> annual rental will be subject to adjustment . . . .

*Id.* at 11. It is undisputed that BNSF breached the Easement Agreement by failing to update the

Tribe regarding the nature of the cargo that was crossing the Reservation and by increasing the

number of trains and the number of cars without the Tribe's written agreement. The primary

issues in the cross-motions for summary judgment are whether these breaches were material and

whether they were willful.

In August 2011, the Tribe contacted BNSF through the railway company's real estate

portfolio manager to initiate an appraisal and fee adjustment under the Easement Agreement.

Dkt. # 147-1 at 59. The Tribe made clear that its proposed adjustment from $20,258.54 per year

to $217,200 per year was based on the assumption that BNSF's use of the rail lines was in

accordance with the train and car limits described above. *Id.*; Dkt. # 136-13 at 6. The real estate

portfolio manager forwarded the correspondence to BNSF's real estate division: both BNSF's

in-house and outside counsel discussed the matter. When the Tribe did not hear back from

BNSF, it sent another letter in October 2011. Dkt. # 147-1 at 61. By that point in time, the Tribe

had heard that the Tesoro Refining and Marketing Company was seeking county approval for an

expansion of its crude oil operations which would substantially increase the number of rail cars

crossing the Reservation.[2] The Tribe reminded BNSF of the limitations imposed by the

Easement Agreement, and noted:

> The Tribe has not to date received a request from Burlington Northern for an
> increase in the number of trains or cars crossing the Reservation. The Tribe must
> be concerned about such a proposed increase in traffic[] since the easement is in
> close proximity to a new hotel now under construction by the Tribe adjacent to its
> Northern Lights Casino.
>
> Further, should such an increase be sought and agreed to, paragraph 7c of the
> "Right-of-Way Easement" states that, "It is understood and agreed that if the
> number of crossings or the number of cars is increased, the annual rental will be
> subject to adjustment . . . ." As stated in my August 17 letter, the proposed
> easement fee of $217,200 was based on the assumption that all uses of the
> easement property are in accordance with and limited to uses as set forth in
> paragraph 7(c) of the Easement. Any proposed increase in the number of trains or
> cars crossing the easement must of course be taken into consideration in the
> easement fee adjustment.

*Id.* at 61-62. BNSF's real estate portfolio manager again forwarded the communication to

BNSF. Despite the fact that the Swinomish easement was the topic of conversation within BNSF

for months (Dkt. # 136-13 at 2-7; Dkt. # 136-17 at 2; Dkt. # 136-18 at 3-12), the Tribe received

no response other than requests for a copy of its underlying appraisal or methodology (Dkt.

# 147-2 at 58-61). BNSF did not notify Tesoro that there were limits on the number of trains and

---

[2] For purposes of this motion, the Tribe is willing to assume that Tesoro's interest in processing
Bakken crude oil constitutes "shipper need" under the Easement Agreement. Dkt. # 134 at 31 n.11.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 5

cars that could cross the Reservation on a given day. Dkt. # 136-20 at 7. BNSF's current Assistant Vice President of the petroleum products business department asserts that neither of the Tribe's letters were forwarded to the marketing department that was negotiating with Tesoro and that marketing would generally not reach out to the real estate department when negotiating a shipper's request for service "because it is rare that a matter under the purview of the real estate department would have any effect on a matter in the marketing department." Dkt. # 152 at ¶¶ 3, 11, and 15.

Tesoro completed the expansion of its facilities in 2012 and began shipping crude oil from the Bakken Formation in and around North Dakota in September of that year. Dkt. # 152 at ¶ 8. The Tribe again wrote to BNSF shortly after the first 100-car trains ("unit trains") began running, summarizing the prior litigation which had resulted in the Easement Agreement and expressing surprise and dismay that BNSF would ignore the limitations imposed by that agreement, especially since the Tribe had reminded BNSF of those limitations over the previous year. Dkt. # 136-22 at 2. The Tribe demanded additional information regarding BNSF's use of the rail line across the Reservation, noting that if the use had been accurately reported in the news, it "would constitute a substantial violation of the parties' easement agreement." *Id.* at 3. Six weeks later, BNSF wrote back, apologizing for not responding in a more timely matter and noting difficulties in coordinating its operations and real estate divisions. Dkt. # 136-23 at 2. It acknowledged that shipper needs in and around the Reservation had increased, indicated that it

was evaluating both the current track usage and probable future demand, and promised to contact the Tribe in the near future to begin a discussion regarding the easement. *Id.*

At a meeting between Swinomish and BNSF in mid-December 2012, BNSF again promised to "obtain and provide a summary of data concerning current average daily railcar volumes eastbound and westbound along the easement route, as well as a reasonable forecast based on future shipper demands," but noted that the "task includes future discussion of potential new business along the line, of which we have little solid information at the moment." Dkt. # 136-24 at 2. BNSF expressed its interest in "discussing a written agreement of mutual benefit relative to the increased shipping volume across the Easement area." *Id.* at 2-3. The parties agreed to move forward on the appraisal process, with BNSF sending an appraiser to the site in early January 2013. *Id.* at 2.

