The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SWINOMISH INDIAN TRIBAL
COMMUNITY, a federally recognized Indian
Tribe,

              Plaintiff,

      v.

BNSF RAILWAY COMPANY, a Delaware
corporation,

              Defendant.

NO. 2:15-cv-00543-RSL

PLAINTIFF'S TRIAL BRIEF

1

**INTRODUCTION**

2        This case involves contract and trespass claims related to BNSF Railway Company's

3    repeated and frequent trespasses over the Swinomish Reservation for nearly a decade.

4    Beginning in September 2012 and continuing until May 2021, BNSF wrongfully ran thousands

5    of unit trains filled with highly combustible Bakken crude oil over the Reservation without the

6    Tribe's consent. The Court's prior rulings, the Ninth Circuit's opinion, and the parties'

7    stipulations have substantially narrowed the remaining issues for trial: whether BNSF willfully,

8    consciously, or knowingly trespassed over the Reservation and whether it deliberately breached

9    the Easement Agreement, such that the Tribe is entitled to disgorge BNSF's wrongfully gained

10   profits. The amount of and other issues related to damages have been bifurcated for a second

11   phase trial.

12        Although BNSF claims that it had a good faith belief that it could violate the Easement

13   over the Tribe's objection because of its common carrier obligations under the ICCTA, BNSF

14   has never been able to and cannot now present any evidence to support this claim. To the

15   contrary, the evidence shows that BNSF was well aware of the substantial risk that it would be

16   confined to the Easement's limitations. BNSF's interactions with the Tribe, which included a

17   pattern of withholding information, were inconsistent with a belief that the existing Easement

18   allowed it to run unit trains without the Tribe's consent. BNSF's internal documents confirm

19   that BNSF was not motivated by a good faith belief that it could not simultaneously adhere to

20   its obligations to the Tribe and its private contract with Tesoro, but by the substantial profits it

21   would reap from transporting Bakken crude to Tesoro. BNSF's self-serving, unsupported

22   allegations that it honestly believed that it could violate the Easement and the IRWA because of

23   its common carrier obligations is insufficient to meet its burden to establish the requisite good

24   faith to avoid liability for willful, conscious or knowing trespass and the opportunistic breach

25   of the Easement.

26

27

PLAINTIFF'S TRIAL BRIEF - 1

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1

**FACTS**

2          The background facts of this case have been briefed multiple times and, due to the

3    reduction of issues for trial, a detailed recitation of all background information is not relevant.

4    The context of the dispute, however, remains essential to evaluating BNSF's consciousness of

5    wrongdoing.

6              **A.  The Tribe has occupied the Puget Sound region since time immemorial.**

7          The Swinomish Indian Tribal Community (the "Tribe") is a federally recognized Indian

8    tribe organized pursuant to Section 16 of the Indian Reorganization Act of 1934, 25 U.S.C. §

9    476. Dkt. 201, Statement of Admitted Facts ("SAF") ¶ 1. The Tribe occupies the Swinomish

10   Indian Reservation (the "Reservation") located on Fidalgo Island in Skagit County,

11   Washington. *Id.* at ¶ 2. The Tribe is a present day political successor-in-interest to certain of the

12   tribes and bands that signed the Treaty of Point Elliott, 12 Stat. 927 (1855), a treaty with the

13   United States that established the Swinomish Reservation. Pl.'s Ex. 1. The Treaty reserved to

14   the Tribe certain rights, including the right of exclusive use, the right to exclude non-Indians,

15   and the "right of taking fish at usual and accustomed grounds and stations," which include

16   Padilla Bay, the Swinomish Channel, and other marine waters of Puget Sound. *United States v.*

17   *Washington*, 459 F. Supp. 1020, 1039, 1041 (W.D. Wash. 1978). *See* SAF ¶ 3. Certain Tribal

18   lands on the Reservation, including those lands that are the subject of this litigation, are held in

19   trust for the Tribe by the United States. *Id.* at ¶ 4.

20              **B.  BNSF's predecessor constructs a rail line over the Reservation without the**
21                 **Tribe's consent and continues to run trains over the Reservation over the**
                   **Tribe's objections.**

22         BNSF Railway Company ("BNSF") operates a railroad across several states in the

23   United States, including Washington. SAF ¶ 5. In 1889, the Seattle and Northern Railroad

24   Company ("SNRC") constructed a railroad within the Swinomish Reservation. SAF ¶ 6. SNRC

25   was the predecessor to Burlington Northern Railroad Company ("BN") and BN is the

26   predecessor to BNSF. SAF ¶ 7. The Tribe objected to the construction of the railroad during its

27

PLAINTIFF'S TRIAL BRIEF - 2

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1    initial construction. SAF ¶ 8. The Acting Commissioner of Indian Affairs at the Department of

2    the Interior informed SNRC that if a right-of-way was not grated by treaty or agreement,

3    congressional legislation would be necessary to procure one. SAF ¶ 9. There is no indication

4    that SNRC obtained approval from the Tribe, the Department of Interior, or Congress before

5    completing the line. SAF ¶ 10. No action was taken by the U.S. Attorney to enjoin the

6    construction or use of the railroad. SAF ¶ 11. But the railroad utilized the tracks without

7    permission for decades. In 1970, the Tribe contacted BN, objecting to BN's ongoing and

8    unauthorized use of Tribal lands. SAF ¶ 12. When the parties were unable to reach an

9    agreement, the Tribe requested that the United States bring a lawsuit against BN for trespass

10   and removal of the rail line in 1977. *Id*. In September 1977, BN applied for a right-of-way with

11   the Bureau of Indian Affairs ("BIA"). SAF ¶ 13. The application was denied because it lacked

12   the statutorily required Tribal consent. *See id.* BNSF appealed that decision, which was

13   affirmed. *Id*. In 1978, the Tribe commenced litigation against BN for trespass in in *Swinomish*

14   *Tribal Community v. Burlington Northern, Inc.*, Case No. C78-429V (W.D. Wash. filed July

15   18, 1978). SAF ¶ 14. This litigation continued for over a decade and in 1990, the Tribe and BN

16   reached a settlement, executed on September 24, 1990, which granted BNSF an easement over

17   the Reservation, conditioned on formal application to and approval by the BIA. SAF ¶ 15, Pl.'s

18   Ex. 3.

### C. The Easement Agreement expressly limits rail traffic to one train of no more than 25 cars in each direction per day unless prior approval is obtained from the Tribe.

21          The settlement culminated in a Right-of-Way Easement Agreement ("Easement

22   Agreement") dated July 19, 1991, which was reviewed and approved by the BIA pursuant to

23   the Indian Right-of-Way Act, 25 U.S.C. §§ 323–28 and 25 C.F.R. Part 169 ("IRWA"). *See*

24   SAF ¶ 16, Pl.'s Ex. 3. The terms of the settlement and Easement Agreement were the result of

25   arms-length negotiations between the Tribe and BN. SAF ¶ 23.

26

27

PLAINTIFF'S TRIAL BRIEF - 3

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

The easement granted by the Easement Agreement is located at the far north end of the Reservation. SAF ¶ 17. The easement traverses the Swinomish Channel by way of a swing bridge and Padilla Bay by way of a trestle, both of which are within the Reservation boundaries. SAF ¶ 18. The Swinomish Channel is a waterway utilized by Tribal members, including Tribal fishermen and the Swinomish Fisheries Department, for access to Padilla Bay and beyond. *See* SAF ¶ 19. The Tribe incorporated its intent to develop the area immediately adjacent to the easement into the Easement Agreement. *See* SAF ¶ 22, Pl.'s Ex. 3. The Tribe did in fact develop the area south of the easement: the easement runs just north of the Tribe's economic development center, which is comprised of a casino, hotel, gas station, retail stores, and RV Park. SAF ¶ 20. The casino was constructed and opened for operation in July 1994. The hotel, the Swinomish Casino and Lodge, was constructed and opened for occupation in April 2012. These commercial operations fund a substantial portion of the Tribe's essential governmental functions. SAF ¶ 21.

Because of its intended development in the area adjacent to the railroad, the Tribe was particularly concerned about the amount and frequency of rail traffic, as well as the identification of cargo transported across the Reservation. Indeed, at the time of the settlement, the only customers served beyond the easement were two oil refineries located on March Point. The Tribe therefore wanted an absolute restriction on rail traffic, while BN desired more flexibility. Pl.'s Ex 2. Ultimately, the parties agreed to the following language regarding rail traffic over the easement:

> Burlington Northern agrees that, unless otherwise agreed in writing, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the Reservation each day. The number of trains and cars shall not be increased unless required by shipper needs. The Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs.

SAF ¶ 24; Pl.'s Ex. 3, Paragraph 7(c). The Easement Agreement also required BN to make annual reports "to keep the Tribe informed as to the nature and identity of all cargo transported which were to "identify any previously shipped cargo that is different in nature, identity or

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

quantity from the cargo described in previous disclosures." SAF ¶ 25, Pl.'s Ex. 3, Paragraph 7(b). The rail line past the easement continues to serve only the two refineries on March Point. SAF ¶ 31. Between 2011 and the present, one of the refineries was owned and operated by Equilon Enterprises LLC dba Shell Oil Products US ("Shell"), which has since been acquired by Holly Frontier. *Id.* The other refinery was owned and operated by Tesoro Refining & Marketing Company ("Tesoro"), which was acquired by Marathon Petroleum Company ("Marathon") in 2018. *Id.*

### D. The Tribe commences an appraisal for a rental adjustment; BNSF fails to inform the Tribe that it is in negotiations with Tesoro to run unit trains of Bakken crude over the Easement.

On July 6, 2010, Jones Lang LaSalle ("JLL") sent a letter to the Tribe identifying itself as the BNSF Real Estate Portfolio manager and instructed the Tribe to provide any notice required under the Easement Agreement to JLL with attention to Camilla Dillon. SAF ¶ 32, Pl.'s Ex. 4. In August and September 2010, the Tribe and JLL communicated regarding an appraisal of the easement and nearby lands in connection with the Tribe's initiation of an adjustment of the annual payment amount pursuant to the Easement Agreement. SAF ¶ 33, Pl.'s Ex. 5. The Tribe commissioned an appraisal, which it received on July 26, 2011, that was based on the assumption that BNSF's use of the rail line was in accordance with the train and traffic restrictions set forth in the Easement Agreement.

Unbeknownst to the Tribe, BNSF began discussions with Tesoro to transport one hundred car unit trains of Bakken crude to the March Point refinery in February 2011; by June 2011, BNSF and Tesoro were engaged in facility design discussions. SAF ¶ 34, Pl.'s Exs. 6, 63. In these early months and to justify necessary track upgrades, BNSF estimated a revenue potential of $66.5 million a year for five years. Pl.'s Ex. 7, 8. BNSF's preliminary economic analysis in July 2011 indicated that the Bakken unit train business could result in an internal rate of return of over 60%. Pl.'s Ex. 9. By September 2011, BNSF estimated that the Tesoro contract would "result in a 5 year after-tax NPV of $75M." Pl.'s Ex. 13.

