HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SWINOMISH INDIAN TRIBAL COMMUNITY, a federally recognized Indian Tribe,<br><br>         Plaintiff,<br><br>  v.<br><br>BNSF RAILWAY COMPANY, a Delaware corporation,<br><br>         Defendant. | No. 2:15-cv-00543-RSL<br><br>BNSF RAILWAY COMPANY'S TRIAL BRIEF |

## I.  INTRODUCTION

The sole issue remaining for trial is whether BNSF Railway Company ("BNSF") consciously, knowingly, and willfully trespassed in exceeding the limitations of the Easement crossing the Swinomish Indian Tribal Community (the "Tribe") Reservation. Specifically, as this Court previously recognized, the inquiry is focused on the nature of BNSF's belief that it was required by its common carrier obligations to operate in excess of the Easement to meet shipper needs. If BNSF held that belief in good faith, then its trespass, although intentional, does not rise to the level of conscious, knowing, and willful trespass.

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 1
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

The evidence at trial will show that BNSF's belief was held in good faith. BNSF's common carrier obligations are baked into its DNA. From the time BNSF began running unit trains across the Easement (and decades before that) until the Ninth Circuit's ruling on interlocutory appeal, BNSF's understanding was that its common carrier obligations necessitated meeting shipper needs absent rail capacity constraints. BNSF also understood that setting rates and services with a customer by contract was a way of **fulfilling** its common carrier obligation, not avoiding it. BNSF discussed and raised this obligation with the Tribe on multiple occasions during the course of negotiations with the Tribe,[1] including sharing the legal basis for this understanding as part of its transparent, good-faith effort to explain its actions. Until this suit was filed, the Tribe never disputed BNSF on this point. And after suit was filed, BNSF continued to raise its common carrier obligations as the basis for its actions consistent with the position it had taken with the Tribe since 2013. That BNSF's position ultimately was rejected by the courts does not constitute bad faith. Rather, as reflected in this Court's initial ruling on the issue of preemption and its ruling granting BNSF's motion for interlocutory review, BNSF's belief, although ultimately rejected, was reasonable. Nor does the fact that BNSF made substantial revenue from its operations over the Easement demonstrate bad faith. To support its argument in this phase of the case, the Tribe would need evidence suggesting that BNSF asserted its belief in its common carrier obligations as a pretext to generate revenue. There is no such evidence. The mere fact that BNSF would profit from its crude by rail shipments is insufficient to make that showing. Accordingly, BNSF did not consciously, knowingly, and willfully trespass.

---

[1] BNSF acknowledges that the Tribe disputes it was in negotiation with BNSF, but that was BNSF's belief.

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 2
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

## II.   STATEMENT OF FACTS

### A.   Background on BNSF

BNSF Railway is one of North America's leading freight transportation companies, with a rail network of 32,500 route miles in 28 states and three Canadian provinces. It moves approximately 10 million carloads per year. BNSF has two major arms: the marketing arm and the operations arm. The marketing department maintains relationships and dealings with shippers. Within the marketing department, there are four business segments for different commodities: industrial products, agriculture products, coal, and consumer products. The operations department is the team that handles the movement of all of these commodities. It also installs and maintains track, and runs trains. Other departments provide support to marketing and operations. Before 2019, BNSF's real estate assets were managed by the finance department, but after 2019, the real estate assets were managed by the marketing department.

### B.   BNSF Transports Vital Interstate Shipments over the Easement

Among its many routes, BNSF transports cargo across its Northern Rail Corridor to refineries now owned by Marathon Petroleum Company ("Marathon") (formerly Tesoro) and Holly Frontier (formerly Shell Oil Products ("Shell")) at March Point. The railroad spur that services these refineries, the Anacortes spur, crosses the Reservation before reaching these refineries.

BNSF operates over the Reservation pursuant to an Easement. The Easement permits BNSF to run one train of up to 25 cars per day in each direction. Until 2012, Marathon and Shell only requested shipment of products that they used to mix with crude oil to make commercial gasoline. The car and train limits in the Easement reflected the needs of shippers at the time— i.e., the requests of Marathon and Shell at the time that the Easement was negotiated in 1990. The Easement further provides that the number of trains and cars may increase if required by

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 3
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

shipper needs and with the Tribe's permission, which may not be arbitrarily withheld. Under the Easement Agreement, if the number of trains or cars is increased, the Tribe is entitled to an adjustment in rent. The Easement imposes reporting requirements on BNSF for both the number of trains and commodities carried. The Easement is unique in that no other easements along BNSF's 32,500 route miles contain limits on the number of trains and cars or require annual commodity reporting.

BNSF did not provide the required car count or commodity reports until the Tribe brought the failure to the attention of BNSF. BNSF admits that it breached the Easement in this regard as found by this Court. The breach is not further at issue in this phase of the case. Damages for the breach will be determined in the next phase of the litigation.

The requirement at issue here is BNSF's failure to obtain the Tribe's consent to increase the number of trains and cars necessary to meet shipper needs. As described below, BNSF breached that provision of the Easement by shipping large unit trains of crude by rail to Marathon at its request without first seeking the Tribe's consent. BNSF's reasoning for continuing to operate this increased traffic to meet its shippers' needs without obtaining the Tribe's consent is the only matter at issue now.

C.      **Marathon and Shell Request Service for Expanding Refineries at March Point**

In 2011, Marathon and Shell began exploring expansion of their refineries at March Point to accommodate delivery of crude oil in 100-car unit trains from the Bakken Formation in North Dakota ("Bakken Crude"). They previously had relied on barging Alaska crude to their refineries but the supply of Alaska crude was diminishing. Marathon completed its expansion and requested that BNSF ship Bakken Crude to its refinery.

