UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SWINOMISH INDIAN TRIBAL COMMUNITY,<br><br>Plaintiff,<br><br>v.<br><br>BNSF RAILWAY COMPANY,<br><br>Defendant. | Cause No. C15-0543RSL<br><br>MEMORANDUM OF DECISION |

This matter was heard by the Court in a bench trial commencing on March 20, 2023, and concluding on March 22, 2023. The only issue to be determined in this phase of the proceedings is whether BNSF's admitted trespass over the Swinomish Reservation between September 2012 and May 2021 was willful, conscious, and knowing. By a preponderance of the evidence, the Court finds as follows:

The Swinomish Indian Tribal Community ("the Tribe") filed this suit in April 2015 alleging that defendant BNSF Railway Company ("BNSF") breached a Right-of-Way Easement Agreement ("Easement Agreement") and was trespassing on the Reservation. The Court has already found that BNSF's affirmative defense of preemption under the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10501 *et seq.*, did not apply to any of the claims asserted in this litigation (Dkt. # 85 at 5), that BNSF breached the contractual obligations

MEMORANDUM OF DECISION - 1

set forth in the Easement Agreement (Dkt. # 75 at 6),[1] and that the Tribe did not arbitrarily refuse to consent to BNSF's unilateral increase in rail traffic (Dkt. # 173 at 22).

Since 1991, BNSF has operated a rail line over the Swinomish Reservation pursuant to the Easement Agreement, which provides in relevant part that BNSF "will keep the Tribe informed as to the nature and identity of all cargo transported by Burlington Northern across the Reservation" and that "unless otherwise agreed in writing, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the Reservation each day." Trial Ex. 3 at 10. The Easement Agreement further provided that:

> The number of trains and cars shall not be increased unless required by shipper needs. The Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs. It is understood and agreed that if the number of crossings or the number of cars is increased, the annual rental will be subject to adjustment . . . .

*Id.* BNSF failed to update the Tribe regarding the nature of the cargo that was crossing the Reservation and unilaterally increased the number of trains and the number of cars without the Tribe's written agreement, thereby violating the conditions placed on BNSF's permission to enter the property. The question for the Court is whether BNSF's overburdening of the easement was knowing, conscious, and willful, such that the Tribe is entitled to equitable remedies for the trespass. Restatement (Third) of Restitution and Unjust Enrichment § 40 and comment b. (2011).

---

[1] The parties agreed that the Court was not required or requested to make any findings of fact or conclusions of law regarding whether BNSF's breach of the Easement Agreement was material. Dkt. # 180.

MEMORANDUM OF DECISION - 2

In August 2011, the Tribe contacted BNSF through the railway company's real estate portfolio manager to initiate an appraisal and fee adjustment pursuant to the terms of the Easement Agreement. The Tribe made clear that its proposed fee adjustment from $20,258 per year to $217,200 per year was based on the assumption that BNSF's use of the rail line was in accordance with the train and car limits described above. The real estate portfolio manager forwarded the correspondence to BNSF's real estate division, and the "Swinomish Easement" and "Swinomish Settlement" were discussed for months, with inside and outside counsel involved. At approximately the same time, BNSF's marketing division was working with the Tesoro Refining and Marketing Company on a proposal to run unit trains of 100 or more cars carrying Bakken crude oil across the Reservation to Tesoro's Cherry Point refinery. Initial estimates suggested that the project would require approximately $5 million in capital improvements, such as bridge work and track upgrades, while generating approximately $65 million in revenues per year.[2] The marketing division and real estate division did not communicate with each other regarding the Tesoro opportunity.

When the Tribe did not hear back from BNSF, it sent another letter in October 2011. The Tribe again raised the issue of adjusting the easement fee and also let BNSF know that it had heard about Tesoro's plan to transport crude over the easement in 100-car unit trains every other day. The Tribe reminded BNSF of the traffic limitations imposed by the Easement Agreement,

---

[2] By the end of September 2011, the expected after-tax net present value of the Tesoro proposal was $75 million per year.

MEMORANDUM OF DECISION - 3

the process by which an increase of those limits could be obtained, and the impact such increase would have on the easement fee:

> The Tribe has not to date received a request from Burlington Northern for an increase in the number of trains or cars crossing the Reservation. The Tribe must be concerned about such a proposed increase in traffic[] since the easement is in close proximity to a new hotel now under construction by the Tribe adjacent to its Northern Lights Casino.
>
> Further, should such an increase be sought and agreed to, paragraph 7c of the "Right-of-Way Easement" states that, "It is understood and agreed that if the number of crossings or the number of cars is increased, the annual rental will be subject to adjustment . . . ." As stated in my August 17 letter, the proposed easement fee of $217,200 was based on the assumption that all uses of the easement property are in accordance with and limited to uses as set forth in paragraph 7(c) of the Easement. Any proposed increase in the number of trains or cars crossing the easement must of course be taken into consideration in the easement fee adjustment.

