1
2
3
4
5

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SWINOMISH INDIAN TRIBAL
COMMUNITY,

                    Plaintiff,

       v.

BNSF RAILWAY COMPANY,

                 Defendant.

CASE NO. 2:15-cv-00543-RSL

ORDER DENYING BNSF'S
MOTION TO COMPEL
ARBITRATION

     This matter comes before the Court on "BNSF Railway Company's Motion to Compel Arbitration." Dkt. # 219. Having reviewed the memoranda, declarations, and exhibits submitted by the parties, the Court finds as follows:

**A. Arbitrability of Gateway Issues**

     The Federal Arbitration Act ("FAA") makes agreements to arbitrate disputes "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). "[A] court may

order arbitration of a particular dispute[, however,] only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010). The FAA, after all, mandates arbitration "in accordance with the terms of the agreement." 9 U.S.C. § 4. If issues arise regarding the existence or scope of an agreement, the court must determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue" before compelling the parties to resolve the dispute through arbitration. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citation omitted).

When determining whether parties have agreed to arbitrate a particular dispute, "[t]he court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA.]'" *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Although "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). "This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT&T Techs., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643, 648-49 (1986). Thus, if the issue is whether the parties agreed to arbitrate threshold issues regarding arbitrability of a

particular dispute, federal arbitration law requires courts to "presume that the parties intend courts, not arbitrators, to decide . . . 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). *See also Galilea, LLC v. AGCS Marine Ins. Co.*, 879 F.3d 1052, 1061 (9th Cir. 2018) ("Under the FAA, 'the usual presumption that exists in favor of the arbitrability of merits-based disputes is replaced by a presumption *against* the arbitrability of arbitrability.'" (quoting *Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 920 (9th Cir. 2011) (emphasis in original)).[1]

Courts "apply ordinary state-law principles that govern the formation of contracts" when deciding whether the parties agreed to arbitrate arbitrability, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), but with one important qualification. That qualification – imposed as a matter of federal arbitration law – is that the evidence that the parties mutually agreed to arbitrate arbitrability must be clear and unmistakable.

---

[1] The Court acknowledges that the Ninth Circuit has determined – seemingly as a matter of law – that a sophisticated contracting party would intend to arbitrate arbitrability by agreeing to settle disputes "by binding arbitration in accordance with the Rules of the American Arbitration Association." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). The decision relied on the fact that Rule 7 of the Commercial Arbitration Rules and Mediation Procedures, by which Brennan agreed to be bound, states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to . . . the arbitrability of any claim . . . , without any need to refer such matters first to a court." https://www.adr.org/active-rules. The agreement in *Brennan* was signed in 2010, more than a decade after the American Arbitration Association amended its rules to include the delegation provision quoted above. Here, in contrast, the agreement to arbitrate was signed years before the rules were changed to expand the scope of the parties' negotiated agreement to include the gateway issues of arbitrability. Given the fact that the term on which *Brennan* relied did not exist at the time of the parties' agreement and Washington's law of contract formation, discussed below, *Brennan* is distinguishable.

1    *Id.* (citing *AT&T Techs.*, 475 U.S. at 649). Thus, under federal arbitration law,

2    Washington's ordinary principles of contract formation apply to the issue of mutual assent

3    and the evidence of the parties' intent to delegate arbitrability issues to the arbitrator must

4    be clear and unmistakable.

5

6        The relevant state law requires the court to determine whether there was an

7    objective manifestation of mutual agreement to submit the question of arbitrability to

8    arbitration. *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 177 (2004).

9    The Washington Supreme Court recently clarified "that incorporation by reference does

10   not, in itself, establish mutual assent to the terms being incorporated" in the absence of

11   evidence in the record that the parties to the agreement "had knowledge of and assented to

12   the incorporated terms." *Burnett v. Pagliacci Pizza, Inc.*, 196 Wn.2d 38, 49 (2020).

13   Despite his signature on an employment contract that imposed on Burnett a duty to read

14   Pagliacci's employee handbook, Burnett was not bound by the arbitration provision

15   contained in the handbook because he was not given an opportunity to review the

16   incorporated document before signing. Without knowledge of the incorporated terms,

17   Burnett "never assented" to the arbitration agreement and it would not be enforced against

18   him. *Id.* at 50. *See also Hastings v. Unikrn, Inc.*, 12 Wn. App.2d 1072, 2020 WL 1640250,

19   at * 7 (2020) (relying on the "longstanding rule in Washington that being deprived of the

20   opportunity to read a contract will prevent the mutual assent required to form a contract" to

21   invalidate an arbitration provision which was buried in an inconspicuous hyperlink);

22   *McMinimee v. Yakima Sch. Dist. No. 7*, No. 1:18-CV-3073-TOR, 2021 WL 1559369, at

