The Honorable Robert S. Lasnik

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10  SWINOMISH INDIAN TRIBAL
11  COMMUNITY, a federally recognized Indian
    Tribe,

12              Plaintiff,

13      v.

14  BNSF RAILWAY COMPANY, a Delaware
    corporation,

15              Defendant.

16

NO. 2:15-cv-00543-RSL

PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
ON DISGORGEMENT

DATE ON NOTING CALENDAR:
April 26, 2024

17

18

19

20

21

22

23

24

25

26

27

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

## **TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................................ 1

**FACTUAL BACKGROUND** ............................................................................ 1

   A.   BNSF's records reflect trespass contribution of nearly $445 million. ............................ 1

   B.   BNSF does not allocate fixed costs, interest, taxes, or determine profit on an individual movement basis. ............................................................................................................... 3

   C.   BNSF receives revenue only after it completes a movement. ........................................ 4

   D.   BNSF seeks to deduct fixed costs, interest expense, and income taxes and requests a substantial apportionment of its trespass profits to significantly reduce its liability. ...... 5

**ARGUMENT** ...................................................................................................... 6

   I.   **The Tribe is entitled to disgorge BNSF's ill-gotten gains. BNSF cannot avoid this by claiming a rent-based damages theory.** ............................................................... 6

      A.   The Restatement recognizes that disgorgement is the appropriate remedy for willful, conscious, and knowing trespass. ...................................................................... 6

      B.   Any rent-based damages theory for BNSF's conscious, willful, and knowing trespass must be rejected. ................................................................................... 7

   II.   **BNSF must disgorge *all* ill-gotten gains from running excess rail traffic over the Reservation. BNSF would benefit substantially if permitted to deduct fixed costs, interest expense, or income taxes.** ............................................................... 9

      A.   BNSF's internal definition of "profit" is irrelevant—it cannot deduct the fixed costs and interest expense it would have incurred independently of the trespass. ............... 9

      B.   BNSF cannot deduct any portion of its fixed costs. ..................................................... 13

      C.   BNSF cannot deduct any portion of its interest expense. ............................................. 15

      D.   BNSF cannot deduct its income taxes paid on revenues earned from trespassing over the Reservation. ............................................................................................. 15

   III.   **BNSF is not entitled to any allocation-based reduction of its ill-gotten gains.** ....... 18

   IV.   ***Enbridge* does not support a finding that BNSF should retain its ill-gotten gains.** 21

**CONCLUSION** .................................................................................................. 23

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISGORGEMENT - ii
Case No. 2:15-cv-00543-RSL

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1

## <u>TABLE OF AUTHORITIES</u>

2
**Page(s)**

3
**Cases**

4
*In re AI Realty Mktg. of New York, Inc.*,
5
    293 B.R. 586 (Bankr. S.D.N.Y. 2003) ...............................................................................11

6
*Alfred Bell & Co. v. Catalda Fine Arts, Inc.*,
    191 F.2d 99 (2d Cir. 1951) .............................................................................................16

7
*Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad*
8
    *River Reservation v. Enbridge Energy Co.*,
    No. 19-cv-602-wmc, 2023 WL 4043961 (W.D. Wis. Jun. 16, 2023) ......................21, 22, 23

9
*Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv.*
10
    *V. Enbridge Energy Co., Inc.*,
11
    626 F. Supp. 3d 1030 (W.D. Wis. 2022) ..........................................................................21

12
*Burger King Corp. v. Pilgrim's Pride Corp.*,
    934 F. Supp. 425 (S.D. Fla. 1996) .................................................................................12

13
*Donell v. Kowell*,
14
    533 F.3d 762 (9th Cir. 2008) ..........................................................................................16

15
*DXS, Inc. v. Siemens Med. Sys., Inc.*,
16
    100 F.3d 462 (6th Cir. 1996) ..........................................................................................11

17
*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*,
    325 F. Supp. 2d 841 (M.D. Tenn. 2004) .........................................................................11

18
*In Design v. K-Mart Apparel Corp.*,
19
    13 F.3d 559 (2d Cir. 1994) .............................................................................................16

20
*Kamar Int'l, Inc. v. Russ Berrie & Co.*,
    752 F.2d 1326 (9th Cir. 1984) ........................................................................................11

21
*Kutner Buick, Inc. v. Am. Motors Corp.*,
22
    868 F.2d 614 (3d Cir. 1989) ...........................................................................................10

23
*Monster Energy Co. v. Integrated Supply Network, LLC*,
24
    533 F. Supp. 3d 928 (C.D. Cal. 2021) .........................................................................7, 15

25
*Morley-Murphy Co. v. Zenith Elecs. Corp.*,
    142 F.3d 373 (7th Cir. 1998) ..........................................................................................10

26

27

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - iii
Case No. 2:15-cv-00543-RSL

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*,
  470 U.S. 226 (1985) ............................................................................................6

*S.E.C. v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ..............................................................................6

*S.E.C. v. Huff*,
  2011 WL 1102777 (S.D. Fla. Mar. 23, 2011) ....................................................16

*S.E.C. v. Kara*,
  2016 WL 794886 (N.D. Cal. Mar. 1, 2016) .......................................................17

*S.E.C. v. Koenig*,
  532 F. Supp. 2d 987 (N.D. Ill. 2007)..................................................................17

*S.E.C. v. Merch. Cap., LLC*,
  486 F. App'x 93 (11th Cir. 2012) .......................................................................16

*S.E.C. v. Shaoulian*,
  2003 WL 26085847 (C.D. Cal. May 12, 2003) ..................................................11

*S.E.C. v. U.S. Pension Tr. Corp.*,
  444 F. App'x 435 (11th Cir. 2011) .....................................................................16

*Schnadig Corp. v. Gaines Mfg. Co.*,
  620 F.2d 1166 (6th Cir. 1980) ............................................................................17

*Sheldon v. Metro–Goldwyn Pictures Corp.*,
  106 F.2d 45 (2d Cir. 1939) .................................................................................16

*Spectravest, Inc. v. Fleet St., Ltd.*,
  1989 WL 135386 (N.D. Cal. Aug. 23, 1989) .....................................................11

*Sunbeam Prod., Inc. v. Wing Shing Prod. (BVI) Ltd.*,
  311 B.R. 378 (S.D.N.Y. 2004), aff'd, 153 F. App'x 703 (Fed. Cir. 2005) .........12

*U.S. v. Santa Fe Pac. R. Co.*,
  314 U.S. 339 (1941) ..............................................................................................6

*In re Weaver*,
  219 B.R. 890 (Bankr. D. Mont. 1998)................................................................16

*Williams Elecs. Games, Inc. v. Garrity*,
  366 F.3d 569 (7th Cir. 2004) ................................................................................6

**Statutes**

26 U.S.C. § 172 ......................................................................................................17

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - iv
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ◆ FAX 206.682.2992

**Other Authorities**

Restatement (Third) of Restitution and Unjust Enrichment § 37.................................................12

Restatement (Third) of Restitution and Unjust Enrichment § 40, cmt. b................................7, 8

Restatement (Third) of Restitution and Unjust Enrichment § 51(4) ..............................9, 18, 20

Restatement (Third) of Restitution and Unjust Enrichment § 51 (5) ............................... *passim*

Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt h............................10, 17

Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt.......................................18

Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt. e. ...................................9

Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. g...................................20

Restatement (Second) of Torts § 929, comment c. (1979)...........................................................6

Restatement (Third) of Restitution and Unjust Enrichment § 40..................................................6

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - v
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**INTRODUCTION**

This Court found that BNSF consciously, willfully, and knowingly trespassed over the Swinomish Reservation when it exceeded the rail traffic limitations set forth in the Easement that grants BNSF a limited right to cross Tribal land. The remedy for such wanton trespass is an accounting and disgorgement of all ill-gotten gains. The dual purpose of the disgorgement remedy is to deprive the defendant of any benefits obtained by trespass, and to deter future tortious conduct.

