HONORABLE ROBERT S. LASNIK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

SWINOMISH INDIAN TRIBAL
COMMUNITY, a federally recognized
Indian Tribe,

                              Plaintiff,

        v.

BNSF RAILWAY COMPANY, a
Delaware corporation,

                              Defendant.

No. 2:15-cv-00543-RSL

BNSF RAILWAY COMPANY'S
REPLY IN SUPPORT OF THE
MOTION TO STRIKE OR IN THE
ALTERNATIVE PERMIT
ADDITIONAL WITNESSES

BNSF RAILWAY COMPANY'S
MOTION TO STRIKE REPLY
2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## I.    INTRODUCTION

The Court should reject the Tribe's effort to inject an eleventh-hour dispute about the hypothetical availability of barging in a counterfactual world where BNSF and Marathon would have barged while BNSF was still trespassing. That dispute is irrelevant: The question for determining whether apportionment is needed is whether BNSF has met its burden of showing that some profit would have been earned without trespassing. The stipulated facts, market realities, and testimony of Michael Baranowski provide a sufficient basis to conclude that BNSF would have earned some profit and that distance-based apportionment is required. Indeed, Mr. Baranowski, in rebuttal to Daniel Fapp's failure to apportion at all, analyzed historical information from 2021 to show that BNSF in fact used an alternative route that was profitable. In contrast to the Tribe's proposed evidence regarding a hypothetical, BNSF's evidence reflects what BNSF actually did.

The Tribe's claim that its belatedly disclosed evidence is necessary to rebut Mr. Baranowski's testimony makes no sense. Mr. Baranowski's rebuttal report opining on the profitability of barging in 2021 was disclosed *four months ago*, on February 16, 2024.  Indeed, the Tribe itself did not think this issue was relevant until just a few days ago. The Tribe's late effort to introduce the testimony of Mr. Tangaro and new Zenith documents without proper disclosure is a sufficient and proper basis for exclusion.

If the Tribe's counterfactual inquiry is relevant, however, BNSF should be permitted to respond with evidence of its own, since the Tribe's theory that BNSF had no alternatives to the trespass for the duration of the period is wrong. There is ample evidence to show that barging to Fidalgo was an available alternative, including evidence that BNSF could have utilized a combination of specific permitted barging facilities, such as Seaport Sound TransMontaigne at the Port of Tacoma and Global, at Port Westward, as well as the Arc/Zenith facility BNSF ultimately did use (which was able to ship crude as early as 2013 or 2014). The Tribe's unsupported arguments about other practical barriers to barging are readily disproved with evidence that BNSF was in fact already participated in rail-to-barge transport of crude to a facility on the East Coast during the 2012-2021 time period.

BNSF RAILWAY COMPANY'S
MOTION TO STRIKE REPLY - 1
2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

BNSF can also offer evidence that, beyond barging to Marathon, BNSF could have sold the crude to another customer, since Bakken crude was a fungible commodity for which demand exceeded supply during the relevant period—a period described as the "Bakken Boom" for precisely this reason. This is not a mere hypothetical: The evidence will show BNSF could have transported the crude directly by rail to other customers in the Pacific Northwest, such as Cherry Point (P66), Par Pacific (US Oil), or Arco (BP). Alternatively, BNSF could have railed crude oil to the East Coast, for example to Philadelphia Energy Solutions or PBF Energy; to Houston or the Gulf Coast; or even to Bakersfield, Stroud, or St. James, where it would be piped to further destinations. Evidence will further show that, although profitably would naturally have varied some based on distance from origin to destination and market dynamics, these alternatives would have yielded a comparable or slightly lower profit to what BNSF in fact earned during the relevant period. The Tribe has now agreed that BNSF may call Mr. John Hack from Marathon to testify about alternatives to the trespass. If BNSF is permitted to rebut the Tribe's testimony (as the Tribe now allows), BNSF should also be permitted to call Mr. Hutchings from BNSF, who was a disclosed and deposed fact witness in the case, and can provide additional unique testimony on this issue.

One way or the other, the Tribe cannot prevail on the new issue it raises. Either the Court should hold that the hypothetical counterfactual inquiry is irrelevant, since BNSF has satisfied its threshold burden to show that it would have profited absent the trespass, and thus that some reasonable distance-based apportionment is required. Or the Court should consider the issue in full and allow BNSF to present evidence to disprove the Tribe's unreasonable position that BNSF would have let valuable crude oil sit forever in North Dakota rather than finding some way to profit from it without trespassing.

