UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SWINOMISH INDIAN TRIBAL COMMUNITY,<br><br>Plaintiff,<br><br>v.<br><br>BNSF RAILWAY COMPANY,<br><br>Defendant. | Cause No. C15-0543RSL<br><br>MEMORANDUM OF DECISION |

This matter was heard by the Court in a bench trial commencing on June 3, 2024, and concluding on June 6, 2024. The only issue to be determined in this phase of the proceedings is the value of the benefits defendant obtained as a result of its willful, conscious, and knowing trespass over The Swinomish Indian Tribal Community's Reservation between September 2012 and May 2021. Restatement (Third) of Restitution § 40, cmt. a.[1] By a preponderance of the evidence, the Court finds as follows:

---

[1] Federal common law governs an action for trespass on Indian lands, and that law generally comports with the consensus of states as summarized in the Restatements. *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009); *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Pathology Lab'ys of Ark., P.A.*, 71 F.3d 1251, 1254 (7th Cir. 1995). Courts, including the United States Supreme Court, rely on the Restatement (Third) of Restitution to determine the contours of the equitable remedy of disgorgement, *see Liu v. SEC*, 591 U.S. 71, 79-80 (2020); *U.S. Commodity Futures Trading Comm'n v. Crombie*, 914 F.3d 1208, 1216 (9th Cir. 2019), and both parties have relied on the Restatements throughout the remedial phase of this litigation.

MEMORANDUM OF DECISION - 1

The Swinomish Indian Tribal Community ("the Tribe") filed this suit in April 2015 alleging that defendant BNSF Railway Company ("BNSF") breached a Right-of-Way Easement Agreement ("Easement Agreement") and was trespassing on its Reservation. The Court has already found that BNSF's affirmative defense of preemption under the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10501 *et seq*., did not apply to any of the claims asserted in this litigation (Dkt. # 85 at 5), that BNSF breached the contractual obligations set forth in the Easement Agreement (Dkt. # 75 at 6), that the Tribe did not arbitrarily refuse to consent to BNSF's unilateral increase in rail traffic (Dkt. # 173 at 22), and that the trespass was willful, conscious, and knowing throughout the trespass period (Dkt. # 216 at 13-15). Consistent with general equitable principles and the Restatements, a conscious wrongdoer will be stripped of the net profits obtained from its unauthorized interference with another's property. Restatement (Third) of Restitution § 40, cmt. b; Restatement (Third) of Restitution § 51(4). "If liability in restitution were limited to the price that would have been paid in a voluntary exchange, the calculating wrongdoer would have no incentive to bargain." Restatement (Third) of Restitution § 40, cmt. b. "Even against a conscious wrongdoer, [however,] restitution may be limited to avoid a liability for gains that are unduly remote . . . or disproportionate to the loss on which liability is based . . . . *Id.* The Court's task, therefore, is to establish BNSF's liability based on the circumstances of the wrong, seeking both to protect the Tribe's interests and to deter future trespass, all without resort to an arbitrary penalty.

MEMORANDUM OF DECISION - 2

### A. Net Profits

A restitutionary award must be limited "to the net profits from wrongdoing, that is, 'the gain made upon any business or investment, when both the receipts and payments are taken into the account.'" *Liu*, 591 U.S. at 83 (quoting *Providence Rubber Co. v. Goodyear*, 9 Wall. 788, 804 (1870)).

> As a general rule, the defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement. Denial of an otherwise appropriate deduction, by making the defendant liable in excess of net gains, results in a punitive sanction that the law of restitution normally attempts to avoid. . . . By contrast, the defendant will not be allowed to deduct expenses (such as ordinary overhead) that would have been incurred in any event, if the result would be that defendant's wrongful activities – by defraying a portion of overall expenses – yield an increased profit from defendant's operations as a whole.

Restatement (Third) of Restitution § 51, cmt. h. In determining net profits, the Tribe has the initial "burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain." Restatement (Third) of Restitution § 51(5)(d). Once that hurdle is met, BNSF bears the "[r]esidual risk of uncertainty in calculating net profit." *Id. See also* Restatement (Third) of Restitution § 51, cmt. g, illustration 14 (noting that the risk of uncertainty in accounting for profits attributable to the wrongdoing is assigned to the wrongdoer).