Meanwhile, hundred-car trains continued to cross the Reservation. In mid-February 2013, BNSF provided data regarding the average number of loaded cars that traveled across the easement in 2011 and 2012.[3] It also provided information regarding the number of trains and their cargo for 2012. The 2012 averages exceeded the 25-car limit by a few cars in each train until the crude oil unit trains began in September 2012. After that point, an additional 102 cars (on average) traversed the easement from four to six times per week. Dkt. # 136-25 at 2. Overall, BNSF exceeded the easement's one-train limit between 21% and 31% of the time in

---

[3] The Easement Agreement does not differentiate between loaded and unloaded cars, nor does it authorize or limit usage based on averages.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 7

2012. *Id.* at 4. It was unable to provide information regarding the number of trains in 2011 because BNSF had not been keeping "information in a format that is directly applicable to the requirements of the existing Easement." *Id.* at 2. Going forward from 2012, BNSF projected that the number of unit trains would increase to "as much as ten times weekly." *Id.* BNSF was still awaiting its appraiser's report regarding the value of the easement but sought to establish a working relationship between the parties' real estate teams so they could address future issues effectively. *Id.* at 3.

By letter dated April 16, 2013, the Tribe thanked BNSF for the traffic volume information but expressed concern that BNSF was unable to say how many trains crossed the Reservation in a given period.

> Although I understand from your letter that BNSF and other railroads may have typical methodologies for monitoring train cars and not trains, BNSF has had a contractual obligation to limit both the number of trains *and* cars crossing the Swinomish Indian Tribal Community easement since the easement agreement was signed in 1991 to settle pending Federal Court trespass litigation. Obviously, assurance that BNSF was operating in full compliance with the easement agreement would have required close monitoring of both trains and cars crossing the Tribe's property for more than two decades. The need for such data was explicitly reinforced by the Tribe's October 18, 2011 letter to BNSF's designated easement agent . . . which reiterated the easement restrictions. Unfortunately, the absence of complete data appears to reflect the same lack of regard for the Tribe, obligations to the Tribe and use of Tribal property by BNSF and its predecessors in interest that resulted in the United States filing the Federal Court trespass litigation in the first place.

Dkt. # 136-26 at 2 (emphasis in original). The Tribe made clear that it "presume[d] and expect[ed] that, now that BNSF has once again been reminded of its contractual obligations

under the easement agreement, BNSF will collect, maintain and provide all data needed to show that BNSF is acting in full compliance with its contractual obligations . . . ." *Id.* The Tribe indicated a willingness to move forward with discussions regarding "the volume of traffic on, and compensation for, the BNSF easement crossing the Swinomish Reservation." *Id.* at 3. Finally, the Tribe noted news reports that Shell Oil was considering development of additional rail capacity for its March Point refinery and that, if the plans involved an increase of rail traffic over the easement, "then this of course is an additional topic that we will want to address with BNSF as part of ongoing discussions." *Id.* Discussions ensued, with the Tribe expressing an interest in BNSF safety/maintenance information (Dkt. # 136-28 at 2; Dkt. # 136-30 at 2) and BNSF promising a comprehensive proposal to address "compensation for current use of the easement (including current unit-train operation); additional compensation for a defined increase in track us (e.g., for anticipated demand); and, mechanism for addressing both future increase and decreases in train traffic" (Dkt. # 136-29 at 2).

On December 23, 2013, more than a year after the first unit trains began crossing the Reservation, BNSF made a proposal for addressing the outstanding usage issues. BNSF forecast that the number of unit trains would increase to approximately 10-12 each week, containing approximately 2,170 cars per week. Dkt. # 136-31 at 2. The unit train traffic was in addition to local, smaller trains, which involved another 25-30 cars per day. "[T]he total forecast use of both loaded and unloaded cars in and out of March Point could be approximately 2,400 to 2,600 cars on a weekly basis (approximately 2 loaded trains in, and 2 empty trains out per day)." *Id.* BNSF

proposed "lifting the Easement's current restriction on track use" and reaching an agreement on

compensation that was based on the value of the land rather than its use of the track. *Id.* at 3.

BNSF proposed only a modest $1,097 increase in the easement fee for 2011 and 2012, noting

that its use in 2011 and before the start of unit trains in 2012 "was within the Easement

specifications" and that "[l]imited unit trains did not commence until September 2012." *Id*. It

offered to pay $138,400 for 2013 (BNSF's appraised value), increasing to $217,200 (the Tribe's

appraised value) for 2014-2018 if the limitations on trains/cars per day and the annual reporting

requirements were lifted. Dkt. # 136-27 at 2; Dkt. # 136-31 at 3. BNSF proposed increasing the

annual payment in 2019 and thereafter by 2-5% based in part on the price of West Texas

Intermediate Crude Oil. Dkt. # 136-31 at 4.