PLAINTIFF'S TRIAL BRIEF - 5

1   On August 17, 2011, the Tribe sent a letter to Camilla Dillon at JLL requesting an

2   appraisal rental adjustment pursuant to Paragraph 3(b)(ii) of the Easement Agreement. SAF ¶

3   35, Pl.'s Ex. 11. Although this letter was received by JLL and immediately transmitted to

4   BNSF employees on August 19, 2011, promptly forwarded to in house Senior General Counsel,

5   Richard Chamberlain on August 22, 2011, and then forwarded to outside counsel, Beth Clark,

6   at Foster Pepper on August 29, 2011, BNSF and JLL did not respond to the letter. *See* SAF ¶

7   36, Pl.'s Exs. 12, 16. Ms. Dillion also sent a copy of the Easement to Richard Chamberlain on

8   August 22, 2011. Pl.'s Ex. 12.

9   Two months later, when the Tribe had not heard back from BNSF or JLL, the Tribe sent

10   another letter to Camilla Dillon on October 18, 2011. SAF ¶ 37, Pl.'s Ex. 14. In the interim,

11   Tribal employees received notice from a Skagit County Planning and Development Services

12   Mitigated Determination of Nonsignificance (MDNS) and Notice of Decision for Tesoro

13   Refining and Marketing Company, that Tesoro planned to construct a unit train receiving

14   facility and intended to start receiving unit train traffic at its refinery. *Id.* A unit train is a train

15   transporting a single commodity. Unit trains are typically transported pursuant to specific

16   contracts between the shipper and the railroad. These contracts are beneficial to both the

17   railroad and shipper: the rates are typically lower than non-contract, common carrier requests,

18   but the railroad's costs are significantly lower because it can transport the train from departure

19   point to destination without needing to make additional stops, carry the cargo additional miles,

20   or coordinate the trip with the transportation of other cargo from other shippers. As a result,

21   shippers pay less, and railroads make more.

22   The only way for unit trains to reach the Tesoro refinery is over the easement. So, in

23   addition to reiterating the request for an appraisal adjustment, the October 18 letter also raised

24   the Tribe's concerns about the potential increased traffic over the Easement. SAF ¶ 37, Pl.'s

25   Ex. 14. The letter reminded BNSF of the traffic restrictions, quoting the train and car limitation

26   section of the Easement, Paragraph 7(c), and informed BNSF that it had not received a request

27

PLAINTIFF'S TRIAL BRIEF - 6

to increase the number of trains or cars. *Id*. The Tribe expressed concern about such an increase in traffic given the proximity of the easement to the Tribe's casino. *Id.* The Tribe reminded BNSF that *if* an increase in traffic was sought and agreed to—which had not occurred—that any proposed increase in the number of trains and cars crossing the easement must be taken into consideration in the easement fee adjustment. *Id*.

JLL received the Tribe's October 18 letter and forward it to BNSF employees on October 20, 2011. SAF ¶ 38, Pl.'s Ex. 15, 16. BNSF Senior General Attorney, Richard Chamberlain, and Foster Pepper counsel, Beth Clark, both received a copy of the letter on October 20, 2011. Pl.'s Ex. 16. BNSF's outside counsel, Stephen DiJulio, at Foster Pepper received a copy of the letter, likely between late October and early November 2011. SAF ¶¶ 39, 40. The Tribe, however, received no response to the October 18 letter except for requests from JLL for a copy of its underlying appraisal. SAF ¶ 41.

Meanwhile, and still unbeknownst to the Tribe, Tesoro and BNSF progressed to negotiating a Master Transportation Agreement for delivery of unit trains of crude oil to Tesoro. Tesoro proceeded with obtaining its permit and started construction of the facility sometime between late 2011 or early 2012. BNSF did not inform Tesoro about the communications from the Tribe raising concerns about the Easement limitations. On August 31, 2012, BNSF and Tesoro entered into a Master Transportation Agreement for unit train service from North Dakota to March Point with an effective date of September 1, 2012. SAF ¶ 43, Pl.'s Ex. 59. Likewise, at least as early as June 2012, BNSF and Shell had communications about transporting Bakken crude by rail to Shell's March Point refinery, including building a rail receiving facility. SAF ¶ 42, Pl.'s Ex. 17. Indeed, BNSF records show that Shell had sent it a "Confidentiality and Restricted Use Agreement" as part of its investigation of the feasibility of such a facility. Pl.'s Ex. 23.

PLAINTIFF'S TRIAL BRIEF - 7

**E.    BNSF contacts the Tribe only after the unit trains start running. The parties engage in discussions about the rail traffic during which BNSF repeatedly withholds or misrepresents information.**

The first unit train crossed the Reservation on September 4, 2012. SAF ¶ 44, Pl.'s Ex. 19. It is undisputed that BNSF did not provide notice to the Tribe or request the Tribe's permission to run unit trains over the Easement before it started running such trains in September 2012. SAF ¶ 46. Instead, the Tribe learned about the commencement of unit train traffic over the Reservation from a local newspaper.

Although BNSF repeatedly apologized for its delayed response and made various excuses for its failure to contact the Tribe before the unit trains started running (e.g., "breakdown in communications" (Pl.'s Ex. 22), "one hand doesn't know what the other is doing")), the truth is that BNSF had already engaged its counsel to evaluate the train and car limitations in the Easement months earlier. Principal actors at BNSF, including specifically Richard Chamberlain and other individuals later involved in discussions with the Tribe, had been aware of the Easement issues for months. *See* Pl.'s Exs. 12, 16, 60. BNSF's privilege log includes entries showing that Terry Finn, who attended BNSF's first meeting with the Tribe after the unit trains began running, had begun drafting a letter called "Swinomish ROW_Follow Up Letter" as early as February 1, 2012. Pl.'s Ex. 60 at 395. Vann Cunningham, another BNSF employee involved in later discussions with the Tribe, was included in an email thread regarding "Swinomish Easement_Fidalgo Refinery Volume." *Id.* Emails with BNSF General Attorney, Russell Parish, who attended two meetings with the Tribe, discussing the "Swinomish Easement Jurisdictional Question" and "Tesoro Liability" were exchanged in June 2012; similar subjects were discussed with operational people within BNSF at this time. *Id.* at 395, 493, 546. Tellingly, Mr. DiJulio had also already started to draft a letter to the Tribe's Chairman in early *August* 2012, the month before the unit trains began running. *Id.* at 413.

Instead of hearing from BNSF, after learning of the unit trains crossing the Reservation, on September 27, 2012, the Tribe's Chairman, Brian Cladoosby, sent a letter to Terry Finn,

PLAINTIFF'S TRIAL BRIEF - 8

BNSF's Executive Director, Governmental Affairs, regarding the unit trains. SAF ¶ 47, Pl.'s Ex. 20. The letter reiterated the traffic limitations and expressed that the Tribe considered the reported use to be a substantial violation of the Easement. Pl.'s Ex. 20. More than a month after the letter was sent, Stephen DiJulio reached out to the Tribe's legal director, Stephen LeCuyer, to inform him that a formal response to the Chairman's letter was forthcoming. SAF ¶ 48. The promised letter was sent on November 12, 2012, from Mr. Finn to Chairman Cladoosby. SAF ¶ 49, Pl.'s Ex. 21. The letter "expressed [BNSF's] regrets . . . for not responding in a more timely manner" and "acknowledge[d] that the Easement in question places obligations on BNSF to communicate with the Tribe about rail car volume and material. We fully intend to honor these obligations in the near term and throughout the remainder of the Easement term." Pl.'s Ex. 21. Notably, although BNSF acknowledged the reporting restrictions, it was silent as to its commitment to adhere to the train traffic limitations. *Id*. It did, however, implicitly acknowledge that it was required to obtain the Tribe's written consent—"BNSF hopes to discuss with tribal representatives an amicable written agreement for an increase in the number of trains across the Easement area." *Id*.

On December 19, 2012, BNSF and Tribal representatives met at the Reservation. SAF ¶ 50; Pl.'s Ex. 22. Assuming that the BNSF representatives might be unfamiliar with the history, Mr. LeCuyer gave a presentation regarding the history of the Easement, beginning with the trespass commencing in 1899 through the Tribe's then-current efforts to obtain a compensation adjustment. Mr. LeCuyer also distributed copies of the trespass litigation complaint, the Tribe's August 17 and October 18 letters to JLL, prior communications between the Tribe and JLL regarding the Easement, and a copy of the Easement Agreement, including attachments of the Settlement Agreement and Stipulation. At no point during this meeting did BNSF representatives mention anything about the common carrier obligation or ICCTA. In response to the request in the Chairman's September 27 letter that BNSF provide details on the number of trains and cars that it expected to run over the easement, BNSF stated that it could provide

PLAINTIFF'S TRIAL BRIEF - 9

only limited information. Also,; BNSF's representatives stated that they were not aware of any discussions with Shell regarding shipping crude oil to Shell's March Point refinery by rail and that nothing was known about Shell requirements. This was also false. BNSF had begun discussions with Shell earlier that summer. SAF ¶ 42.

On January 7, 2013, BNSF's Terry Finn sent Chairman Cladoosby a letter regarding the December 19 meeting. SAF ¶ 51; Pl.'s Ex. 22. The letter identified two main tasks from the parties' discussion: moving forward with the appraisal process and "to obtain and provide data concerning current average daily railcar volumes eastbound and westbound along the easement route, as well as a reasonable forecast based on future shipper demands." Pl.'s Ex. 22. The letter acknowledged that this included consideration of additional traffic to Shell: "The latter task includes future discussion of potential new business along the line, of which we have little solid information at the moment." *Id.* Again, BNSF failed to disclose to the Tribe that BNSF was actively involved in discussions with Shell. *Id.*

Over a month later, on February 14, 2013, BNSF provided its "initial information gathered . . . regarding track usage" by letter to Mr. LeCuyer from Russell Parish, BNSF's in-house counsel. Pl.'s Ex. 25; *see also* SAF ¶ 52. In that letter, BNSF represented that the line is operated 6 days a week and that in 2012, "BNSF ran 62 unit trains of crude oil," and that it anticipated that "in the near term, unit trains may increase from four to six times weekly to as much as ten times weekly." Pl.'s Ex. 25.