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 4
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

Pursuant to Marathon's request, BNSF began shipping crude oil by rail from North Dakota to Marathon's refinery at March Point. These shipments traverse multiple states in moves of approximately 1,500 miles on average. The only route to reach Marathon was across the Easement. The Easement is less than one mile of the 1,500 mile route.

**D.    BNSF Negotiated in Good Faith for Increased Traffic**

On August 17, 2011, the Tribe wrote to BNSF that it was initiating an appraisal for the property value of the Easement and requesting an adjustment to BNSF's annual fee. The Tribe sent this correspondence to Jones Lang LaSalle ("JLL"), BNSF's real estate portfolio manager. JLL treated this correspondence as a request for a rental adjustment and forwarded it to BNSF's real estate division in the finance department and in-house attorney who in turn forwarded the correspondence to BNSF's outside real estate attorney.

Shortly after, the Tribe became aware of the proposed increased rail traffic over the Easement. On October 18, 2011, the Tribe followed up on its prior letter and asserted that any proposed increase in the number of trains or cars crossing the easement must be taken into consideration in the easement fee adjustment. JLL responded on November 11, 2011, and continued to engage in discussions with the Tribe regarding appraisals through 2012. Unfortunately, the Tribe's concern regarding increased traffic was not forwarded to the group responsible for BNSF's relationships with shipper customers, the marketing department, which was communicating with Marathon regarding its plans. Accordingly, no one at BNSF involved with the increased traffic was aware of the Tribe's concern or the Easement's potential limitation, until after the increased traffic had begun. This was an error and a breach of the Easement. The error was a result of the right hand (real estate) not knowing what the left hand was doing

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

(marketing). There is, however, no evidence that BNSF started delivering Bakken Crude to Marathon in bad faith.

On September 4, 2012, the first unit train operated over the Easement. On September 27, 2012, the Tribe sent another letter, this time to Governmental Affairs at BNSF, alleging the Tribe had not received a response to its earlier correspondence requesting a rent adjustment and expressing concern that BNSF was running trains in excess of the Easement limitations. The Tribe asked BNSF to inform it of the extent and frequency of expected use of the Easement and BNSF's intentions as to the terms of the Easement.

In October 2012, BNSF retained Steve DiJulio to assist in discussions with the Tribe. Mr. DiJulio had worked for both BNSF and other railroads as well as Tribes. And he had successfully negotiated agreements with Tribes including the Swinomish. He reached out to Stephen LeCuyer, counsel to the Tribe, to engage on these issues. BNSF also wrote to the Tribe on November 12, 2012, to apologize for its untimely response to the Tribe's correspondence, explain the difficulty BNSF had coordinating between separate divisions given its size, and begin rebuilding its relationship with the Tribe. Per the Tribe's September request, BNSF stated that it was evaluating current and future shipper needs and invited the Tribe to engage in negotiations to discuss an agreement for an increase in the number of trains crossing the Easement. BNSF noted the engagement of Mr. DiJulio to assist in moving matters forward. While the delay in response was wrong, there is no evidence of bad faith.  Lack of communication among divisions of a large corporation is not bad faith.

On December 19, 2012, BNSF and the Tribe met to discuss issues and to restore a working relationship. BNSF confirmed that its two main tasks were to move forward with the appraisal process and provide a summary of current and forecast traffic based on future shipper demands.

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 6
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

BNSF indicated it looked forward to discussing a written agreement relative to increased shipping volume across the Easement.

In February 2013, BNSF wrote regarding the challenges it faced in reporting car counts across the Easement and provided preliminary information on train traffic in 2011 and 2012, including information about commodities. The Tribe responded on April 16, 2013, reiterating the requirements of the Easement. And it anticipated continuing discussions with BNSF on issues relating to the volume of railroad traffic on, and compensation for the use of, the Easement. The Tribe also noted that if Shell planned to increase rail traffic on the Easement, this would be an additional topic to address with BNSF as part of ongoing discussions.

On May 2, 2013, BNSF proposed a meeting the week of May 20 to discuss the appraisals, a modification to reporting requirements, and the interest in an amended easement to enable BNSF to serve customers on the rail line as may be necessary. The parties met on May 21, during which Mr. DiJulio and Mr. LeCuyer, among other Tribal and BNSF representatives, discussed the issues of preemption and the common carrier duty to serve.

In July 2013, Mr. DiJulio followed up on the May meeting as requested by the Tribe.  Mr. DiJulio provided statutory and case law authority supporting BNSF's position on Surface Transportation Board ("STB") jurisdiction and BNSF's common carrier obligation to serve its customers including the refineries on March Point. Mr. DiJulio also confirmed BNSF was in the process of developing a comprehensive outline to address compensation for current use of the easement; additional compensation for a defined increase in track use (for example, for anticipated demand); and a mechanism for addressing both future increases and decreases in train traffic. Neither Mr. DiJulio nor BNSF received a response to or any question about the authority provided on STB jurisdiction and the common carrier duty to serve.

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 7
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

In December 2013, BNSF presented a comprehensive outline to address BNSF's current and future use of the rail line. The proposal included information about current and forecasted use of the Easement and proposed compensation for past, current, and future use.