Trial Ex. 14. BNSF's real estate portfolio manager again forwarded the communication to BNSF, specifically alerting BNSF that the Tribe had brought up "a potential for an additional 100 car train traversing the track on an every other day basis." Trial Ex. 15. Thus, as of October 20, 2011, the real estate division not only knew about the Easement Agreement and its limitations, but also that BNSF was considering a proposal that would significantly overburden the easement. The Tribe received no response to the October letter other than a request for a copy of the Tribe's underlying appraisal or methodology.

At some point in 2012, BNSF began discussing with Shell Puget Sound Refinery the possibility of bringing Bakken crude into Shell's Anacortes refinery via rail. Initial calculations suggested that hauling crude from the Bakken Formation in and around North Dakota would be

MEMORANDUM OF DECISION - 4

"much more profitable" than handling the short haul traffic BNSF was currently carrying for Shell. Trial Ex. 17. Meanwhile, Tesoro completed the expansion of its facilities and, in September 2012, BNSF began shipping hundred-car unit trains of Bakken crude over the Reservation. The Tribe again wrote to BNSF, this time explaining how the Easement Agreement came about and expressing surprise and dismay that BNSF would ignore the limitations imposed by that agreement, especially since the Tribe had reminded BNSF of those limitations over the previous year. The Tribe requested additional information regarding BNSF's use of the rail line across the Reservation, noting that if the use had been accurately reported in the news, it "would constitute a substantial violation of the parties' easement agreement." Trial Ex. 20. On November 12, 2012, BNSF wrote back, apologizing for not responding in a more timely manner and noting difficulties in coordinating the activities of its marketing division and real estate division. It acknowledged that shipper needs in and around the Reservation had increased, indicated that it was evaluating both the current track usage and probable future demand, and promised to contact the Tribe in the near future to begin a discussion regarding easement issues.

At trial, BNSF's Vice President of Consumer Products admitted that the existence of the Easement Agreement was a red flag that should have been investigated, that the legal department reviewing the Easement Agreement should have notified the marketing division of the limitation contained therein, and that the limitations should have been disclosed to the shippers. BNSF's outside counsel acknowledged that the Easement Agreement imposed limitations on BNSF's ability to move cars across the Reservation, that the limitations were

MEMORANDUM OF DECISION - 5

"subject to increase to meet shippers' needs, but [that] BNSF needed to get approvals from the Tribe in order to do that . . . ." Trial Tr. at 161.

Over the course of the next year, BNSF and the Tribe continued to discuss the potential for amending the Easement Agreement to allow more cars and trains to cross the Reservation. At no point did the Tribe approve BNSF's unilateral decision to transport unit trains across the Reservation, agree to increase the train or car limitations, or waive its contractual right of approval. BNSF clearly wanted an agreement that would increase shipping volumes across the easement, but it knew that it did not have such an agreement at the time and was affirmatively seeking the Tribe's approval. While BNSF felt the weight of its common carrier duty to serve Tesoro's and Shell's shipping needs during this period of time, it recognized that it was not free to simply ignore the limitations imposed by the Easement Agreement and, instead, needed to address that issue through negotiations with the Tribe. *See, e.g.*, Trial Tr. at 165.

Meanwhile, hundred-car unit trains continued to cross the Reservation. When BNSF revealed that it was unable to provide information regarding the number of trains that had crossed the Reservation in 2011 because it did not keep information in that format, the Tribe expressed concern.

> Although I understand from your letter that BNSF and other railroads may have typical methodologies for monitoring train cars and not trains, BNSF has had a contractual obligation to limit both the number of trains *and* cars crossing the Swinomish Indian Tribal Community easement since the easement agreement was signed in 1991 to settle pending Federal Court trespass litigation. Obviously, assurance that BNSF was operating in full compliance with the easement agreement would have required close monitoring of both trains and cars crossing the Tribe's property for more than two decades. The need for such data was

MEMORANDUM OF DECISION - 6

> explicitly reinforced by the Tribe's October 18, 2011 letter to BNSF's designated
> easement agent . . . which reiterated the easement restrictions. Unfortunately, the
> absence of complete data appears to reflect the same lack of regard for the Tribe,
> obligations to the Tribe and use of Tribal property by BNSF and its predecessors
> in interest that resulted in the United States filing the Federal Court trespass
> litigation in the first place.