ORDER DENYING BNSF'S MOTION TO COMPEL
ARBITRATION - 4

*21 (E.D. Wash. Mar. 26, 2021), appeal dismissed, No. 21-35297, 2021 WL 8154944 (9th Cir. Dec. 15, 2021) (where a party was not provided with and was unaware of the terms of a collective bargaining agreement referenced in her contract, the terms did not become part of the contract); *Cooper v. Agrify Corp.*, No. 2:21-CV-0061-RSL-JRC, 2022 WL 2374587, at * 3 (W.D. Wash. June 2, 2022) (in the absence of evidence that an unsophisticated party would understand that the incorporation of the AAA rules expanded the scope of the parties' agreement to arbitrate, there was insufficient evidence of mutual assent to arbitrate arbitrability). In the circumstances presented here, neither party had access to the incorporated contract term BNSF seeks to enforce because it was not yet in existence. There is no indication that either party considered submitting, much less agreed to submit, the issue of arbitrability to the arbitrator.

BNSF nevertheless argues that the Tribe agreed to arbitrate gateway issues because, under Rule 1 as it existed in 1991, the Tribe agreed that the AAA rules "and any amendment thereof shall apply in the form obtaining at the time the arbitration is initiated." The issue, however, is whether there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. It is undisputed that the parties never negotiated, considered, or agreed to arbitrate gateway issues: the Easement Agreement and the AAA rules in force at the time are silent on the matter. As a matter of undisputed fact, the parties did not reach any agreement on delegation. At the time, no level of diligence, inquiry, or sophistication would have informed the Tribe that the incorporation of the AAA rules did anything more than identify the procedures that would apply once arbitration was initiated.

There was no warning that the reference would, in the future, change the substantive scope of the agreement to arbitrate by compelling the arbitration of additional disputes not contemplated by the parties – *i.e.*, those regarding arbitrability. Given the facts and circumstances, it is impossible to conclude that the reference to the AAA rules constituted consent to a term that did not exist at the time. Evidence of mutual intent and assent is entirely missing.

In the alternative, the Court finds that BNSF waived the applicability of the AAA rules. Even if one could find that the parties had mutually agreed to delegate arbitrability to the arbitrator through the 1991 reference to the AAA rules, BNSF has knowingly waived the contractual right to proceed under those rules.

> [T]he FAA's "policy favoring arbitration" does not authorize federal courts to invent special, arbitration-preferring procedural rules. *Moses H. Cone*, 460 U.S. at 24. . . . The policy is to make "arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395, 404, n. 12 (1967). . . . If an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it.

*Morgan v. Sundance, Inc.*, __ U.S. __, 142 S. Ct. 1708, 1713 (2022). Under Washington law, "waiver is the intentional and voluntary relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right." *In re Estate of Lindsay*, 91 Wn. App. 944, 950 (1998)). The waiver can be express or inferred from the circumstances, but it must be a voluntary act which implies that the party has made a choice to give up or forego some advantage or thing of value. *Matter of Est. of Petelle*, 8 Wn. App. 2d 714, 720 (2019), *aff'd*, 195 Wn.2d 661 (2020).

In this case, the parties agreed to pursue arbitration of their on-going rental adjustment dispute before retired United States District Judge Ronald B. Leighton. They subsequently agreed to include in that arbitration the damages claims at issue here if the Court were to grant BNSF's motion to compel. When the parties were informed that Judge Leighton's organization, the Washington Arbitration & Mediation Service ("WAMS") "does not administer cases under the AAA Rules," they were given two choices: to pursue arbitration using an AAA arbitrator or to agree to proceed under WAMS rules before Judge Leighton. The parties agreed to proceed before Judge Leighton using the WAMS rules. Having waived any right it may have had to proceed under the AAA Rules, BNSF cannot insist on applying those rules to determine whether arbitrability must be arbitrated.

The Court finds that determining whether the arbitration provision in the Easement Agreement applies to the damage claims at issue in this lawsuit is subject to judicial resolution.

## B. Scope of Agreement to Arbitrate

In exchange for an easement running over the Reservation, BNSF promised to make an annual payment of $10,000 for the year beginning January 1, 1989, with the amount adjusted annually based on the All Items Consumer Price Index. Every five years, the rent would be subject to an appraisal adjustment so that it was 12% of the value of the land that is subject to the right-of-way plus the severance damage to Reservation lands north of State Highway 20. The agreement specifies that the values are to be "determined by normal real estate appraisal methods considering the highest and best use of such adjacent

lands." Dkt. # 222-1 at 5 (Easement Agreement ¶ 3(b)(ii)). The Tribe could also opt to initiate an appraisal adjustment to account for any increase in the number of crossings or the number of cars on the easement under ¶ 7(c) of the agreement. "If the parties are unable to agree upon a rental adjustment, such adjustment shall be determined in accordance with the Commercial Arbitration Rules of the American Arbitration Association and the provisions set forth herein by binding arbitration." Dkt. # 222-1 at 6 (Easement Agreement ¶ 3(b)(iii)).