The Tribe and BNSF agree on the revenues BNSF derived from its trespass and the variable costs it incurred directly in obtaining these revenues. The Tribe submits that this gain—known in the rail industry as "contribution"—must be disgorged as the "profits" attributable to BNSF's trespass and that this amount is subject to prejudgment interest or adjustment to present value.

Four issues remain as part of this remedy phase: (1) whether a rent-based remedy is appropriate for BNSF's willful, conscious, and knowing trespass in lieu of disgorgement; (2) whether BNSF can deduct additional fixed costs, interest expenses, and income taxes; (3) whether the disgorgement award should be substantially reduced by "apportioning" BNSF's ill-gotten gains to a relative portion of the entire route; and (4) what interest rate should be applied to the disgorgement award to bring the near decade of profits BNSF generated from trespassing over the Reservation into present-day dollars. The Tribe seeks summary judgment on the first three issues.

**FACTUAL BACKGROUND**

**A.  BNSF's records reflect trespass contribution of nearly $445 million.**

Following this Court's ruling on liability, BNSF produced data, including from one of its proprietary internal financial databases, the Activity Based Costing System ("ABS"), for all traffic that crossed the Reservation between September 2012 and May 2021 (the "Trespass Period"). ABS consolidates all costs associated with rail traffic within BNSF's system and,

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISGORGEMENT - 1
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

where possible, assigns variable costs (e.g., costs that vary with incremental changes in volume) to individual rail car and locomotive movements. *See* Declaration of Christopher Brain, Ex. 1 ("Palmarozzi Depo.") at 26:1-27:17; 33:14-34:10. While certain variable costs are more readily calculable—for example, the cost of fuel used to transport a rail car between origin and destination—the variability of other costs is often less apparent. ABS incorporates variability factors that BNSF has developed through complex regression analysis that it uses to identify and assign the variable component of *every* cost in BNSF's operations. *Id.* at 26:1-27:17. Although to some extent, these variability ratios represent judgment calls made by BNSF as to the extent that any cost component is variable, the Tribe accepts BNSF's methodology and agrees that the ABS variable cost assignments reasonably reflect the variable costs associated with specific movements within its network. Any costs that cannot be associated with individual movements are fixed costs. *Id.* at 33:14-34:10.

In the railroad industry, "contribution" means revenue obtained less variable costs associated with particular movements. Brain Decl. Ex. 2 ("Baranowski Depo.") at 38:18-39:8. Contribution reflects what an individual movement can "contribute" toward BNSF's company-wide fixed costs, interest expenses, and taxes, with the remainder reflecting total company profit. Palmarozzi Depo. 27:18-28:6; 32:12-14; 55:22-56:13 (defining profit as revenue less operating expenses, less total interest expenses, less income taxes); 51:19-25 ("contribution of margin is the portion of [a business unit's] revenue that is available to cover all other costs . . . fixed costs, interest and taxes.").

BNSF uses contribution, along with estimates of any necessary capital charges, to evaluate prospective new business. Palmarozzi Depo. 29:3-25; 30:7-31:3; 63:15-64:7; 64:23-65:11. Capital charges refer to the expenditures required for BNSF to accommodate the traffic, such as line improvements or expansions. *Id.* at 29:3-31:1. BNSF's controller further testified that BNSF will not make a movement unless it projects an adequate rate of return, factoring in

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISGORGEMENT - 2
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1   revenue, variable costs, and necessary capital charges, which is "anywhere in the mid teens" for

2   both new projects and incremental increases in existing traffic. *Id*. at 68:4-24.

3        Using waybills and ABS data produced by BNSF for all the movements over the

4   Reservation during the September 2012 to May 2021 Trespass Period, the Tribe's expert, Dan

5   Fapp, meticulously isolated the trespassing trains and cars to calculate the total revenue

6   generated from BNSF's unauthorized rail traffic over the Reservation as well as the variable

7   costs associated with each of those movements. Brain Decl., Ex. 3 (Dan Fapp Opening Report).

8   During expert discovery, Mr. Fapp and BNSF's expert, Michael Baranowski, reached a

9   consensus on the number of train cars, the total revenue, and total variable costs for both unit

10  trains and excess local trains that crossed the Reservation. Brain Decl., ¶ 8, Exs. 4–7. As a

11  result, the parties stipulated to the total contribution from the trespassing traffic is

12  $444,956,537. Brain Decl. ¶ 8, Ex 7.

### B.  BNSF does not allocate fixed costs, interest, taxes, or determine profit on an individual movement basis.

15       In addition to the variable costs the Tribe agrees should be deducted from BNSF's

16  revenues to determine its ill-gotten gains from trespassing on the Reservation, BNSF also seeks

17  credit for a portion of its company-wide fixed costs, interest expense, and income taxes based

18  on its own internal accounting procedures. BNSF determines its own profits by aggregating

19  from its operating business units all revenues and deducting all variable costs, fixed costs,

20  interest expense, and taxes. Palmarozzi Depo. 32:12-14; 56:2-13. It contends that, even without

21  identifying what fixed costs directly contributed to its trespasses, it should be able to apply a

22  proportion of its total company-wide fixed costs, interest expense, and incomes taxes here.

23       Although BNSF seeks to have this Court deduct fixed costs, interest expense, and taxes

24  from the agreed contribution to arrive at a disgorgement award for the individual trespassing

25  movements, BNSF admits that, internally, it does not calculate "profit" on an individual

26  movement basis. Palmarozzi Depo. 34:23-35:8; 64:8-18. Indeed, BNSF's controller conceded

27  that profit per movement is never calculated in practice and that she is not aware of any

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - 3
Case No. 2:15-cv-00543-RSL

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

situation, other than this case, where BNSF has attempted to allocate fixed costs, interest, or taxes to an individual movement. *Id.* at 77:4-7. Instead, for business analytics, BNSF allocates its total fixed costs among four[1] operational business units in proportion to each unit's relative share of certain variability factors, such as unit miles and gross ton miles. *Id.* at 34:11-14 (fixed costs are "not [allocated] to individual movements, but to the business units and the forecast groups, as well"); 34:19-22 ("we do not allocate fixed costs to individual movements."); 46:24-48:5; 48:16-49:19. Interest expenses and taxes are allocated to business units based on their relative gross ton miles. *Id.* at 51:10-13.