## II.     ARGUMENT

### A.     The Court Should Exclude Mr. Tangaro and the Zenith Documents

As BNSF explained in its motion to strike, the Tribe's last-minute attempt to introduce Mr. Tangaro and the Zenith documents is both irrelevant and improper. If Mr. Tangaro's testimony is

BNSF RAILWAY COMPANY'S
MOTION TO STRIKE REPLY - 2
2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

true—*it is not*, as discussed in detail below—that testimony should not change this Court's conclusion that "some distance-based apportionment can be found." Dkt. 260 at 13. After the trespass ceased, BNSF found an alternative way to continue to make some profit from transporting Bakken crude. That alone "suggests some division," confirming that apportionment is required and providing "a springboard" for distance-based apportionment. *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 829 (9th Cir. 1985). Mr. Tangaro's speculative claims about two specific facilities before BNSF and Marathon *ever tried* to find an alternative does not change this.

Even were the Tribe's testimony relevant, it is not properly before the Court. The Tribe never adequately disclosed Mr. Tangaro on this topic (even though he was called to testify in the first trial) and this Court recognized that the barging alternative has long been in the record—indeed, this Court recently noted: "that Bakken crude oil can be transported to the March Point refineries without crossing the Reservation w[as] *known at the time of the liability trial in March 2023*." Dkt. 261 at 2-3 (emphasis added); *see also* Dkt. 260 at 6; Trial Ex. 30 at 3 (evidence of BNSF building port facilities from Phase One trial); Trial Exs. 524-25 (excerpts from Bakken Boom presentation). But the Tribe never propounded discovery on the issue, and is instead engaged in an eleventh-hour effort to revise its trial strategy while preventing BNSF from responding.

The Tribe argues now that Mr. Tangaro was identified as a witness in an early draft of the pretrial order on "virtually the same issues." Tribe's Resp. at 9. Not so. Mr. Tangaro was identified by BNSF to testify about the barging alternative that BNSF has *actually* used, not historical hypotheticals. His testimony was unnecessary once the Tribe agreed to stipulate that BNSF started transporting crude via barge in 2019. *See* Dkt. 258 at 14. Now the Tribe wants to use that limited identification to bring in undisclosed, undeveloped evidence about the feasibility of barging in a counterfactual world where BNSF and Marathon would have barged while BNSF was still trespassing—including about the Vancouver Energy project, Marathon's purposes for unloading crude at Zenith in 2019, and the volume of barging—without allowing BNSF to respond. None of

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

this testimony is "virtually the same" as testifying to what BNSF *actually did* when the trespass ceased.

The Court should exclude the Zenith documents for the same reasons. The Tribe argues its disclosure was late because "the Tribe did not know about" the documents until Memorial Day weekend. *See* Tribe's Resp. at 12. But the Tribe learned about the barging alternative from Mr. Tangaro in Phase One of the trial, *in 2021*, and there was nothing preventing the Tribe from discovering and disclosing the Zenith documents earlier. *See* Dkt. 235-4 at 28. Likewise, Mr. Baranowski's rebuttal report discussing the profitability of barging in 2021 was disclosed to the Tribe on February 16, 2024. The Tribe offers no reason why it waited four months to disclose this evidence in response. Furthermore, his testimony regarding the profitability of barging in 2021 was itself offered in response to Mr. Fapp's opinion that no profit should be attributed to BNSF's lawful trespass. Mr. Baranowski therefore showed that the barge opinion *in 2021* was viable and profitable. Baranowski Rebuttal Rep. at 19. Mr. Baranowski did not state or imply that barging was an available alternative during the time of the trespass.

### B.     The Court Should Permit Cary Hutchings and John Hack to Testify

If the Court decides that Mr. Tangaro's testimony and the Zenith documents are relevant to show (inaccurate) counterfactuals relating to barging alternatives for the duration of the trespass, BNSF at the very least should be permitted to respond in kind with accurate historical facts. Indeed, the Tribe now accepts that BNSF may call Mr. Hack—admitting that BNSF is entitled to *some* response—but tries to narrow BNSF's response by excluding Mr. Hutchings and limiting both witnesses' testimony.

Here is a summary of the unique testimony these respective witnesses will each provide if permitted given their respective roles at BNSF and Marathon:

- BNSF could have facilitated rail delivery to a facility that would then have shipped some Bakken crude oil beginning as early as 2013 or 2014 (e.g., Zenith).

- Arc Terminals, Zenith's predecessor, applied for a permit in 2014 to build an offloading facility capable of handling 44 cars and received that permit in 2015.

BNSF RAILWAY COMPANY'S
MOTION TO STRIKE REPLY - 4
2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

- If BNSF and Marathon had needed the Zenith option sooner, it would have worked with them to accelerate development.

- There was a sufficient supply of Jones Act compliant barges available at the time.

- BNSF could also have shipped to the Port of Tacoma Seaport facility and the Port Westward/Global facility, both of which had permits at the relevant times. These facilities, in combination with Zenith, were capable of handling a comparable volume of crude that BNSF transported to Fidalgo.

- BNSF was part of a crude-by-rail movement for the shipment of crude to a barging-capable facility on the East Coast during the trespass (the Delta Monroe facility in Eddystone, PA).

- Bakken crude was a fungible commodity and could have been sold to another customer. The demand for Bakken crude oil during the "Bakken boom" exceeded supply.