Prior to the start of the damages phase of the trial, the parties reached an agreement regarding the number of trespassing cars that passed over the Easement between September 2012 and May 2021, the gross revenues generated by those cars, whether the cars were part of a local/manifest train or a unit train, and the costs BNSF attributed to those cars or trains in its

MEMORANDUM OF DECISION - 3

activity-based costing system ("ABS"). Trial Exhibit ("Tr. Ex.") 64. The parties' experts agreed that ABS captures all costs that "vary with changes in traffic volumes that can be attributed directly to individual shipments." Dkt. # 236-3 at 6 (Rebuttal Report of Michael R. Baranowski). The captured costs include portions of fixed costs, such as salaries, railway maintenance, and equipment, that BNSF could attribute to individual movements using various service units. Using the agreed gross revenue and ABS data, the amount of revenues available from the trespassing shipments to contribute toward BNSF's fixed costs and other operating expenses was:

    Unit Train Contribution:    $402,259,513

    Local Train Contribution:    <u>$42,697,024</u>

    Total:    $444,956,537

At the dispositive motion stage, BNSF argued that contribution is not an appropriate proxy for net profit because it does not take into account a proportional share of fixed costs or overhead expenses that were incurred in the same time frame and without which BNSF could not have provided services to Fidalgo Bay at all.[2] The Restatements' calculation of unjust enrichment differs from general accounting principles and is not bound by the way BNSF calculates or reports profit, however. Rather, net profits for disgorgement purposes are calculated by subtracting only marginal costs – *i.e.*, those that vary with the production of one

---

[2] In its "Order Regarding Motions for Summary Judgment," the Court found that BNSF could not reduce its disgorgement liability by the amounts it paid during the trespass period to service its debts or as income taxes. Dkt. # 260 at 7-8 and 10.

MEMORANDUM OF DECISION - 4

additional unit or, in this case, the shipment of one additional car or train – from gross revenues. If it were otherwise, a defendant could use revenues from its wrongful activities to offset its overhead and fixed expenses, costs that would have been incurred in any event, thereby placing it in a better position than it would have been had it not trespassed. *See* Restatement (Third) of Restitution § 51, cmt. h. The Court noted in its summary judgment ruling that while it was entirely possible that a cost or expenditure which varied with traffic volume across the Easement was not captured in ABS, BNSF's listing of certain expenses that probably varied over nearly a decade of trespass was insufficient to satisfy its burden of showing costs that were actually incurred in generating the revenues at issue. Dkt. # 260 at 9.

At trial, BNSF presented the testimony of its Vice President and Controller, Candace Palmarozzi, who explained how BNSF distinguishes between variable and fixed costs and that long-term costs that appear to be "fixed" over a one-year period actually vary over a period of two to five years. She specifically identified types of costs that would change over the years as a result of a consistent change in traffic volume, such as the number of support staff at headquarters, the number of field workers, capital investments in locomotives, rail, tie, and ballast, and property taxes. The argument has some appeal. Property taxes, for example, are based on the amount of profits accrued in a particular county over a five-year period. Despite being categorized as "fixed" costs in BNSF's system, they vary with the amount of traffic volume (at least to the extent that traffic volume corresponds with profit). But other categories of expenses identified by Ms. Palmarozzi are more problematic. Some railway maintenance costs are included in ABS and have already been deducted from gross revenues. Neither Ms.