The Tribe was not interested in abandoning its contractual right to limit the number of

trains and cars that cross its Reservation and sought to disentangle the fee adjustment process it

had initiated in August 2011 from BNSF's subsequent proposal to alter or remove the train and

car limitations. Dkt. # 136-33 at 2; Dkt. # 136-34 at 16. The Tribe gave BNSF an opportunity to

make a rental adjustment proposal that did not hinge on the lifting of the track use restrictions: if

no such proposal were forthcoming, the Tribe would seek a resolution of the dispute through

arbitration. Dkt. # 136-33 at 2. The Tribe made clear that its willingness to discuss possible

revisions of the limitations in the context of a fee adjustment did not constitute permission for

BNSF to unilaterally increase the numbers of cars or trains crossing the Reservation. Dkt. # 136-

34 at 14-15.

1
2
3
4
5
6
7
8

BNSF proposed, and the Tribe accepted, an increase in the easement fee for 2011 to $217,200 (the Tribe's appraised value) with indexed adjustments through 2015, resulting in a net payment to the Tribe of $1,029,774.26. Dkt. # 136-37 at 2; Dkt. # 148-2 at 23. BNSF recognized that the Tribe's acceptance of this payment did not modify the Tribe's previous objections to the increased train traffic on the easement that began in late 2012. Dkt. # 148-2 at 23.

9
10
11
12
13
14
15
16
17
18
19
20

With regards to BNSF's request to remove the limitations and reporting requirements from the Easement Agreement, the Tribe noted that its awareness of the safety and environmental risks associated with the transport of Bakken crude oil by rail had increased dramatically since 2011 (or even 2013), as had the Tribe's infrastructure development in the area of the easement. *Id*. at 2-3. Based on information from the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), the Tribe deduced that the unique features of operating unit trains carrying Bakken crude oil would continue to result in an increased rate of derailments with catastrophic consequences. *Id*. at 3-7.[4]

21
22
23
24
25
26
27
28

---

[4] The Tribe specifically cited to an impact analysis performed by PHMSA, which states:

There is reason to believe that derailments of HHFTs will continue to involve more cars than derailments of other types of trains. There are many unique features to the operation of unit trains to differentiate their risk. The trains are longer, heavier in total, more challenging to control, and can produce considerably higher buff and draft forces which affect train stability. In addition, these trains can be more challenging to slow down or stop, can be more prone to derailments when put in emergency braking, and the loaded tank cars are stiffer and do not react well to track warp which when combined with high buff/draft forces can increase the risk of derailments.

*Id*. at 6-7.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 11

It therefore requested information regarding what BNSF had done or had irrevocably committed

to do "to enhance and ensure the safety of oil transport across the Reservation easement and to

limit if not eliminate the potential harm to human health or life, the aquatic ecosystems, and the

Tribe's economic development enterprises." *Id.* at 7. In light of the increased volatility of

Bakken crude oil over other fuels (or even over other crude oils), the Tribe reiterated its

objection to the fact that BNSF had started carrying Bakken crude oil over its Reservation

without informing the Tribe. *Id.* at 10-12. "This is a situation that should not have arisen and

should not be continuing, given the clear requirement for disclosure – voluntarily agreed to by

BNSF – in the easement." *Id.* at 11-12. Finally, the Tribe noted that it had submitted comments

opposing Shell Oil's request for permits that would allow it to build facilities for crude oil

loading and unloading. *Id.* at 14. The Tribe requested that BNSF provide the factual basis for its

projection of 10-12 unit trains per week, stating that, "[i]n the absence of additional facts . . . ,

mere speculation as to potential future shipper requests is not a reasonable basis for the Tribe to

assess any modification of the volume of train and railcar traffic allowed under the current

easement." *Id.* It further stated that, "[i]n the face of the serious, substantial and broad-ranged

threats discussed above, there is not now and has not been sufficient information and assurance

concerning the safety of Bakken crude oil rail transport by BNSF for the Tribe to grant

permission to expand that risk by increasing the volume of trains and cars currently allowed to

cross the Reservation on the BNSF easement." *Id.* at 15.