In April 2013, the Tribe learned from a local newspaper that Shell was considering developing its own unit train receiving facility and was in discussions with BNSF about this. In a letter dated April 16, 2013, Mr. LeCuyer wrote to Mr. Parish notifying BNSF that the Tribe had learned about Shell's intentions and its communications with BNSF, noting that this would need to be addressed by BNSF as part of the ongoing discussions. Pl.'s Ex. 26. The letter also expressed the Tribe's concerns that although BNSF had been obligated to conform to traffic limitations since the Easement was executed in 1991, BNSF had not been keeping track of the

PLAINTIFF'S TRIAL BRIEF - 10

number of trains or cars crossing the Reservation. *Id.* The letter further stated that "the Tribe presumes and expects that, now that BNSF has once again been reminded of its contractual obligations under the easement agreement, BNSF will collect, maintain and provide all data needed to show that BNSF is acting in full compliance with its contractual obligations (or . . . the precise extent and nature of the non-compliance)." *Id.*

On May 2, 2013, Mr. Parish wrote to Mr. LeCuyer and finally acknowledged that "in addition to the current service at the Tesoro facility, there may be demand for unit trains to serve the Shell facility, as well." SAF ¶ 56, Pl.'s Ex. 27. In this letter, Mr. Parish also communicated BNSF's desire for an "amended easement . . . to enable BNSF to serve customers on the rail line as may be necessary" and to obtain a "modification to reporting requirements" required under the existing easement. *Id.*

Representatives for the Tribe and BNSF met again in person at the Reservation on May 21, 2013. SAF ¶ 57. Mr. DiJulio also indicated at the meeting that there would be ten trains per week to serve Tesoro and up to 15 – 16 trains depending on Shell's needs. SAF ¶ 58. The Tribe also sought information from BNSF regarding safety and accident information, as well as information regarding inspection, maintenance, and repairs to the swing bridge over the Swinomish Channel. SAF ¶ 59. These requests were followed up by email to Mr. DiJulio on May 30. SAF ¶ 60.

At this meeting, BNSF also raised the issue of its common-carrier obligations and jurisdiction of the Surface Transportation Board ("STB") to the Tribe for the first time. *Id*. BNSF stated that easements with use limitations are unusual, and that operational people would not be used to such limitations. The issue of common carrier obligations was not discussed in detail. In response to BNSF's comments, Mr. LeCuyer noted that any common carrier obligations were not the only federal obligations at play; he therefore raised the federal Indian law counterparts to Mr. DiJulio: the federal statutory and regulatory law that is applicable to Tribal trust land, under which the Easement was established, as well as the Tribe's Treaty

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1  which, under the Constitution, is the supreme law of the land. Mr. LeCuyer—who is not a

2  railroad attorney—asked Mr. DiJulio to send him additional information about the common-

3  carrier obligation and STB for consideration. SAF ¶ 59.

4          On July 2, 2013, Mr. DiJulio sent a letter to Mr. LeCuyer in response to the Tribe's

5  request for information. The letter promised that BNSF was working to develop a proposal "to

6  include compensation for current use of the easement (including current unit-train operations);

7  additional compensation for a defined increase in track use (e.g., for anticipated demand); and

8  mechanism for addressing both future increases and decreases in train traffic across the

9  easement." Pl.'s Ex. 28. In addition to some requested safety information, the letter included a

10  three-paragraph discussion of the STB and BNSF's purported common carrier duties. SAF ¶

11  61, Pl.'s Ex. 28. This generic and basic background information about the STB and common

12  carrier duties did not include any analysis of its application to the Easement or intersection with

13  the Tribe's rights under the IRWA or Treaty. Pl.'s Ex. 28. Indeed, the letter did not even cite

14  the IRWA, its implementing regulations, or the Treaty. *Id.* Neither did the letter acknowledge

15  precedent upholding agreements voluntarily entered into by a railroad containing obligations

16  the railroad later sought to disclaim. *Id.* Nor did the letter expressly state that BNSF believed

17  that its common carrier obligations superseded its obligations to the Tribe under the Easement.

18  *Id*. Nevertheless, although BNSF's written explanation of its common carrier obligations was

19  insufficient to inform the Tribe that BNSF believed its common carrier duties superseded its

20  obligations to the Tribe, the Tribe was awaiting BNSF's promised proposal and did not feel that

21  a legal debate would be productive until the Tribe had an opportunity to evaluate BNSF's

22  proposal. BNSF did not raise the issue of its common carrier obligations with the Tribe again

23  until 2015. Pl.'s Exs. 43, 44.

24          In the meantime, BNSF was continuing to work with Shell to develop its own unit train

25  receiving facility. Pl.'s Ex. 29. Internal communications reflect that Shell was not only aware of

26  the Swinomish Easement but had concerns. *Id.* A BNSF employee questioned whether there

27

PLAINTIFF'S TRIAL BRIEF - 12

1   was "a possibility that this could go sideways making this project?" *Id*. BNSF's Reeve Geary

2   responded that "Shell is particularly concerned about the easement with the Swinomish tribe.

3   Larry is working with Kurt Geringer to resolve the issue. I've told my contacts at Shell that it's

4   something that will get worked out, but still they worry." *Id*.

5       Shell was right to worry. Internal BNSF communications reveal that BNSF employees

6   engaged with the Tribe were concerned about bringing "execs" into the discussions "to avoid

7   unnecessarily exposing them to any future litigation should it arise" and acknowledged that

8   "[BNSF was] very exposed with the Tribe already", that it "could be fatal if not handled right",

9   and that "[BNSF did] not want to go back to Federal Court with the tribe." Pl.'s Ex. 31.

10      To avoid the known risk of attempting to litigate against the Tribe and to protect the

11  "over $200 million of new and existing business with Shell and Tesaro [sic]", BNSF put

12  together a proposal for an amended easement for the Tribe's consideration. Pl.'s Ex. 32. When

13  pitching the proposed amendment to BNSF executives, a presentation was prepared that

14  acknowledged that BNSF was "limited to 1 train / day each way", "limited to 25 cars / train",

15  and that "increases in traffic can be negotiated with the Tribe." *Id.* The draft proposal would

16  eliminate "all reporting of traffic volumes" and "any volume restrictions" as well as giving

17  BNSF the right to "renegotiate if [it] no longer operate unit trains on the line." *Id*. The benefits

18  of the proposed amendments were described as: "the right to cross Swinomish Tribe land," . . .

19  "a chance to renegotiate if volume decreases," "no disruption of unit train movements,"

20  "eliminate all reporting and volume restrictions," and optimistically, "goodwill with a Native

21  American tribe in the PNW." *Id.* The proposal did not, tellingly, evaluate whether the proposal

22  would have any benefits to the Tribe.

23      BNSF communicated the proposal to the Tribe by letter from Mr. DiJulio dated

24  December 23, 2013. SAF ¶ 62, Pl.'s Ex. 33. The letter provided that "BNSF believes it to be in

25  the interest of both parties to reach an agreement for the use of the Easement area based on the

26  value of the land . . . and not on the track use." Pl.'s Ex. 33. In addition to the elimination of

27

PLAINTIFF'S TRIAL BRIEF - 13

traffic restrictions and reporting obligations, and addition of a unilateral right for BNSF to revise and terminate at its convenience, the letter proposed to eliminate the annual CPI payment adjustment and to replace it with a capped "percentage change to the price of West Texas Intermediate Crude Oil." *Id.* The proposal did not provide an explanation of how this amendment would benefit the Tribe in any way – the Tribe would have less control over its land, receive less information, would be compensated based on an extrinsic metric tied to oil prices, and would not receive any additional compensation for past or future unit train traffic (the offered past and future compensation was less than what the Tribe had already told BNSF it was entitled to for easement-authorized traffic). Moreover, it was substantially different than what was outlined in Mr. DiJulio's July 2 letter, which represented that the proposal would include a request for a "defined increase in track use," not the unlimited use ultimately presented. The Tribe was disappointed that BNSF did not make a serious proposal or request under the existing Easement.

On March 20, 2014, BNSF employees Vann Cunningham and Skip Kalb met with Tribal staff, including Mr. LeCuyer, for purposes including BNSF's relationship building; the Tribal Chairman was not available as planned. SAF ¶ 63. Prior to this meeting, Mr. DiJulio and Mr. LeCuyer agreed by phone that the Tribe did not expect to discuss the easement proposal.

**F. The Tribe discovers that BNSF has been transporting "Bakken Crude" oil and investigates the substantial and unique dangers posed by rail transport of Bakken Crude.**

At some point after BNSF began running unit trains over the Easement, the Tribe learned that BNSF was transporting Bakken Crude and not just crude oil as BNSF had represented in its annual reports. This omission was substantial as the Tribe's research revealed that Bakken Crude posed additional and unique dangers when transported by rail. The Tribe highlighted its concerns in a letter dated November 25, 2014 to Mr. DiJulio and requested additional safety information specifically relating to the transport of Bakken crude across the easement. SAF ¶ 65; Pl.'s Ex. 35. The letter reminded BNSF that the Chairman had requested

PLAINTIFF'S TRIAL BRIEF - 14

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

that BNSF "immediately cease unauthorized use" and "conform its use to the terms of the easement agreement" back in September 2012 and that BNSF's continued unauthorized use was taken at its own risk. Pls. Ex. 35.

Reflecting the Tribe's uncontroverted understanding that the Easement limitations were absolutely enforceable, Mr. LeCuyer also requested that "if BNSF should somehow be of the opinion that the limits on trains and cars are not applicable, or have not been applicable, to its train or cars, [to] please provide the Tribe with an explicit and detailed statement of BNSF's position and each of its legal and factual bases so that the Tribe may have the benefit of BNSF's perspective." *Id.*

On the same day, Mr. LeCuyer sent another letter to Mr. DiJulio regarding the rental adjustment and traffic increases, expressing that the Tribe desired to keep its rental adjustment – which had begun in 2011, before unit trains began operating – separate from BNSF's proposal to remove traffic limitations. SAF ¶ 65, Pl.'s Ex. 36. The letter further stated that if BNSF did not intend to make a rental adjustment proposal separate from a proposal to amend the Easement, the Tribe would proceed with arbitration. *Id.* at Pl.'s Ex. 36.

BNSF responded to both letters on December 16, 2014. SAF ¶ 66, Pl.'s Ex. 37. BNSF proposed accepting the Tribe's appraisal valuation retroactive to 2011 and informed the Tribe that it was working to gather safety information requested by the Tribe. Pl.'s Ex. 37. Despite the Tribe's continued demand that BNSF cease unauthorized use of the easement, BNSF's Vann Cunningham wrote that "while discussions continue between BNSF and the Tribe over a proposed increase in volume, BNSF plans to continue rail operations at their current levels in order to meet the needs of existing shippers." *Id.* BNSF ignored the Chairman's September 2012 demand that BNSF cease non-compliant rail traffic, and instead unilaterally determined that following the Chairman's letter "the Tribe and BNSF have been involved in what we feel has been a constructive dialogue" and expressed its "hope that BNSF's willingness to accept the Tribe's previous proposal regarding the annual payment amount and our commitment to

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1    respond promptly to the Tribe's other requests will be seen by the Tribe as a sign of BNSF's
2    continued good faith efforts to promptly resolve the remaining open issues." *Id*. Although
3    BNSF stated that it would continue to run unit trains over the Tribe's objection, the letter failed
4    to provide any legal justification for that decision, as requested by the Tribe.