The parties met in March 2014 and exchanged communications through 2014. On November 25, 2014, two years into the discussions between the parties regarding increased traffic and compensation, the Tribe wrote two letters to BNSF. One requested that the appraisal process for the adjustment of payment for one 25-car train per day be treated separate from ongoing discussion of issues related to increased use of the track. The second focused on increased use of the track for transportation of Bakken Crude by unit train. This letter sought additional information in response to a number of specific safety concerns the Tribe raised for the first time,[2] renewed the Tribe's request that BNSF provide annual reports on the commodities transported, and raised other questions. The letter reiterated the Easement terms and BNSF's lack of compliance and also indicated its request for information and documentation was to continue the Tribe's assessment of any potential increase in allowed traffic for transporting Bakken crude.  BNSF recognizes the Tribe made that statement without waiver of rights and remedies under the Easement.  Notably, the letter did not address BNSF's claim regarding preemption and the common carrier duty to serve.

BNSF responded on December 16, 2014, confirming it was assembling information requested by the Tribe.  The letter also confirmed that BNSF would continue its then current levels of operations to meet the needs of existing shippers. The Tribe responded in January 2015 reiterating its Easement rights and that the Tribe had not consented to increased traffic. Again, the Tribe did not dispute the authority Mr. DiJulio had provided regarding the common carrier duty to serve.

---

[2] The Tribe had previously raised safety generally as an issue, but the level of detail and specifics here were new.

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 8
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

BNSF and the Tribe set a further meeting for February 25, 2015, to discuss the Tribe's concerns. The Tribe was not able to confirm that meeting because of scheduling conflicts but reiterated the desire to receive the information requested in the November letter recognizing that the next meeting would be more productive if received in advance. BNSF continued to gather the information requested by the Tribe.

Unbeknownst to BNSF, on March 5, 2015, the Tribal Senate met in executive session to discuss BNSF's increased track usage. Without disclosing that session, on March 11, 2015, the Tribe sent a letter acknowledging they had participated in discussions to revise limits on train traffic, but unlike communications in 2013 and 2014, demanded BNSF immediately cease operations in excess of 25 cars per day. In response, BNSF acknowledged the demand, restated its obligation to fulfill its common carrier obligation under federal law to continue running trains to Marathon, and proposed continuing discussions on economic terms. Again, unbeknownst to BNSF, the Tribal Senate met on March 17, 2015 in executive session and voted to commence this litigation against BNSF.

BNSF continued to provide information requested by the Tribe on March 24 and 30. In response, on April 6, after deciding to bring litigation, the Tribe wrote to correct a "misunderstanding" that the Tribe had been working with BNSF to accommodate shipper needs over the Easement. The Tribe instead stated that communications from November 2012 to March 2015 had been only for the purpose of making the Tribe's position clear, communicating safety concerns, and obtaining information to understand BNSF's positions related to the Easement. Notably, again, the Tribe did not question that BNSF had a common carrier obligation under federal law to meet Marathon's needs for shipment of Bakken crude.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

1    While the Tribe can dispute that it was engaging in negotiations with BNSF from the end

2   of 2012 to the beginning of 2015 over amending the terms of the Easement and obtaining additional

3   compensation, BNSF's communications unequivocally reflect its efforts to amicably resolve

4   issues relating to increased rail traffic. As Mr. DiJulio stated in his declaration in support of

5   BNSF's Cross-Motion for Summary Judgment, he and BNSF believed and understood that BNSF

6   and the Tribe had been engaged in good faith negotiations. Dkt. # 148 at 2. There is no evidence

7   to the contrary.

8

9    The next day the Tribe told BNSF that it did not plan to consent to increased rail traffic.

10  The Tribe filed this lawsuit on April 7, 2015.

11  **E.    Until the Ninth Circuit's Ruling, BNSF Consistently Argued its Common**
12  **Carrier Understanding**

13   Consistent with its position communicated to the Tribe, BNSF argued from the outset of

14  this litigation that its increased use of the Easement was necessitated by its common carrier

15  obligations and that the train and car limitations in the Easement were preempted by federal law.

16  BNSF made this argument in its motion to dismiss, answer, cross-motion for summary judgment,

17  opposition to the Tribe's motion for reconsideration, motion for certification of interlocutory

18  appeal at the Ninth Circuit, and in the appeal itself.

19

20   Initially, this Court agreed with BNSF and concluded that the Tribe's trespass claim, to

21  the extent that it could support a limitation on cars traveling over the Easement, was preempted

22  by federal law. Dkt. # 75 at 10; Dkt. # 85 at 2 ("The Court found, however, that the Tribe's state

23  law claims for an injunction limiting the number of cars and/or the type of cargo that cross the

24  reservation were preempted under 49 U.S.C. § 10501(b) because such an injunction would

25  interfere with the carrier's operations and unreasonably burden interstate commerce."). After a

26  motion for reconsideration, the Court changed that ruling and allowed a federal law trespass

27

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 10
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

claim to proceed in full.  Dkt. # 85 at 5.  BNSF then moved for certification of an interlocutory

appeal.  Dkt. # 96.  This Court granted BNSF's motion, acknowledging that there was

"substantial ground for difference of opinion" on its order on summary judgment.  Dkt. # 103 at

2. The Ninth Circuit granted interlocutory review. Ultimately, however, the Ninth Circuit

disagreed with BNSF's understanding of ICCTA's preemptive effect on easement rights granted

under the Indian Right of Way act such that BNSF's common carrier obligation did not authorize

operating trains and cars in excess of the Easement limitations.

## F.    Recent Procedural History

This Court has already resolved the majority of the legal issues raised in the first phase of

this case, including the enforceability of the easement traffic limitation, Dkt. # 85, *see also* Dkt.