Trial Ex. 26. (emphasis in original). The Tribe made clear that it "presumes and expects that, now that BNSF has once again been reminded of its contractual obligations under the easement agreement, BNSF will collect, maintain and provide all data needed to show that BNSF is acting in full compliance with its contractual obligations . . . ." *Id.* The Tribe indicated a willingness to move forward with discussions regarding the volume of traffic on, and compensation for, the easement and indicated that it was aware that Shell was also considering an increase in rail traffic to its refinery.

Further discussions ensued. At a meeting in May 2013, BNSF's in-house counsel told the Tribe that the railroad believed it had a common carrier obligation to serve its customers, and that BNSF was hopeful that the obligation could be addressed through the "shipper needs" provision of the Easement Agreement.[3] The Tribe's counsel pushed back, pointing out that this

---

[3] *See also* Trial Tr. at 165:

Q: And at that meeting was there any discussion of the common carrier obligation and STB jurisdiction?

A: Yes. Russell Parish discussed the common carrier obligation in light of the provision in the easement regarding shipper needs and so, yes, there was discussion at that time, and BNSF's feeling that it had an obligation to serve under its common carrier duty.

Q: Despite the car limitations in the easement?

MEMORANDUM OF DECISION - 7

was not the typical right-of-way case involving state or local regulation, but rather involved limitations arising from a federally-approved easement crossing tribal trust lands established by treaty, the supreme law of the land. In response to the Tribe's request for more information regarding the jurisdiction of the Surface Transportation Board ("STB") and the common carrier obligation, BNSF's outside counsel provided background information and case law that was not specific to the situation presented here and made no mention of tribal treaty rights, the Indian Right-of-Way Act, or the Easement Agreement. At trial, outside counsel acknowledged that his July 2013 descriptions of STB jurisdiction and common carrier duties, while accurate and made in good faith as far as they went, "didn't excuse having to deal with the easement." Trial Tr. at 167.

In August 2013, Shell made clear to BNSF that it was concerned about the implications of the Easement Agreement for its plan to bring Bakken crude to the Anacortes refinery by rail. While BNSF assured Shell that "it's something that will get worked out" (Tr. Ex. 29), BNSF internally acknowledged that the relationship with the Tribe was fraught with peril, noting that missteps in the handling of the easement issues could be fatal to the Bakken crude projects and adversely impact operations at other Pacific Northwest terminals (Tr. Exs. 31 and 32). At the time, BNSF continued to recognize that it needed to negotiate with the Tribe to obtain approval for increases in rail traffic above the limitations set forth in the Easement Agreement.

---

> A: I don't know if I'd characterize it "despite the car limitation," but it had an obligation to serve, and it needed to address that issue through this agreement, hopefully, to be reached with the Swinomish Tribe.

On December 23, 2013, more than a year after the unit trains had started crossing the Reservation, BNSF made a proposal for addressing the easement limitations. BNSF proposed "lifting the Easement's current restriction on track use" and replacing it with a compensation arrangement based on the value of the underlying land rather than its use of the track. BNSF forecast that the number of unit trains – which were in addition to the local, smaller trains that continued to cross the Reservation – would increase to approximately 10-12 each week, containing approximately 2,170 cars per week. The proposal was met with silence for eleven months. In November 2014, the Tribe stated that it was not interested in abandoning its contractual right to limit the number of trains and cars that cross the Reservation and sought to disentangle the fee adjustment process it had initiated in August 2011 from BNSF's subsequent proposal to alter or remove the train and car limitations. The Tribe gave BNSF an opportunity to make a rental adjustment proposal that did not hinge on the lifting of the track use restrictions and to provide additional information and documentation regarding the shipment of Bakken crude, but made clear that its willingness to continue discussions did not constitute permission for BNSF to unilaterally increase the numbers of cars or trains crossing the Reservation.

With regards to the rental adjustment, BNSF proposed, and the Tribe accepted, an increase in the easement fee for 2011 to $217,200 (the Tribe's appraised value) with indexed adjustments through 2015, for a total payment to the Tribe of $1,029,774.26. BNSF recognized that the Tribe's acceptance of this payment did not modify or waive the Tribe's objections to the increased train traffic on the easement that began in September 2012.