BNSF argues that any dispute regarding monies owed from BNSF to the Tribe in relation to its use of the Easement Agreement is subject to the arbitration provision. But the parties' agreement is much narrower than that. The parties agreed to arbitrate disputes regarding rental adjustments, which, as described in the Easement Agreement, are disputes which arise out of the appraisal process set forth in ¶ 3(b)(iii). They did not agree to arbitrate any and all claims that might impact what BNSF pays the Tribe. The arbitration agreement clearly does not preclude judicial resolution of breach of contract claims, claims arising from a train derailment, claims arising from the negligent maintenance of or interference with the rails across the Reservation, or other tort claims. BNSF has never argued otherwise and has not sought to compel arbitration of the breach of contract and trespass claims asserted here. The successful litigation of non-arbitrable claims would, in the normal course, result in an award of damages in favor of one party and against the other, but that does not make those claims (or the jury's damage calculations) subject to arbitration.

ORDER DENYING BNSF'S MOTION TO COMPEL
ARBITRATION - 8

After hearing all of the evidence regarding liability, the Court determined that BNSF breached the Easement Agreement and willfully trespassed on tribal lands. Now, because the damage calculations were bifurcated from the liability determinations, BNSF has taken the opportunity to argue that arbitration of the damages phase is required because (1) the damage awards are "compensation" for use of the easement and (2) any "compensation" must be a rental adjustment. Neither assertion is entirely accurate. With regards to the trespass damages, the Tribe is entitled to more than simply compensation (generally measured by the injury to the property caused by the trespass) or restitution (generally measured by the rental value of what BNSF took or used).

> "A conscious wrongdoer will not be left on a parity with a person who—pursuing the same objectives—respects the legally protected rights of the property owner. If liability in restitution were limited to the price that would have been paid in a voluntary exchange, the calculating wrongdoer would have no incentive to bargain." [Restatement (Third) of Restitution and Unjust Enrichment § 40 (2011)]. Thus, "if a defendant is a willful trespasser, the owner is entitled to recover from him the value of any profits made by the entry." Restatement (Second) of Torts § 929, comment c. (1979). *See U.S. v. Santa Fe Pac. R. Co*., 314 U.S. 339 (1941) (reinstating claim for quiet title and an accounting of all rents, issues and profits derived from the unauthorized use of tribal lands).

Dkt. # 216 at 12. Disgorgement of profits is a remedy where compensatory awards are considered inadequate. The damages at issue in the trespass action cannot be accurately described as "compensation."

Even if the breach of contract and trespass damages claimed here could be tied to BNSF's use of the easement, by, for example, proposing damage calculations that are based on the number of trains and cars BNSF ran across the Reservation, they are not part

of a rental adjustment as described in ¶ 3(b) of the Easement Agreement. Only a dispute arising from an appraisal process and the subsequent negotiation over a rental adjustment is subject to arbitration. The parties were very specific about the type of dispute that would be arbitrated, and it involves an inability to agree on a future financial adjustment, not allegations of wrongful conduct. The damages the Tribe seeks in this litigation are not subject to determination "by normal real estate appraisal methods considering the highest and best use of [] adjacent lands," neither party initiated the appraisal adjustment process with regards to these damages, and the damages will not establish the rental payment for the next five years. ¶ 3(b)(ii) and (iii). The processes and procedures of ¶ 3(b)(iii), including the arbitration provision, are simply inapplicable.[2] The parties' agreement to resolve disputes regarding a "rental adjustment" through arbitration does not compel arbitration of damage awards arising from non-arbitrable contract and tort claims. Although "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25, the Tribe "cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960).

---

[2] BNSF insists that the reference to ¶ 3(b)(iii) in ¶ 7(c) of the Easement Agreement means that the amounts owed as a result of an increase in rail traffic over the easement must be determined in arbitration. This interpretation cherry picks words from both subsections and ignores the context of the arbitration provision. Regardless whether the increase in rail traffic is lawful or unlawful, ¶ 7(c) makes clear that an increase in use warrants an adjustment in the annual rental payment under ¶ 3(b)(iii). Paragraph 3(b)(iii) authorizes the Tribe, not BNSF, to initiate an appraisal process that could lead to the rent adjustment discussed in ¶ 7(c). The Tribe has not done so, instead preferring to litigate the breach of contract and trespass claims arising from BNSF's unilateral increase in traffic across the Reservation.

ORDER DENYING BNSF'S MOTION TO COMPEL
ARBITRATION - 10

For all of the foregoing reasons, BNSF's motion to compel arbitration is DENIED.


Dated this 17th day of July, 2023.

Robert S. Lasnik
United States District Judge