That BNSF does not allocate fixed costs, interest expense, or taxes to individual movements is not surprising because the assignment of non-variable costs to any particular movement would be economically arbitrary. Unlike variable costs, which fluctuate with changes in volume of production (or in this case rail car movements), fixed costs for a company stay the same regardless of changes in volume. Baranowski Depo. 70:22-71:2. In fact, to the extent that any overhead costs vary with changes in the volume of rail traffic, they are already identified as variable costs within the ABS system. Palmarozzi Depo. 50:7-51:4. In other words, if BNSF had confined its rail traffic over the Reservation to the Easement limits, its fixed costs would not have changed. BNSF has not identified any fixed costs that it would not have incurred had it complied with the Easement; indeed, it does not even identify the reduction in fixed costs it no longer incurs since it started to comply with the Easement. Palmarozzi Depo. 69:15-19; 74:23-76:16; Baranowski Depo. 50:12-52:14.

**C. BNSF receives revenue only after it completes a movement.**

At the liability trial, BNSF's Director of Corporate Real Estate Cary Hutchings testified that BNSF could not transport rail cars directly to the Fidalgo refineries unless it crosses the Reservation. Brain Decl., Ex. 9 at 56:24-57:12. Accordingly, BNSF did not and could not earn

---

[1] These units are its consumer, agricultural, industrial, and coal rail divisions. Palmarozzi Depo. 32:19-22. In 2020, BNSF merged coal into its industrial products group. *Id.* at 46:7-16.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISGORGEMENT - 4
Case No. 2:15-cv-00543-RSL

*any* revenue from the unit train or excess local train traffic unless and until it trespassed across the Reservation. *See* Palmarozzi Depo. 13:21-14:3 (testifying that there are no circumstances where BNSF would take revenue except after delivery completed). Until it did so and the deliveries were complete, to the extent that any part of "profit" could be apportioned to individual segments of a route, BNSF had negative profit because all it had were incurred costs. The Fidalgo refineries would not and did not pay BNSF to transport rail cars up to the Reservation and BNSF generated no revenue from such movements unless and until it trespassed.

> **D.   BNSF seeks to deduct fixed costs, interest expense, and income taxes and requests a substantial apportionment of its trespass profits to significantly reduce its liability.**

BNSF's expert, Michael Baranowski, agrees with the Tribe's calculation of contribution BNSF received from trespassing over the Reservation. He, however, opines that BNSF should be entitled to additional allocated deductions for fixed costs, interest expense, and income taxes exceeding $200 million. Brain Decl., Ex. 8 (Baranowski Revised Work Paper Tables at 5-R). Mr. Baranowski opines that these profits should be reduced further to give BNSF credit for the relative portions of the routes where BNSF did not trespass. He suggests segmenting the total route into non-trespassing and trespassing sections and apportioning the profits "attributable" to the trespassing section to determine the disgorgement award. Mr. Baranowski proposes three apportionment models: a pro rata model, based on relative, actual route length; an Average Total Cost approach, which segments the route based on relative segment costs; and a 100-mile block approach, which breaks the route up into 100-mile blocks. Mr. Baranowski opines that BNSF's ill-gotten gains from trespassing over the Reservation under these approaches are less than 5% of its contribution. *Id*. at Tables 6-R, 8-R, 9-R, 10-R, 11-R.

Mr. Baranowski also opines that the "hypothetical" maximum total rent that BNSF would owe the Tribe under the Easement's terms for an assumed "total diminution in the value of the subject property" arising from BNSF's excess rail traffic would be $7,241,118,

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISGORGEMENT - 5
Case No. 2:15-cv-00543-RSL

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

considering the parties' agreed appraisal values and the rent BNSF already paid during the

Trespass Period. Brain Decl. Ex. 4 at 17–21.

**ARGUMENT**

I.     **The Tribe is entitled to disgorge BNSF's ill-gotten gains. BNSF cannot avoid this
       by claiming a rent-based damages theory.**

     A.  **The Restatement recognizes that disgorgement is the appropriate remedy
       for willful, conscious, and knowing trespass.**

The appropriate remedy for trespass over Tribal lands and for willful, conscious, and

knowing trespass is disgorgement of wrongfully obtained profits. Restatement (Second) of

Torts § 929, comment c. (1979) ("if a defendant is a willful trespasser, the owner is entitled to

recover from him the value of any profits made by the entry."); Restatement (Third) of

Restitution and Unjust Enrichment § 40 (2011) ("RESTATEMENT OF RESTITUTION") ("A person

who obtains a benefit by an act of trespass or conversion . . . is liable in restitution to the victim

of the wrong."); *U.S. v. Santa Fe Pac. R. Co.*, 314 U.S. 339 (1941) (reinstating claim for quiet

title and an accounting of all rents, issues and profits derived from the unauthorized use of

tribal lands); *Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226,

235–36 (1985) ("Indians have a common-law right of action for an accounting of 'all rents,

issues and profits' against trespassers on their land.") (quoting *Santa Fe*, 314 U.S. at 344);

*Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) ("one way to deter [a

deliberate tort] is to make it worthless to the tortfeasor by stripping away all his gain, since if

his gain exceeded the victim's loss a damages remedy would leave the tortfeasor with a profit

from his act."). In the restitution context, profit is defined to include "any form of use value,

proceeds, or consequential gains that is identifiable and measurable and not unduly remote."

RESTATEMENT OF RESTITUTION § 51(5)(a).

Disgorgement is an equitable remedy distinct from traditional damages. Whereas

"damages" seek to compensate a victim for the harm it suffered, disgorgement seeks to divest a

defendant's ill-gotten gains. *See e.g.*, *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d

Cir. 1996) ("Since disgorgement is a method of forcing a defendant to give up the amount by which he was unjustly enriched, it is unlike an award of damages."). Disgorgement serves two primary goals: to deter future misconduct and to prevent a tortfeasor from profiting from its past misconduct. *See e.g.*, *Monster Energy Co. v. Integrated Supply Network, LLC*, 533 F. Supp. 3d 928, 933 (C.D. Cal. 2021) ("disgorgement of profits would assist in deterring Defendant from continuing to infringe on Plaintiff's trademarks, particularly since the jury awarded $0 in compensatory damages . . . . Fairness also supports disgorgement of profits so that Defendant does not profit from its unlawful infringement."). While equitable remedies "may be limited to avoid a liability for gains that are unduly remote . . . or disproportionate to the loss on which liability is based," the profits the Tribe seeks to disgorge are neither remote nor disproportionate. RESTATEMENT OF RESTITUTION § 40, cmt. b.

"A claimant who seeks disgorgement of profit has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain. Residual risk of uncertainty in calculating net profit is assigned to the defendant." RESTATEMENT OF RESTITUTION § 51(5)(d).

## B. Any rent-based damages theory for BNSF's conscious, willful, and knowing trespass must be rejected.

As an initial matter, disgorgement of ill-gotten gains is the only appropriate remedy for BNSF's conscious, willful, and knowing trespass over the Reservation. To the extent that BNSF contends that the appropriate remedy is a "rent adjustment" as indicated in its Motion to Compel Arbitration (Dkt. 219) and in its expert's opening report, the Court should find that this breach-based remedy is legally inappropriate for the Tribe's trespass claim.[2]

Any contract-based damages theory for BNSF's trespass cannot withstand scrutiny. A rent increase presupposes consent to the rail traffic. The Easement provides that *if* the Tribe agrees to allow an increase in rail traffic over the Reservation, it is entitled to additional rent.