- BNSF's network of delivery of Bakken is nationwide, and while the trespass route was profitable, it was not unusually so.

- BNSF could have railed additional Bakken crude to Pacific Northwest customers at Cherry Point (P66), Par Pacific (US Oil), or Arco (BP).

- BNSF also could have participated in a crude-by-rail movement railing Bakken crude to the East Coast, for example Philadelphia Energy Solutions or PBF Energy; to Houston or the Gulf Coast; or to Bakersfield, Stroud, or St. James where the crude would have gone into a pipeline.

- Depending on which alternative was used, BNSF would have generated comparable or slightly less profit than it did transporting crude to Fidalgo.

- The Optimization department at Marathon would have been responsible for figuring out how to get the Bakken crude oil to Fidalgo, with or without the Zenith option.

- Throughout the trespass period, Marathon wanted as much Bakken crude as it could get, and Marathon would have worked with BNSF to get that crude by any means possible, at any refinery possible.

BNSF RAILWAY COMPANY'S
MOTION TO STRIKE REPLY - 5
2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

This evidence is directly responsive to the issues the Tribe seeks to raise through the testimony of Mr. Tangaro and it disproves the unavailability of alternative means for BNSF to profit from the crude from 2012—including by barging it to Fidalgo. If the Tribe is allowed its testimony, it can have no excuse for excluding or limiting BNSF's. The Tribe recognizes this when it comes to Mr. Hack, who the Tribe accepts may testify, but the Tribe changes its tune when it comes to Mr. Hutchings, who was previously disclosed and deposed, meaning that the Tribe cannot claim any prejudice from his testimony. The Tribe contends that "BNSF already attempted to disclose Mr. Hutchings on these subjects in the pretrial order, confirming that BNSF knew that his knowledge may be relevant." Tribe's Resp. at 14. But the point of Mr. Hutchings testimony at that point was only to make clear that barging was in fact happening and thus rail was not the only way to get crude to Fidalgo. When the Tribe agreed to a stipulated fact to that effect, BNSF withdrew Mr. Hutchings per agreement with the Tribe and also withdrew Mr. Tangaro as that was the limited scope of his potential testimony as well. But to respond to Mr. Tangaro's current proposed testimony, which is not "virtually the same" as his disclosure, Mr. Hutchings' testimony necessarily will exceed his initially disclosed subjects. It is the Tribe that seeks to inject this issue into the case. If the Tribe believed it was relevant, it had every opportunity to pursue it when Mr. Hutchings was deposed. Or when he testified in Phase One of the trial, including about alternate destinations for delivery of crude oil out of North Dakota. Trial Testimony of Cary Hutchings (Trial Tr. 21:22-23:1) (noting that crude oil from North Dakota was sent to refineries in Oklahoma, Louisiana, the East Coast, and the West Coast).

Moreover, if historical alternatives are relevant, there is no reason to limit the evidence to barging. The Tribe suggests that this Court already limited BNSF's testimony in this regard and additional testimony would prejudice the Tribe. *See id.* (claiming Dkt. 275 excluded "testimony on other locations or customers"). But in this Court's order on the Tribe's Daubert motion, the Court prohibited *Mr. Baranowski* from offering *expert testimony* about alternative markets for lack of adequate support. Dkt. 261 at 5; *see also* Dkt. 275 at 1 ("BNSF may not offer *expert testimony* regarding other potential customers or destinations for Bakken crude." (emphasis added)). But

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

neither Mr. Hutchings nor Mr. Hack are expert witnesses; they are fact witnesses, and they have the requisite knowledge to testify to alternative routes and customers. Finally, in the Court's order regarding the Tribe's motions in limine, the Court stated BNSF would "not be permitted to offer" undisclosed "evidence related to the profitability of shipping only to the Columbia River," only if it would prejudice the Tribe. Dkt. 275 at 2. But any testimony regarding the profitability of shipping only to the Columbia River was disclosed. And the rest of Mr. Hutchings and Mr. Hack's testimony is proper rebuttal that will not prejudice the Tribe.

The Tribe asks this Court to handcuff BNSF and deprive it of any meaningful defense. If this Court thinks the feasibility of barging through the specific facilities in Portland and Vancouver is relevant, then BNSF must be allowed to present its evidence that it was feasible.

## III.    CONCLUSION

The Court should grant BNSF's motion.

I certify that this memorandum contains 2,375 words, in compliance with the Local Civil Rules, including specifically LCR 7(f)(4).

DATED this 2nd day of June, 2024.

PACIFICA LAW GROUP LLP

By: */s/ Paul J. Lawrence*
   Paul J. Lawrence, WSBA #13557
   Kai A. Smith, WSBA #54749
   Meha Goyal, WSBA #56058

*Attorneys for Defendant BNSF Railway*

BNSF RAILWAY COMPANY'S
MOTION TO STRIKE REPLY - 7
2:15-cv-00543-RSL

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750