MEMORANDUM OF DECISION - 5

Palmarozzi nor Mr. Baranowski testified that there were any extraordinary maintenance or replacement costs incurred on the segments between North Dakota and Fidalgo Bay during the trespass period. Instead, BNSF simply assigned long-term operating costs to the trespassing shipments in proportion to their variable costs, switch events, financial metrics, train miles, or other service-related units. While the Court is willing to assume that certain long-term, fixed costs were incurred because BNSF added approximately 2,290 unit trains and 37,655 local cars to its network between September 2012 and May 2021, allocating a portion of all long-term and overhead expenses to the trespassing units is not appropriate where BNSF has not provided evidence that those expenses would have been avoided had it honored the Easement Agreement. *See* Restatement (Third) of Restitution § 51, cmt. h ("[T]he defendant will not be allowed to deduct expenses (such as ordinary overhead) that would have been incurred in any event, if the result would be that defendant's wrongful activities – by defraying a portion of overall expenses – yield an increased profit from defendant's operations as a whole."). The capital assets and human resources that support BNSF's overall operations supported its lawful use of both the Easement and the other segments of the North Dakota to Fidalgo Bay route. To the extent those costs would have been incurred in the absence of the trespass, allowing a deduction from gross profits would be inconsistent with the Restatements.

    Keeping in mind that BNSF bears the "[r]esidual risk of uncertainty in calculating net profit," Restatement (Third) of Restitution § 51(5)(d), the Court finds that a deduction of one-third of the long-term, fixed costs Mr. Baranowski assigned to the trespassing shipments, Tr. Ex. 510, is equitable, fair, and appropriate to ensure disgorgement without penalty. Thus, the

MEMORANDUM OF DECISION - 6

contribution amount of $444,956,537 is reduced by $47,685,160, leaving net profits attributable to the wrongdoing of $397,271,377.

**B. Apportionment**

As set forth in the Court's summary judgment order, the Tribe has a colorable claim to all of the net profits BNSF obtained from transporting cars and trains that exceeded the terms of the Easement Agreement to the Shell and Tesoro/Marathon refineries located on March Point, just to the northwest of the Reservation. That being the case, the burden then shifts to BNSF to show that some portion of the net profits earned from the March Point refineries arose from its legitimate activities and would have been realized even in the absence of the wrongful trespass. Restatement (Third) of Restitution § 51, cmt. g.

BNSF's efforts to show that it could have used the locomotives and crews that were assigned to the Fidalgo Bay routes elsewhere in its network to make a profit by servicing other customers and refineries are unavailing. The question is what portion of the net profits at issue here – the $397,271,377 received for hauling Bakken crude and other goods to the March Point refineries – would have been realized had BNSF not trespassed. If BNSF's theory of apportionment were part of the law of disgorgement, any business with more than one customer or product could argue that it would have profitably used its assets and expertise in service of another customer or in producing another product. The theory would absolve an intentional trespasser of all liability by pretending that the profits earned on the trespassing line of business were (or could have been) earned through a separate, legitimate line of business. BNSF has not identified any case in which such an argument was made, much less adopted.

MEMORANDUM OF DECISION - 7

BNSF bears the burden of proof on the apportionment issue and initially offered three possible allocation schemes, all of which break the North Dakota to Fidalgo Bay route into segments of various lengths and assign profits proportionally to those segments. But the evidence shows that BNSF was paid for completed movements to the refineries, not for completed miles or segments of the route. Had BNSF brought unit or local trains to the eastern edge of the Reservation (or to within 100 miles of the Reservation), it would have earned no revenues, much less profit. BNSF's proposed allocation schemes break the route into unworkable segments that do not align with any rail facilities and would not result in the delivery of materials to the March Point refineries. They do not, therefore, establish that a portion of the net profits earned from the March Point refineries arose from BNSF's legitimate activities and would have been realized even in the absence of the wrongful trespass. In addition, allocation schemes that would allow BNSF to retain between 94.1% and 99.9% of the profits earned from a line of business that was negotiated and provided only because BNSF was willing to intentionally, consciously, and knowingly interfere with the Tribe's property rights would not deprive BNSF of its unjustly earned gains or deter future wrongful conduct.