Twelve weeks later, in February 2015, the Tribe again requested a written response to its requests for cargo, traffic flow, safety, and insurance information. Dkt. # 136-36 at 2-4. The Tribe reiterated that it "remains very concerned by BNSF's reported transport of Bakken crude oil across the Reservation, and the resulting threats posed to residents, guests and employees, the marine and other aquatic ecosystems, and the Tribe's economic development enterprises." *Id*. at 3. The Tribe noted that, despite the industry's adoption of enhanced standards for tank cars used to transport flammable liquids, derailments and explosions involving Bakken crude oil continued to be reported. *Id.* These concerns were raised again in correspondence dated March 11, 2015, with more recent derailments highlighted. Dkt. # 136-38 at 2. The Tribe again stated that, "while BNSF and the Tribe have previously discussed possible revisions of limits on train traffic contained in the easement document, the Tribe has not granted permission to BNSF to increase the number of trains and cars that are allowed to cross the Swinomish Reservation pursuant to the easement document." *Id.* at 3. The Tribe demanded "that BNSF immediately cease any use of the easement that is not in conformity with the express limitations in the easement agreement." *Id.* BNSF provided a written response to the Tribe's requests for information on March 24, 2015, noting that it appreciated the Tribe's "further attention to our on-going discussions regarding shipper needs and BNSF's common carrier obligation." Dkt. # 136-37 generally and at 2.

In response to the Tribe's demand that BNSF restrain its operations to the uses permitted under the Easement Agreement, BNSF referred to the mechanism in the easement for adjusting

rail volumes to meet shipper needs, asserted that it had "been working with the Tribe to increase rail traffic levels specified in the easement for over two years,"[5] and declared that, "in order to fulfill our common carrier obligation under federal law, we will continue running trains to the highest level of safety as required under federal law and as we have been doing for over two years while we continue to discuss economic terms." Dkt. # 136-39 at 2. Four days later, on March 17, 2015, the Swinomish Indian Senate unanimously passed a resolution authorizing the initiation of this lawsuit to enforce the terms of the Easement Agreement or to seek its termination. Dkt. # 136-43. The Resolution acknowledged that "BNSF has requested that the limits on trains and cars in the easement agreement be increased to allow additional trains and rail cars, and in particular 'unit trains' consisting of 100 tank cars, carrying Bakken crude oil to cross the Reservation." *Id.* at 2. This lawsuit was filed on April 7, 2015.

On December 18, 2020, BNSF requested permission to operate in each direction across the easement sixteen Bakken crude unit trains per month plus daily local trains during 2021.

---

[5] The Tribe took issue with this characterization of the communications between the parties, making it clear that it never sought or approved an increase in rail traffic over the Reservation and was simply reacting to BNSF's unilateral actions. Dkt. # 148-2 at 65.

> The Tribe does not consider its informing BNSF of the easement limitations, its objections to BNSF's violation of those limitations, or its requests for safety information that is within BNSF's custody and control to be "working with" BNSF "to increase the rail traffic levels specified in the easement." Rather, communications between the Tribe and BNSF have been primarily for the purpose of (1) making clear to BNSF the Tribe's position as to BNSF's obligations under the easement agreement, (2) communicating the Tribe's increasing safety concerns and (3) obtaining information from and listening to BNSF as necessary to allow the Tribe to understand the facts and BNSF's positions related to the easement obligations."

*Id.*

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 14

1    Dkt. # 147-2 at 2. BNSF assured the Tribe that its operations would be performed in strict

2    compliance with all federal and state regulations and that it would use the safest tank cars

3

4    currently available. *Id.* It also reminded the Tribe that it had operated across the Reservation for

5    many decades without incident. *Id*. at 3. The Swinomish Indian Senate met on February 16,

6    2021, for five hours to hear presentations and discuss the request, which was unanimously

7

8    denied. Dkt. # 147-2 at 6. The Tribe noted that it had previously sought "to have the

9    unauthorized rail line removed entirely from the Reservation, and only agreed to the 25-car daily

10   train as a compromise. This represented the Tribe's tolerance for the risks posed by the

11

12   movement of petroleum products and refining chemicals by rail . . . ." *Id.* It posited that the

13   parties "never contemplated nor intended the Easement Agreement to allow for an increase in

14   rail traffic" of the magnitude BNSF proposed and that each additional train and car carrying

15

16   crude oil brought additional risk to the Swinomish, the Reservation, their economy, and the

17   surrounding waters. *Id*. at 6-7. The Tribe also noted that the additional traffic over the easement

18   that started in late 2012 had required additional closures of the swing bridge, noticeably

19

20   interfering with Tribal fishermen's access to and from Padilla Bay and raising the possibility

21   that the Tribe's Fisheries Enforcement vessels would not be able to respond to an emergency. *Id*.

22   at 7-8. As of May 15, 2021, BNSF stopped operating unit trains over the easement and limited

23

24   its daily trains to 25 cars or less in each direction. Dkt. # 146 at 20.