5            On January 12, 2015, Mr. LeCuyer wrote to BNSF to accept BNSF's stipulation to the
6    rental adjustment, provided that it was understood that this was for authorized easement use
7    only, not BNSF's increased traffic. SAF ¶ 67, Pl.'s Ex. 38. And that "while BNSF may choose
8    to take unilateral actions based upon its business interests or opportunities, any such BNSF
9    unilateral decision or action to cross the Reservation outside of compliance with the easement
10   limits, or to fail or refuse to comply with its obligations under the easement, has been and will
11   be undertaken at BNSF's own risk and without the Tribe's express or implied consent." *Id.*

12           On February 12, 2015, Vann Cunningham sent a letter confirming the stipulation on the
13   rental adjustment and provided an adjustment calculation identifying that the BNSF owed the
14   Tribe $1,029,774.26. SAF ¶ 68, Pl.'s Ex. 39. BNSF acknowledged that "the Tribe's acceptance
15   of BNSF's payment of the easement fee adjustment as requested by the Tribe and confirmed by
16   BNSF does not modify the Tribe's previously stated position regarding increased train traffic
17   on the easement beginning in late 2012." *Id.* On the same date, Skip Kalb of BNSF wrote a
18   letter to Mr. LeCuyer responding to his November 25, 2014 letter and itemizing the Tribe's
19   expressed concerns regarding crude-by-rail to be discussed at a meeting that he hoped to take
20   place on February 25, 2015. SAF ¶ 69, Pl.'s Ex. 40. Missing from this list of Swinomish
21   concerns is any reference to an explicit and detailed explanation of BNSF's position as to why
22   it could run the unit trains, as requested in Mr. LeCuyer's November 25 letter. Pl.'s Ex. 40. At
23   this point, it had been over two months since the Tribe requested that BNSF provide its legal
24   justification for running unit trains over the Reservation in violation of the Easement.

25           On February 19, 2015, Mr. LeCuyer wrote to Mr. Kalb and Mr. Cunningham to inform
26   them that Tribal staff would not be available to meet on February 25, but that he would confer

27

PLAINTIFF'S TRIAL BRIEF - 16

with Tribal staff regarding availability for dates in March. SAF ¶ 71; Pl.'s Ex. 41. Mr. LeCuyer requested that BNSF provide a formal written response to his November 25, 2014 letter prior to any meeting to give the Tribe an adequate opportunity to evaluate BNSF's information and prepare for the meeting. *Id*.

As the parties continued to discuss dates for a meeting, Mr. Cunningham sent a letter to Mr. LeCuyer on March 13, 2015 stating for the first time, in generic terms, BNSF's justification for continued use of the easement without the Tribe's consent: "in order to fulfill our common carrier obligation under federal law, we will continue running trains to the highest level of safety as required under federal law and as we have been doing for over two years while we continue to discuss economic terms." *See* SAF ¶ 75, Pl.'s Ex. 43. The letter did not respond to the request in Mr. LeCuyer's November 25, 2014 letter for BNSF to provide a "explicit and detailed statement of BNSF's position . . ." or give any indication that BNSF had evaluated its Easement obligations to the Tribe under federal law pursuant to the IRWA.

BNSF sent a subsequent letter to the Tribe on March 24, 2015. SAF ¶ 78, Pl.'s Ex. 44. This letter also provided no explanation of BNSF's position and again made a generic reference to "BNSF's common carrier obligation" and provided certain safety information requested by the Tribe four months prior. *Id*. The letter included attachments identifying the number of unit trains, local trains over 25 cars, and local trains under 25 cars that crossed the Reservation in 2013 and 2014. *Id*. Although BNSF had generated specific data showing the precise numbers of trains and cars that crossed the Reservation *per day*, BNSF's letter only provided the Tribe with the annual summaries. *Compare* Pl.'s Ex. 44 *with* Exs. 47, 48. The letter's other attachments included a two-page executive summary regarding "Hazardous Materials Emergency Planning" and information about the Anacortes Spur. Pl.'s Ex. 44. The letter also expressed BNSF's position that it was only required to report *changes* in the products or commodities shipped across the easement because it was "not aware of any prior requests by the Tribe for reports from BNSF in the years preceding the increase in crude shipments in 2012." Pl.'s Ex. 44.

PLAINTIFF'S TRIAL BRIEF - 17

1    During the years of waiting for BNSF to make a request for a defined increase in traffic

2    for it to consider, the Tribe's concerns regarding the safety of transporting Bakken crude

3    increased substantially as additional catastrophic derailments of Bakken oil trains occurred. On

4    March 17, 2015, the Tribal Senate authorized its legal department to take action, including

5    litigation, against BNSF for its ongoing trespasses over the Reservation. The Tribe filed suit

6    against BNSF on April 7, 2015. Dkt. 1. BNSF again failed to inform Tesoro, this time that the

7    Tribe had filed suit. And Tesoro eventually learned about the Tribe's Easement and traffic

8    limitations from a comment letter the Tribe submitted urging that an Environmental Impact

9    Statement be prepared for the proposed Shell receiving facility.

10    BNSF continued to run unit trains over the Reservation until May 2021 and committed

11    many violations of the Easement both in terms of the number of trains crossing on a daily basis

12    as well as the number of cars. In 2013, BNSF ran 252 unit trains with 25,450 cars. Pl.'s Ex. 47.

13    In 2014, BNSF ran 249 unit trains with 25,169 cars. Pl.'s Exs. 48, 62. In 2015, BNSF ran 268

14    unit trains with 27,355 cars. Pl.'s Ex. 49, 62. BNSF did not provide the detailed daily and

15    monthly train and car counts until discovery in this litigation, despite the fact that it was

16    contractually obligated to do so.

17    In the years after the litigation was filed, BNSF did not cease—but rather increased—its

18    violations of the Easement. In 2016, BNSF ran 260 unit trains with 26,466 cars. Pl.'s Ex. 50,

19    62. In 2017, BNSF ran 281 unit trains with 29,647 cars. Pl.'s Ex. 51, 62. In 2018, BNSF ran

20    283 unit trains with 30,036 cars. Pl.'s Exs. 52, 62. In 2019, BNSF ran 312 unit trains with

21    33,529 cars. Pl.'s Exs. 55, 62. In 2020, BNSF transported 190 unit trains with 19,724 cars. Pl.'s

22    Exs. 58, 62. And in 2021, BNSF ran 58 unit trains over the Reservation with 5,960 cars. Pl.'s

23    Ex. 58. In addition, as documented by these exhibits, BNSF also violated the Easement

24    restrictions with respect to the number of trains and cars related to the "local" trains crossing

25    the Reservation.

26

27

PLAINTIFF'S TRIAL BRIEF - 18

1

**PROCEDURAL BACKGROUND AND PRIOR RULINGS**

2

Despite repeated rulings against its preemption arguments, BNSF continued to run the

3

unit trains during this litigation. It only stopped unit train service a year after the Ninth Circuit

4

confirmed that the Interstate Commerce Commission Termination Act of 1995 ("ICCTA") did

5

not abrogate the Tribe's Treaty or the IRWA.

6

On June 14, 2015, BNSF filed a motion to dismiss claiming that the Tribe's claims were

7

preempted by ICCTA and subject to the exclusive jurisdiction of the Surface Transportation

8

Board. Dkt. 8. The motion did not address the IRWA, and while it claimed that ICCTA

9

preempted federal law, it only cited cases where state laws and regulations were found

10

preempted. *See* Dkt. 8 at 6–8. In response to this motion, the Tribe pointed out that the STB is

11

not competent to resolve disputes under the IRWA—the federal statutory authority and

12

regulatory scheme under which the Easement was issued—and that the STB regularly declines

13

to resolve disputes arising from voluntary contracts. Dkt. 11 at 1, 5, 10–21. The Court held a

14

hearing on the motion to dismiss on September 2, 2015 (Dkt. 22). At the hearing, the Court

15

rejected BNSF's efforts to classify the Tribe as a "private party":

16

17

18

19

20

21

22

> [Y]ou talk about the private parties. The tribe is not a private party, right? It's a
> sovereign nation that has made an agreement with a railroad, with the blessing of the
> United States, to accommodate them on Indian trust land where they have an absolute
> right to exclude non-Indians. And the Bureau of Indian Affairs and the Secretary of the
> Interior have an absolute obligation to make sure that it's consistent with the best
> interests of the tribal land that's being held in trust . . . of course I would think the STB
> will come back and say, yeah, the carriers really need that rail line. So the country needs
> to get that crude up there to the refineries. . . . from all the usual analysis they do,
> dealing with either state environmental law, or a municipal zone issue, or looking back
> at an agreement that was made between a municipality and the railroad 100 years ago or
> so, that's what they're good at. But this is a completely different animal . . .

23

Dkt. 22 at 8–9. The Court also acknowledged that this dispute required the reconciliation of

24

competing federal laws. *Id.* at 53–54. The Court ultimately declined to refer the issue to the

25

STB in its written order entered on September 11, 2015. Dkt. 19.

26

27

PLAINTIFF'S TRIAL BRIEF - 19

1    Six months later, on March 10, 2015, the Tribe moved for summary judgment on

2    BNSF's preemption defense. Dkt. 31. The motion raised all of the issues ultimately presented

3    to the Ninth Circuit: that ICCTA's preemption clause prohibits only regulation of railroads by

4    state and local actions, that ICCTA preemption does not prohibit actions to enforce voluntary

5    contracts, and that ICCTA does not "preempt" other federal laws, including the IRWA, and

6    abrogation is the proper analytical framework for addressing competing and inconsistent

7    federal legislation. *Id.* The noting date for the motion was extended at BNSF's request to allow

8    for discovery and the Tribe filed an amended summary judgment motion, with additional

9    exhibits, on July 21, 2016. Dkt. 58.

10    BNSF filed a response and cross-motion for summary judgment, primarily arguing that

11    the Tribe acted arbitrarily in denying consent to increased rail traffic when such denial would

12    force BNSF to violate federal law—i.e., its common carrier obligations. Dkt. 63. The Tribe

13    filed its response to BNSF's motion pointing out the flaws in BNSF's reasoning, including that:

14    consideration of the IRWA was critical to resolving this dispute, ICCTA does not "preempt"

15    other federal laws, nothing in ICCTA implicitly repeals the IRWA, the Tribe's status as a

16    sovereign nation, and BNSF voluntary agreement to restrict rail traffic. Dkt. 65. The Court held

17    a hearing on December 15, 2016. Dkt. 81.