# 111, BNSF's breach of the Easement, Dkt. # 75 at 6, and BNSF's intentional trespass over the

Reservation, Dkt. # 174 at 22-23. The Court has also determined that the Tribe did not act

arbitrarily in refusing to allow BNSF to transport unit trains of Bakken Crude oil over the

Easement. Dkt. # 174 at 18-22.

The Tribe withdrew its claim for injunctive relief upon receiving notice from BNSF in a

letter dated December 18, 2020 that it would comply with the traffic limitations. Dkt. # 134 at

34. The Parties later stipulated that the materiality of BNSF's breach of the Easement Agreement

was not relevant to the remaining issues to be tried. Dkt. # 180.

Thus, the remaining issue for resolution is whether BNSF had a good faith belief that its

role as a common carrier compelled it to exceed the limitations of the Easement Agreement to

meet shipper needs such that its intentional trespass was not willful, conscious, and knowing.

Dkt. # 174 at 26. The issues regarding damages, including what damages the Tribe is entitled to

for BNSF's breach of the Easement Agreement and trespass and the amount thereof, are reserved

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

for the second phase of trial. Relatedly, as this Court previously recognized, the question currently at issue is "whether disgorgement is *an available* remedy." *Id.* (emphasis added); *see also* Dkt. # 201 at 12-13. The current question is not whether disgorgement is *the appropriate* remedy, nor, as noted above, is the scope of any potential disgorgement at issue.  Accordingly, regardless of the result of this trial on the issue of BNSF's consciousness of wrongdoing, the question of whether any profit should be disgorged and the scope of any disgorgement is reserved for the second phase of trial.

### III.    ISSUE BEFORE THE COURT

**1.**  Did BNSF possess a good faith belief that increased use of the Easement was necessitated by its common carrier obligation to meet shipper needs such that its trespass was not knowing, willful, and conscious?

### IV.    ARGUMENT

**A.    BNSF Possessed a Good Faith Belief That Increased Use of the Easement Was Necessitated By Its Common Carrier Obligation**

From before the time BNSF began running unit trains across the Easement, BNSF understood that its common carrier obligations compelled it to meet shipper needs and that contracting with a shipper was a way to fulfill its obligation, not avoid it. As such, when Marathon requested that BNSF transport Bakken Crude to its March Point refinery, BNSF believed it was required to fulfill Marathon's request and could not unreasonably withhold service. While BNSF generated revenue from running the unit trains, it was not an improper motivator. As explained above, BNSF believed in good faith that it was obligated to fulfill Marathon's request for service. No evidence suggests that this belief was a pretext for generating revenue.

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 12
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

After the Tribe raised its concerns about the increased traffic across the Easement, BNSF engaged in what it believed were good faith negotiations with the Tribe and repeatedly expressed its need to evaluate and meet shipper needs and comply with its common carrier obligations. During these negotiations, BNSF provided legal authority to support its understanding of its common carrier obligations. The Tribe never communicated to BNSF that it did not believe that BNSF's common carrier obligations preempted the traffic restrictions in the Easement.

Despite BNSF's earnest attempt to negotiate with the Tribe and communicate its belief that its common carrier obligations necessitated running unit trains across the Easement, the Tribe filed suit against BNSF. From the outset of the litigation until the Ninth Circuit ruled otherwise, BNSF maintained its position that the increased use of its Easement was necessitated by its common carrier obligations under federal law. BNSF's argument was never deemed frivolous. Indeed, this Court initially agreed with BNSF. Dkt. # 75 at 17.

Based on this evidence, BNSF possessed a good faith belief that its common carrier obligations necessitated increased use of its Easement and its actions were not knowing, conscious, and willful.

### 1. Knowing, conscious, and willful trespass is a significantly higher bar than intentional trespass

As noted above, this Court previously determined that BNSF engaged in an intentional trespass. As such, the issue for trial is whether BNSF possessed a good faith belief that increased use of the Easement was necessitated by its common carrier obligations such that its intentional trespass was not knowing, conscious, and willful.

The conscious or willful nature of a defendant's trespass is a question of fact. *See In re de Jong*, No. 2:14-BK-00886-PS, 2017 WL 2417189, at *8 (B.A.P. 9th Cir. June 2, 2017). Once a trespass has been determined, the burden shifts to the defendant to establish that it acted in good

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 13
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

faith and that its trespass was not knowing, conscious, and willful. 87 C.J.S. Trespass § 81 ("One charged with trespass has the burden of showing that the act was a mistake or unintentional, or that the trespass was innocent, casual or involuntary, or not willful or reckless. Good faith on the part of a trespasser is a fact that must be proved by the defendant . . . ."); *see Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 458 (6th Cir. 2016) (explaining that once trespass is determined, the burden shifts to the defendant to establish that its act was not willful).

This heightened trespass occurs when a party consciously disregards a claimant's rights, such as when the trespasser has no reason to believe that their presence is lawful. Restatement (Third) of Restitution and Unjust Enrichment § 40, comments b-c; *Id.* § 3, comment e ("It may be difficult to describe the wrongful conduct of an infringer . . . as 'conscious' . . . when the defendant has pursued self-interested objectives on the basis of colorable justification— sometimes including legal advice."). In addressing this question, courts consider, among other factors, the good faith nature of the trespasser's conduct and whether the trespasser acted based on a mistake. 87 C.J.S. trespass § 81; *see also id.* §§ 127, 129 (noting factors relevant to determining appropriateness of exemplary damages for trespass include among others bad faith, gross wrongdoing, and maliciousness); Restatement (Second) of Torts § 908 (same). Thus, trespass committed under a bona fide claim of right or title is not conscious or willful. *See Payne v. Consolidation Coal Co.*, 607 F. Supp. 378, 380 (W.D. Va. 1985) (citing *Mullins v. Clinchfield Coal Corp.*, 227 F.2d 881, 884-85 (4th Cir. 1955)) ("Until the decree was declared void by this court, the parties considered their lease to be valid and enforceable. A trespass which is committed under a bona fide claim of right or title is not willful."). And if an act is done by mistake not induced by gross negligence, it is not willful. *Id.* at 382; *see also* Restatement (Second) of Torts § 908.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