MEMORANDUM OF DECISION - 9

With regards to BNSF's use of the easement, the railway baldly asserted that it would "continue rail operations at their current levels in order to meet the needs of existing shippers." Trial Ex. 37. BNSF suggested that the parties' involvement in "a constructive dialogue" since September, 27, 2012, somehow authorized the movement of unit trains over the Reservation. Trial Ex. 37. The unit train crossings began on or about September 5, 2012, however, and BNSF offers no explanation for how communications occurring after that date could have authorized or justified the overburdening of the easement. The September 27th communication to which BNSF referred expressly stated that such use was unauthorized and a breach of the Easement Agreement (Trial Ex. 20), and the Tribe reiterated that position in various ways throughout the negotiations. It did so again in January 2015 in response to BNSF's declaration that it intended to continue running unit trains across the Reservation regardless of the Tribe's objections.

Requests for and production of information continued for another two months. On March 11, 2015, however, the Tribe requested that BNSF immediately bring its use of the easement within the terms of the Easement Agreement. When BNSF responded by asserting that it had to continue running unit trains "in order to fulfill our common carrier obligation under federal law" (Trial Ex. 43), the Swinomish Indian Senate unanimously passed a resolution authorizing the initiation of this lawsuit to enforce the terms of the Easement Agreement or to seek its termination. This lawsuit was filed on April 7, 2015.

In September 2015, the undersigned denied BNSF's motion to dismiss or stay on the ground that the Tribe's claims implicate BNSF's common carrier obligations and were subject to the primary jurisdiction of the STB. In 2017, the undersigned issued rulings regarding

MEMORANDUM OF DECISION - 10

BNSF's preemption arguments, finding that state law claims would be preempted, but the Tribe's federal claims were not. An interlocutory appeal followed, and the Ninth Circuit affirmed in March 2020. The parties attempted to mediate the dispute, but were unsuccessful. In December 2020, BNSF formally requested permission to move sixteen Bakken crude unit trains per month (plus daily local trains) in each direction across the easement during 2021. The request was denied.

"Federal common law governs an action for trespass on Indian lands," and "[t]hat law generally comports with the Restatement of Torts." *U.S. v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009) (citations omitted). A trespass occurs if permission to enter the property is conditioned or restricted and the defendant violates those conditions or restrictions. Restatement (Second) of Torts § 168 (1965); *Sanders v. City of Seattle*, 160 Wn.2d 198, 215 (2007) ("Trespass occurs upon the misuse or overburdening of an easement."). It is undisputed that BNSF's intentional crossings of the Reservation exceeded the conditions and restrictions imposed by the Easement Agreement. It has, therefore, trespassed on Indian lands and is liable for the damages caused by its overburdening of the easement. Restatement (Second) of Torts § 163 comment b and § 164.

In some circumstances, equitable relief in addition to an award of compensatory damages arising from the trespass may be appropriate. "A person who obtains a benefit by an act of trespass or conversion . . . is liable in restitution to the victim of the wrong." Restatement (Third) of Restitution and Unjust Enrichment § 40 (2011). While a restitutionary award is generally commensurate with the rental value of what the defendant took or used, that

MEMORANDUM OF DECISION - 11

calculation may not be sufficient where the trespass was knowing, conscious, and willful. *Id.*, comment b. "A conscious wrongdoer will not be left on a parity with a person who—pursuing the same objectives—respects the legally protected rights of the property owner. If liability in restitution were limited to the price that would have been paid in a voluntary exchange, the calculating wrongdoer would have no incentive to bargain." *Id.* Thus, "if a defendant is a willful trespasser, the owner is entitled to recover from him the value of any profits made by the entry." Restatement (Second) of Torts § 929, comment c. (1979). *See U.S. v. Santa Fe Pac. R. Co.*, 314 U.S. 339 (1941) (reinstating claim for quiet title and an accounting of all rents, issues and profits derived from the unauthorized use of tribal lands). Even with regards to a conscious wrongdoer, however, equitable remedies "may be limited to avoid a liability for gains that are unduly remote . . . or disproportionate to the loss on which liability is based . . . ." Restatement (Third) of Restitution and Unjust Enrichment § 40, comment b.

The parties agree that the burden is on BNSF to establish that it acted in good faith and that its trespass, while intentional, was not conscious, willful, and knowing. 87 C.J.S. Trespass § 81. BNSF has taken the position that there were "mistakes, misunderstandings, questionable legal judgment and bad luck, but no bad faith." Trial Tr. at 5. Having reviewed the exhibits, heard the testimony of the witnesses, and considered the arguments of counsel, the Court disagrees. When BNSF began running unit trains over the Reservation, its real estate division had known for more than ten months that the railroad's right of access was restricted *and* that BNSF was contemplating an arrangement with Tesoro that would significantly exceed the authorized use. That BNSF's marketing division would not have thought to consult with the real