---

[2] At BNSF's request at trial, the Court declined to consider the Tribe's claim for opportunistic breach.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISGORGEMENT - 7
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Brain Decl., Ex. 10 at ¶ 7(c). That is not what happened here. BNSF consciously, willfully, and knowingly ran thousands of rail cars over the Reservation over the Tribe's express and acknowledged objections for nearly 10 years. When a "defendant has intentionally bypassed an existing market—consciously taking without asking, or proceeding in the face of the owner's refusal" such "[e]nrichment resulting from intentional trespass is not properly measured by ordinary rental value." RESTATEMENT OF RESTITUTION § 40, cmt. b. As this Court recognized, "[a] conscious wrongdoer will not be left on a parity with a person who—pursing the same objectives—respects the legally protected rights of the property owner. If liability in restitution were limited to the price that would have been paid in voluntary exchange, the calculating wrongdoer would have no incentive to bargain." Dkt. 216 at 12 (quoting RESTATEMENT OF RESTITUTION § 40, cmt b). As a matter of law, BNSF cannot limit its liability to the Tribe to "rent" damages. To do so would not only allow BNSF to overburden the Easement at its discretion and with no financial consequence, but it would eviscerate the very thing the Tribe bargained to protect when settling the original trespass litigation: its consent to any increase in traffic.

But even if a rental increase were an appropriate remedy, any rent increase proposed by BNSF is speculative. There is nothing in the Easement nor any evidence that would demonstrate *what* rent the Tribe would have accepted to allow the rail traffic at issue. Indeed, BNSF cannot even demonstrate what rent *it* would have agreed to pay for its desired, unrestricted traffic during the trespass period. The only evidence in the record on this point is BNSF's December 2013 letter to the Tribe proposing an amended easement that would have allowed unlimited rail traffic, while simultaneously eliminating its reporting requirements. Brain Decl. Ex. 11. Any attempt to identify an *agreed* rental adjustment to cover traffic increases that were never authorized by the Tribe would be entirely speculative.

The Court should therefore find that as a matter of law, BNSF is not entitled to seek a rent-based remedy in lieu of disgorgement for its conscious, willful, and knowing trespass.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - 8
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**II.     BNSF must disgorge *all* ill-gotten gains from running excess rail traffic over the Reservation. BNSF would benefit substantially if permitted to deduct fixed costs, interest expense, or income taxes.**

Here, no matter how viewed, BNSF's ill-gotten gains from its willful trespass over the Reservation are equal to the contribution it received from the trespassing traffic. BNSF contends that it is entitled to deduct artificially allocated fixed costs, interest expense, and income taxes to reach a manufactured individual movement "profit" as its starting point for the disgorgement award. BNSF's proposal, however, would result in a substantial net benefit to BNSF that would contravene the policies behind disgorgement for willful trespass.

**A.     BNSF's internal definition of "profit" is irrelevant—it cannot deduct the fixed costs and interest expense it would have incurred independently of the trespass.**

At the heart of BNSF's stance that it is entitled to substantial deductions for its allocation of fixed costs, interest expense, and income taxes is its reliance on and adoption of the "accounting" definition of profit. It is undisputed that BNSF's internal financial departments define profit to mean total company revenues less all variable costs, fixed costs, interest expense, and income taxes. BNSF's definition of profit, however, is irrelevant to answer the question presented in this case: what were BNSF's *ill-gotten gains* from its trespass over the Reservation?

Disgorgement profits under the Restatement and accounting profits are not interchangeable. The liability "of a conscious wrongdoer . . . is the net profit attributable to the underlying wrong." RESTATEMENT OF RESTITUTION § 51(4). "Net profit" does not mean accounting profit. Instead, "[t]he profit for which the wrongdoer is liable by the rule of § 51(4) is the net increase in the assets of the wrongdoer, to the extent that this is attributable to the underlying wrong." RESTATEMENT OF RESTITUTION § 51, cmt. e. The Restatement makes clear that "profit" in the restitution context is *not* synonymous with the accounting definition of profit but "includes any form of use value, proceeds, or consequential gains that is identifiable and measurable and not unduly remote." RESTATEMENT OF RESTITUTION § 51(5)(a).

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

When it comes to deductions, the Restatement explicitly refutes BNSF's position: "the defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement. . . . By contrast, the defendant will not be allowed to deduct expenses (such as ordinary overhead) that would have been incurred in any event, if the result would be that defendant's wrongful activities—by defraying a portion of overall expenses—yield an increased profit from defendant's operations as a whole." RESTATEMENT OF RESTITUTION § 51, cmt h. In other words, if a defendant's wrongful activity makes up only a portion of its entire profitable endeavor, and it has other *legitimate*, revenue-generating components of its operations, treating fixed costs as a credit against defendant's wrongfully obtained revenues would result in a total net gain from the infringing activity. Doing so would reduce the proportion of the other legitimate revenue that would be required to pay the fixed costs that it would have incurred even in the absence of its tortious acts. To allow BNSF to claim a fixed cost deduction would effectively allow it to subsidize its legitimate activity with its unlawful activity over the Easement; BNSF would increase its overall profitability because less revenue from its legitimate activities would need to be utilized to pay its system-wide fixed costs.[3]

This tracks the approach taken by courts in the converse situation: lost profits cases, where damages are calculated by ascertaining lost revenue and deducting any avoided costs. *See e.g.*, *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 617–18 (3d Cir. 1989) ("The effect on net income must be measured by revenue lost less costs avoided. This translates into lost revenue less the variable cost of producing this lost revenue. Fixed or unavoidable costs are, by definition, unrelated to the individual income producing activity and thus are not relevant to the change in net profit calculation."); *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 382 (7th Cir. 1998) ("The court should not also allow recovery of the fixed costs

---

[3] In circumstances where the entirety of a defendant's operations involves wrongful conduct, then allocation of fixed costs could be appropriate because the fixed costs would support only the wrongful conduct. But that is not the case here.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1  . . . because the lost profit award has already put the company in the same position it would

2  have enjoyed if the contract had been performed: it has its profits net of avoidable costs, and it

3  can use all or part of that sum to defray fixed costs."); *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100

4  F.3d 462, 474 (6th Cir. 1996) ("In calculating its but-for condition, a plaintiff must deduct any

5  costs that it avoided as a result of being illegally excluded for a profitable opportunity. . . .

6  However, it need not deduct all costs incurred in association with that revenue, such as fixed

7  costs.").

8      Similarly, in the SEC's securities enforcement context, courts reject efforts by

9  defendants to deduct expenditures made from ill-gotten gains because the ability to make the

10  expenditure from the unlawful proceeds is itself a benefit. *S.E.C. v. Shaoulian*, 2003 WL

11  26085847, at *6 (C.D. Cal. May 12, 2003) ("Expenditures a defendant makes for his or her

12  own use from illegally obtained funds are counted against the defendant, precisely because he

13  or she benefited from those expenditures.").