In his rebuttal report, Mr. Baranowski mentioned that, at least with regards to unit trains in 2021, BNSF had an alternative to trespass that would have involved moving trains from North Dakota to Portland, where the crude oil could be transloaded onto barges for delivery to the Fidalgo Bay. Dkt. # 236-3. The shorter rail route and the extra costs associated with transloading and shipping meant that this option would have been less profitable for BNSF. Evidence admitted at trial shows that the average profit per car was reduced by 27.48%, from

MEMORANDUM OF DECISION - 8

$1,157 to $839, when using the Portland transloading option. Tr. Ex. 68.[3] The Restatements address this type of situation in two ways. First, where the evidence reveals an alternative to trespass, an intentional trespasser's liability in restitution is limited to the avoided costs of that alternative. Restatement (Third) of Restitution § 40, Illustrations 2, 6, and 7. Second, where the evidence supports a finding that a proportion of the profits are attributable to the wrongdoing while the remainder arises from the defendant's legitimate activities, plaintiff is entitled to only that which arises from the wrongdoing. Restatement (Third) of Restitution § 51, cmt. g and Illustration 14. Applying these principles here suggests that, if the Portland transloading alternative were available during the trespass period, BNSF's unjust enrichment should be measured by what it was paid over and above the non-trespassing alternative while retaining net profits arising from the legitimate use of its rail network to get Bakken crude to Portland. If, however, there were no viable alternative available at the time, BNSF's use of its rail network could not generate any profits without the trespass, and the measure of its unjust enrichment would include all net profits earned as a result of the trespass.

Cary Hutchings, who joined BNSF in 2011 as a regional manager of economic development, and John Hack, the director of rail operations for Tesoro/Marathon since 2013,

---

[3] In his rebuttal report, Mr. Baranowski assumed that profits were earned equally for every mile of the route and simply divided the profit by the miles from North Dakota to Portland and the miles from Portland to Fidalgo Bay to calculate the profits lost in the transloading option. Dkt. # 236-3 at 21. Trial Exhibit 68, on the other hand, is based on BNSF's actual shipping records rather than an assumption regarding per-mile profits. Because BNSF is not entitled to favorable assumptions when calculating the disgorgement award (much less when those assumptions are contradicted by evidence), the Court has adopted the per car profit figures in Trial Exhibit 68.

MEMORANDUM OF DECISION - 9

testified that the companies investigated a number of options for getting Bakken crude oil to the Pacific Northwest, including transloading at facilities in Seattle, Tacoma, Portland, Clatskanie, and further south in Oregon. The only three options that Tesoro/Marathon was interested in pursuing were a new facility that Tesoro/Marathon hoped to build in Vancouver, Washington, the Zenith facility in Portland, Oregon, and the Global/Port Westward facility in Clatskanie, Oregon. Each is considered below.

### 1. Vancouver Energy Project

From 2013-017, Tesoro/Marathon attempted to develop rail infrastructure in Vancouver, Washington, to facilitate the off-loading of unit trains into tanks and then onto ships. The goal was to build a large capacity facility that could handle unit trains and supply crude oil to Tesoro/Marathon's West Coast facilities and to other customers. The facility did not get the regulatory approvals it needed to proceed and was never built. Vancouver Energy Project was not, therefore, a viable alternative to direct rail shipments to the March Point refineries.

### 2. Zenith

The Zenith facility is located on the Willamette River near Portland, Oregon. It was not authorized to conduct marine crude loading operations until November 11, 2018. *See, e.g.*, Tr. Ex. 94. It began loading Bakken crude onto ships in March 2019. *See, e.g.*, Tr. Ex. 95. Given the operational limitations at Zenith before November 11, 2018, bringing crude from North Dakota to the facility before that date would not have resulted in a completed delivery to the March Point refineries and was not, therefore, a viable alternative until November 12, 2018.

MEMORANDUM OF DECISION - 10

The question thereafter is whether Zenith had any excess capacity that BNSF could utilize for additional Tesoro/Marathon shipments from November 2018 through May 2021. Mr. Hack testified that, as a practical matter, the maximum capacity at Zenith was roughly one unit train every other day and that as the volume of one commodity (such as Bakken crude) went up, the volume of other commodities (such as AWB crude) had to go down. The reports Zenith filed with the Oregon Department of Environmental Quality ("DEQ") show commodity volumes and overall throughput on a monthly basis and support Mr. Hack's testimony. Tr. Exs. 94-99. While total throughput varied widely, there were three consecutive months between August and October 2023 when Zenith was able to handle an average of 50,477,436 gallons of fossil fuels (Bakken crude and diesel), which equates to 1,683 cars or 16-17 unit trains per month. Tr. Ex. 99. Based on the existing record, the Court adopts that number as the maximum throughput for the Zenith facility.[4] Comparing the capacity utilized each month with the capacity that was available shows how many of the rail cars that were shipped directly to Fidalgo Bay could have been transshipped at Zenith:

---

[4] Mr. Hutchings testified that Zenith eventually had the capacity to handle the same volume of Bakken crude oil that was being shipped directly by rail to Fidalgo Bay, which was a unit train every day. That does not appear to be the case.