25

26   //

27

28

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 15

1

2

**Discussion**

**A. Material Breach**

The Tribe asserts that BNSF's acknowledged breaches of the Easement Agreement were material and therefore excuse the Tribe from further performance. The parties agree that the contract issues in this case must be determined by reference to traditional common law principles as found in Washington state law and the Restatement of Contracts. Dkt. # 134 at 20; Dkt. # 146 at 23 n.7. Under Washington law, "[i]f a breach is slight or insubstantial, it is called a partial breach, for which plaintiff's damages are restricted to compensation for the defective performance." *Colo. Structures, Inc. v. Ins. Co. of the West*, 161 Wn.2d 577, 589 (2007) (citing Laurence P. Simpson, Handbook of the Law of Contracts § 187, at 377 (2d ed. 1965)). "While any breach will give rise to a cause of action for damages, a breach does not become cause for repudiation until it is, under all of the circumstances surrounding the contract, so material as to amount to a substantial or total failure of consideration." *Cartozian & Sons, Inc. v. Ostruske-Murphy, Inc.*, 64 Wn.2d 1, 5-6 (1964). *See also 224 Westlake, LLC v. Engstrom Properties, LLC*, 169 Wn. App. 700, 724–25, 281 P.3d 693, 707 (2012) ("[M]ateriality is a term of art in contract analysis, and identifies a breach so significant it excuses the other party's performance and justifies rescission of the contract. As stated in the Washington Pattern Jury Instructions: Civil, a material breach is one 'serious enough to justify the other party in abandoning the contract ... one that substantially defeats the purpose of the contract.'") (citations omitted). Likewise, the Restatement (Second) of Contracts § 237 (1981) makes clear that a party's

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 16

remaining duties under a contract are conditioned on there being "no uncured material failure by the other party to render any such performance due at an earlier time." Pursuant to Section 241 of the Restatement (Second) of Contracts, courts consider the following factors when determining whether a failure to render or to offer performance is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

The materiality of a breach is a question of fact that depends on the circumstances of each particular case. *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 179 Wn. App. 205, 221 (2014). Not every breach is material. The general gist of the materiality analysis is that, unless the parties have made it clear that literal and exact compliance is necessary, "substantial performance will suffice, especially if requiring literal performance will result in a forfeiture." *Id.*

There is evidence in the record – both as described above and as summarized in the Court's prior order regarding preemption (Dkt. # 75) -- that the purpose of the Easement

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 17

Agreement was to convert BNSF's trespass into an authorized entry while allowing the Tribe to

retain control over the scope of the interference with and risks posed to its people and its lands.

Taking the evidence in that light, a reasonable fact finder could conclude that the Tribe was

wholly deprived of the benefit it reasonably expected from the bargain, that the loss of control

cannot be adequately compensated, that BNSF refused to cure its breach for years (even after the

Tribe demanded that it return its operations to the sanctioned level), and that BNSF's behavior

throughout has been inconsistent with its obligations of good faith and fair dealing. On the other

hand, the fact finder could conclude that the primary object of the Easement Agreement was to

ensure that the Tribe was compensated for BNSF's use of the rail lines across the Reservation,

with the amount increasing with any increase in traffic required by shipper needs. In that case,

while the Tribe was deprived of advance warning regarding the scope of BNSF's use of the

easement, BNSF's failures could largely be remedied with appropriate financial payments and

reasonable assurances of future compliance, thereby avoiding a forfeiture of the right of access

and any inference of bad faith.

The Court declines to decide this disputed issue in the context of a summary judgment

motion. Whether BNSF's breaches justify repudiation of the Easement Agreement will have to

be determined at trial.

**B. "Arbitrarily Withhold Permission"**

BNSF argues that the Tribe's 2015 decision to enforce the traffic limitations set forth in

the Easement Agreement was arbitrary because the increase in traffic was necessary to meet

shipper needs and because the Tribe's safety concerns were untethered to the actual risks posed by the unit trains.[6] The Tribe, for its part, argues that (1) the contractual duty to act non-arbitrarily was not triggered because BNSF did not seek permission to increase traffic before this lawsuit was filed, (2) the magnitude of the increase BNSF sought was outside the reasonable expectations of the parties (making the Tribe's denial *per se* non-arbitrary), and (3) the denial was a principled decision based on the facts at the Tribe's disposal and BNSF's continuing refusal to abide by the easement limitations.[7]

The mere fact that BNSF wanted to run unit trains across the Reservation in order to serve its customers' needs does not mean that the Tribe was obligated to approve its request. The Easement Agreement presupposes that any request to increase traffic would be based on shipper needs, but the existence of a need does not give rise to an automatic increase in the easement limitations. Rather, the Tribe has a chance to decide whether to grant or deny the request, the only limitation being that it must consider the request and make a non-arbitrary

---

[6] The parties agree that the Tribe's 2021 refusal to allow an increase in traffic over the Reservation is not at issue here.