18    On January 13, 2017, the Court issued an order on the cross-motions for summary

19    judgment finding that although ICCTA did not preempt the IRWA, the Tribe's "state law

20    claims for injunctive relief" were preempted. Dkt. 75 at 17.

21    Two weeks later, however, the Tribe filed a motion for reconsideration explaining that

22    its breach of contract and trespass claims and the remedies for injunctive relief were not

23    brought under state law, but federal common law. The Court directed BNSF to respond. BNSF

24    filed a response on February 7, 2017. Dkt. 79. On June 8, 2017, after considering the parties'

25    arguments, the Court acknowledged that it had not analyzed the Tribe's contract and trespass

26    claims under the appropriate federal framework; after doing so, the Court reversed its order and

27

PLAINTIFF'S TRIAL BRIEF - 20

1   held that the Tribe's requests for injunctive relief were not preempted. Dkt. 85.

2       BNSF filed a motion for clarification asking the Court to clarify, or in the alternative

3   reconsider, that its ruling "did not decide on summary judgment any factual issue of possessory

4   rights or the Treaty's scope," in other words, BNSF's claim that the Tribe did not own the trust

5   land at issue. Dkt. 92. The Tribe responded, explaining that BNSF conceded that the Tribe

6   owned the land in question when it settled the trespass litigation. Dkt. 91. The Court denied

7   BNSF's motion, pointing out that BNSF presented no evidence disputing the Tribe's ownership

8   claim and "that counsel can imagine a factual dispute regarding ownership . . . does not mean

9   there is a genuine issue of disputed fact." Dkt. 93 at 4.

10      BNSF requested that the Court certify its orders on the preemption defense for

11  interlocutory appeal. Dkt. 102. After interlocutory review was approved, BNSF filed its

12  opening appellate brief on November 14, 2018. Ninth Cir. Dkt. 11. Its briefing was peppered

13  with misstatements regarding critical facts and legal rulings in its cited case law. The Ninth

14  Circuit panel publicly chastised BNSF regarding "serious concerns with the integrity of

15  [BNSF's] brief" due to "statements and representations that [it] view[ed] as inaccurate and

16  misleading to an unusual degree." May 14, 2019 Oral Argument (video recording provided by

17  Ninth Circuit, available at https://www.ca9.uscourts.gov/media/video/?20190514/18-35704/).

18  Following oral argument, the Ninth Circuit panel issued an order directing BNSF to explain

19  how its representations were candid representations of key documents and legal rulings. Order,

20  May 22, 2019 (9th Cir. Dkt. 53).

21      The Ninth Circuit affirmed this Court's orders and held that ICCTA did not preempt,

22  repeal, or abrogate the IRWA or the Treaty, that enforcement of the Easement was not

23  unreasonable interference with rail transportation, and that ICCTA, the IRWA, and the Treaty

24  could be harmonized. Dkt. 111. Specifically, the Ninth Circuit held that "the Department of the

25  Interior retains authority to issue and enforce right-of-way agreements, including any agreed-

26  upon conditions negotiated between a tribe and a railroad. On the other, the STB retains

27

PLAINTIFF'S TRIAL BRIEF - 21

1  authority under the ICCTA to regulate rail operations over Indian lands, such as rates for

2  service, so long as those regulations are consistent with the terms of a normal easement granted

3  under the Indian Right of Way Act." *Id*. at 35.

4       After the Ninth Circuit ruling, the parties agreed that BNSF would not immediately seek

5  certiorari to the Supreme Court and the Tribe would not immediately move for a preliminary

6  injunction. Instead, the Tribe filed an amended complaint and the parties continued with

7  discovery on the Tribe's trespass and contract claims, and BNSF's arbitrariness defense. The

8  parties filed cross motions for summary judgment on these issues. Dkts. 134, 146, 158, 163.

9  The Court ruled on these cross-motions finding that as a matter of law BNSF trespassed and the

10  Tribe did not act arbitrarily, but that fact issues precluded the Court from ruling on whether

11  BNSF's breach of the easement was material and whether BNSF's trespass was conscious or

12  willful. Dkt. 174. The Court further held that if BNSF's trespass was conscious, willful, or

13  knowing, that BNSF could be subject to disgorgement of its profits. *Id*.

## ARGUMENT

15       A person who consciously, knowingly or willfully trespasses over another's property

16  may be required to disgorge all profits earned as a result of said trespass. Restatement (Second)

17  of Torts, § 929 cmt. c ("if the defendant is a willful trespasser, the owner is entitled to recover

18  from him the value of any profits made by the entry."); Restatement (Third) of Restitution and

19  Unjust Enrichment, § 3 ("A person is not permitted to profit from his own wrong."), § 40 ("A

20  person who obtains a benefit by an act of trespass or conversion, by comparable interference

21  with other protected interests in tangible property, or in consequence of such an act by another,

22  is liable in restitution to the victim of the wrong.").

23      **A.**    **BNSF agrees it bears the burden to show that its trespass was not willful,**

24             **conscious, or knowing.**

25       With respect to trespass, "the law presumes that a party intended the natural

26  consequence of his acts, and if a person has the means of ascertaining facts, but refuses to use

27  these means, and, reckless of the rights of the true owner, appropriates his property to his own

PLAINTIFF'S TRIAL BRIEF - 22

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

use, the law will presume that he did it intentionally and willfully." *Liberty Bell Gold Min. Co. v. Smuggler-Union Min. Co.*, 203 F. 795, 799 (8th Cir. 1913). Accordingly, the burden is on the defendant to show that its conduct was not intentional or willful. *Id.* Indeed, the Supreme Court has recognized that in cases where damages sought include disgorgement of profits in lieu of damage to plaintiff's property, the burden of proof falls on the defendant. *United States v. State of Wyo.*, 331 U.S. 440, 458 (1947) ("when suit is brought for the value of minerals wrongfully removed from the plaintiff's land, and the trespass and conversation are established, the burden of pleading and proving good faith is on the defendant."). Courts that have considered the issue routinely find that there is a presumption of willfulness for every trespass that the defendant has the burden to refute. *See Bostic v. Whited*, 198 Va. 237, 93 S.E.2d 334, 335 (1956) ("Every trespass is prima facie wilful, and where a trespass is conceded . . . the burden of proof is on defendant to show that the trespass is not wilful.").

BNSF agrees that it bears the burden of proof.

**B.      BNSF was a knowing, conscious, or willful trespasser.**

> **1.      BNSF cannot show that it had a good faith belief that it could breach the Easement and trespass over the Reservation.**

Although BNSF has repeatedly stated that it had a good faith belief that its common carrier obligations allowed it to breach the Easement and trespass over the Reservation, BNSF has provided no admissible evidence to support this contention.

Instead, BNSF claims that the evidence lies in testimony that can be offered by BNSF's former attorney, Stephen DiJulio, and documents that BNSF has withheld from production under claims of privilege.[1] According to BNSF's privilege logs, Mr. DiJulio worked closely with (among others) Richard Chamberlain, BNSF's Senior General Attorney, who was intimately involved in all aspects of the internal discussions at BNSF regarding the appraisal,

---

[1] BNSF has stated that although its communications with counsel are privileged, it is not relying on advice of counsel as a defense. Dkt. 185 at 8, n. 4 ("BNSF is not relying on an advice of counsel defense; it is considering having Mr. DiJulio testify because he was centrally involved in the negotiations with the Tribe and BNSF's assessment of its common carrier obligations.").

PLAINTIFF'S TRIAL BRIEF - 23

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

the Easement traffic limitation issues, and other issues related to communications with and

liability to the March Point refineries. BNSF was offered an opportunity to present such

evidence, provided that BNSF also produce all communications pertaining to its decision to run

unit trains over the Reservation that had been withheld for privilege pursuant to Federal Rule of

Evidence 502 and to avoid prejudice to the Tribe. Dkt. 190. BNSF elected not make the

production and has consequently forgone the opportunity to provide evidence of attorney

communications at trial.

Of course, BNSF has the right to invoke the attorney-client privilege to avoid disclosing

such information. Although the law is unclear as to what inferences may be drawn from a claim

of privilege in the Ninth Circuit, out of an abundance of caution the Tribe would suggest that

no inferences as to its contents—either favorable or adverse to BNSF— be drawn from such a

claim. *See McKesson Info. Sols., Inc. v. Bridge Med., Inc.*, 434 F. Supp. 2d 810, 811 (E.D. Cal.

2006) (citing *Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337

(Fed. Cir. 2004)) (acknowledging that in willful patent infringement cases, no adverse

inferences may be drawn from the assertion of privilege or the absence of opinion from

counsel).

While BNSF may argue that the Tribe cannot suggest, for example, that BNSF's refusal

to produce all privileged communications pertaining to its decision to breach the Easement

Agreement must mean that the privileged communications contain evidence that support

liability, the reverse is also true. BNSF may not rely on its invocation of the attorney-client

privilege to suggest or infer the subjects, content, or adherence to any advice provided in the

withheld communications. Neither BNSF nor the Court may infer that by communicating with

counsel BNSF must have received advice regarding its common carrier obligations, the IRWA,

the Treaty, the relationship between these authorities, or the substance of any such

communications. Likewise, BNSF cannot argue, nor can the Court infer, that because BNSF

sought the advice of counsel, that BNSF's conduct must have been consistent with any advice

PLAINTIFF'S TRIAL BRIEF - 24

1  provided and that therefore, it acted in good faith.

2      BNSF's privilege assertions are factually neutral and if BNSF seeks to meet its burden

3  to establish that it acted in good faith, it must rely on evidence wholly outside the scope of the

4  attorney-client relationship. There is no evidence on which it could do so.

5      To the contrary, the limited production of internal documents and other evidence that

6  relate to the decision to run unit trains over the Easement confirm that BNSF was motivated by

7  profits, intentionally avoided disclosing the risks that the Tribe could prevail to the March Point

8  refineries, and acknowledged that BNSF had substantial exposure to the Tribe if the dispute

9  could not be resolved prior to litigation. Other documents confirm that BNSF did not believe

10  that it had common carrier obligations, or at least acknowledged that it could not and was not

11  obligated to meet every shipper request.

12  <center>**a.    BNSF was motivated by profit, not its common carrier**</center>
13  <center>**obligations.**</center>

14      In early communications regarding unit train service to Tesoro, BNSF acknowledged

15  that it would have to make substantial "mainline" upgrades to the Anacortes spur that would

16  need to be factored into the contract rate charged for such service. Pl.'s Ex. 6. These cost

17  implications, initially estimated to be between $3.5 to $5 million, however, were weighed

18  against the substantial revenue BNSF anticipated to receive: $66.5 million per year for five

19  years. Pl.'s Exs. 6–8. A preliminary economic analysis conducted by BNSF in July 2011

20  anticipated that the Anacortes Spur upgrades would have an internal rate of return "of over

21  60%." Pl.'s Ex. 9.