For example, in *Raaum Estates v. Murex Petroleum Corp.*, the Court found that the defendant Murex intentionally trespassed on the Raaum Estates' property when it conducted a commercial saltwater disposal operation, which was beyond its rights under its lease, a pipeline agreement and access road consent, and a separate agreement from 1980. No. 4:14-CV-024, 2017 WL 2870070, at *17-18 (D.N.D. July 5, 2017). But the court concluded that Murex was not a conscious trespasser: although the agreements ultimately did not authorize the saltwater operation, the "applicable legal principles [were] difficult" and there was no evidence Murex purposefully attempted to ignore the Raaum Estates' rights. *Id*. at *22; *see also Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co., Inc.*, No. 19-CV-602-WMC, 2022 WL 4094073, at *13 (W.D. Wis. Sept. 7, 2022) (holding that a reasonable jury would have found defendant to be a conscious trespasser where the defendant knew that its easements had expired and otherwise had "no reasonable basis for believing that its presence continued to be lawful").

Here, BNSF will establish that it had a good faith, if mistaken, belief that increased use of its Easement was necessitated by its common carrier obligations. Specifically, BNSF believed in good faith that its common carrier obligations preempted the traffic restrictions in the Easement, based on the fundamental nature of common carrier obligations to U.S. rail carriers and the legal authority provided to the Tribe; engaged in good faith negotiations with the Tribe; and as shown by the position it took in this litigation and at the STB. Indeed, this Court acknowledged the "substantial grounds for difference of opinion" on the issue of preemption. Dkt. # 103 at 2; *see Raaum Estates* at *22.

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

### 2. Common carrier obligations are fundamental to U.S. rail carriers

Rail carriers like BNSF have been subject to statutory obligations to provide service to those who demand it for over a century.[3] *See* Hepburn Act, 34 Stat. 584, 584 (1906) ("[I]t shall be the duty of every carrier subject to the provisions of this Act to provide and furnish such transportation, upon reasonable request therefor, and to establish through routes and just and reasonable rates applicable thereto."); Transportation Act, 1920, 41 Stat. 456, 475 (1920) ("It shall be the duty of every common carrier subject to this Act engaged in transportation of passengers or property to provide and furnish such transportation upon reasonable request therefor . . . ."). The obligations are broad, and generally a railroad cannot avoid them. *See, e.g.,* *Pejepscot Indus. Park, Inc., d/b/a Grimmel Indus.-Petition for Declaratory Order*, FD 33989, 2003 WL 21108198, at *6 (S.T.B. served May 9, 2003) ("The only appropriate mechanisms a railroad may employ to excuse itself, permanently or temporarily, from its common carrier obligations on a line of railroad are abandonment [of the line] or embargo . . . .").[4]

In recent history, there has been only one major reduction in the scope of the common carrier obligation—the removal of the duty to provide common carrier services to rail passengers. In the late 1960s, railroads were struggling financially. This was in part due to their obligation to

---

[3] Even before the passage of statutory obligations for common carriers, courts repeatedly held that rail carriers were subject to some version of common carrier obligations at common law. *E.g.*, *Missouri Pac. R. Co. v. Larabee Flour Mills Co.*, 211 U.S. 612, 615 (1909) ("No legislative enactment, no special mandate from any commission or other administrative board, was necessary, for the duty [to provide services to similarly situated shippers] arose from the fact that it was a common carrier."); *see also Olcott v. Fond du Lac Cnty.*, 83 U.S. 678, 694 (1872) ("That railroads, though constructed by private corporations and owned by them, are public highways, has been the doctrine of nearly all the courts ever since such conveniences for passage and transportation have had any existence.")

[4] "An embargo notice is a unilateral declaration by a carrier that it temporarily will suspend service over a part of its system. Typically a notice is issued when the carrier temporarily is unable to provide service because of damage to the line or some other impediment to service." *Pejepscot*, 2003 WL 21108198, at *2 n.5.

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 16
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

provide passenger services despite plummeting ridership accompanying the rise of car and air travel. *Application of the Nat'l R.R. Passenger Corp. Under 49 U.S.C. 24308(a)—Canadian Nat'l Ry. Co.*, FD 35743, 2019 WL 3781073, at *1-2 (S.T.B. served Aug. 9, 2019). Congress acted by passing the National Railroad Passenger Act of 1970, which created Amtrak and allowed railroads to relieve themselves of their common carrier obligations to provide service to passengers. *Id.*; Pub. L. No. 91-518, 84 Stat. 1327, 1334.

The most recent iteration of the common carrier obligation was passed as part of the Interstate Commerce Commission Termination Act ("ICCTA"), and provides:

> A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall provide the transportation or service on reasonable request.