MEMORANDUM OF DECISION - 12

estate division when negotiating a transportation contract with a shipper is immaterial in the circumstances presented here: the real estate division had all of the relevant information and chose not to share it. This is not a situation in which bits and pieces of information were compartmentalized or siloed in such a way that the corporation's unlawful conduct could nevertheless be deemed in good faith. Nor, as counsel repeatedly argued, does the evidence give rise to an inference of mistake. BNSF is burdened with the knowledge of its real estate division, and, despite having full possession of the relevant facts, it failed to comply with the dictates of the document which created BNSF's right of access. As the Ninth Circuit panel pointed out during oral argument on the interlocutory appeal, the Easement Agreement set out a process by which increases based on shipper needs could be negotiated, and "there's nothing in this agreement that says you can just unilaterally go do it." https://youtu.be/LN5_JZBdZ3o at 17:20. BNSF's assertion that the failure to follow the procedure was a mistake was roundly rejected: "They weren't even mistakes. The Tribe repeatedly wrote to BNSF. BNSF doesn't even respond, that's not a mistake, that's a deliberate failure to abide by the Easement." https://youtu.be/LN5_JZBdZ3o at 15:30. Instead of approaching the Tribe with a request to increase the rail traffic as required by the Easement Agreement, BNSF ignored the limitations and the agreed procedures in its rush to meet Tesoro's request for service. In the absence of the Tribe's written approval, BNSF's decision to breach the terms of the Easement Agreement and unilaterally increase rail traffic over the Reservation in September 2012 was conscious, willful, and knowing.

MEMORANDUM OF DECISION - 13

The subsequent negotiations between the parties confirm that BNSF knew that it had no right to move more than 25 cars at a time across the easement. The railroad recognized that the Easement Agreement was an impediment to its ability to provide the service requested by the shippers, and the whole point of the discussions with the Tribe was to obtain permission to increase the volume of traffic that could cross the Reservation. Those discussions – undertaken with the goal of obtaining permission – in no way shows that BNSF believed, in good faith, that running unit trains was authorized by the Easement Agreement or compelled by its common carrier obligations. It was only when it proved difficult to obtain the necessary approval that BNSF switched gears, asserting not that the Tribe should approve an increase in the number of cars and trains because of BNSF's common carrier obligations and shipper needs, but rather that BNSF did not need the Tribe's approval because its common carrier obligations trumped the negotiated limitations on its right of access. There is no evidence that BNSF evaluated the impact of the voluntarily negotiated limitations through which it first obtained a right to be on the Reservation, the Tribe's treaty rights in the land underlying the easement, or the requirements of the Indian Right-of-Way Act on its common carrier duties before this startling shift, despite the fact that the Tribe's counsel specifically raised these issues at a meeting in May 2013.

BNSF has not shown that it had good faith belief that its common carrier obligations overrode the easement limitations at any point after the unit trains started running. It failed to acknowledge, much less evaluate, the unique circumstances impacting its ability to provide the

MEMORANDUM OF DECISION - 14

service requested. BNSF willfully, consciously, and knowingly exceeded the limitations on its right of access from September 2012 to May 2021.

The Court's findings do not mean that every person at BNSF operated in bad faith in their interactions with the Tribe. The witnesses who testified at trial provided credible and reasonable explanations for various missteps that contributed to the overburdening of the easement. The marketing division may have acted in good faith when its only consideration was to "get to yes" in its discussions with Tesoro. And BNSF's pursuit of negotiations with the Tribe to increase the easement limitations and its efforts to obtain a favorable ruling on the common carrier issues may also have been in good faith. But BNSF's movement of unit trains during these time periods with full knowledge that it lacked the authorization to do so was not in good faith. The absence of testimony from the individuals who made the decision to ignore the procedures set forth in the Easement Agreement in the ten months before September 2012 and who chose to continue to run unit trains in the absence of permission and against the express wishes of the Tribe means there is nothing to contradict the evidence of a conscious breach in pursuit of profits. Thus, the Tribe is entitled to equitable remedies, including the recovery from BNSF of profits made by the unlawful entry. Restatement (Second) of Torts § 929, comment c.; *U.S. v. Santa Fe Pac. R. Co.*, 314 U.S. 339 (1941). The extent to which equity supports disgorgement will be determined in the next phase of the trial.

//

MEMORANDUM OF DECISION - 15

The parties are directed to confer and submit a proposed case management schedule for the remaining damages issues on or before April 14, 2023.

DATED this 27th day of March, 2023.

Robert S. Lasnik
United States District Judge

MEMORANDUM OF DECISION - 16