14      Even in copyright and patent cases, where courts sometimes allow a defendant to deduct

15  a portion of fixed costs in determining the amount of statutory disgorgement damages, the

16  defendant must show specifically what fixed costs directly and *actually* contributed to the

17  infringement. *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984) ("An

18  award of infringer's profits is aimed in part at deterring infringements . . . . [which] can best be

19  achieved by allowing a deduction for overhead only when the infringer can demonstrate it was

20  of actual assistance in the production, distribution or sale of the infringing product.") (internal

21  citation omitted); *Spectravest, Inc. v. Fleet St., Ltd.*, 1989 WL 135386, at *7 (N.D. Cal. Aug.

22  23, 1989) ("To be a valid deduction, the expense must have "actually contributed" to the

23  infringing sales. . . . Defendant cannot deduct expenses which would occur whether the

24  particular item is sold or not."); *In re AI Realty Mktg. of New York, Inc.*, 293 B.R. 586, 619

25  (Bankr. S.D.N.Y. 2003) ("those fixed costs that assist in the production of infringing products

26  should be attributable to those products."); *Gibson Guitar Corp. v. Paul Reed Smith Guitars,*

27

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISGORGEMENT - 11
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1   *LP*, 325 F. Supp. 2d 841, 853 (M.D. Tenn. 2004) (allowing defendant to deduct fixed costs

2   "provided that a proximate and direct correlation is shown" and finding that any uncertainty

3   regarding such costs must be resolved in plaintiff's favor) (reversed on other grounds); *Burger*

4   *King Corp. v. Pilgrim's Pride Corp.*, 934 F. Supp. 425, 426 (S.D. Fla. 1996) ("To allow a

5   deduction from gross profits, Defendant must establish that the claimed expenses actually relate

6   to the sale and production of the infringing product."); *Sunbeam Prod., Inc. v. Wing Shing*

7   *Prod. (BVI) Ltd.*, 311 B.R. 378, 401 (S.D.N.Y. 2004), aff'd, 153 F. App'x 703 (Fed. Cir. 2005)

8   ("portions of fixed costs are deductible in calculating profit to the extent those portions can be

9   attributed to the infringing product.").

10      The Restatement provisions related to copyright infringement are particularly

11   illuminating:

12      If the defendant manufactures several products and is subject to liability for conduct
        relating to only one, the defendant's costs must be apportioned among the various
13      products. **Internal apportionments made by the defendant are not necessarily
        determinative. Only costs directly attributable to the production of the infringing
14      goods are deductible. Variable costs and any portion of general expenses that
        would not have been incurred if the infringing goods had not been produced are
15      properly deductible. If the manufacture and marketing of the infringing goods
        caused no increase in general expenses, no portion should be deducted in
16      calculating profits.** Thus, although normal accounting practice may allocate overhead
        and general expenses over all products, such an allocation is not necessarily appropriate
17      for purposes of determining the net profits for which the defendant must account. . . .

18

19   RESTATEMENT OF RESTITUTION § 37, cmt. h (emphasis added). This provides helpful guidance

20   here where rail traffic over the Reservation makes up only a small fraction of BNSF's overall

21   business operations and because BNSF is authorized to run *some* traffic over the Reservation.

22   Due to the incremental nature of BNSF's trespass, the revenues and variable costs associated

23   with each trespassing car can be identified using BNSF's own records; no estimation is needed.

24   BNSF has produced zero evidence to identify or even estimate what fixed costs *actually*

25   contributed to rail traffic over the Reservation. As discussed below, arbitrarily apportioning a

26

27

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - 12
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1  ratio of BNSF's overall, company-wide fixed costs to individual movements fails to meet any

2  standard for identifying deductible costs.

3        **B.  BNSF cannot deduct any portion of its fixed costs.**

4        Here, BNSF manufactures a movement-level allocation of its fixed costs to individual

5  trespass movements, something that BNSF's controller testified BNSF does not do in the

6  ordinary course of its business and which it has never done before. Palmarozzi Depo. 34:23-

7  35:8; 64:8-18; 77:4-7. BNSF then contends that it is entitled to deduct this arbitrary allocation

8  of its fixed costs from individual trespass revenues; it is wrong.

9        That BNSF could not have trespassed over the Reservation without some overhead

10  expense and infrastructure does not entitle it to deduct fixed costs. Had BNSF complied with

11  the Easement's terms, the burden on its infrastructure would simply have decreased, but its cost

12  would have remained the same. By requesting a fixed cost deduction, BNSF effectively asks

13  this Court to subsidize its company-wide lawful traffic with proceeds from trespassing over the

14  Reservation. Every dollar that BNSF generated from its trespass that was used to pay fixed

15  costs was one less dollar that BNSF needed to devote from its legitimate rail operations to pay

16  those same costs. If BNSF can deduct its allocated fixed costs, this would result in a net gain to

17  BNSF.[4] As a matter of law this must be rejected.

18        But the undisputed facts also preclude a fixed cost deduction. While an appropriate

19  allocation of fixed costs is normally a question of fact, BNSF has not identified a single fixed

20  cost that was necessary for operation of the trespassing traffic. *See* Palmarozzi Depo. 69:15-19;

21  74:23-76:16. Instead, BNSF seeks an allocation of its *company-wide* fixed costs incurred in all

22  28 states in which BNSF operates. Brain Decl. Ex. 12. This cannot meet BNSF's burden to

23  identify the fixed costs directly associated with or that actually assisted in running the trespass

24  _____

25  [4] Alternatively, the Court could allow BNSF to allocate a portion of its fixed costs to the trespassing traffic, but then it would need to add the net increase in its overall operating profit to the disgorgement award to capture the entire benefit retained by BNSF. Restatement (Third) of Restitution § 51(5)(a)

26  ("profit includes any form of use value, proceeds, or consequential gains . . ."). Either way, the outcome is the same.

27

**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

traffic. The costs BNSF seeks to allocate here are paid from the total contribution of all of BNSF's rail traffic within its system. For internal management purposes *only*, BNSF engages in a quarterly top-down allocation of its fixed costs to its four operational business units: consumer, agricultural, industrial, and coal.[5] Palmarozzi Depo. 32:12-33:1. Through this exercise, BNSF assigns a portion of fixed costs to each of its business units. *Id.* at 46:24-47:22. BNSF does this to evaluate the relative profitability of each business unit as it makes business decisions. *Id.* at 53:24-54:17. BNSF does not assign any fixed costs to individual movements, nor does it calculate "profit" for individual movements. *Id.* at 34:11-14; 34:23-35:8; 64:8-18; 77:4-7. Any allocation of fixed costs to an individual movement is inherently arbitrary because there is no direct correlation between the cost and the activity. Brain Decl., Ex. 3 at 15–16; Ex. 5 at 18, 22–29, 38–40.