MEMORANDUM OF DECISION - 11

| Month | Volume Transshipped[5] | Capacity Available[6] | Capacity Available in Cars[7] |
|---|---|---|---|
| November 2018 | 14,770,252 | 0[8] | 0 |
| December 2018 | 0 | 50,477,436 | 1,683 |
| 2018 Total: | | | 1,683 |

| Month | Volume Transshipped | Capacity Available | Capacity Available in Cars |
|---|---|---|---|
| January 2019 | 14,827,681 | 35,649,755 | 1,188 |
| February 2019 | 21,191,190 | 29,286,246 | 976 |
| March 2019 | 14,960,551 | 35,516,885 | 1,184 |
| April 2019 | 10,600,728 | 39,876,708 | 1,329 |
| May 2019 | 24,148,045 | 26,329,391 | 878 |
| June 2019 | 23,049,981 | 27,427,455 | 914 |
| July 2019 | 13,325,670 | 37,151,766 | 1,238 |
| August 2019 | 5,609,390 | 44,88,046 | 1,496 |
| September 2019 | 11,340,091 | 39,137,345 | 1,305 |
| October 2019 | 8,103,059 | 42,374,377 | 1,412 |
| November 2019 | 8,359,465 | 42,117,971 | 1,404 |
| December 2019 | 11,699,997 | 38,777,439 | 1,293 |
| 2019 Total: | | | 14,617 |

| Month | Volume Transshipped | Capacity Available | Capacity Available in Cars |
|---|---|---|---|
| January 2020 | 17,171,779 | 33,305,657 | 1,110 |
| February 2020 | 21,177,199 | 29,300,237 | 977 |
| March 2020 | 28,172,348 | 22,305,088 | 744 |
| April 2020 | 25,136,646 | 25,340,790 | 845 |
| May 2020 | 12,597,122 | 37,880,314 | 1,263 |

---

[5] From DEQ reports, Trial Exhibits 94-97.

[6] Maximum capacity as described in the text minus the volume actually shipped that month, except for November 2018 (discussed below in fn. 8).

[7] Divide the gallons of capacity available by 30,000 gallons/car.

[8] Until December 1, 2018, Zenith had only 12 rail spots for off-loading cars, less than 30% of the capacity it had in 2023. Tr. Ex. 91. The 14,770,252 gallons transshipped in November 2018 likely utilized all of Zenith's then-existing capacity.

MEMORANDUM OF DECISION - 12

| Month | Volume Transshipped | Capacity Available | Capacity Available in Cars |
|---|---|---|---|
| June 2020 | 2,497,958 | 47,979,478 | 1,599 |
| July 2020 | 22,348,041 | 28,129,395 | 938 |
| August 2020 | 18,551,348 | 31,926,088 | 1,064 |
| September 2020 | 4,005,118 | 46,472,318 | 1,549 |
| October 2020 | 27,383,572 | 23,093,864 | 770 |
| November 2020 | 11,338,873 | 39,138,563 | 1,305 |
| December 2020 | 44,484,634 | 5,992,802 | 200 |
| 2020 Total: | | | 12,364 |

| Month | Volume Transshipped | Capacity Available | Capacity Available in Cars |
|---|---|---|---|
| January 2021 | 48,048,946 | 2,428,490 | 81 |
| February 2021 | 24,027,329 | 26,450,107 | 882 |
| March 2021 | 32,370,903 | 18,106,533 | 604 |
| April 2021 | 27,899,708 | 22,577,728 | 753 |
| May 2021 | 22,882,776 | 27,594,660 | 920 |
| 2021 Total: | | | 3,240 |