[7] BNSF asserts that the Tribe refused its request to increase the number of trains and cars on the ground that "a deal is a deal." Dkt. # 146 at 29 (citing the deposition testimony of then-Chairman Brian Cladoosby). BNSF's suggestion that the Tribe refused to consider a requested increase and simply insisted on enforcing the existing contract limitations mischaracterizes the testimony. Chairman Cladoosby was asked why the Tribe was "opposing the increase in rail traffic across the right-of-way" and his response was that "we have a deal that only allows 25 cars a day." Dkt. # 147-2 at 54. At the time, BNSF was running unit trains over the Reservation and had not sought, much less obtained, the Tribe's written agreement in clear contravention of the terms of the Easement Agreement. Chairman Cladoosby would not agree to counsel's suggestion that the Tribe would never agree to an increase in rail traffic, but rather stated that the Tribe opposed BNSF's current unauthorized use of the easement and would have to assemble a team to discuss any future requests for an increase. Dkt. # 147-2 at 54-55.

determination. "Arbitrary" is defined in the Miriam Webster Dictionary as "existing or coming about seemingly at random or by chance or as a capricious and unreasonable act of will" and "based on or determined by individual preference or convenience rather than by necessity or the intrinsic nature of something." Similarly, the Oxford English Dictionary defines "arbitrary" as "[d]erived from mere opinion or preference; not based on the nature of things; hence, capricious, uncertain, varying." *See also U.S. v. Carmack*, 329 U.S. 230, 242 n. 14 (1946).

BNSF argues that the Tribe improperly considered the safety risks associated with the transport of Bakken crude by rail when making its determination because there is another provision of the Easement Agreement which requires BNSF "to comply strictly with all Federal and State Regulations regarding classifying, packaging and handling of rail cars so as to provide the least risk and danger to persons, property and the natural environment of the Reservation." Dkt. # 136-10 at 11. BNSF argues that this provision somehow limits what the Tribe can consider when evaluating a request to increase traffic across the easement. The Court disagrees. The only limitation, as discussed above, is that the Tribe act non-arbitrarily.

Finally, BNSF argues that the Tribe failed to take into account all relevant facts and circumstances regarding BNSF's proposed use of the easement. In particular BNSF argues that the Tribe should have considered (or weighed more heavily) its unblemished safety record over the easement, should have awaited receipt of the safety materials the Tribe had requested from BNSF, and should have critically evaluated the causes of other Bakken crude oil derailments/spills/fires to determine the likelihood of such an event occurring on the easement.

BNSF asserts that the Tribe misjudged the actual risk of transporting Bakken crude oil over the Reservation in multiple unit trains per day, citing the 2021 declaration of a professor of rail transportation and engineering for the proposition that tank car improvements meant that the risk of running a unit train across the Reservation in 2015 was not substantially greater than the risk of running a 25-car train in 1991 when the Easement Agreement was signed. Dkt. # 149 at ¶ 11.

The Tribe's obligation was to make a non-arbitrary determination of BNSF's request: there is no requirement that it make an unassailable determination. No reasonable fact finder could conclude that the Tribe acted arbitrarily. Upon learning from third-party sources that BNSF was contemplating a significant increase in the traffic across the easement, the Tribe expressed concern about the proposal given the easement's proximity to the Tribe's economic hub. When BNSF began running unit trains across the easement, the Tribe requested information regarding the shipper needs, the cargo, and the number of trains and cars at issue. The Tribe did what it could to obtain relevant information from BNSF, considered and responded to the information provided, identified a string of recent and catastrophic derailments of rail cars carrying Bakken crude oil, researched federal regulatory publications regarding the risks posed by the transport of Bakken crude by rail, and eventually turned to outside counsel to advise the Swinomish Senate regarding the various options for transporting crude oil and their relative risks. Dkt. # 136-41. The Tribe did not reject the idea of increasing the traffic across the rail line out of hand. While it was clearly annoyed that BNSF seemed unaware of its obligations under the Easement Agreement as of 2012 and that the railway company proceeded to ignore the

limitations imposed by the agreement, the Tribe spent years communicating with BNSF, identifying the Tribe's concerns, and providing BNSF every opportunity to inform the decision-making process.[8] As the Tribe learned more about what BNSF was carrying over the Reservation, how Bakken crude oil differed from other petroleum products, and the on-going regulatory concern regarding the inadequacy of existing tank cars, it demanded a reset of the traffic volume to the agreed limits.[9] The Court finds as a matter of law that there was nothing arbitrary about the Tribe's conduct from 2011-2015, its decision-making process, or the ultimate decision to enforce the train and car limitations set forth in the Easement Agreement.