22      BNSF was also aware in the early stages of its negotiations with Tesoro of the safety

23  and environmental risks posed by the shipment of Bakken crude by rail. In an August 1, 2011

24  presentation for an "Environmental & Hazmat Staff Call," in which BNSF described Bakken

25  crude as "Black Gold," "Bakken Bullion," and "North Dakota Tea," BNSF also acknowledged

26  that Bakken was "not your father's crude" and had substantially different properties than other

27  crude oils. Pl.'s Ex. 10. These properties included that "flashpoint and boiling points vary . . .

PLAINTIFF'S TRIAL BRIEF - 25

1    typically lower than gasoline." *Id.* BNSF also recognized the substantial risks posed by

2    derailment, citing a derailment in Luther, OK that resulted in fire, and the serious problems

3    with the most common tank car used to transport it, the DOT-111, which was "not insulated,

4    thermally protected or jacketed." *Id*.

5         This was, however, no deterrent. By September 22, 2011, BNSF's analysis of the

6    proposed contract with Tesoro anticipated "a 5 year after-tax NPV of $75M" based on a five

7    year contract with service of approximately 3 unit trains per week. Pl.'s Ex. 13. But by this

8    time Tesoro was already pressing for more unit trains once unit train service began.

9    Communications in August 2011 confirm that BNSF understood Tesoro to want 7 trains per

10   week or "one train per day to Fidalgo." Pl.'s Ex. 18.

11        Despite BNSF's repeated assertions in this litigation that it must meet its shippers'

12   requirements under the federal common carrier obligation, BNSF did not retain such sentiments

13   in its negotiations with Tesoro. To the contrary, due to BNSF's own limitations and other

14   traffic on the "busy" "Bellingham sub," BNSF employees cautioned that it should "wait and

15   see how [3 trains per week] goes before we comit [sic] to 5 or 7 trains. And when we do, we

16   will need capacity to meet their expectations. Trust me, we want the business but we need to be

17   careful so we don't impact other business." *Id*.

18        BNSF did, eventually, run 5 to 7 or more trains over the Reservation each week and its

19   efforts were highly profitable. As a result of the financial success of unit train service to

20   Tesoro, BNSF began "aggressively working toward finding a way to land crude at all of the

21   refineries on the west coast." Pl.'s Ex. 30. An evaluation of BNSF's 2013 figures showed that

22   of the profitable engagements "Tesoro leads the pack by a landslide." Pl.'s Ex. 34.

23        In December 2013, as BNSF prepared a proposal for an amended easement to offer the

24   Tribe, BNSF noted that unit train service to Tesoro and potential service to Shell represented

25   "$200 million of new and existing business" that it did not want to lose. Pl.'s Ex. 32.

26

27

PLAINTIFF'S TRIAL BRIEF - 26

These internal estimates are consistent with testimony from Dan Fapp, an expert on rail transportation and economics. *See e.g.*, Dkt. 135. Mr. Fapp was asked to provide an estimate of BNSF's gross transportation revenues and variable costs of services for transportation of crude oil and residual oil in unit train service from North Dakota to Fidalgo, WA and to identify the difference between BNSF's gross revenues and variable costs from such movements. To evaluate BNSF's revenues, Mr. Fapp used the rates established in BNSF's Master Transportation Contract with Tesoro and appropriate addendums and applied them to the detailed train and car counts produced by BNSF in this litigation. To estimate BNSF's variable costs, Mr. Fapp utilized the STB's Uniform Railroad Costing System ("URCS") Phase III model. URCS is the STB's general purpose costing system which estimates variable unit costs and total variable costs for Class I railroads, such as BNSF. The STB uses URCS to assess variable costs in a variety of settings without requiring the railroad supply data establishing its actual costs. After Mr. Fapp completed his calculations, he determined that the difference between BNSF's gross revenues and URCS variable costs between September 1, 2012 and December 31, 2019 was approximately $300 million. This figure does not include analysis of the differential between revenues and variable costs between January 2020 and May 2021 because he did not have the Master Transportation Contract amendments for that time period.

> **b.      BNSF acted inconsistently with a purported good faith belief that its common carrier obligations trumped the Easement Agreement.**

BNSF's conduct toward the Tribe and its own customers confirms that BNSF did not believe that it could violate the Easement's terms based on its common carrier duties.

The Tribe reached out to BNSF in October 2011, approximately a year before unit train service began in September 2012, expressing its concerns about reports of impending construction of a unit train receiving facility at the Tesoro refinery and reminding BNSF of the train and car limitations imposed by the Easement. Pl.'s Ex. 14. BNSF elected not to respond to the Tribe until after unit train service began on September 4, 2012, despite having engaged

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

counsel to prepare a response to the Tribe's Chairman before service began. Pl.'s Ex. 60 at 360, 413. This "act first, ask for forgiveness later" approach is inconsistent with a good faith belief that the Easement's traffic restrictions were superseded by common carrier obligations. Had BNSF believed that the terms of the Easement were unenforceable in this circumstance, BNSF could have and should have explained that to the Tribe and, under that legal framework, could have offered to renegotiate the Easement. BNSF's strategy had one significant consequence: by the time that BNSF opened communications with the Tribe the status quo had been altered from no unit train service to unit train service. This would have made it substantially more difficult for the Tribe to seek a preliminary injunction to resolve any legitimate legal dispute about the interplay between ICCTA, the IRWA, and the Treaty.

Once BNSF finally responded to the Tribe, it continued to withhold its purportedly incontrovertible common carrier argument that would defeat the Tribe's objection to unit train service. Instead, it represented to the Tribe, through an in-house attorney, that it sought to "discuss the SITC interest in an amended easement, and such consideration that may be appropriately required, *to enable BNSF to serve customers on the rail line as may be necessary*." Pl.'s Ex. 27 (emphasis added). Such a need to amend the easement to allow BNSF to serve customers is completely at odds with a common carrier obligation so expansive that it would supersede limitations in the existing easement. Indeed, it is unclear how BNSF could hold a good faith belief that it could serve its customers under the existing Easement pursuant to its common carrier obligations while simultaneously believing that an amended easement would be required to *enable* it to serve those same customers. If BNSF had such a good faith belief, why would it not have invoked the argument to secure a better bargaining position for an amended easement in negotiations with the Tribe?[2]

---

[2] The only reason why BNSF might choose not to disclose this argument would be to prevent the Tribe from discovering that the Agreement was voidable due to a material misrepresentation by BNSF during the negotiation process. In other words, even if BNSF had a good faith belief that its common carrier obligations would prevail over the Easement restrictions, it must have known that its understanding would render the entire agreement voidable, precluding it from offering *any* rail service to the refineries on March Point. *See Southern Pacific Transp. Co. v. Watt*, 700 F.2d 550 (9th Cir. 1983); Restatement (Second) of Contracts § 153 (allowing party who

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1    Meanwhile, by the time that BNSF engaged with the Tribe, it was already in discussions

2 with Shell about providing similar unit train service to the Shell refinery over the Reservation.

3 Pl.'s Ex. 17 (showing discussions as early as August 2012). Shell had, however, learned about

4 the Tribe's Easement and was concerned about how it would impact its project. In an internal

5 email exchange from August 2013 between BNSF employees, BNSF's Reeve Geary

6 represented that "Shell is particularly concerned about the easement with the Swinomish tribe.

7 Larry is working with Kurt Geringer to resolve that issue. I've told my contacts at Shell that it's

8 something that will get worked out, but they still worry." Pl.'s Ex. 29. This summary of the

9 reassurances to Shell also undermines BNSF's claim regarding its common carrier beliefs. Had

10 BNSF believed that its common carrier obligations rendered the train and car restrictions in the

11 Easement unenforceable, why did it inform Shell that it was an issue that would need to "get

12 worked out"?

13    BNSF's failure to be forthcoming with Shell was not unique. Indeed, although the Tribe

14 inquired about whether Shell also planned to request unit train service—which BNSF was

15 already negotiating—BNSF told the Tribe that it was not aware of any discussions with Shell.

16 The Tribe had to learn about the Shell plans from a local newspaper. Similarly, and tellingly,

17 Tesoro—who BNSF was already illegally serving—was kept in the dark about the Swinomish

18 problem until after the litigation was filed. The Tesoro facility's former general manager,

19 James Tangaro, will testify that he learned about the Swinomish Easement in 2016. And Mr.

20 Tangaro heard not from BNSF, but from a comment letter prepared by the Tribe in November

21 2015 as part of the proceedings regarding Shell's proposed unit train receiving facility. If

22 BNSF believed in good faith that its common carrier obligations to Tesoro superseded its

23 contractual agreement with the Tribe, why did it not inform Tesoro of the conflict as soon as

24

25 made mistake as to basic, material assumption to void contract); Restatement (Second) of Contracts § 152

26 (allowing adversely affected party to void contract where there was a mutual mistake); Restatement (Second) of Contracts § 164 (allowing party to void contract when manifestation of assent is induced by fraudulent or material misrepresentation).

27

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

possible? Instead, BNSF kept Tesoro in the dark for years, apparently hoping that it could paper a new agreement with the Tribe with Tesoro being none the wiser.

This is exactly what BNSF attempted to do. Despite its post-litigation claims that it always believed it could use the easement as much as it liked to serve shippers, BNSF only raised its common carrier obligations with the Tribe on four occasions. BNSF's outside counsel, Mr. DiJulio, first raised the issue of common carrier duties and STB exclusive jurisdiction at an in-person meeting with the Tribe's on May 21, 2013—nearly eight months after the unit trains started running. During that discussion, Mr. DiJulio briefly mentioned the duty to serve and the STB's exclusive jurisdiction. Mr. LeCuyer, an experienced Indian law attorney who was also familiar with issues of federal preemption, responded by identifying competing federal authority to Mr. DiJulio: the Tribe's Treaty, the Supremacy Clause, and the federal statutory and regulatory law under which the Easement was issued. Mr. LeCuyer requested that BNSF provide additional information about the common carrier duty and STB jurisdiction. The response that Mr. DiJulio provided over a month later was lackluster, to say the least. Instead of offering an analysis of how ICCTA's preemption provisions related to the federal statutory and regulatory law under which the easement was established, the Tribe's Treaty or the Supremacy Clause, Mr. DiJulio provided only a generic, three-paragraph summary of the exclusive jurisdiction of the STB and the duty to serve. Pl.'s Ex. 28. BNSF's failure to address the intersection of ICCTA with other relevant federal authorities, when given the opportunity after being notified by the Tribe that they were relevant, as well as BNSF's failure to expressly state that it believed its common carrier obligations superseded the Tribe's rights, belie its good faith claims.