49 U.S.C. § 11101(a). Rail carriers may enter into contracts with shippers, but they remain common carriers and continue to have common carrier obligations. The law makes clear that "[contract c]ommitments which deprive a carrier of its ability to respond to reasonable requests for common carrier services are not reasonable." *Id.* Importantly, the common carrier obligation applies to the transport of hazardous materials, and rail carriers generally cannot refuse to transport materials on the basis that they are hazardous. *B.N.S.F. Ry. Co.—Pet. for Declaratory Order*, 2010 WL 4909200, at *5 (S.T.B. served Dec. 2, 2010) ("Railroads have not only a right but a statutory common carrier obligation to transport hazardous materials 'where the appropriate agencies have promulgated comprehensive safety regulations.'" (internal citation omitted)).

The Tribe has argued that by entering into a contract to serve Marathon the common carrier obligation is extinguished. Not so. In *Riffin v. Surface Transp. Bd.*, 733 F.3d 340, 347 (D.C. Cir. 2013), the court held: "If a line of rail track has not been abandoned or embargoed [i.e., rendered physically inoperative], there is an absolute duty to provide rates and service over the line upon

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

reasonable request, and a failure to perform that duty is a violation of section 11101." (cleaned up). When a shipper requests service, the railroad can meet its statutory obligation to provide the service by issuing a published tariff setting forth common carrier rates and terms of service. Or the railroad and the shipper can enter into a rail transportation contract to provide service.  49 U.S.C. §§ 11101, 10709. The effect of entering into a contract is to meet, not avoid, the common carrier obligation for the duration of the contract. The contract does not extinguish the railroad's obligations; it simply prevents the shipper that voluntarily agreed to rate and service terms from seeking regulatory relief from the STB for the transportation covered by the contract. *Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444, 448 (D.C Cir. 2010) (stating that section 10709(c)(1) does not take "private contracts completely outside the federal regulatory regime," but "merely limits the Board's authority over the terms of private contracts" and labeling plaintiff's contrary view of the statute "plainly erroneous" (emphasis omitted)). *See also* Francis P. Mulvey & Michael F. McBride, *Railroads' Common Carrier Obligation: Its Legal and Economic Context*, U.S. Department of Agriculture (April 2020), https://ageconsearch.umn.edu/record/303739 ("Neither the ICC nor the STB have ever found that a railroad's contractual obligations impaired its CCO or excused it from providing common carrier service."); *Otter Tail Power Co. v. BNSF Ry. Co*, FIN 42071, 2006 WL 275904, at *4 (S.T.B. served Jan. 27, 2006) (reviewing dispute over common carrier rates provided by shipper in lieu of contract rates). Indeed, the Master Transportation Contract with Marathon is clear: BNSF's "obligation to provide service under this Contract shall be no greater than it would be as a common carrier." Trial Ex. 59 at 3 (BNSF0008019).

Concomitant with the requirement that railroads meet this common carrier obligation is a sweeping statutory preemption.  ICCTA created the STB, and vested it with jurisdiction over many aspects of rail transportation:

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 18
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

> The jurisdiction of the [STB] over . . . transportation by rail carriers, and the remedies provided in [ICCTA] with respect to . . . practices, routes, services, and facilities of such carriers . . . is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).  Courts have recognized this preemption as broad: "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *CSX Transp., Inc. v. Georgia Public Service Comm'n*, 944 F.Supp. 1573, 1581 (N.D. Ga. 1996); *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1030 (9th Cir. 1998) ("All the cases cited by the parties find a broad reading of Congress' preemption intent, not a narrow one."). ICCTA's statutory preemption ensures that a railroad's common carrier obligations will not be restricted, regulated, or eliminated by state or federal law. Mr. DiJulio shared this authority with the Tribe to substantiate BNS's position regarding its common carrier duty to serve.

### 3.  The common carrier obligation is baked into BNSF's DNA

The testimony of BNSF's witnesses Katie Hower and Cary Hutchings will demonstrate how longstanding common carrier obligations operate as a bedrock principle for all that the company does.  From the perspective of their teams, the common carrier obligation means that the railroad generally cannot refuse the requests of shippers. When they receive a request to ship a certain volume, they look at if existing resources can support it. If they can, and the request is otherwise reasonable, BNSF must provide the service. If existing resources are insufficient, BNSF does not decline the shipper's request. Instead, consistent with its obligations, BNSF looks at the cost of the steps necessary to provide the requested service. It is only if the cost is prohibitively expensive or the project is otherwise not reasonably feasible that BNSF might consider labeling the request unreasonable and declining the request. And even then, BNSF will work with the

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 19
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

shipper to determine if there is another method to meet their needs. The common carrier obligations—translated into on-the-ground operating principles—means that when a shipper requests service, BNSF does its best to make it work.

The evidence at trial will show that when, in 2011, Marathon requested that BNSF provide rail service to its March Point in the form of 100-car unit trains, BNSF did what it always had done. It assessed its resources and identified changes it would have to make to meet the request. BNSF determined it could service Marathon's request and it began the process of fulfilling its common carrier obligations.

### 4.  BNSF's negotiations with the Tribe support its good faith belief

The evidence also will show that when the Tribe first reached out regarding the Easement, it contacted JLL, BNSF's real estate portfolio manager. Trial Ex. 11. JLL treated this correspondence as a request for a rental adjustment as did BNSF's real estate division. Unfortunately, this meant that the Tribe was not in communication with BNSF's marketing department, the group responsible for responding to shippers' requests in compliance with BNSF's common carrier obligations.

Throughout its negotiations, BNSF believed that it had an obligation as a common carrier to meet its shippers' needs, and that the Easement could not prevent it from fulfilling that obligation. Relatedly, BNSF and its shippers, Marathon and Shell, believed that the STB had jurisdiction over any dispute between it and the Tribe over the Easement if that dispute implicated its common carrier obligation.