But more importantly, BNSF cannot meet its burden to show that any of these fixed costs have any relationship to the trespass traffic because it *already* allocated the variable component of any fixed costs to these movements. BNSF captures all costs as they occur and undertakes complex studies on a regular basis to determine the variability component of every cost—including overhead costs. Palmarozzi Depo. 50:7-51:4. Therefore, to the extent that *any* cost has a variable component, BNSF has already determined and included it as a variable cost within its ABS system. *Id*. BNSF has not identified any additional fixed costs associated with rail traffic over the Reservation, and makes no effort to identify and allocate specific fixed costs that have a direct correlation or actually contributed to running the trespassing traffic over the Reservation. Likewise, BNSF cannot identify any fixed costs that decreased after bringing its rail operations over the Reservation into compliance with the Easement's express volume

---

[5] Beginning in 2020, BNSF combined the industrial and coal business segments into a single unit for management purposes. Palmarozzi Depo. 46:7-16.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISGORGEMENT - 14
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

1   limitations. *Id.* at 69:15-19; 74:23-76:16. This is fatal to BNSF's efforts to deduct further, non-

2   variable fixed costs.[6]

3       Accordingly, as a matter of law, BNSF is not entitled to a deduction of fixed costs from

4   its revenues to determine its ill-gotten gains from trespassing on the Reservation.

5                **C.  BNSF cannot deduct any portion of its interest expense.**

6       BNSF also seeks to deduct a portion of its system-wide interest expense—money it

7   pays on company-wide debts—from its trespass revenues. Like fixed costs, any deduction of

8   interest expense would be entirely inappropriate and would result in a net gain to BNSF

9   because this expense would have been incurred anyway. Moreover, BNSF identifies no

10  connection between any of the interest expense it seeks to deduct and its trespassing operations

11  over the Reservation. BNSF cannot make a credible argument that paying its debt interest was a

12  prerequisite to its trespass. *Monster Energy*, 533 F. Supp. 3d at 938 (declining to deduct interest

13  expenses that had no discernable relationship to and did not actually contribute to the sale of

14  infringing products). Indeed, BNSF's expert testified that BNSF does not even assign its

15  company-wide interest expenses to its individual business operating groups. Baranowski Depo.

16  52:15-23; 72:5-73:15. And BNSF's controller testified that BNSF does not internally assign

17  any interest expense to individual movements. Palmarozzi Depo. 64:8-18. BNSF's attempt to

18  do so here is not only legally impermissible but does not even align with BNSF's own internal

19  accounting procedures. The allocation and deduction of any interest expenses to the trespass

20  traffic must be rejected as a matter of law.

21          **D.  BNSF cannot deduct its income taxes paid on revenues earned from**
22               **trespassing over the Reservation.**

23      BNSF also seeks to deduct a portion of its income taxes from its trespass revenues. This

24  is barred as a matter of law for two reasons.

25

---

26  [6] Even if BNSF could identify any fixed costs specific to the rail line or the Anacortes spur that serves
    the Fidalgo refineries, because BNSF is permitted to run *some* traffic over the Reservation, any fixed
27  costs incurred on the line should be borne by this legitimate traffic.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - 15
Case No. 2:15-cv-00543-RSL

1    First, courts routinely recognize that payment of income taxes is collateral to the receipt

2    of the gain and that in the disgorgement context, income taxes may not be deducted to reduce

3    disgorgement liability because what a defendant ultimately does with its ill-gotten gains is

4    irrelevant. Again, cases arising out of the copyright and patent context and SEC enforcement

5    actions are instructive. In copyright and patent cases, courts distinguish between good faith and

6    bad faith infringers, precluding conscious and deliberate actors—like BNSF—from deducting

7    income taxes from disgorgement awards. "It is settled law that the income tax paid on profits is

8    not deductible where infringement was conscious and deliberate." *In Design v. K-Mart Apparel*

9    *Corp.*, 13 F.3d 559, 566–67 (2d Cir. 1994) (citing *L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr.,*

10   *Co.*, 277 U.S. 97 (1928)); *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 106 (2d

11   Cir. 1951); *Sheldon v. Metro–Goldwyn Pictures Corp.*, 106 F.2d 45, 53 (2d Cir. 1939); *In re*

12   *Weaver*, 219 B.R. 890, 902 (Bankr. D. Mont. 1998) (declining to allow deduction of income

13   taxes where debtor willfully and deliberately infringed on trademark).

14   In SEC enforcement actions, courts deny efforts to deduct income taxes paid on

15   unlawfully obtained gains, even for defendants who acquired the benefits in good faith. *See*

16   *Donell v. Kowell*, 533 F.3d 762, 779 (9th Cir. 2008) (declining to allow good faith investors in

17   a Ponzi scheme to offset disgorgement by amounts paid in federal income taxes); *see also*

18   *S.E.C. v. U.S. Pension Tr. Corp.*, 444 F. App'x 435, 437 (11th Cir. 2011) ("The court's

19   disgorgement figure was a reasonable approximation of the amount necessary to deprive the

20   Individual Defendants of their ill-gotten gains. . . . We know of no authority, and the Individual

21   Defendants cite none, requiring the court to deduct from the disgorgement figure the amount of

22   ill-gotten gains paid to the government in income tax."); *S.E.C. v. Merch. Cap., LLC*, 486 F.

23   App'x 93, 96–97 (11th Cir. 2012) (declining to allow deduction of income taxes paid on

24   salaries received); *S.E.C. v. Huff*, 2011 WL 1102777, at *6 (S.D. Fla. Mar. 23, 2011) ("courts

25   have also disgorged sums from defendants in amounts equal to ill-gotten gains used to pay

26   income taxes. . . . The idea behind doing so comports with the premise of disgorgement not to

27

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - 16
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ♦ FAX 206.682.2992

allow an individual to enjoy ill-gotten gain in that where a person receives income, payment of the income tax on that income bestows a benefit upon the person who received the income: but for the use of the improperly-obtained monies to pay the tax liability on the income, the person receiving the income would have had to have paid the taxes on the sum. In other words, it matters not how the ill-gotten gains were ultimately expended, so long as the spending of the ill-gotten gains bestowed a benefit on the person from whom the monies are to be disgorged.") (internal citations omitted); *S.E.C. v. Kara*, 2016 WL 794886, at *5 (N.D. Cal. Mar. 1, 2016) ("Although the taxes are related to ill-gotten gains, taxes are collateral to the illegal transactions, not an integral part of it. The collateral nature of tax liability is illustrated by the fact that the precise tax due could be affected by other financial factors (e.g., other reported income, deductions, tax credits, etc.) unrelated to the ill-gotten gains.").

Second, allowing an income tax deduction would result in a net gain to BNSF. The Restatement recognizes "[t]he defendant is normally denied a credit for income taxes paid . . . . to avoid a distortion resulting from the net effect of the judgment on the defendant's future tax liability." RESTATEMENT OF RESTITUTION § 51, cmt. h. In other words, because BNSF will be able to deduct any judgment from its revenues for the year in which the judgment is paid, the increase in taxes paid in the years 2012 through 2021 will be offset by the corresponding reduction in taxes for the year it pays the judgment. To the extent that there are variances in the tax code that conceivably could result in BNSF not breaking even on taxes, it should be able to deduct those losses. 26 U.S.C. § 172; *see also Schnadig Corp. v. Gaines Mfg. Co.*, 620 F.2d 1166, 1169 (6th Cir. 1980) (granting disgorgement on pre-tax profits). It would therefore be improper for BNSF to deduct income taxes to determine its gains subject to disgorgement. Moreover, while BNSF's ability to deduct a disgorgement judgment from its taxes will be subject to then-applicable tax laws and regulations, the Tribe is not aware of any restriction on BNSF's ability to deduct the disgorgement award and any uncertainty on this issue must be resolved against BNSF. RESTATEMENT OF RESTITUTION  § 51(5)(d); *S.E.C. v. Koenig*, 532 F.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISGORGEMENT - 17
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

Supp. 2d 987, 994 (N.D. Ill. 2007) (acknowledging the possibility the defendant may obtain future tax deductions but leaving the decision for the defendant to work out with the IRS).