Each of the annual totals representing available car capacity is less than what was actually shipped to Fidalgo Bay via rail during that period. BNSF's liability in restitution is limited only to the extent that there was an alternative actually available to it, such that it could have delivered that Bakken crude to Fidalgo Bay without trespassing on the Reservation. At most, BNSF could have delivered 33,094 of the trespassing cars to Zenith between November 2018 and May 2021, thereby avoiding the trespass and legitimately earning 72.52% of the average profit per car.[9]

---

[9] Per Mr. Baranowski's calculations, BNSF's average profit from carrying Bakken crude directly to the March Point refineries in 2021 was $1,157/car. Tr. Ex. 68. If the shipments stopped in Portland and Tesoro/Marathon had to pay to transload and ship the crude by barge, BNSF's average profit per car dropped to $839. *Id.* The ratio of those numbers shows the percentage profit BNSF could have earned

MEMORANDUM OF DECISION - 13

| Year | Total Net Profits[10] | Net Profits Per Car[11] | Number of Cars that Could Have Been Transshipped | Deduction from Net Profits[12] |
|---|---|---|---|---|
| 2018 | $28,003,438 | $937 | 1,683 | $1,576,971 |
| 2019 | $38,822,371 | $1,169 | 14,167 | $12,010,199 |
| 2020 | $37,851,918 | $1,919 | 12,364 | $17,206,469 |
| 2021 | $10,681,030 | $1,792 | 3,240 | $4,210,569 |

BNSF's net profits from the unit train shipments will therefore be reduced by $35,004,208 to reflect the amount BNSF could have legitimately earned from the use of its rail lines had it utilized the non-trespassing alternative Zenith offered, maxing out Zenith's remaining capacity and reducing the scope of its trespass.

### 3. Global/Port Westward

The Global/Port Westward facility is located in Clatskanie, Oregon, west of Portland along the Columbia River. It is not on BNSF's rail lines: any shipments of Bakken crude to Global/Port Westward would have to be handed to a short line railroad in Oregon and then transloaded at the facility onto ships. Although BNSF used Global/Port Westward to service

---

had it adopted an alternative plan and honored plaintiff's property rights. The remainder is the cost (or loss) avoided through the trespass.

[10] Tr. Ex. 101, Column (3) reduced by 10.72% to reflect the fixed costs that the Court deducted from contribution to arrive at net profits.

[11] Total unit train contribution in a given year divided by the number of unit train rail cars shipped. Tr. Ex. 101, Columns (2) and (3).

[12] Contribution per car multiplied by the number of cars that could have been transshipped through the Zenith facility

MEMORANDUM OF DECISION - 14

other customers, none of the Bakken crude shipped to the March Point refineries went through there, and BNSF has not provided any numbers regarding the profitability of this option[13] or whether Tesoro/Marathon would agree to it. In the absence of any cost data, the Court would have to speculate regarding the impact this alternative would have had on BSNF's profits.

In addition, the testimony regarding Global/Port Westward's capacity for handling crude oil during the trespass period is extremely vague. The facility was originally constructed to produce ethanol, but the production facility was mothballed in the late 2000s and for a few years the rail infrastructure was used to transship various fuel types, including crude oil. Mr. Hutchings and Mr. Hack gave varying estimates of the facility's maximum capacity over time, from a low of 15 unit trains per month to a high of 20-25 unit trains per month, with a plan for 54 unit trains per month. Regardless, Mr. Hutchings testified that BNSF helped Global/Port Westward maximize its throughput, shipping as much ethanol as the facility could handle when markets for ethanol were good and switching to crude when that market peaked. Although not entirely clear from the record, there does not appear to have been any excess capacity to handle shipments for Tesoro/Marathon prior to 2016 or 2017, at which point Global/Port Westward stopped handling crude oil in favor of ethanol.

BNSF has not met its burden of showing that it could have earned some portion of its net profits by using the Global/Port Westward facility. It provided no cost or revenue data, nor did it establish that the facility had excess capacity to handle crude oil for Tesoro/Marathon during the

---

[13] Mr. Hutchings testified that it would generate less profits than the direct run to Fidalgo Bay.