**C. Intentional Trespass**

"Federal common law governs an action for trespass on Indian lands," and "[t]hat law generally comports with the Restatement of Torts." *U.S. v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009) (citations omitted). A trespass occurs if permission to enter the property is conditioned or restricted and the defendant violates those conditions or restrictions. Restatement (Second) of Torts § 168 (1965); *Sanders v. City of Seattle*, 160 Wn.2d 198, 215 (2007) ("Trespass occurs upon the misuse or overburdening of an easement."). "One is subject to

---

[8] BNSF acknowledges that from 2012 through the filing of the lawsuit, "the Tribe requested significant information about BNSF's current and anticipated operation of unit trains over the easement, BNSF's safety protocols regarding the transportation of Bakken crude, the types of tank cars being utilized by Marathon (previously, Tesoro), the safety of the tracks and swing bridge, BNSF's financial ability to respond to a potential release and resulting damage, and BNSF's legal obligations to provide rail service as a common carrier." Dkt. # 148 at ¶ 5.

[9] For purposes of this motion, the Court considers the demand that traffic over the easement return to the agreed levels a rejection of BNSF's implicit request that the Tribe ratify its unilateral increase in traffic.

liability to another for trespass, irrespective of whether he thereby causes harm to any legally

protected interest of the other, if he intentionally (a) enters land in the possession of the other, or

causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from

the land a thing which he is under a duty to remove." Restatement (Second) of Torts § 158

(1965). *See also* Restatement (Second) of Torts § 163 ("One who intentionally enters land in the

possession of another is subject to liability to the possessor for a trespass, although his presence

on the land causes no harm to the land, its possessor, or to any thing or person in whose security

the possessor has a legally protected interest.") The intent at issue is the intent to be upon the

particular piece of land: it is not necessary that the defendant intend to invade another's

possessory rights, and a mistaken belief that he has a right to enter is immaterial. Restatement

(Second) of Torts § 163 comment b and § 164.

There is no real dispute that BNSF engaged in an intentional trespass under the

Restatements and is therefore liable for the damages caused by its overburdening of the

easement.[10] In the absence of injury to the property, an award of nominal damages would be

---

[10] BNSF argues that the Tribe's trespass claim fails as a matter of law because it has not shown
an intentional trespass or "actual and substantial damages" as those phrases are used in Washington case
law. *Grundy v. Brack Fr*., 151 Wn. App. 557, 567 (2009). The Supreme Court and the Ninth
Circuit have held in varying circumstances that tribal land claims are exclusively matters of federal
common law. *See Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 241
(1985); *Oneida Indian Nation of N. Y. State v. Oneida Cnty., New York*, 414 U.S. 661, 677 (1974)
(federal jurisdiction "rests on the not insubstantial claim that federal law now protects, and has
continuously protected from the time of the formation of the United States, possessory rights to tribal
lands, wholly apart from the application of state law principles which normally and separately protect a
valid right of possession."); *Milner*, 583 F.3d at 1182. While state law may be consulted to fill gaps in
federal decisional law or where uniformity is not required, the Ninth Circuit has determined that the
federal common law of trespass is generally set forth in the Restatements (*Milner*, 583 F.3d at 1182),

appropriate. The Tribe further argues, however, that it is entitled to equitable remedies for the trespass, such as restitution and/or disgorgement.[11] "A person who obtains a benefit by an act of trespass or conversion . . . is liable in restitution to the victim of the wrong." Restatement (Third) of Restitution and Unjust Enrichment § 40 (2011). While a restitutionary award is generally considered an appropriate remedy for trespass in that it gives to the property owner what "should properly have been the subject of negotiation and payment," it may not be sufficient where the trespass was knowing, conscious, and willful. *Id.*, comment b. If the defendant has consciously taken or used the property without asking or in the face of owner opposition, "[e]nrichment resulting from intentional trespass is not properly measured by ordinary rental value. A conscious wrongdoer will not be left on a parity with a person who— pursuing the same objectives—respects the legally protected rights of the property owner. If liability in restitution were limited to the price that would have been paid in a voluntary

---

and that state rules which, if applied, would not deter unauthorized invasions of tribal lands are inconsistent with federal policy and therefore inapplicable (*U.S. v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549-51 (9th Cir. 1994)). The Washington Supreme Court has, for its part, recognized that the common law of trespass entitled a landowner to recover nominal damages for the invasion of his property, without a showing of actual or substantial injury. *See Bradley v. Am. Smelting & Ref. Co*., 104 Wn.2d 677, 691 (1985) (altering the common law rule to deal with the unique circumstance of widespread particulate pollution). As further discussed in the text, federal common law authorizes the recovery of nominal, compensatory, and equitable relief (if supported by the evidence) in order to safeguard tribal lands. *See Oneida Cnty.*, 470 U.S. at 235-36 ("More recently, the Court held that Indians have a common-law right of action for an accounting of all rents, issues and profits against trespassers on their land.") (internal quotation marks and citation omitted). BNSF's reliance on state law precepts is misplaced.