BNSF's internal communications also contradict its good faith claim. BNSF's internal discussions reveal that BNSF actually had substantial concerns about the dispute with the Tribe. In an email exchange from September 2013, Vann Cunningham—one of the BNSF employees tasked with negotiating with the Tribe—cautioned against bringing a specific

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1  executive up to speed with the "Anacortes issue" because they "need to be careful in terms of

2  how he and our other execs are brought in to avoid unnecessarily exposing them to any future

3  litigation should it arise." Pl.'s Ex. 31. In the same email chain, Mr. Cunningham expressed

4  that BNSF was "very exposed with the tribe already. It could be fatal if not handled right. At a

5  minimum, we do not want to back to Federal Court with the tribe." *Id*. BNSF could not have

6  simultaneously believed in good faith that its common carrier obligations legally permitted it to

7  exceed the Easement limitations while also believing that it would be "fatal" to litigate the

8  issue in federal court. *Id*.

9         Over the next two years, BNSF did not raise the issue of common carrier obligations to

10  the Tribe again. It instead continued its efforts to obtain an amended easement that would

11  eliminate any traffic restrictions altogether. *See* Pl.'s Ex. 32, 33. When internally supporting a

12  proposal for an amended easement in a December 3, 2013 email, Mr. Cunningham represented

13  that "over $200 million of new and existing business with Shell and Tesaro [sic] is at risk,"

14  indicating that BNSF understood that an amended easement was required to continue to serve

15  the March Point refineries with unit trains. Pl.'s Ex. 32. These efforts and statements are

16  inconsistent with a good faith belief that the common carrier obligations would prevail because

17  if such belief were true, there would be no need for an amended easement. In his November 25,

18  2014 letter to BNSF regarding safety, Mr. LeCuyer expressly invited BNSF to provide any

19  legal bases on which it contended it could violate the Easement:

20         [I]f BNSF should somehow be of the opinion that the limits on trains and cars are not
21         applicable, or have not been applicable, to its trains or cars, please provide the Tribe
       with an explicit and detailed statement of the BNSF position and each of its legal and
22         factual bases so that the Tribe may have the benefit of BNSF's perspective.

23  Pl.'s Ex. 35 at 15. If BNSF had a good faith belief that its common carrier duties prevailed

24  from the outset, responding to this request should have been easy to prepare for the Tribe's

25  consideration. But BNSF did not provide any such legal justification in its December 16, 2014

26  response (Pl.'s Ex. 37), February 12, 2015 letter regarding the rental adjustment (Pl.'s Ex. 39),

27

PLAINTIFF'S TRIAL BRIEF - 31

or February 12, 2015 letter listing the Tribe's concerns to be discussed at a future meeting (Pl.'s Ex. 40). Three and a half months after the Tribe's request, on March 13, 2015, Mr. Cunningham provided only the following brief justification: "in order to fulfill our common carrier obligation under federal law, we will continue running trains to the highest level of safety as required under federal law and as we have been doing for over two years while we continue to discuss economic terms." Pl.'s Ex. 43. BNSF provided no analysis on its obligations under other, applicable federal law, such as the IRWA or the Treaty. Moreover, this representation to the Tribe was inconsistent with BNSF's contemporaneous assessment of the situation. In a March 4, 2015 email, a BNSF employee wrote to Mr. Cunningham that "Questions were asked around the Shell Anacortes project" in an IP capital meeting, and that others were "not aware of the magnitude of the Swinomish issues." Pl.'s Ex. 42.

There is simply no evidence, other than BNSF's post-facto *ipse dixit* representations, that it believed it could violate the Easement's terms pursuant to its common carrier obligations.

### 2. BNSF must establish that it did not willfully, knowingly, and consciously trespass—if it was willful, knowing, or conscious it may be subject to disgorgement.

The Restatement provides for a remedy of restitution in the event of a conscious, knowing, or willful trespass. Restatement (Third) of Restitution and Unjust Enrichment, § 51(3) ("a conscious wrongdoer is a defendant who is enriched by misconduct and who acts (a) with knowledge of the underlying wrong to the claimant, or (b) despite a known risk that the conduct in question violates the rights of the claimant."); Restatement (Third) of Restitution and Unjust Enrichment § 40 cmt. b ("Enrichment resulting from intentional trespass is not properly measured by ordinary rental value. A conscious wrongdoer will not be left on a parity with a person who—pursuing the same objectives—respects the legally protected rights of the property owner. If liability in restitution were limited to the price that would have been paid in a voluntary exchange, the calculating wrongdoer would have no incentive to bargain.");

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

Restatement (Second) of Torts, § 929 cmt. c ("if the defendant is a willful trespasser, the owner is entitled to recover from him the value of any profits made by the entry."); *see also U.S. v. Santa Fe Pac. R. Co.*, 314 U.S. 339 (1941) (reinstating claim for quiet title and an accounting of all rents, issues and profits derived from the unauthorized use of tribal lands); *Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 235–36 (1985)("Indians have a common-law right of action for an accounting of 'all rents, issues and profits' against trespassers on their land.") (quoting *Santa Fe*, 314 U.S. at 344); *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) ("one way to deter [a deliberate tort] is to make it worthless to the tortfeasor by stripping away all his gain, since if his gain exceeded the victim's loss a damages remedy would leave the tortfeasor with a profit from his act.").

> **a.     A willful, knowing, *or* conscious trespasser is subject to disgorgement; BNSF must establish that it was none of these.**

BNSF has claimed that its trespass must be willful *and* knowing *and* conscious for it to be liable and, implicitly, if it can show it was not one of the three, that the Tribe cannot be entitled to disgorgement. Not so. BNSF must show that its trespass was not willful, knowing *or* conscious; in order to avoid liability, it must prove that it was none of the three.

First, "willful," "knowing," and "conscious" are all fundamentally the same and seek to describe the mental state of an actor. As explained in more detail in the sections below, whether an act is willful, knowing, or conscious are merely different ways of framing the same question: did the party act in good faith?

Second, there are numerous authorities finding willful trespass, awarding disgorgement damages, without likewise concluding that the trespass was also conscious or knowing. *See e.g.*, *Liberty Bell Gold Min.*, 203 F. 795, 799 (discussing willful trespass); *In re de Jong*, 793 F. App'x 659, 660 (9th Cir. 2020) (awarding disgorgement for conscious trespass). Indeed, the various Restatement sections that provide for this remedy use these terms singularly. Restatement (Third) of Restitution and Unjust Enrichment, § 51(3) (providing for disgorgement

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

for conscious wrongdoing); Restatement (Second) of Torts, § 929 cmt. c (providing for recovery of profits where trespasser is willful).

The Tribe is unaware of any authority that has held that all three states of mind must be found to obtain a disgorgement remedy. Regardless, however, in this case BNSF's trespass was conscious, willful, and knowing.

<div align="center"><strong>b.  BNSF knowingly and consciously trespassed.</strong></div>

BNSF was a knowing and conscious trespasser as defined by the Restatement and other sources. An act is committed knowingly if it is done "with knowledge; consciously; intelligently." Knowingly, Black's Law Dictionary; *see also* Ninth Circuit Manual of Model Criminal Jury Instructions § 4.8 ("an act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident."); RCW 9A.08.010 (defining knowledge for criminal culpability when a person "knows or acts knowingly or with knowledge when (i) he or she is aware of a fact, facts, or circumstances or results described by a statute defining an offense; or (ii) he or she has information which would lead a reasonable person in the same situation to believe that facts exists which facts are described by a statute defining an offense."). A "conscious wrongdoer is a defendant who is enriched by misconduct and who acts (a) with knowledge of the underlying wrong to the claimant, or (b) despite a known risk that the conduct in question violates the rights of the claimant." Restatement (Third) of Restitution and Unjust Enrichment, § 51(3).

BNSF was enriched by its unauthorized entry onto the Reservation as it made substantial profits from its unit train service. It had knowledge that it did not have the Tribe's permission to exceed the easement traffic limitations as it received and evaluated the Tribe's August and October 2011 letters and failed to obtain the Tribe's consent prior to commencing unit train service in September 2012. BNSF was therefore obligated to conduct a thorough evaluation of its common carrier obligations in light of the IRWA, the Easement Agreement, and the Tribe's Treaty before it could have reasonably formed a belief that its common carrier

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1  obligations would prevail. In failing to establish that it conducted such an analysis, BNSF was a

2  knowing and conscious trespasser.

3      Further, even if BNSF believed that it was privileged to exceed the easement's

4  limitations pursuant to its common carrier obligations—which it cannot establish—in the

5  absence of any legal authority clarifying in BNSF's favor the interplay between ICCTA and the

6  IRWA and Tribal Treaty rights, there was an unavoidable and known risk that its conduct was

7  not permitted. Indeed, BNSF acknowledged this risk when it internally remarked that it was

8  "very exposed" to the Tribe and that the situation "could be fatal if not handled right." Pl.'s Ex.

9  31. BNSF could therefore not have had a good faith belief that it was privileged by its common

10 carrier obligations under ICCTA to enter the Reservation without the Tribe's consent. The

11 Restatement is clear: while a mistaken belief about *facts* that would, if reasonably believed,

12 have justified entry under an existing statutory authority could justify a trespass, because "the

13 privilege to enter the land depends upon the existence of the duty or authority in the actor, a

14 reasonable belief on his part as to its *existence* will not justify his entry if he has in fact no such

15 duty or entry." Restatement (Second) Torts § 211 (Entry Pursuant to Legislative Duty or

16 Authority), cmt. e (emphasis added). BNSF could not, therefore, justify its trespass over the

17 Reservation based even on a reasonable belief that its common carrier obligations entitled it to

18 do so. Accordingly, if there were questions as to the authority to enter, BNSF could not have

19 acted in good faith by entering first and proclaiming its rights later.

### c.      BNSF willfully trespassed.

21     BNSF was also a willful trespasser. The concept of willfulness typically arises in the

22 context of criminal law or statutory schemes like bankruptcy. The Supreme Court has found

23 that "willful" "generally connotes a voluntary, intentional violation of a known legal duty."

24 *United States v. Pomponio*, 429 U.S. 10, 12 (1976). Evidence of motive is unnecessary to

25 establish willfulness. *Id.* at 12–13 (holding trial court did not err in not instructing jury on good

26 faith). The Ninth Circuit Manual of Model Criminal Jury Instructions likewise provides

27

PLAINTIFF'S TRIAL BRIEF - 35

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1   guidance on the word "willful," acknowledging that its meaning is often dependent on context.

2   Manual of Model Criminal Jury Instructions, § 4.6 (distinguishing between offenses where

3   knowledge of illegality was relevant to offense and those where it is not). The Ninth Circuit has

4   noted that "willfulness," in the context of administrative proceedings for the revocation of

5   federal grazing rights "is basically a subjective standard of the trespasser's intent" and depends

6   on whether there is evidence "which objectively shows that the circumstances did not comport

7   with the notion that the trespasser acted in good faith or innocent mistake, or that his conduct

8   was so lacking in reasonableness or responsibility that it became reckless or negligent."