Early on, Stephen DiJulio was brought in to assist BNSF in its discussions with the Tribe regarding the increased traffic over the Easement. He played a key role in the multi-year negotiations including in conveying BNSF's common carrier understandings to the Tribe. His

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 20
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

testimony will show that, from the start, BNSF saw these discussions as a negotiation regarding *how* BNSF could meet its common carrier obligations to its shippers while fairly compensating the Tribe and, ideally, repairing the relationship between BNSF and the Tribe. BNSF's negotiating position was rooted in its belief that it was obligated to provide those services and the Easement could not interfere with that duty.  BNSF did not view it as a question of *whether* it could meet its shippers' needs because it believed that its common carrier duties obligated it to do so. Importantly, when Mr. DiJulio explained to the Tribe this belief in the common carrier obligations and the STB's jurisdiction, the Tribe did not dispute it.

On May 21, 2013, representatives of BNSF and the Tribe met in person for the first time to discuss the dispute. Although the focus of the meeting was on adjusting the fees for the Easement, Mr. DiJulio also explained BNSF's beliefs that (1) it had a common carrier obligation to fulfill its shippers' requests that could not be limited and (2) that the STB had jurisdiction over any dispute between the parties.

On July 2, 2013, BNSF provided more information to the Tribe regarding its belief in its common carrier obligation, including legal authorities that supported BNSF's belief. Trial Ex. 28. For example, Mr. DiJulio wrote that "[b]oth the ICCTA and the common law impose duties on rail carriers to provide transportation or service upon reasonable request." *Id.* at 2 (citing 49 U.S.C. § 11101(a); *Johnson* v. *Chicago, Milwaukee, St. Paul & Pac. R.R.,* 400 F.2d 968, 971 (9th Cir. 1968)). Mr. DiJulio also pointed the Tribe to 49 U.S.C, § 10501(b)'s statement that "the remedies provided under the ICCTA with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal and State law." *Id.* at 1. BNSF also provided the Tribe with cases discussing the breadth of ICCTA's preemption, including the Ninth Circuit's endorsement of the idea that "[i]t is difficult to imagine a broader statement of Congress's intent

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

to preempt state regulatory authority over railroad operations." *Id.* (citing *City of Auburn v. U.S. Gov't*, 154 F.3d at 1030 (9th Cir. 1998)).

Mr. DiJulio will testify that when he made these statements to the Tribe, they were true and accurate based on his understanding of the law, and reflected his ethical obligations towards negotiations with a third party. He will also testify that one of BNSF's key goals in the negotiation was restoring good will with the Tribe so that the two groups could have an amicable working relationship moving forward. To that end, Mr. DiJulio also will testify that BNSF's choice to share its legal analysis with the Tribe was part of a good-faith effort to transparently explain BNSF's actions.

In the almost two years of negotiations that followed, the Tribe never took issue with any of BNSF's legal authorities or presented BNSF with alternative legal analysis that rebutted BNSF's belief in its common carrier obligations. Although the Tribe was not under any obligation to do so, the Tribe's silence on the issue meant that BNSF had no reason to question what it viewed as long-standing precedent that mandated it meet its shipper's requests. In fact, in March of 2015, in one of BNSF's last pre-litigation communications with the Tribe, BNSF reiterated its belief that it needed to fulfill its common carrier obligations under federal law by continuing to run trains over the Easement. Trial Ex. 43.

### 5. The history of this suit supports the reasonableness of BNSF's position

Once the Tribe filed suit against BNSF, BNSF followed the same course that it had since the beginning of their negotiations: it continued to explain its belief that its common carrier obligations mandated that it provide service to meet its shipper's needs. For example, in BNSF's motion to dismiss, its first substantive filing in this case, BNSF wrote:

> As a common carrier, BNSF has a statutory obligation to provide
> transportation service upon reasonable request by a shipper. Under

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

> established case law, common carriers cannot decline to provide
> service for commodities that are considered hazardous, and they
> must use reasonable efforts to provide transportation in the
> volumes requested by shippers.

Dkt. # 8 at 10 (citing 49 U.S.C. § 11101(a). BNSF further explained its belief that "[t]he Settlement and Easement did not limit BNSF's ability to satisfy common-carrier obligations on the line." *Id.* And in its Answer, BNSF also raised as defenses that the Tribe's claims, as well as any relief requested, were preempted by ICCTA. Dkt. # 21 at 9.

During the early parts of this litigation, Tesoro and Shell also petitioned the STB to issue a declaratory order on the question of whether 49 U.S.C. § 10501(b) preempted the Tribe's claims. BNSF also intervened in the proceeding. The majority of the STB Commissioners declined to issue a declaratory order, but they did not reach the merits of Tesoro and Shell's petition. Rather, they based their decision on the fact that this Court had concurrent jurisdiction to answer questions of preemption and had already declined to refer the matter to the STB. *Tesoro Ref. & Mktg. Co., LLC - Petition for Declaratory Order*, FD 36041, 2016 WL 6809953, at *4 (STB served Nov. 16, 2016). One member of the STB dissented from the Board's order. That Commissioner expressed the concern that the "the parties could end up back here asking the Board to address Tesoro's concerns of interference with BNSF's common carrier obligations." *Id.* at *5. The Commissioner also expressed general support for BNSF's position in this lawsuit, noting that "Board precedent already tells us, as a general principle, that private contracts between carriers and third parties cannot excuse carriers from meeting their common carrier obligations to shippers." *Id.* (citing *R.R. Ventures—Aban. Exemption—Between Youngstown, Ohio, & Darlington, Pa., in Mahoning & Columbiana Cntys., Ohio, & Beaver Cnty., Pa.*, STB 467, 469-70 (STB served Jan. 7, 2000) ("While the Board encourages privately negotiated agreements, any contractual restrictions that unreasonably interfere with common carrier

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 23
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

operations are deemed void as contrary to public policy."), *aff'd sub nom. R.R. Ventures v. STB*, 299 F.3d 523, 560-63 (6th Cir. 2002)). If nothing else, BNSF's shippers' actions demonstrate the common understanding in the industry.