Accordingly, the Court should find as a matter of law that BNSF cannot deduct its income taxes paid on ill-gotten revenues to reduce its disgorgement liability.

**III.     BNSF is not entitled to any allocation-based reduction of its ill-gotten gains.**

To further reduce its liability, BNSF seeks to apportion the gains earned from trespassing over the Reservation, claiming this would to account for the fact that the tracks across the Reservation make up only a fraction of the total distance travelled by each trespassing car.

While the Restatement acknowledges that apportionment *may* be appropriate in cases where *some* part of the profit would have been realized even if the defendant had not engaged in misconduct, that principle does not and cannot apply in the way BNSF proposes. The Restatement asks: "When the net profit in question has been realized in part as a result of the wrong to the claimant and in part from the defendant's legitimate activities—so that some part, at least, of the defendant's profit *would have been realized in the absence of the wrong*—what proportion of the net profit is attributable to the wrong to the claimant?" RESTATEMENT OF RESTITUTION § 51 cmt. g (emphasis added). To that end, the Restatement recognizes that while "the court may . . . make such apportionments . . . as reason and fairness dictate" it must do so "consistent with the object of restitution" "to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty." RESTATEMENT OF RESTITUTION § 51(4), (5).

Here, the Tribe does not seek to disgorge BNSF's gains from traffic authorized under the Easement. Accordingly, in calculating BNSF's gains from unauthorized traffic, the Tribe carefully excluded trains and cars that fell within the Easement's one train of 25 cars or less per day restrictions—even if the train violated these limitations. For example, if the only train BNSF ran across the Easement on a particular day was a local train of 30 cars, the Tribe calculated the revenues associated with the 5 excess cars, while excluding revenues from the

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - 18
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1  first 25 cars, even though the entire train technically violated the Easement. Thus, the only

2  appropriate apportionment necessary to ensure BNSF's liability is limited to its ill-gotten gains

3  and is not a penalty has already been accomplished for in the agreed revenue figures.

4        BNSF, however, wants to take the apportionment concept even further. It posits that

5  because it can lawfully transport rail traffic over every other portion of the routes leading to the

6  Fidalgo refineries, its "profits" attributable to the trespass should be calculated based on a some

7  ratio of the entire route. BNSF's expert suggests three different allocation methodologies: a

8  pro-rata approach (whereby the length of the Easement is divided by the total length of each

9  trespassing car's route with that resulting ratio multiplied against the total revenues less

10 variable costs and the fixed costs, interest expense, and income taxes assigned to the movement

11 by BNSF); an Average Total Cost ("ATC") based allocation used by the STB in rate making

12 disputes, whereby the total route is segmented based on the average total of service over

13 respective segments are compared to the total cost of the route using the STB's Uniform Rail

14 Costing System ("URCS"); and a 100-Mile Block based allocation, also used by the STB in

15 ratemaking and allocating revenues between multiple carriers engaged for a single shipment,

16 whereby the route is segmented into 100-mile blocks. Brain Decl. Ex 4 at 10–17.

17       Although the Tribe contests the reliability and appropriateness of any of BNSF's three

18 allocation methodologies,[7] *see* Brain Decl. Ex. 5 at 36–40, the Court need not consider the

19 specific contours of BNSF's approaches because all three fail for one simple reason: BNSF

20 would not have earned *any* profit from the excess trains and cars had it not trespassed over the

21 Reservation. Simply dividing the rail line into trespassing and non-trespassing segments does

22 not change the reality that the refineries only paid BNSF because it brought the trains and

23 carloads directly their doorstep—which required crossing the Reservation.

24

25

26 [7] Indeed, they are all dead on arrival because all three assume that the question can be reduced to a
   simple matter of allocating total route revenue—which assumes, in turn, that BNSF had the ability to
27 cross the Reservation and complete the deliveries in the first place. It did not.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - 19
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1    During the liability phase trial, Cary Hutchings testified that if BNSF were not

2   permitted or able to move trains and rail cars over the Easement, it would not be physically

3   possible for BNSF to transport anything to the Fidalgo refineries directly by rail. Brain Decl.,

4   Ex. 9. BNSF does not, nor can it, dispute that the only way it can service the Fidalgo refineries

5   directly by rail is by crossing the Reservation. Practically speaking, the refineries would not

6   pay BNSF for an incomplete delivery to the edge of the Reservation, thus no part of its

7   trespassing profits "would have been realized in the absence of the wrong." RESTATEMENT OF

8   RESTITUTION § 51 cmt. g. BNSF's own internal accounting protocols reflect this reality.

9   BNSF's controller testified that BNSF does not take any revenue until the movement is

10   completed—i.e., delivered to the shipper. Palmarozzi Depo. 13:21-14:3. If BNSF does not earn

11   any revenue until the shipment is complete, then it generates no "profit" until the shipment is

12   complete. Here, the only way BNSF could complete the shipments was by crossing the

13   Reservation. BNSF cannot apportion "profit" that it could not—and indeed did not—realize

14   until after it trespassed over the Reservation.

15    Indeed, any apportionment proposal would necessarily and impermissibly disregard the

16   fundamental tenet of disgorgement for willful misconduct. RESTATEMENT OF RESTITUTION §

17   51(4), (5) (2011). Only disgorgement of *all* profits generated by excess rail traffic over the

18   Easement meets this objective, otherwise BNSF would still benefit from its misconduct.

19   BNSF's apportionment proposal would result in it retaining between 95% and 99.9% of the

20   gains generated by its trespasses. *Compare* Brain Decl., Ex. 7 (agreed contribution) *with* Ex. 8

21   (proposed apportionment calculations).

22    Nor does this approach penalize BNSF; BNSF still retains its profits from activity in

23   compliance with the Easement and it breaks even on non-compliant activity by keeping the

24   revenue used to pay variable costs. That is, BNSF is not penalized because it does not sustain a

25   loss.

26

27

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1    No matter what profit apportionment methodology BNSF suggests, because BNSF

2    would have realized zero revenue had it not trespassed over the Easement, any attempt to

3    apportion profits to the segment of BNSF's routes that cross the Reservation is barred as a

4    matter of law.

5    **IV.     *Enbridge* does not support a finding that BNSF should retain its ill-gotten gains.**

6    Ignoring all authorities to the contrary, BNSF will undoubtedly point to the trial court's

7    decision in *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River*

8    *Reservation v. Enbridge Energy Co.*, No. 19-cv-602-wmc, 2023 WL 4043961 (W.D. Wis. Jun.

9    16, 2023) ("*Enbridge*") as support for its accounting definition of profit (*i.e.*, deducting fixed

10   costs, interest expenses, and taxes) as well as the argument that it should be allowed to limit its

11   disgorgement through apportionment. This reliance is misplaced.