MEMORANDUM OF DECISION - 15

trespass period. Ultimately, Global/Port Westward was rejected in favor of Zenith, with the reasonable inference being that it was not financially advantageous and/or it had capacity limitations.

BNSF was unjustly enriched in the amount of its net profits ($397,271,377) minus the portion of the net profits that could have been realized on the legitimate use of the rail network ($35,004,208) for a total disgorgement award of $362,267,169.

**C. Supplemental Enhancement**

A person who is found liable for the disgorgement of profits is also liable for "supplemental enrichment in the form of interest, rent, or other measure of use value, to the extent that such further enrichment is either realized in fact or appropriately presumed." Restatement (Third) of Restitution § 53(1). A conscious trespasser is liable for assets received as a direct product of the trespass (in this case, $362,267,169) as well as the consequential gains obtained as a result of its subsequent investment or use of those profits. *Id.* at § 53(2) and (3). "[A]ny question of liability for supplemental enrichment is necessarily decided so as to exclude the possibility that the defendant might retain a benefit from the underlying wrong. The usual consequence is that use value at a market rate is readily imputed, even in the face of evidence that the actual benefit to the defendant was something less." *Id.*, cmt. b. *See also id.*, Illustration 4 (conscious wrongdoer held liable for market interest on the funds unlawfully withheld or the amount of interest actually earned on the funds, whichever is greater).

The first step in the supplemental enhancement analysis is to account for the income taxes defendant paid on the revenues received because only after-tax funds were available to BNSF for use or investment. Mr. Baranowski calculated the taxes paid on the $898,917,735 in revenues arising from the trespassing shipments, less expenses, deductions, and interest costs, to be $98,634,070. Tr. Ex. 510. Mr. Fapp accepted that figure for purposes of calculating supplemental enhancement. While BNSF now objects to that number on the ground that the Court excluded deductions for certain fixed costs and interest expenses when calculating the disgorgement amount, how disgorgement is calculated under the Restatements has nothing to do with the taxes BNSF paid. As Mr. Baranowski acknowledged at trial, BNSF deducted all operating expenses when filing its consolidated tax returns. The amount of taxes paid does not vary based on the Court's restitutionary calculations in this case. Thus, the amount BNSF had to use or invest over the trespass period was the total disgorgement award of $362,267,169 minus taxes paid of $98,634,070, for a total of $263,633,099.

The next step is to calculate the consequential gains earned with that amount or the market rate, whichever is higher. BNSF does not track particular dollars or income streams in a way that would allow it to show how it used the funds it obtained from the trespassing shipments. Ms. Palmarozzi, testified that BNSF uses its after-tax profits to pay down debt, as a dividend for its sole shareholder (Berkshire Hathaway, Inc.),[14] to fund capital improvements, or as part of its cash reserves. While a dividend payment to a shareholder would not directly

---

[14] BNSF transfers three to five billion dollars a year to its shareholder.

MEMORANDUM OF DECISION - 17

benefit BNSF, the retirement of debt, purchase or improvement of capital assets, and investment in a money market account undoubtedly would, resulting in varying rates of return.

Although the many unknowns regarding the uses to which BNSF put its ill-gotten profits and the return rates on those investments should be resolved in the Tribe's favor to ensure that BNSF does not retain any benefit from its wrongdoing, doing so would add hundreds of millions of dollars to an already large restitutionary award. The Court finds that, in the interests of justice and equity, supplemental enhancement in an amount that approximates the money market return is appropriate here. While not an exact calculation of the compound returns BNSF received over the years, the Court hereby awards $32,250,000 as a measure of the use value of after-tax profits.

For all of the foregoing reasons, the Clerk of Court is directed to enter judgment in favor of plaintiff and against defendant as follows:

| | |
|---|---|
| Net profits attributable to the trespass | $362,267,169 |
| Use value of the post-tax profits arising from the trespass | $32,250,000 |
| Total: | $394,517,169 |

Dated this 17th day of June, 2024.

*Robert S. Lasnik* (signature)
Robert S. Lasnik
United States District Judge

MEMORANDUM OF DECISION - 18