   [11] Contrary to BNSF's argument, the Tribe has not asserted a claim of unjust enrichment. Rather, the Tribe seeks equitable remedies for BNSF's trespass (*i.e.*, for entries not authorized by contract), as provided in the relevant Restatements.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 24

exchange, the calculating wrongdoer would have no incentive to bargain." *Id*.. Thus, "if a

defendant is a willful trespasser, the owner is entitled to recover from him the value of any

profits made by the entry." Restatement (Second) of Torts § 929, comment c. (1979). *See U.S. v.*

*Santa Fe Pac. R. Co.*, 314 U.S. 339 (1941) (reinstating claim for quiet title and an accounting of

all rents, issues and profits derived from the unauthorized use of tribal lands). Even with regards

to a conscious wrongdoer, however, equitable remedies "may be limited to avoid a liability for

gains that are unduly remote . . . or disproportionate to the loss on which liability is based . . . ."

Restatement (Third) of Restitution and Unjust Enrichment § 40, comment b.

   The Tribe seeks a summary determination that BNSF's trespass was willful and that the

Tribe is therefore entitled to a disgorgement of profits. BNSF argues that it was unaware that its

use of the easement exceeded the authorized use because (1) its admitted exceedances did not

constitute a material breach and/or the Tribe was obligated to approve or ratify the exceedances,

(2) "it believed it was in active negotiation for an agreement to allow additional traffic" across

the Reservation, and (3) it thought its conduct was privileged because it was operating as a

common carrier. The first two arguments are nonstarters. By November 2012 at the very latest,

BNSF was aware of the unambiguous train and car limitations contained in the Easement

Agreement and, once it apprised itself of the facts, that it had exceeded those limitations by a

little in 2011 and by a lot after September 2012. It also knew that the Tribe had not agreed in

writing to increase the train and car limitations at any point during the parties' on-going

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 25

negotiations. If anything, these two arguments help establish the willfulness of BNSF's

wrongful entry.

There is still, however, a question of fact regarding BNSF's consciousness of

wrongdoing. If, as it repeatedly asserts, BNSF had a good faith belief that its role as a common

carrier compelled it to exceed the limitations of the Easement Agreement, BNSF may not have

been conscious of wrongdoing. Outside counsel for BNSF asserts that, throughout the

negotiations between the parties, "BNSF believed that it was obligated to serve Marathon's

cargo needs as required by its federal common carrier obligation." Dkt. # 148 at 3. BNSF made

similar assertions in its 2015 correspondence with the Tribe. The basis for the purported belief is

unclear, however. We now know that BNSF's common carrier obligations do not, in fact, trump

the promises it made to the Tribe in order to gain a right of access across the Reservation in the

first place. There is also reason to suspect that common carrier obligations are inapplicable to

cargo transported under a contract and/or where the limitation on carriage arises from the nature

of the cargo or restrictions in capacity (as opposed to discrimination among shippers). The lack

of evidence regarding BNSF's evaluation of its common carrier obligations combined with the

significant income associated with the transportation of Bakken crude oil for Tesoro/Marathon

creates a fact issue regarding BNSF's consciousness that the Court declines to resolve in the

context of a motion for summary judgment. Thus, whether disgorgement is an available remedy

for the trespass at issue here will have to be decided at trial.

**D. Injunctive Relief**

The Tribe's claim for injunctive relief is dismissed as moot.

**E. Testimony of Allen Olson**

BNSF requests that the Court strike the 30(b)(6) testimony of Allen Olson regarding the Tribe's motivation in negotiating the Easement Agreement as improper extrinsic evidence and inadmissible hearsay. As discussed in section A, above, evaluating whether BNSF's breaches of the Easement Agreement were so significant that they excuse the Tribe's performance and justify rescission of the contract requires an evaluation of the purpose of the agreement. The contract itself could support two different findings: in these circumstances, extrinsic evidence of the intent of the parties will be helpful to the fact finder.

With regards to BNSF's hearsay objection, the Tribe intends to call Mr. Olson as a witness at trial, removing any obstacles that are based on the use of his deposition transcript. Hearsay objections to specific questions and answers can be raised and ruled upon at trial.

For all of the foregoing reasons, the parties' cross-motions for summary judgment (Dkt. # 134 and Dkt. # 146) are GRANTED in part and DENIED in part. Disputed issues of fact prevent judgment as a matter of law regarding the materiality of BNSF's breaches and whether BNSF's trespass was conscious or willful. The Court finds, however, that the Tribe may be entitled to a disgorgement of profits if it proves that BNSF's trespass was conscious or willful

and that the Tribe's decision to enforce the limits imposed by the Easement Agreement was not arbitrary. The Tribe's claim for injunctive relief is dismissed as moot.

BNSF's motion for leave to file certain documents under seal (Dkt. # 141) is DENIED as moot. All of the documents at issue (Dkt. # 143) are publicly available as exhibits to the Declaration of Rebecca Solomon (Dkt. # 136).

Dated this 23rd day of August, 2022.


Robert S. Lasnik
United States District Judge