9   *Holland Livestock Ranch v. United States*, 655 F.2d 1002, 1006 (9th Cir. 1981)

10          Here, the same conclusion arises: even if BNSF believed that its common carrier

11  obligations might trump the Easement's plain terms, it acted willfully in running unauthorized

12  trains prior to obtaining either the Tribe's consent or a judicial determination that it had

13  common carrier obligations to provide unit train service *and* that such obligations overrode

14  Tribal consent as provided under the IRWA. In other words, it was reckless for BNSF to

15  proceed with running unit trains in 2012 without obtaining the Tribe's consent. It was reckless

16  for BNSF to continue to run unit trains over the Tribe's objections until the suit was filed. It

17  was reckless for BNSF to continue to run unit trains after the Tribe filed suit, and after the

18  Court denied its motion to dismiss. It was reckless for BNSF to run unit trains after the Court's

19  orders on the motions for summary judgment and motions for reconsideration. It was reckless

20  for BNSF to run unit trains during the pendency of its appeal, including after oral argument.

21  And it was reckless for BNSF to run unit trains after the Ninth Circuit issued its order. At each

22  step, BNSF's conduct became increasingly reckless. That BNSF was able to present a legal

23  argument to the Court does not absolve BNSF. Unless BNSF can show that it had – and

24  reasonably had – no doubts whatsoever that ICCTA would abrogate the Treaty and the IRWA,

25  its conduct was willful.

26

27

PLAINTIFF'S TRIAL BRIEF - 36

1

                **d.**           **BNSF knowingly trespassed.**

2

      Finally, BNSF was also a knowing trespasser. *See also* Ninth Circuit Manual of Model

3 Criminal Jury Instructions § 4.8 ("an act is done knowingly if the defendant is aware of the act

4 and does not act through ignorance, mistake, or accident."); RCW 9A.08.010 (defining

5 knowledge for criminal culpability when a person "knows or acts knowingly or with

6 knowledge when (i) he or she is aware of a fact, facts, or circumstances or results described by

7 a statute defining an offense; or (ii) he or she has information which would lead a reasonable

8 person in the same situation to believe that facts exists which facts are described by a statute

9 defining an offense.") Here, BNSF cannot claim ignorance: the undisputed evidence shows that

10 it received the Tribe's correspondence, which included excerpts from the relevant Easement

11 Agreement, prior to commencing unit train service over the rail line. BNSF cannot claim

12 accident: it intended to serve the Tesoro refinery pursuant to a Master Transportation Contract.

13 BNSF claims that it mistakenly believed that it was allowed to trespass by its common carrier

14 obligations. But BNSF has failed to show that its mistake was the result of a good-faith belief

15 that its common carrier obligations superseded its obligations to the Tribe. This necessarily

16 required that BNSF investigate the applicable law—including how the Tribe's Treaty, the

17 IRWA, and the federally-issued Easement impacted its normal common carrier duties.

18

      **3.**      **BNSF's breach of the Easement Agreement was opportunistic.**

19

      Federal common law recognizes that when a party deliberately breaches a contractual

20 agreement, it may be subject to disgorgement when otherwise available contract damages are

21 inadequate. Restatement (Third) of Restitution and Unjust Enrichment, § 39(1) ("if a deliberate

22 breach of contract results in profit to the defaulting promisor and the available damage remedy

23 affords inadequate protection to the promisee's contractual entitlement, the promisee has a

24 claim to restitution of the profits realized by the promisor as a result of the breach.").

25

      BNSF's conduct establishes an opportunistic breach of the Easement Agreement.

26

27

PLAINTIFF'S TRIAL BRIEF - 37

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

First, BNSF's breach was deliberate. Restatement, § 39(1). It was informed of the Easement restrictions before it began running unit trains. Even if the economic development and operations departments were unaware of the restrictions when they began negotiations with Tesoro or started running trains, BNSF's attorneys became aware and failed to inform the relevant divisions. The knowledge of BNSF's counsel and managerial employees is imputed to it. *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 876 (9th Cir. 1989) (applying agency principles to employer-employee relationship for purpose of determining what knowledge is imputed to employer under Washington law); *Am. Flood Rsch., Inc. v. Jones*, 192 S.W.3d 581, 584 (Tex. 2006) ("in the context of an enduring attorney-client relationship, knowledge acquired by the attorney is imputed to the client."); *Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962) ("each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'"). The United States Supreme Court adopted Section 39 in a dispute between the states of Nebraska and Kansas regarding water rights to the Republican River Basin as set forth in an interstate compact, which is construed as federal law. *Kansas v. Nebraska*, 574 U.S. 445, 448, 455–56 (2015). In that case, even though there was no finding that Nebraska deliberately breached the compact, the Supreme Court upheld a disgorgement award because "the State 'knowingly exposed Kansas to a substantial risk' of breach, and blithely proceeded." *Id*. at 462. The same is true here: even if BNSF did not desire to breach the Easement Agreement, and proceeded only because it believed it was acting in accordance with its separate common carrier obligations to third-parties (which the Tribe disputes), it still knowingly exposed the Tribe to a substantial risk of breach, and proceeded to run unit trains without first obtaining a legal ruling on the competing rail and Tribal rights and interests, or allowing the Tribe to obtain such a ruling.

Second, BNSF's breach was profitable. Restatement § 39(1), cmt. b. Although BNSF's exact profits are unknown because all damages issues have been bifurcated, Dan Fapp will testify that the differential between BNSF's revenues and estimated expenditures calculated

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1  using the industry standard URCS methodology, show that BNSF's profits were in the
2  hundreds of millions of dollars.

3          Third, any available contractual remedy is inadequate to protect the Tribe's contractual
4  entitlement to limited rail traffic because such damages would not provide the Tribe with a full
5  equivalent to BNSF's promised performance. Restatement § 39(1), (2), cmt. b, cmt. c. Indeed,
6  the Restatement acknowledges that this remedy is appropriate: "Cases in which restitution
7  reaches the profits from a breach of contract are those in which the promisee's contractual
8  position is vulnerable to abuse." *Id.* at cmt. b. In such a circumstance, the Restatement makes
9  disgorgement available "where what the wrongdoer seeks to acquire is . . . the modification or
10 release of his own contractual obligation. . . . Confronted with a situation . . . in which the
11 appropriate course of action would be to negotiate regarding legal entitlements, the wrongdoer
12 takes without asking." *Id.* Further, the purpose in allowing restitution for breach of contract is
13 "to reinforce the stability of the contract itself, enhancing the ability of the parties to negotiate
14 for a contractual performance that may not be easily valued in money." *Id.*

15         There is substantial overlap between the policies underscoring injunctive relief and
16 specific performance and disgorgement. "Disgorgement yields a remedial equivalent after the
17 fact, returning the breaching party to the same position that (enforced) adherence to the contract
18 would have produced." Restatement § 39, cmt. c. And, as the Restatement acknowledges,
19 restitution is generally appropriate in situations involving a negative covenant that is breached.
20 *Id.* at cmt. d (e.g., illustration 8).

21         Here, any contractual remedy available to the Tribe for BNSF's extensive breach of the
22 Easement would be inadequate. The Tribe has a treaty-guaranteed right to exclude non-Indians
23 from its Reservation. The Tribe has a statutory right to consent to any use of its reservation, and
24 a corollary right to impose conditions on such use. The Tribe exercised these rights when it
25 executed the Easement Agreement by requiring BNSF to adhere to a strict limitation on rail
26 traffic, unless and until the Tribe consented to more. It is not possible to assign monetary value

27

PLAINTIFF'S TRIAL BRIEF - 39

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1  to the Tribe's consent. The only contractual remedy BNSF has identified as available to the

2  Tribe is increased rent. While the contract does provide for a rental adjustment in the event that

3  traffic increases, that term immediately follows the terms limiting rail traffic and requiring that

4  BNSF obtain the Tribe's consent. Pl.'s Ex. 3, ¶ 7(c). It is not reasonable to construe this

5  paragraph as authorizing BNSF to increase traffic over the Tribe's objections and be liable only

6  for increased rent that it would have paid had the Tribe consented. The Tribe bargained for and

7  was promised a right to consent; increased rent would not compensate the Tribe for that breach.

8  Moreover, BNSF has represented that because the rail line prevents the Tribe from using or

9  accessing the easement land and anything north thereof, any rent increases arising from the

10  "severance" damages would be marginal, if anything. BNSF has therefore conceded that the

11  Tribe's monetary compensation would be a pittance. This is inadequate and disgorgement is

12  appropriate.

13                                        **CONCLUSION**

14       BNSF bears the burden to show that its trespasses over the Reservation were not willful,

15  conscious, or knowing. BNSF will not meet this burden. The Tribe's evidence at trial will

16  establish that BNSF's words and conduct are inconsistent with a good faith belief that its

17  common carrier obligations permitted it to breach the Easement and run unit trains over the

18  Reservation without the Tribe's consent. Moreover, the Tribe's evidence will show that

19  BNSF's breach of the Easement was opportunistic. The Court should, after considering the

20  arguments and evidence of the parties, find that BNSF willfully, consciously, and/or knowing

21  trespassed on the Reservation and deliberately breached the Easement. The Court should

22  therefore find that the Tribe is entitled to disgorge BNSF's profits in an amount to be

23  determined after a second-phase damages trial.

24

25

26

27

PLAINTIFF'S TRIAL BRIEF - 40

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1     DATED this 15th day of March, 2023.

2                                      TOUSLEY BRAIN STEPHENS PLLC
                                       By:  *s/ Christopher I. Brain*
3                                      By: *s/ Chase C. Alvord*
                                       By: *s/ Rebecca L. Solomon*
4
                                          Christopher I. Brain, WSBA #5054
5                                         cbrain@tousley.com
                                          Chase C. Alvord, WSBA #26080
6                                         calvord@tousley.com
                                          Rebecca L. Solomon, WSBA# 51520
7                                         rsolomon@tousley.com
                                          1200 Fifth Avenue, Suite 1700
8                                         Seattle, Washington 98101
                                          Telephone:  206.682.5600/Fax: 206.682.2992
9

10                                     OFFICE OF THE TRIBAL ATTORNEY, SWINOMISH
                                       INDIAN TRIBAL COMMUNITY
11

12                                     By:  */s Weston R. LeMay*
                                          Weston R. LeMay, WSBA #51916
13                                        wlemay@swinomish.nsn.us
                                          11404 Moorage Way
14                                        La Conner, WA 98257
                                          Telephone:  360.466.1058
15                                        Fax: 360.466.5309

16
                                          ***Attorneys for Plaintiff***
17

18

19

20

21

22

23

24

25

26

27

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992