BNSF continued to maintain this position in its first motion for partial summary judgment. Dkt. # 63 at 12 ("First, the Easement does not give—and could not have given—the Tribe authority to supersede BNSF's federal law obligations toward its shippers."). BNSF also raised the related argument that ICCTA's broad preemption of remedies defeated the Tribe's claims. *Id.*

Initially, this Court agreed with BNSF and concluded that the Tribe's trespass claim, to the extent that it could support a limitation on cars traveling over the Easement, was preempted by federal law. Dkt. # 75 at 10; Dkt. # 85 at 2 ("The Court found, however, that the Tribe's state law claims for an injunction limiting the number of cars and/or the type of cargo that cross the reservation were preempted under 49 U.S.C. § 10501(b) because such an injunction would interfere with the carrier's operations and unreasonably burden interstate commerce."). After a motion for reconsideration, however, the Court changed that ruling and allowed the trespass claim to proceed in full. Dkt. # 85.

BNSF then moved for certification of an interlocutory appeal. Dkt. # 96. This Court granted BNSF's motion, acknowledging that there was "substantial ground for difference of opinion" on the Court's order on summary judgment. Dkt. # 103 at 2. The Ninth Circuit likewise granted interlocutory review. Ultimately, however, the Ninth Circuit disagreed with BNSF's understanding of ICCTA preemption and the Tribe's ability to limit BNSF's ability to meet its common carrier obligations.

In sum, the facts demonstrate that BNSF had a good faith basis for its increased use of the Easement: (1) it expressed its belief that its common carrier obligations demanded it provide

BNSF RAILWAY COMPANY'S TRIAL BRIEF - 24
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

increased service over the Easement in its first meeting with the Tribe in 2013; (2) it maintained that position throughout its entire negotiations with the Tribe (and without any rebuttal); and (3) it litigated the issue for years, including through an interlocutory appeal. Although the Tribe disagreed with BNSF's legal theory in this litigation, it never raised any disagreement prior to litigation, nor moved for sanctions or otherwise argued that BNSF did not have a good faith basis to make its arguments. The rulings of this Court underscore the reasonableness of BNSF's position.

### 6. BNSF's revenue does not show bad faith

There is no dispute that BNSF earned revenue from operating trains over the Easement. But that has no bearing on whether BNSF's belief in its common carrier obligation was made in good faith. As explained above, the evidence shows BNSF did have reason to believe that its common carrier obligations required it to run increased traffic over the Easement. No evidence suggests that BNSF altered this belief due to an improper motive to generate revenue.

Moreover, the Court should not look to generated revenue standing alone to determine whether its conduct was committed in bad faith. *See Thomas Indus., Inc. v. Wagner Spray Tech Corp.*, 619 F. Supp. 1280, 1287 (E.D. Wis. 1985) ("The relevance of Thomas' costs and profits to the issue of its intent to infringe is questionable. . . ."); *In re Norplant Contraceptive Prods. Liab. Litig.*, No. MDL 1038, 1997 WL 80526, at *1 (E.D. Tex. Feb. 19, 1997) (excluding evidence of profit margin, offered to demonstrate party's motive to not warn of dangers, as irrelevant to failure to warn issue). If, as the Tribe argues, generating revenue from a breach or trespass demonstrated bad faith, then revenue would arise in every such dispute. That is not the case. Indeed, some jurisdictions mandate that such evidence not be admitted until *after* a factfinder has determined in the first instance that exemplary damages are appropriate. *E.g.*, *Torres v. Auto. Club of So. Cal.*, 937 P.2d 290, 293 (Cal. 1997), *as modified on denial of*

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750

*reh'g* (July 16, 1997) ("The court shall, on application of any defendant, preclude the admission of evidence of that defendant's profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of [conditions allowing award of exemplary damages].") (quoting Cal. Civ. Code § 3295(d)).  Here, too, the revenue BNSF generated does not in and of itself demonstrate bad faith and, at most, should be considered in the next phase of the case. Rather, to support its argument, the Tribe would have to show that BNSF asserted its common carrier obligation as a pretext or that BNSF made a conscious decision to breach the Easement without justification. There is no such evidence.

## V.    CONCLUSION

BNSF's common carrier obligations are a part of its history and DNA. From the commencement of negotiations with the Tribe, through litigation here and to the Ninth Circuit's ruling, BNSF repeatedly and in good faith argued that its common carrier obligations under federal statute preempted the Easement limitations. Based on this evidence, this Court should find that BNSF had a reasonable, if mistaken, good faith basis for its increased use of the Easement. Because BNSF acted in good faith, its trespass was not knowing, conscious, and willful. And the Court should so find at the conclusion of the trial.

DATED this 15th day of March, 2023.


Pacifica Law Group llp

By: */s/ Paul J. Lawrence*
        Paul J. Lawrence, wsba #13557
        Kai A. Smith, wsba #54749
        Meha Goyal, wsba #56058
        *Attorneys for Defendant BNSF Railway*


BNSF RAILWAY COMPANY'S TRIAL BRIEF - 26
Cause No. 2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245.1700
FACSIMILE: (206) 245.1750