12   The *Enbridge* case is at best superficially similar. It involves an Indian tribe, a federally

13   issued easement under the IRWA, and conscious, willful, and knowing trespass over tribal land

14   to transport an energy product. The similarities, however, stop there. Unlike the present case,

15   *Enbridge* involved a complex mix of easements of varying terms over both land wholly owned

16   by the Bad River Band itself and over allotments in shared ownership by individual Native

17   Americans and the Band. *Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad*

18   *River Rsrv. V. Enbridge Energy Co., Inc.*, 626 F. Supp. 3d 1030, 1037–41 (W.D. Wis. 2022). In

19   the early 1990s, the Band issued a fifty-year easement renewal to Enbridge Energy to run a

20   crude oil and natural gas pipeline over its wholly-owned reservation land in Northern

21   Wisconsin. *Id.* However, the Bureau of Indian Affairs had only been willing to simultaneously

22   approve twenty-year easement renewals over the allotted parcels, resulting in a patchwork of

23   expiration dates. *Id.* During that twenty-year period, the Tribe re-acquired interests in some of

24   the allotted parcels that were burdened by the easement. *Id.* The 70-year-old pipeline crossing

25   these parcels—Line 5—is only one part of a larger international pipeline system that transports

26   23 million gallons of crude oil daily. *Enbridge*, at *2.

27

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - 21
Case No. 2:15-cv-00543-RSL

In 2013, Enbridge's twenty-year easements over the allotted parcels expired and the parties engaged in negotiations for a possible renewal of the allotment easements. *Enbridge*, at *2. Simultaneously, significant flooding caused changes at the "meander" where Line 5 crossed the Bad River, including substantial soil erosion that exposed the pipeline. *Id*. at *3. In January 2017, the Band passed a resolution definitively stating that it would not agree to renew the allotment easements for the pipeline, principally because of its growing concern that the pipeline would rupture and cause catastrophic damage to adjacent river and watersheds. *Id*. at *2. Nevertheless, Enbridge continued to operate Line 5 over the Band's objections. *Id*. at *15.

After finding that Enbridge consciously, willfully, and knowingly trespassed on the Bad River Reservation, the court had to determine the ill-gotten gains obtained by Enbridge from this trespass. *Id*. at *14–18. Unlike this case, where BNSF's contribution generated by the trespassing traffic across the Easement can be isolated and calculated to a near certainty, in *Enbridge* the pipeline at issue is part of a larger, connected system that operates throughout the Midwest and parts of Canada. *Id.* Accordingly, Enbridge's accounting is system-wide. In other words, the *Enbridge* court could not calculate disgorgement based on evidence identifying the ill-gotten gains generated specifically by Line 5 because that evidence did not exist. *Id*. Unable to carve out Line 5 revenue or variable costs, the court made an allocation of the total accounting profits generated by Enbridge during the trespass period premised on the rough depreciation Enbridge allocated to the Line 5 portion of the system. *Id*. This necessarily included deductions for Enbridge's fixed and overhead costs. *Id.* Critically, the Band did not refute this approach, nor did it offer any alternative method of calculating revenue or variable costs.

*Enbridge* does not articulate *the* formula for calculating disgorgement in a willful trespass case. It exemplifies one court's approach to solving a complex problem posed by Enbridge's lack of documentation to determine trespass profits with certainty—a problem not present in this case. Here, the Court need not engage in this imprecise, top-down analysis

1    because BNSF maintains highly detailed records of both revenues and all variable costs

2    associated with all of its movements, including the identifiable trespass movements.

3          The Court should also decline to follow *Enbridge*'s profit allocation because it benefits

4    a willful trespasser, contrary to established law. After the court in *Enbridge* estimated the profit

5    reasonably attributable to Line 5, it went further and multiplied the total Line 5 profit allocation

6    by .0036 (reflecting the percentage of Line 5 that trespassed over tribal parcels) and then *again*

7    by the Band's fractional interest in each of those parcels. *Enbridge*, at *17. The court in

8    *Enbridge* provided no explanation, rationale, or citation to relevant legal authorities in support

9    of this allocation method, *id.*, which is roughly equivalent to the "pro rata" allocation promoted

10   by BNSF and Mr. Baranowski. Not coincidentally, this allocation approach would allow BNSF

11   to retain 95% to 99.9% of its trespass profits.

12         To the extent *Enbridge* allowed a willful trespasser to retain ill-gotten gains by

13   "deducting" fixed costs and generously allocating profits, the case was wrongly decided. At

14   most, *Enbridge* reflects a single trial court's determination of ill-gotten gains under the

15   specific—and distinguishable—facts of that case; it does not provide a *rule* for defining or

16   apportioning trespass profits. Indeed, the Bad River Band has appealed this portion of the

17   court's decision based on its failure to adhere to the disgorgement and restitution principles set

18   forth in relevant case law and the Restatement.

19                                          **CONCLUSION**

20         BNSF consciously, willfully, and knowingly trespassed over the Reservation—over the

21   Tribe's express and repeated objections—for nearly a decade. During that period, it generated

22   nearly $445 million in contribution, which represents BNSF's ill-gotten gains *before*

23   adjustment to present-day dollars. Any attempt by BNSF to deduct its fixed costs, interest

24   expense, and income taxes from its contribution must be rejected as a matter of law. Further,

25   BNSF's request to apportion profits generated over trespassing and non-trespassing segments

26   of its route cannot be supported as a matter of law or fact. The Court should therefore grant the

27

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - 23
Case No. 2:15-cv-00543-RSL

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

1   Tribe's motion partial summary judgment and hold the sole remaining issue for trial is the

2   appropriate rate to apply to calculate net present value and/or prejudgment interest.

3

4          DATED this 29th day of March, 2024.

5

6                                    I certify that this memorandum contains 8,292 words, in
                                     compliance with the Local Civil Rules.

7                                    **TOUSLEY BRAIN STEPHENS PLLC**

8                                    By:  *s/Christopher I. Brain*
                                     By: *s/Chase C. Alvord*

9                                    By: *s/Rebecca L. Solomon*
                                         Christopher I. Brain, WSBA #5054

10                                        cbrain@tousley.com
                                         Chase C. Alvord, WSBA #26080

11                                        calvord@tousley.com
                                         Rebecca L. Solomon, WSBA# 51520

12                                        rsolomon@tousley.com
                                         1200 Fifth Avenue, Suite 1700

13                                        Seattle, Washington  98101

14                                        Telephone:  206.682.5600/Fax: 206.682.2992

15                                   **OFFICE OF THE TRIBAL ATTORNEY,**
                                     **SWINOMISH INDIAN TRIBAL COMMUNITY**

16

17                                   By:  */s/ Stephen T. LeCuyer*
                                         Stephen T. LeCuyer, WSBA #36408

18                                        slecuyer@swinomish.nsn.us
                                         Weston R. LeMay, WSBA #51916

19                                        wlemay@swinomish.nsn.us
                                         11404 Moorage Way

20                                        LaConner, WA  98257

21                                        Telephone:  360.466.1058
                                         Fax: 360.466.5309

22

23                                   *Attorneys for Plaintiff*

24

25

26

27

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
DISGORGEMENT - 24
Case No. 2:15-cv-00543-RSL